**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**TEMBEC INC., TEMBEC INVESTMENTS**     )
**INC., TEMBEC INDUSTRIES INC.,**       )
                                        )
    **Petitioners,**   )
                                        )
    **v.**             )    **No. 07-CV-1905 (RMC)**
                                        )
**UNITED STATES OF AMERICA,**           )
                                        )
    **Respondent.**     )
_____)

**<u>TEMBEC'S OPPOSITION TO UNITED STATES' MOTION TO DISMISS</u>**

        Tembec has petitioned to vacate the NAFTA Article 1126 tribunal's costs award, dated July 19, 2007, and released to Tembec on August 2, 2007 ("Costs Award").[1]  The Costs Award was issued after this Court's April 19, 2007 decision in case number 05-CV-2345, which addressed the terms of the Settlement of Claims Agreement ("SCA") contained in the Softwood Lumber Agreement of 2006 ("SLA").[2] This Court previously ruled that Tembec could not re-instate that action to challenge an interim award of the NAFTA Article 1126 tribunal dated September 7, 2005, consolidating Tembec's arbitration with those of two other Canadian Lumber producers ("Consolidation Award").  This lawsuit respects the Court's ruling.  It concerns a new and different award never previously before the Court.  Consequently, it is not barred by *res judicata* or collateral estoppel.

---

[1] *See Canfor Corporation v. United States, Tembec et al v. United States, Terminal Forest Products Ltd., v. United States*, Joint Order on the Costs of Arbitration and for the Termination of Certain Arbitral Proceedings, attached as Exh. 1.

[2] *See* Settlement of Claims Agreement, attached as Exh. 2.

*Res judicata* bars the assertion of *claims* or *causes of action* that were decided or could have been decided in a prior lawsuit.  Tembec could not have sought vacation of the Costs Award as part of the prior litigation because the Costs Award did not exist prior to the Court's decision. The Costs Award gives rise to a new claim.

In its prior decision, the Court did not address any of the issues raised by this challenge to the Costs Award and, therefore, the doctrine of issue preclusion also does not apply.  Issue preclusion applies only when an issue in a prior case was finally adjudicated.

The United States relies upon the SCA to argue that this case is barred, but the very terms of the SCA preserve Tembec's right to bring this action.  The United States and Tembec agreed in the SCA that the stipulated dismissal of case number 05-CV- 2345 "is without prejudice to the position of any party to this [SCA] on any issue in any action referenced in this [SCA]."

Tembec does not seek to re-litigate any of the issues previously decided by this Court.  Thus, the United States' arguments concerning re-litigation of the negotiation of the SCA and SLA documents are not at issue, and the United States' motion to dismiss should be denied.

## I.    STATEMENT OF FACTS

### A.    The *Softwood Lumber* Dispute

The United States initiated antidumping and countervailing duty investigations on softwood lumber imported from Canada in April 2001, imposing duties as high as 29%.  Tembec and other Canadian lumber producers repeatedly challenged the legality of these duties.  Time and again, arbitration panels convened pursuant to the North American Free Trade Agreement ("NAFTA") concluded that the duties were

unlawful under United States law and international trade agreements. The United States collected more than $5 billion in duty deposits from Tembec and other Canadian lumber companies while litigation continued over enforcement of these agency determinations.

On July 21, 2006, the U.S. Court of International Trade, in a case in which Tembec was the lead plaintiff, finally held the duties unlawful and declared the United States' conduct *ultra vires* and void. *Tembec v. United States*, 441 F. Supp. 2d 1302 (CIT 2006). The duty deposits, however, were never fully reimbursed because the United States and Canada entered into the Softwood Lumber Agreement of 2006 the day before the Court of International Trade ordered full refunds, on October 13, 2006.

The *Softwood Lumber* dispute engaged the leaders and cabinet officers of both countries for more than five years. The U.S. Commerce Secretary, U.S. Trade Representative (who is in the Executive Office of the President) and Secretary of State, personally spent considerable time on the issue.[3] President Bush was personally involved both with his cabinet and with Canadian leaders, including especially in a November 2004 meeting with Canada's then Prime Minister Paul Martin, and in later meetings with Canada's current Prime Minister, Stephen Harper.

---

[3] *See, e.g., Trade: Hearing of the Senate Finance Committee*, 107th Cong. (2002) (Statement of Robert Zoellick, U.S. Trade Representative). Ambassador Zoellick boasted that he was personally involved in the softwood lumber dispute, stating, "[I]n general on softwood lumber, you and I are actually in very close agreement in that, as you know, we backed the cases that were filed by the coalition, including – I personally, while it was a commerce decision, suggested the critical circumstances finding which was important along the way, was the one that was appropriate. And so we now do have the preliminary countervailing duty and anti-dumping duties." Ambassador Zoellick thus adopted and pursued a position contrary to Tembec's interests without the results of agency investigations.

B.    The NAFTA Article 1120 Arbitrations

The unlawful duties inflicted severe damage on Canadian lumber companies.  Between November 2001 and March 2004, three Canadian lumber companies initiated arbitration claims against the United States under NAFTA Article 1120, which allows an award of money damages when a NAFTA signatory engages in arbitrary, unfair, and discriminatory conduct towards the nationals of another signatory. The imposition of unlawful duties was such conduct, according to the three claimants. Canfor Products Corp. ("Canfor") filed its statement of claim in November 2001, and Tembec filed one in December 2003.[4]  Terminal Forest Products Ltd. ("Terminal") filed a notice of arbitration in March 2004 but never sought to appoint a tribunal.[5]  The arbitrations were administered by the International Centre for the Settlement of Investment Disputes ("ICSID"), an agency of the World Bank.  In the Canfor and Tembec arbitrations, the claimants and the United States each appointed one arbitrator and the chairman was chosen by consent of both parties.

From the outset, Tembec, Canfor, and the Canfor tribunal all questioned the United States whether it intended to seek consolidation of the arbitrations under NAFTA Article 1126. Tembec inquired as early as January 2004.  The United States told the Canfor tribunal, "I can assure you that we have given [consolidation]

---

[4] *In the Matter of Tembec et al v. United States*, Notice of Arbitration and Statement of Arbitration Claim (Dec. 3, 2003) (hereinafter "Tembec's Statement of Claim"), available at http://www.naftaclaims.com/Disputes/USA/Tembec/Tembec-Claim.pdf (last visited March 13, 2008).

[5] See *In the Matter of Canfor Corp. v. United States*, Notice of Arbitration and Statement of Claim (July 9, 2002) available at http://www.naftaclaims.com/Disputes/USA/Canfor/Canfor%20Notice%20of%20Arbitration%20and%20Statement%20of%20Claim.pdf (last visited March 13, 2008); *In the Matter of Terminal Forest Products Ltd. v. United States*, Notice of Arbitration (March 30, 2004) available at http://naftaclaims.com/Disputes/USA/Terminal/TerminalNoticeOfArbitration.pdf (last visited March 13, 2008).

considerable thought, that we have no intention of invoking Article 1126 in this proceeding [the consolidation provision]."[6]  The United States participated in the separate tribunals until both were nearly finished addressing jurisdictional challenges raised by the United States.  Only then, after developing a substantial acquaintance with both tribunals (and losing procedural motions) did the United States move to dispose of both of them.[7]

On March 7, 2005 – fifteen months into the Tembec arbitration – the United States asked ICSID to appoint a new tribunal under NAFTA Article 1126 to consolidate the Tembec, Canfor, and Terminal claims.[8]  Canfor had already completed a jurisdictional hearing and was awaiting a decision; Tembec had completed jurisdictional briefing and was preparing for a hearing.[9]

C.    NAFTA Article 1126 Consolidation

According to NAFTA Article 1126, the ICSID Secretary General appoints the three arbitrators to a consolidation tribunal – as opposed to the consensual appointment process under Article 1120.  ICSID's consistent practice during its forty years of existence has been to vet appointments with the parties to ensure they are acceptable.[10]  ICSID, however, abandoned its established practice in this case.  Without

---

[6] *In the Matter of Canfor Corp. v. United States*, Hearing Transcript, vol. 3 (Dec. 9, 2004) at p. 112 (Ms. Menaker, representing the United States) available at http://www.naftaclaims.com/Disputes/USA/Canfor/Canfor-Jurisdiction-Transcript-DayThree.pdf.

[7] The United States' appointee to the Canfor tribunal, Conrad Harper, resigned on March 2, 2005 after being questioned by Canfor about an undisclosed conflict.  The United States refused to make a timely appointment to replace Mr. Harper.  The United States used his recusal as pretext to dispose of the two tribunals.

[8] Letter from Mark A. Clodfelter to Roberto Dañino (Mar. 7, 2005) attached at Exh. 3.

[9] Terminal did not take further action to pursue its claim after filing its Notice of Arbitration in March 2004.

[10] *See* Ibrahim F.I. Shihata and Antonio R. Parra, "The Experience of the International Centre for Settlement of Investment Disputes," 14 *ICSID Review Foreign Investment Law Journal* 299 (Fall 1999).

(continue)

consulting with the parties, ICSID named Dr. Albert Jan van den Berg of The

Netherlands, Mr. Davis R. Robinson of the United States, and Mr. L. Yves Fortier of

Canada as arbitrators to the consolidation tribunal.[11]   The Parties, therefore, did not

have the opportunity to conduct due diligence and inform ICSID of potential issues with

the appointees before they had been named.

      The United States immediately objected to the appointment of Mr. Fortier

on the basis that his former law firm had been involved with representing Canadian

parties in the United States' trade proceedings, even though Mr. Fortier had no personal

involvement in the representation and the lawyers involved already had left his firm.  Mr.

Fortier immediately withdrew, which has been the long-standing customary practice

among international arbitrators.[12]   ICSID then appointed Professor Armand de Mestral

of Canada in place of Mr. Fortier.[13]

      Upon being named, Mr. Robinson did not disclose any relationship to

President George W. Bush.  During its due diligence, however, Tembec found a family

tree on the Internet indicating that a person bearing the name "Davis Robinson" was a

member of the Bush inner family.  On May 2, 2005, Tembec wrote to ICSID to inquire

---

(continued)

Mr. Parra, ICSID's Deputy Secretary-General, wrote of the pre-appointment consultation process: "As a result of such consultation, most of the appointments of the Chairman have been made with the express concurrence of the parties.  A party cannot, however, veto a particular appointment by the Chairman. Obviously unreasonable objections by a party are unlikely to affect such an appointment.  The fact remains that none of Chairman's appointments to date has been made over a party's objections to the appointee."  *Id.* at 312.  Mr. Parra added, "This useful procedure, of consulting with the parties to the extent possible before making an appointment, has also generally been employed by the Secretary-General when he has acted as the appointing authority of ad hoc arbitrators."  *Id.* at 354-355.

[11] Letter from Gonzalo Flores to the Parties (April 19, 2005) attached at Exh. 4.

[12] *See* Letter from Gonzalo Flores to the Parties (May 4, 2005), attached at Exh. 5.  *See also* Declaration of Ronald A. Cass, attached at Exh. 6.

[13]  *See* Letter from Gonzalo Flores to the Parties (May 4, 2005), attached at Exh. 5.

as to whether Mr. Robinson was related to President Bush, and to the nature of any

relationship, so Tembec could determine whether to challenge Mr. Robinson's

appointment as giving rise to "justifiable doubts as to the arbitrator's impartiality or

independence" under Article 10 of the UNCITRAL Rules (the applicable procedural

rules under NAFTA Article 1126).[14]

        ICSID responded in a letter on Friday, May 6, 2005, confirming the three

appointments and attaching a statement from Mr. Robinson.[15]  He revealed for the first

time that he is married to Suzanne Walker, a first cousin (once removed) of the

President of the United States, George Walker Bush.[16]

        Mr. Robinson was a close enough member of the Bush family to have

been appointed as the Legal Adviser in the U.S. State Department while George

Herbert Walker Bush held the office of Vice President of the United States.  Mr.

Robinson also was appointed by President George Walker Bush as one of four U.S.

representatives on the ICSID Panel of Arbitrators.[17]  Tembec subsequently discovered,

without Mr. Robinson's disclosure, that Mr. Robinson has supported loyally his wife's

cousins in their presidential campaigns over three decades,[18] and has benefited from

---

[14] *See* Letter from Elliot J. Feldman to Jose Antonio Rivas (May 2, 2005) attached at Exh. 7.

[15] *See* Letter from Gonzalo Flores to the Parties (May 6, 2005) attached at Exh. 8.

[16] Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005) attached at Exh. 9.

[17] *See* Public Papers of the Presidents, Digest of Other White House Announcements (May 23, 2002) attached at Exh. 10.  Mr. Robinson denied in his May 6, 2005 letter having received appointments in two different Republican administrations.  The appointment he did not acknowledge or disclose was the Presidential assignment as an ICSID arbitrator.

[18] According to www.politicalmoneyline.com, a nationally-acclaimed Internet website that monitors Federal Election Commission data, Mr. Robinson and Mrs. Robinson repeatedly have made maximum contributions to Bush family political campaigns dating back to 1979.  *See* documents attached at Exh. 11.

the relationship with presidential appointments and other opportunities, including foreign travel with his wife as personal delegates of the President.[19]

As Legal Adviser, Mr. Robinson was the principal legal counsel to the United States on foreign policy matters and represented the United States in international legal disputes.[20]  The Office of the Legal Adviser represents the United States in investor-state arbitrations and has conducted the United States' defense against Tembec's claims before the NAFTA Article 1120 and Consolidation Tribunals.

Tembec, thus, was being forced to arbitrate its claim before the cousin and former chief lawyer for the chief executive of the opposition.  With President Bush acting directly on the matter in dispute, Mr. Robinson's relationship violated several provisions of the International Bar Association's Guidelines for conflicts of interest in international arbitrations.[21]  His failure to disclose his relationship was a serious breach of the responsibilities of arbitrators recognized by the U.S. Supreme Court and most arbitration rules.[22]  The UNCITRAL Arbitration Rules, which governed this arbitration, required disclosure of "any circumstances likely to give rise to justifiable doubts as to his

---

[19] For example, President George Herbert.Walker Bush sent Mr. and Mrs. Robinson on travel overseas as part of a United States delegation.  *See* Christopher Connell, *Bush Makes Global Relations a Family Affair:  Having a Relative in the White House has its Privileges*, Associated Press, (Dec. 1, 1991) attached at Exh. 12 ("Suzanne Robinson, a Bush cousin, and her husband Davis Robinson, a former State Department lawyer, were in the official U.S. party that attended the dedication of a new wing of the Polish-American Children's Hospital in Krakow, Poland. Pope John Paul II also attended the ceremony in his hometown, along with Polish President Lech Walesa.").

[20] *See* U.S. Department of State: Office of the Legal Adviser website, *available at* http://www.state.gov/s/l/ (last visited March 14, 2008).

[21] *See* Letter from Elliot J. Feldman to Gonzalo Flores (May 20, 2005) at 2, attached as Exhibit 13.

[22] *See generally Commonwealth Coatings v. Continental Casualty Co.*, 393 U.S. 145 (1968).

impartiality or independence." Strict disclosure requirements are essential to ensure the integrity of the arbitration process.[23]

On Monday, May 9, 2005, the United States requested that the Consolidation Tribunal issue an order to stay Tembec's Article 1120 arbitration proceedings in light of the immediate need, in its view, to prevent a decision from the Canfor Article 1120 tribunal and a June 2-3, 2005 hearing on jurisdiction scheduled by Tembec's Article 1120 tribunal.[24] Tembec opposed the United States' request on that same day, pointing out that a stay would be premature because Tembec had not been allowed the fifteen days allotted under the UNCITRAL Rules to evaluate the startling information disclosed for the first time in Mr. Robinson's May 6 letter.[25]

On May 10, 2005, Canfor wrote to the parties to disclose another potential, undisclosed conflict of interest.[26] Canfor advised that Professor Armand de Mestral was of counsel to a law firm pursuing another NAFTA Chapter 11 claim against the United States, and that one of the co-counsel in Canfor also was acting as co-counsel with Professor de Mestral's firm in the other case.

On May 19, 2005, fewer than fifteen days after information had been disclosed regarding potential conflicts of interest for two of the three named arbitrators—Mr. Davis R. Robinson and Prof. Armand de Mestral—the Consolidation Tribunal ordered a stay of the Article 1120 proceedings pending its decision whether to

---

[23] *See id.* at 147-49.

[24] *See* Letter from Andrea J. Menaker to Prof. Albert Jan van den Berg *et al* (May 9, 2005) at 1 attached at Exh. 14.

[25] *See* Letter from Elliot J. Feldman to Gonzalo Flores and Jose Antonio Rivas (May 9, 2005) attached at Exh. 15.

[26] Letter from P. John Landry to Albert Jan van den Berg *et al* (May 10, 2005) attached at Exh. 16.

assume jurisdiction over the claims, and fixed an expedited schedule for determining the issue of consolidation without consulting any of the parties.[27]

On May 20, 2005, Tembec submitted a timely objection to Mr. Robinson's participation and to the premature action by the Tribunal in staying the Article 1120 proceedings.[28] The other Claimants joined Tembec's objection to Mr. Robinson, while the United States alone opposed.[29]

On June 1, the Tribunal decided to go forward despite the challenge, saying "[o]n the basis of the Tribunal's discretionary powers under the UNCITRAL Arbitration Rules, the consolidations [*sic*] proceedings are not suspended pending the challenge of Mr. Davis R. Robinson."[30] In response to the challenge, Mr. Robinson declined to follow the accepted international practice as Mr. Fortier had done; he responded that he "respectfully refuse[s] to withdraw as an arbitrator in this matter."[31] Because the process is intended to be consensual, international arbitrators routinely withdraw when one party (or in this case three parties) challenges them.[32]   As Ronald

---

[27] *See* Letter from Gonzalo Flores to the Parties (May 19, 2005) attached at Exh. 17; *See also* Letter from Professor Armand de Mestral to Gonzalo Flores (May 20, 2005) attached at Exh. 18. Professor de Mestral disclosed his affiliation with the law firm mentioned in the Canfor letter only after the Article 1120 proceedings were stayed, and explained that he terminated his relationship with that law firm in order to continue his participation in the Consolidation Tribunal even before any decision could be taken whether the Consolidation Tribunal would have any long-term business to conduct.

[28] Letter from Elliot J. Feldman to Gonzalo Flores (May 20, 2005), attached at Exh. 13; Letter from Elliot J. Feldman to Albert Jan van den Berg *et al* (May 20, 2005) attached at Exh. 19. *See also* Letter from Elliot J. Feldman to Roberto Dañino (May 12, 2005) attached at Exh. 20 (indicating that the time for challenging Mr. Robinson's appointment would run until May 21, 2005, in accordance with Article 11 of the UNCITRAL Rules, permitting the parties fifteen days to challenge an appointment).

[29] *See* Letter from P. John Landry to Roberto Dañino. (May 24, 2005) attached at Exh. 21; Letter from Andrea J. Menaker to Roberto Dañino (May 24, 2005) attached at Exh. 22.

[30] Letter from Gonzalo Flores to the Parties (June 1, 2005) attached at Exh. 23.

[31] Letter from Davis R. Robinson to Antonio R. Parra (June 3, 2005) attached at Exh. 24.

[32] See Cass Declaration, attached at Exh. 6.

Cass, former Dean of the Boston University Law School affirmed: "... even the most experienced arbitrators whose reputations for fairness are strong routinely withdraw."[33]

Tembec's Article 1120 tribunal stayed its proceedings as instructed by the Consolidation Tribunal's decision and cancelled the Article 1120 tribunal's hearing on jurisdiction.[34]

Tembec submitted its challenge to Mr. Robinson to the ICSID Secretary-General on June 9, 2005, pursuant to UNCITRAL Article 11(3).[35]  The Consolidation Tribunal proceeded as though it had obtained full consent and authorization from the parties, requiring written submissions regarding consolidation, and ordering the parties to appear at a hearing on consolidation on June 16, 2005.[36]  ICSID's decision not to compel Mr. Robinson's withdrawal came on the morning of the first hearing with the Consolidation Tribunal, two of whose members had journeyed to Washington, D.C. from foreign countries, just thirty minutes before the hearing was scheduled to begin.  Having placed himself in an untenable position by not vetting the tribunal appointees, the ICSID Secretary General discounted Mr. Robinson's familial relationship as "somewhat distant," and wrote, with little explanation, that his government service should not matter in "the NAFTA context."[37]

---

[33] *Id.*

[34] *See* Letter from Jose Antonio Rivas to Tembec and the United States (May 23, 2005) attached at Exh. 25.

[35] Letter from Elliot J. Feldman to Antonio R. Parra (June 9, 2005) attached at Exh. 26.

[36] Letter from Gonzalo Flores to the Parties (June 1, 2005) attached at Exh. 23.

[37] *See* Letter from Roberto Dañino to the Parties (June 15, 2005) attached at Exh. 27 (The facsimile notifying the Parties that ICSID would not sustain the challenge to Mr. Robinson's appointment was not sent until 9:04 p.m. on June 15, 2005, directed to a main office well after the close of business.  Tembec and its counsel effectively did not receive notice of ICSID's decision until the morning of June 16, 2005, just before the Consolidation hearing was scheduled to begin at 10:00 a.m.).

The Consolidation Tribunal then decided virtually every argument in favor of the United States and consolidated the NAFTA Chapter 11 cases in the Consolidation Award dated September 7, 2005.  Tembec had seen enough of a tribunal that included President Bush's cousin.  It sought to withdraw from the proceeding and pursue its objections to the Consolidation Tribunal in this Court.

D.    Tembec Requests And Obtains A Termination Of Proceedings

On December 7, 2005, Tembec filed its Petition to Vacate Arbitration Award, which challenged the Consolidation Award, and it wrote the Tribunal asking it to terminate the arbitration proceedings as to Tembec.  The Tribunal granted Tembec's request and terminated the proceedings without "declar[ing] the termination … either with prejudice to reinstatement or without prejudice to reinstatement of Tembec's NAFTA claims …."  The Tribunal reserved the issue of costs.[38]

Tembec's assessment of the Tribunal proved to be correct.  Canfor and Terminal proceeded to argue the jurisdictional question before the Tribunal, despite their own misgivings.  The Tribunal ruled against Canfor and Terminal on June 6, 2006, finding that it did not have jurisdiction over effectively all of their NAFTA Chapter 11 claims in connection with the softwood lumber duties.

E.    The *Softwood Lumber* Dispute Settles

During 2006, the United States and Canada engaged in negotiations to settle the *Softwood Lumber* dispute, which intensified after the Court of International Trade declared the duties unlawful in *Tembec v. United States.*  On October 12, 2006, the United States and Canada executed The Softwood Lumber Agreement of 2006

---

[38] January 10, 2006 Order at par. 1.3, attached at Exh. 28.

("SLA"), which purported to settle the *Softwood Lumber* dispute (within the first eighteen months of the SLA two arbitrations have been launched by the United States and after eighteen months at least two cases, besides this one, remain open).  Canada needed concessions from Tembec, Canfor and Terminal to satisfy the United States' demands to settle the NAFTA Chapter 11 litigation.  On October 11 and 12, 2006, Canfor, Terminal, Tembec, the Governments of Canada and the United States, through their various representatives, signed a "Settlement of Claims Agreement," ("SCA") which became Annex 2A of the SLA.[39]

The SCA parties agreed in paragraph 1 that the United States and Tembec "shall file a joint stipulation of dismissal in *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia))."  In paragraph 8, the SCA states that, "No party … shall seek to hold any other party liable to pay its costs and expenses of litigation relating to any action referenced in this [SCA]."  The parties agreed in paragraph 10 that they would not "re-file any of the actions" referenced in paragraph 1.  The SCA also provided in paragraph 9 that it "is *without prejudice to the position of any party to this [SCA] on any issue in any action referenced in this [SCA].* (Emphasis added)."[40]

Based upon the SCA, the United States and Tembec directly negotiated a stipulation of dismissal.  Tembec and the United States agreed to dismiss the litigation with prejudice subject to the terms of the SLA.  Each party agreed to pay its own costs.

---

[39] *See* Exh. 2.

[40] *Id.*

When the dust of the negotiations had settled, all of the Canadian lumber companies received only 80 percent refunds of their duty deposits made over a five year period – even though the duties had been determined by the Court of International Trade's decision to have been unlawful from the outset.  Tembec settled its claims with the United States, including its NAFTA Chapter 11 claims, even though it meant giving away twenty percent (approximately $77 million) of unlawful duty deposits and hundreds of millions of dollars more in damages that might have been won through its NAFTA Chapter 11 arbitration.

This windfall for the United States was enough as to Canfor and Terminal, but not as to Tembec.  The United States wanted a few hundred thousand dollars more in a costs claim against Tembec alone, in retribution for aggressive litigation during the *Softwood Lumber* dispute.

F.    Tembec Objects To The United States' Petition For Costs

On October 13, 2006, the very day the SLA was announced as in force, the United States wrote to the Consolidation Tribunal requesting an award of costs against only Tembec (Terminal had not even signed an SCA at that point).  Tembec opposed the United States' request, and on November 9, 2006, filed a motion with this Court under FRCP 60(b) to reinstate the motion to vacate the Consolidation Award. The issue before the Court on Tembec's Rule 60(b) motion was whether the United States was permitted under the terms of the SLA and SCA to seek a costs award from the Consolidation Tribunal, and whether the stipulated dismissal was procured through mistake, misrepresentation or misconduct.  The Court denied Tembec's motion on April 19, 2007, holding that the SLA and SCA did not prohibit the United States from pursuing a costs award from the Consolidation Tribunal, and that Tembec had not satisfied the

burden of showing mistake, misrepresentation or misconduct in order to reinstate the action to vacate the Consolidation Award.[41]  The Court never reached the merits of the Consolidation Award, including Tembec's objections to the appointment of Davis Robinson or to the Tribunal's premature conduct.

G.    Tembec's Opposition To The Costs Award

Tembec opposed the United States' request to the Consolidation Tribunal for costs on the merits and also re-asserted its objections to the Tribunal and its conduct.

ICSID delivered the Tribunal's Costs Award on August 2, 2007, awarding the United States $271,844.24.[42]  These costs were in addition to the contributions already made by Tembec and the other parties for the Consolidation Tribunal's expenses.  The Consolidation Tribunal members awarded themselves $930,294.80 for arbitration proceedings that never advanced to the merits of any party's claims.[43]

The Tribunal wrote that it awarded costs to the United States because Tembec became the "unsuccessful party" when the order terminating the proceedings for Tembec was issued.  The Tribunal never reconciled this statement with its prior determination that the Tribunal did not have the "competence" to decide whether the termination was with or without prejudice to Tembec's claim.  That approach contravenes the prevailing, historic view that costs are divided equally except for

---

[41] See Tembec v. United States, 2007 U.S. Dist. LEXIS 28952 (D.D.C. April 19, 2007)

[42] See Letter (Second) from Emilio Rodriguez Larrain to the parties, Aug. 2, 2007 attached at Exh. 1.  The cover letter to the Costs Award said that the award was dated July 19, 2007, but no explanation for the date was provided.

[43] See Costs Award at par. 175, attached at Exh. 1.

extreme circumstances when a punitive award is required.[44]  Moreover, the Tribunal did not follow its own "costs follow the event" theory with respect to the United States' unsuccessful attempt to keep Tembec in the arbitration proceedings.  Instead, the Tribunal brushed the loss aside as merely "a consequence of Tembec's decision to withdraw in the first place."[45]

The award of $271,844.24 included $62,403.02 for arbitration costs and legal costs associated with the NAFTA Article 1120 tribunal.  That tribunal, however, had been terminated upon the request of the United States, not Tembec, and the costs should have been decided by the Article 1120 tribunal because they were incurred prior to the Consolidation Tribunal's assumption of jurisdiction.

Of the more than one hundred Canadian lumber companies that had participated in arbitrations and litigation, only Tembec has been subject to a costs award.

H.    Motion To Vacate Costs Award

On October 19, 2007, Tembec filed this Petition to Vacate Arbitration Award, objecting to the Costs Award, which had not been made at the time of this Court's prior decision.  The United States has moved to dismiss on the grounds of *res judicata* and collateral estoppel, based upon this Court's earlier ruling in the case

---

[44] *See, e.g., Berschader v. Russian Federation*, SCC Case No. 080/2004, April 21, 2006 at paras. 215, 216 (Tribunal found that equally apportioning costs between parties was "in line with a clear tendency in international investment arbitrations not to order a losing private party to bear the winning government party's costs," and that "the same principle should be applied with regard to costs for legal representation.") (citations omitted); *see also, Mondev International Limited v. United States of America*, ARB(AF)/99/2, October 11, 2002 at para. 159 (declining to award costs to the United States even though claim had been defeated).

[45] Costs Award at par. 172, at Exh. 1.

seeking to challenge the Consolidation Award and upon the United States' interpretation of the SCA.

## II.    ARGUMENT

A.    The New Costs Award Is A Post-Judgment Event That Could Not Have Been Litigated And Cannot Now Be Barred Under A Theory Of *Res Judicata*

The doctrine of *res judicata* precludes re-litigation of the same claim or cause of action; however, *res judicata* "does not bar a litigant from doing in the present what he had no opportunity to do in the past." *Drake v. Federal Aviation Administration*, 291 F.3d 59, 67 (D.C. Cir. 2002). Tembec had no opportunity to bring a cause of action challenging the NAFTA Consolidation Tribunal's Costs Award in its prior litigation before the Court because the Costs Award had not been issued. The Court rendered its decision on Tembec's Rule 60(b) motion on April 19, 2007. The Costs Award was completed on July 19, 2007 and delivered to Tembec on August 2, 2007.[46]

The courts have held that post-judgment events give rise to new claims. In *Lawlor v. Nat'l Screen Service Corp.*, 349 U.S. 322, 327-28 (1955), the Supreme Court held that a stipulated dismissal of plaintiff's antitrust claims with prejudice did not act as a bar to claims for identical conduct that occurred after the prior judgment. Plaintiffs brought an antitrust action against National Screen Service Corp ("NSSC") in 1942. The parties settled and the suit was dismissed "with prejudice" by the court without any findings of fact or law. Plaintiffs subsequently brought another suit against NSSC for anti-competitive conduct that occurred after the first case had been dismissed. The Supreme Court rejected NSSC's *res judicata* defense, saying,

---

[46] See Letter from E. Rodriguez Larrain to Elliot J. Feldman, Aug. 2, 2007, attached at Exh. 1.

> That both suits involved 'essentially the same course of wrongful conduct' is not decisive. … While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.

349 U.S. at 327-28.

The D.C. Circuit followed *Lawlor* in *Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72 (D.C. Cir. 1997). Attorney John Stanton, had his law license suspended. In successive, annual petitions for reinstatement, he challenged substantive and procedural aspects of the original suspension proceeding. The D.C. Court of Appeals barred those arguments under *res judicata* because Stanton failed to raise them originally in the suspension hearing. He then filed a case in federal court challenging the constitutionality of the D.C. Court of Appeals' procedures for reinstatement, seeking prospective relief. The D.C. Circuit rejected arguments for a *res judicata* defense, stating:

> Federal law is clear that post-judgment events give rise to new claims, so that claim preclusion is no bar. Thus, if the plaintiff alleges a combination in restraint of trade, a new cause of action accrues each time it operates against him, and previous judgments do not bar repeated challenges.

[citing *Lawlor*]. 127 F.3d at 78. The court then held that even if Stanton could have raised the facial challenges to the reinstatement law in prior proceedings, he was not barred from raising them in a subsequent action "so long as they concern post-judgment events," which they did because they would "govern future petitions for reinstatement." *Id.* at 79.

In *Drake v. Federal Aviation Administration*, 291 F.3d 59 (D.C. Cir. 2002), flight attendant Richard Drake was fired from Delta Airlines for failing random employee

drug tests administered by the airline and required by the FAA.  Drake sued Delta, alleging, *inter alia*, that its drug testing procedures violated FAA regulations.    That aspect of Drake's suit was dismissed by a federal court in New York.  *See id.* at 64.  Drake then requested the FAA to investigate what he alleged to be illegalities in Delta's processing of his test sample.  Before the FAA's investigation could be completed, Drake sued the FAA arguing that its drug testing regulations violated the Fourth Amendment of the Constitution and procedural due process.  *See id.* at 64.  The FAA subsequently completed its investigation of Delta and reported to Drake that it had not found any violations by the airline.  Drake then filed another suit against the FAA, this time alleging that it had conspired with Delta to reach an unreasonable determination about Delta's regulatory compliance, and that the agency had disregarded its own regulations by not providing Drake with certain information from the investigation.  *See id.* at 65.

The district court dismissed both cases, the second on grounds of *res judicata*.  The Court of Appeals disagreed that *res judicata* barred the claims in the second case.  The agency had not told Drake the contents of its investigative report, nor reached a determination on the requested information, until at least four months after the first complaint had been filed.  The Court explained:

> *Res judicata* does not preclude *claims* based on facts not yet in existence at the time of the original action. …. So it is here.  The doctrine does not bar a litigant from doing in the present what he had no opportunity to do in the past.

*Id.* at 66-67 (citation omitted).

Tembec's Petition to Vacate the Costs Award is based on a new claim that could not have been raised during the prior litigation.  The claim, as defined by the

Federal Arbitration Act, is to "vacate … an award."  9 U.S.C. §12.  Factually, Tembec could not have brought a claim to vacate the Costs Award in the prior litigation because the Costs Award did not exist.  The District Court issued its judgment with respect to Tembec's Rule 60(b) motion on April 19, 2007.  The Costs Award was written on July 19, 2007 and delivered to Tembec on August 2, 2007.

Tembec also could not have brought a cause of action to vacate the Costs Award as a matter of law.  Section 12 provides that notice of a motion to vacate must be provided "within three months *after* the award is filed or delivered."  *See id.* (emphasis added).  Consequently, Tembec could seek to vacate the Costs Award only after it was delivered, which occurred only after the judgment rendered in the prior litigation.

B.     Issue Preclusion Does Not Apply Because None Of The Issues In
       <u>Tembec's Petition To Vacate The Consolidation Order Was Adjudicated</u>

The United States asserts that the stipulation of dismissal precludes the assertion of not only the prior claim, but also any issues that were raised and not adjudicated in the prior claim.  That assertion confuses the application of *res judicata* and collateral estoppel.  It is true that a stipulated dismissal of a *claim* with prejudice precludes the same *claim* from being raised again, even when not adjudicated on the merits, but the rule is different for issue preclusion.

Under the doctrine of collateral estoppel (or "issue preclusion"), a judgment precludes re-litigation of *issues* that were actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit.  Collateral estoppel does not apply, however, where the issue sought to be precluded arises from a stipulation or a judgment by consent.  *See United States v. Int'l Building Co.*, 345 U.S. 502 (1953); *Lawlor*, 349 U.S. at 326; *Levinson v. United States*,

969 F.2d 260 (7th Cir. 1992) (fraud issue was not actually litigated in prior proceeding because it was dismissed by consent of the parties).

The seminal decision on this issue was rendered by the Supreme Court in *United States v. Int'l Building Co.* There, a taxpayer claimed that a prior consent decree stipulating he owed no tax deficiency for three tax years barred the IRS from litigating a similar deficiency claim for subsequent tax years. The Supreme Court rejected this argument because the issue of the tax liability had not been litigated and determined on the merits in the consent decree. 345 U.S. 502 (1953). The parties settled their controversy for reasons undisclosed, and the Court was not able to tell whether the agreement of the parties was based on the merits or on some collateral consideration. *Id.* at 505. The consent judgment entered by the lower court merely was *pro forma* acceptance by the court of the agreement between the parties. The Supreme Court concluded that, unless an issue was adjudicated on the merits, the doctrine of estoppel by judgment would serve an unjust cause, as "it would become a device by which a decision not shown to be on the merits would forever foreclose inquiry into the merits." *Id.* at 506.

Similarly, in *Lawlor*, the Supreme Court found that the prior consent judgment, dismissed with prejudice, was "unaccompanied by findings and hence did not bind the parties on any *issue*…which might arise in connection with another cause of action." *Lawlor*, at 327 (emphasis added).

None of the issues raised in Tembec's Petition to Vacate the Consolidation Award ever was litigated and determined by the Court. There were no findings of fact or law. None of the issues from the Petition to Vacate the Consolidation

Award is precluded by the doctrine of issue preclusion from being raised in this separate action to vacate the subsequent Costs Award.[47]  In fact, just the opposite is true:  the SCA specifically preserved both parties' positions on the issues.

C.    The SCA Does Not Prohibit This Action But It Does Prohibit The United States' Assertion Of Issue Preclusion

The SCA  specifically prohibits the United States from asserting issue preclusion here based on any prior litigation that was the subject of the SCA. Paragraph 9 states that the SCA is "without prejudice to the position of any party to this [SCA] on any *issue* in any action referenced in this [SCA]."  *See* SCA, par. 9 (emphasis added) at Exh. 2.  Thus, even were issues of (a) the arbitrators' biases and misconduct; (b) whether the arbitrators exceeded their powers; and (c) whether the arbitrators issued a decision contrary to public policy adjudicated by the Court in the prior action (which also was listed in the SCA), the United States is estopped by its agreement with Tembec in the SCA from asserting issue preclusion.

The United States suggests that the SCA bars this action because paragraph 10 does not allow a party to "re-file" an action.  This action, however, is not a "re-filing" of a prior action nor could it have been.  Here, Tembec seeks to vacate the Costs Award, which did not exist at any time during the prior litigation and, for the reasons provided

---

[47] Even had there been findings that the arbitrators did not demonstrate evident partiality, those findings would not necessarily be binding in a subsequent proceeding.  In *Aviall v. Ryder*, 110 F.3d 892 (2nd Cir. 1997), the Court of Appeals for the Second Circuit held that neither issue preclusion nor the law of the case doctrine would apply to a future challenge of an arbitration award where the district court had opined that there was no evidence of partiality among the arbitrators.  The district court in *Aviall* had ruled that the petitioners were not allowed to sue for substitution of the arbitrators prior to the issuance of an award, and that there did not appear to be evident partiality in any case.  The Second Circuit said that the issue of the arbitrators' partiality was not material to the district court's decision, and that Aviall had not received a full and fair opportunity to litigate the issue.  Thus, it could not be asserted as issue preclusion once Aviall brought a challenge to the final arbitration award.  *See* 110 F.3d at 897-898.  In this case, there have been no findings as to the arbitrators' partiality or misconduct, so there can be no issue preclusion.

above, could not have been the subject of the prior litigation factually or as a matter of law.

      D.    <u>The New Costs Award Raises New Issues</u>

New issues necessarily are raised in this petition because its subject is a previously non-existent arbitration award.  Whether the arbitrators exceeded their powers in issuing the Costs Award, and whether the Costs Award violates public policy concerns, are new issues relating to the new award.

The Costs Award also raises new issues regarding the arbitrators' partiality and misconduct.  The Tribunal's misconduct in deciding that the "unsuccessful party" pays the other side's fees while refusing to apply that norm to the United States arises in the context of a new award and a new record.

An arbitration award, even in the absence of any allegations of arbitrator misconduct, can demonstrate such "evident partiality" among the arbitrators that a court may decide to vacate the award.  *See Tinaway v. Merrill Lynch*, 658 F.Supp. 576, 578-579 (S.D.N.Y. 1987) (vacating award for arbitrators' "evident partiality" where drastic reduction of claimant's award was inexplicable).  Some cases also have suggested that a court must scan the record to see whether there is evidence corroborating the arbitrators' partiality, *Saxis S. S. Co. v. Multifacs Intern. Traders, Inc.*, 375 F.2d 577 (2nd Cir. 1967), and a new award necessarily means there is a different record to be scanned.

The Court has settled whether the SCA permitted the United States to submit a claim for costs to the Consolidation Tribunal when Tembec and the United States had stipulated a dismissal of prior litigation before the Court, and that issue will not be in dispute in the forthcoming briefing on the motion to vacate the Costs Award.

However, the grounds for vacatur of the Tribunal's Costs Award were not and could not have been raised until the Costs Award became available, after the prior litigation had concluded. These issues are new, therefore, and subject to adjudication in this case.

      E.    <u>Tembec Does Not Seek To Re-Litigate Issues Adjudicated By The Court</u>

        The United States objects to Tembec's restatement of facts, mistaking it for a forecast of issues to be litigated. Tembec has no intention of re-litigating issues already adjudicated by the Court. Thus, the United States' arguments that Tembec seeks to re-litigate issues in the Rule 60(b) motion from prior litigation, U.S. Motion at 13-17, are moot.

## CONCLUSION

        For the foregoing reasons, the Court should deny the United States' motion to dismiss.

Respectfully submitted,

_____/s/_____
Elliot J. Feldman (D.C. Bar No. 418501)
Mark A. Cymrot (D.C. Bar No. 164673)
Michael S. Snarr (D.C. Bar No. 474719)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Suite 1100
Washington D.C. 20036-5304
Tel: (202) 861-1679
Fax: (202) 861-1783

Dated: March 14, 2008                *Counsel for Petitioners*

# *EXHIBIT 1*

**International Centre for Settlement of Investment Disputes**
1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534   Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsd

**By email**                                                        August 2, 2007

**Canfor Corporation and**                    **United States of America**
**Terminal Forests Products, Ltd.**           c/o Mr. Mark A. Clodfelter
c/o Mr. P. John Landry                        *Assistant Legal Adviser*
DAVIS & COMPANY LLP                           *Office of the Legal Adviser*
2800-666 Burrard Street                       Ms. Andrea J. Menaker
Vancouver, British Columbia                   *Chief, NAFTA Arbitration Division*
Canada V6C 2Z7                                Office of International Claims
  and                                           and Investment Disputes
Mr. Keith E. W. Mitchell                      UNITED STATES DEPARTMENT OF STATE
HARRIS & COMPANY                              2430 E Street, N.W.
1400 – 550 Burrard Street                     South Building, Suite 203
Vancouver, British Columbia                   Washington, DC 20037-2800
Canada V6C 2B5                                United States of America

**Tembec Inc., Tembec Investments Inc., and**
**Tembec Industries, Inc.**
c/o Mr. Elliot J. Feldman
Mr. Mark A. Cymrot
Mr. Michael S. Snarr
Mr. Ronald J. Baumgarten
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
United States of America

      Re:    **Canfor Corp. v. United States of America; Terminal Forest Products Ltd. v.
United States of America; Tembec *et al* v. United States of America.**

Dear Sirs and Madam,

In the absence of Mr. Gonzalo Flores from the office this week, attached please find an advance electronic copy of the Joint Order on the Costs of Arbitration and for the Termination of Certain Arbitral Proceedings, dated July 19, 2007, which the President of the Tribunal has asked me to send you. We will provide you with certified copies of this Order in the course of this month.

Sincerely yours,

Emilio Rodriguez Larrain
Consultant

c.c. (by email):

Members of the Tribunal

In the Consolidated Arbitration Pursuant to Article 1126
of the North American Free Trade Agreement (NAFTA)
and the UNCITRAL Arbitration Rules
between


CANFOR CORPORATION
v.
UNITED STATES OF AMERICA


TEMBEC *ET AL.*
v.
UNITED STATES OF AMERICA

AND

TERMINAL FOREST PRODUCTS LTD.
v.
UNITED STATES OF AMERICA


JOINT ORDER
ON THE
COSTS OF ARBITRATION
AND FOR THE
TERMINATION OF CERTAIN ARBITRAL PROCEEDINGS


Before the Arbitral Tribunal established under Article 1126 of the NAFTA and
comprised of:

Professor Armand L.C. de Mestral, Arbitrator
Davis R. Robinson, Esq., Arbitrator
Professor Albert Jan van den Berg, Presiding Arbitrator

Secretary of the Tribunal:
Mr. Gonzalo Flores, ICSID

Washington, D.C., 19 July 2007

**Representing the United States**
**of America:**
Mr. Mark A. Clodfelter
  *Assistant Legal Adviser*
  *Office of the Legal Adviser*
Ms. Andrea J. Menaker
  *Chief, NAFTA Arbitration Division*
UNITED STATES DEPARTMENT OF STATE
Washington, DC 20520
United States of America

**Representing Canfor Corporation**
  **and**
**Terminal Forests Products, Ltd.:**
Mr. P. John Landry
DAVIS & COMPANY LLP
2800-666 Burrard Street
Vancouver, British Columbia
Canada V6C 2Z7
  and
Mr. Keith E. W. Mitchell
HARRIS & COMPANY
1400 – 550 Burrard Street
Vancouver, British Columbia
Canada V6C 2B5

**Representing Tembec Inc.,**
**Tembec Investments Inc.,**
  **and**
**Tembec Industries, Inc.:**
Mr. Elliot J. Feldman
Mr. Mark A. Cymrot
Mr. Michael S. Snarr
Mr. Ronald J. Baumgarten
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
United States of America

# Table of Contents

I.      INTRODUCTION ..................................................................................................................4

II.     RELEVANT COSTS PROVISIONS OF THE UNCITRAL ARBITRATION RULES ......................5

III.    BACKGROUND ...................................................................................................................7
        A.      Introduction ..............................................................................................................7
        B.      The Costs Dispute, Especially as between Tembec and the United States ..............9
        C.      Withdrawal of Claims by Canfor and Terminal ................................................... 36

IV.     SUMMARY OF THE POSITIONS OF TEMBEC AND THE UNITED STATES AS TO COSTS .......... 37
        A.      Position of the United States .................................................................................. 37
        B.      Position of Tembec ................................................................................................. 42

V.      ANALYSIS BY THE TRIBUNAL OF THE POSITIONS OF TEMBEC AND THE UNITED STATES AS
        TO COSTS ........................................................................................................................ 48
        A.      Introduction ............................................................................................................ 48
        B.      Jurisdiction ............................................................................................................. 48
        C.      The Alleged Agreement on the Costs of Arbitration ............................................. 51
        D.      Determination of Which of Tembec and the United States Shall Bear the Costs ... 65

VI.     THE COSTS OF THE PROCEEDINGS AS BETWEEN CLAIMANTS CANFOR AND TERMINAL AND
        RESPONDENT UNITED STATES ........................................................................................ 70

VII.    THE COSTS OF THE NAFTA ARTICLE 1120 PROCEEDINGS ............................................. 71

VIII.   ADVANCES OF THE PARTIES IN THE NAFTA ARTICLE 1126 PROCEEDINGS ..................... 74

IX.     THE THREE SEPARATE PHASES OF THE NAFTA ARTICLE 1126 PROCEEDING FOR PURPOSES
        OF ALLOCATION OF COSTS ............................................................................................. 75

X.      COMPUTATION OF AMOUNTS OWING IN THE NAFTA ARTICLE 1126 PROCEEDINGS ......... 82

XI.     DETERMINATION OF UNITED STATES LEGAL COSTS VIS-À-VIS TEMBEC IN THE NAFTA
        ARTICLE 1120 AND 1126 PROCEEDINGS .......................................................................... 85

XII.    DECISIONS ...................................................................................................................... 89

## I.   INTRODUCTION

1.   To consider and decide on costs in international arbitration is a relatively simple exercise. Not so in this case. The controversy between Claimant Tembec, Inc., Tembec Investments, Inc., and Tembec Industries, Inc. (together, "Tembec") and Respondent United States of America (the "United States") over the allocation of costs has consumed unusual amounts of time and energy, not only by the two parties but by the Tribunal as well.

2.   The allocation of costs as between Claimants Canfor Corporation ("Canfor") and Terminal Forest Products Ltd. ("Terminal") and Respondent United States, on the other hand, is a more mundane affair not only because of the express terms of the 12 October 2006 Softwood Lumber Agreement between the Governments of Canada and the United States and an annex thereto but also because of the actions subsequently taken by Canfor, Terminal and the United States, all as more fully explained in this Joint Order.

3.   The costs debate between Tembec and the United States has required not less than four rounds of written submissions, a questionnaire of the Tribunal with more than twenty-five questions, answers by these two parties to those questions, and a separate hearing on the subject. That extensive pleading between the two may seem surprising in light of the amount of legal costs claimed by the United States: to wit, some US$ 150,000 (not including reimbursement of its advances on costs). This amount may be contrasted with the US$ 242 million that was paid to Tembec within less than three weeks after the Softwood Lumber Agreement entered into force on 12 October 2006. However, the United States submits that this contentious issue between Tembec and the United States constitutes a matter of principle: the United States argues that it is entitled to costs "because Tembec abandoned its claim on the eve of the jurisdictional hearing . . . ," and that the failure to award costs in favour of the United States under the circumstances

4

"would open the door to abusive tactics by future Chapter Eleven claimants."[1] The issue also involves grave accusations by these two parties against each other. The United States contends that Tembec has misled the Tribunal, while Tembec asserts misrepresentation, undue influence, duress, coercion, and bad faith by the United States. Those circumstances and accusations have thereby necessitated an order on costs of an extraordinary length.

4.       As an introductory matter, the Tribunal notes that, by its Order of 10 January 2006, the Tribunal terminated these NAFTA Article 1126 consolidated proceedings with respect to Claimant Tembec, save for the costs of arbitration, as further described herein. Thus, this final Joint Order of the Tribunal constitutes both (i) an order for the termination of the arbitral proceedings with respect to the other two Claimants, Canfor and Terminal, as well as with respect to the Respondent, the United States, and (ii) an order on the allocation of the costs of the consolidated arbitration with respect to the three Claimants and the Respondent.

## II.    RELEVANT COSTS PROVISIONS OF THE UNCITRAL ARBITRATION RULES

5.       Before addressing the facts and procedure, it is useful to quote at the outset the relevant provisions contained in Articles 38 to 40 ("Costs") of the UNCITRAL Arbitration Rules:

> **Article 38**
>
> The arbitral tribunal shall fix the costs of arbitration in its award. The term "costs" includes only:
>
> (a)  The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;

---

[1]       United States submission of 4 December 2006 at p. 10.

(b)   The travel and other expenses incurred by the arbitrators;

(c)   The costs of expert advice and of other assistance required by the arbitral tribunal;

(d)   The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;

(e)   The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;

(f)   Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

**Article 39**

1.   The fees of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject-matter, the time spent by the arbitrators and any other relevant circumstances of the case.

2.   If an appointing authority has been agreed upon by the parties or designated by the Secretary-General of the Permanent Court of Arbitration at The Hague, and if that authority has issued a schedule of fees for arbitrators in international cases which it administers, the arbitral tribunal in fixing its fees shall take that schedule of fees into account to the extent that it considers appropriate in the circumstances of the case.

3.   If such appointing authority has not issued a schedule of fees for arbitrators in international cases, any party may at any time request the appointing authority to furnish a statement setting forth the basis for establishing fees which is customarily followed in international cases in which the authority appoints arbitrators. If the appointing authority consents to provide such a statement, the arbitral tribunal in fixing its fees shall take such information into account to the extent that it considers appropriate in the circumstances of the case.

4.   In cases referred to in paragraphs 2 and 3, when a party so requests and the appointing authority consents to perform the function, the arbitral tribunal shall fix its fees only after

consultation with the appointing authority which may make any comment it deems appropriate to the arbitral tribunal concerning the fees.

**Article 40**

1.   Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

2.   With respect to the costs of legal representation and assistance referred to in article 38, paragraph *(e)*, the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

3.   When the arbitral tribunal issues an order for the termination of the arbitral proceedings or makes an award on agreed terms, it shall fix the costs of arbitration referred to in article 38 and article 39, paragraph 1, in the text of that order or award.

4.   No additional fees may be charged by an arbitral tribunal for interpretation or correction or completion of its award under articles 35 to 37.


III.   **BACKGROUND**

A.   Introduction

6.   The initiation of the arbitration by Canfor, Tembec and Terminal and the subsequent proceedings are described in the Order of the Consolidation Tribunal of 7 September 2005 (the "Consolidation Order").[2]

---

[2]   Available online at: http://www.state.gov/documents/organization/53113.pdf, at ¶¶ 21-23.

7.      In the Consolidation Order the Tribunal decided that it:

>       (1) ASSUMES JURISDICTION over all claims in the Article 1120
>       arbitrations *Canfor Corporation v. United States of America,*
>       *Tembec Inc., Tembec Investments Inc. and Tembec Industries*
>       *Inc. v. The United States of America,* and *Terminal Forest*
>       *Products Ltd. v. The United States of America,* within the
>       meaning of Article 1126(2)(a) of the NAFTA;
>
>       (2) DENIES Tembec's Motion to Dismiss of 27 June 2005; and
>
>       (3) RESERVES the decision on the costs of the present
>       proceedings to a subsequent order, decision or arbitral award.

8.      The reasons for Decision No. 3 quoted above are stated at ¶ 225 of the
Consolidation Order:

>       The Tribunal reserves the decision on the award of costs of the
>       present proceedings as referred to in Articles 38-40 of the
>       UNCITRAL Arbitration Rules to a subsequent order, decision or
>       arbitral award, having regard to the fact that none of the parties
>       has made submissions on costs. Reservation of the decision on
>       costs is also appropriate in light of the alternative relief sought
>       by Canfor and Terminal in their reply post-hearing brief to the
>       effect that, if consolidation is ordered, "the United States should
>       be ordered to pay Canfor and Terminal's costs that have been
>       thrown away by virtue of the United States having been dilatory
>       in bringing this consolidation application," [footnote omitted] to
>       which relief the United States has not had an opportunity to
>       respond because of the timing of the relief sought.

9.      Three months later, on 17 December 2005, the Tribunal issued Procedural Order
No. 1.[3]  The Preamble of the Order gives an overview of the procedure and the
circumstances as a result of which it took more than three months after release of
the Consolidation Order to issue the Procedural Order.  The Order itself is
concerned with a preliminary and separate phase of the proceedings with respect to

---

[3]      Available online at: http://www.state.gov/documents/organization/58579.pdf.

8

the objection raised by the United States on the basis of Article 1901(3) of the NAFTA[4] against the Claimants' NAFTA Chapter Eleven claims.

    B.    <u>The Costs Dispute, Especially as between Tembec and the United States</u>

10.    In the meantime, by letter of 7 December 2005, Tembec advised that:

> Tembec removes its Statement of Claim from these Article 1126 arbitration proceedings, and is filing in U.S. District Court for the District of Columbia a notice of motion to vacate the Tribunal's decision and order of September 7, 2005, which terminated Tembec's Article 1120 arbitration proceedings,

and requesting that:

> the Tribunal order its Secretary to terminate the Article 1126 proceedings as to Tembec, and make a final accounting of arbitration fees and costs up until today's date.

11.    As previously noted, on 10 January 2006, the Tribunal issued a Termination Order with respect to Tembec in which it decided:

> **1.  Termination**
>
> 1.1 The Tribunal hereby terminates the present proceedings with respect to Tembec, subject to the provisions of this Order, considering that Canfor, Terminal and the United States have not raised justifiable grounds for objection as provided in Article 34(2) of the UNCITRAL Arbitration Rules. The United States has not shown to the satisfaction of the Tribunal that this Tribunal has the competence referred to in Sub-section 1.3 below and, as a consequence, the United States has not raised a justifiable ground for objection.

---

[4]    Article 1901(3) of the NAFTA provides: "Except for Article 2203 (Entry into Force), no provision of any other Chapter of this Agreement shall be construed as imposing obligations on a Party with respect to the Party's antidumping law or countervailing duty law."

1.2 The Tribunal rejects Tembec's request in its letter of 7 December 2005 that "the Tribunal order its Secretary to terminate the Article 1126 proceedings as to Tembec . . ." since the power to terminate pertains to the Tribunal.

1.3 The Tribunal does not declare the termination referred to in Sub-section 1.1 above either with prejudice to reinstatement or without prejudice to reinstatement of Tembec's NAFTA claims as filed in its Notice of Arbitration and Statement of Claim on 3 December 2004, considering (i) that neither any of the provisions of Chapter 11 of the NAFTA nor Article 28(1) or Article 34(2) or any other provision of the UNCITRAL Arbitration Rules confers upon the present Tribunal competence to issue such a declaration; and (ii) that the question whether or not the termination as to Tembec is with or without prejudice to reinstatement is to be considered and decided upon by the Article 1120 tribunal, if any, to which Tembec may resubmit the afore-mentioned NAFTA claims, notwithstanding, *inter alia*, the provisions of Article 1121(1)(b) of the NAFTA, Tembec's waiver made thereunder and the provisions of Article 1126(8) of the NAFTA.

## 2.    Costs

2.1 The Tribunal will determine at an appropriate time whether, and if so to what extent and in which manner, Tembec is to bear the costs of arbitration referred to in Articles 38 through 40 of the UNCITRAL Arbitration Rules, considering (i) that the Tribunal reserved its decision concerning costs to a subsequent order, decision or arbitral award in Decision No. 3 of the Consolidation Order of 7 September 2005; (ii) that the United States requested in its letter of 13 December 2005 "the opportunity to make a submission detailing its costs in defending against Tembec's claim;" and (iii) that Canfor, Tembec and Terminal have not made a submission on the question of costs as to Tembec either.

2.2 For the purposes of the determination referred to in Sub-section 2.1 above, the Tribunal will invite Tembec, Canfor, Terminal and the United States to submit their views in a manner and according to a schedule to be determined by the Tribunal in consultation with Tembec, Canfor, Terminal and the United States.

10

2.3 Accordingly, at present, the Tribunal rejects Tembec's request in its letter of 7 December 2005 that "the Tribunal order its Secretary to . . . make a final accounting of arbitration fees and costs up until today's date" and to "provide a refund to Tembec of any remaining balance of the deposit paid."

**3.   Competence**

3.1 The Tribunal notes the pendency of Tembec's Petition and Notice of Motion to Vacate Arbitration Award, i.e., the Tribunal's Consolidation Order of 7 September 2005, filed with the United States District Court for the District of Columbia on 7 December 2005.

3.2 In regard of Sub-section 3.1 above, the Tribunal further notes that it is unaware of any applicable existing international or national law or other governing circumstance that affects the Tribunal's competence to decide any matters before it, including but not limited to the issuance of this Order for Termination of the present proceedings with respect to Tembec.

12.   The Article 1126 proceedings thereafter continued only with Canfor, Terminal and the United States, subject, however, to the reservation for costs in the previously recited Tembec Termination Order.   A hearing on the preliminary question referred to in ¶ 9 above was held in Washington on 11-12 January 2006.

13.   On 7 February 2006, Tembec filed a "Motion to Vacate Arbitration Award" and a Memorandum in support of the Motion with the U.S. District Court for the District of Columbia, seeking a setting aside of the Consolidation Order.[5]

14.   Canfor, Terminal and the United States filed Cost Submissions in the present NAFTA Article 1126 proceedings on 7 April 2006.   The Submission on Costs of the United States was accompanied by witness statements of Mr. Gregory K. Holobaugh (Budget Analyst in the Office of the Executive Director of the Legal

---

[5]    Civil Action No. 05-2345. Available online at: http://www.state.gov/documents/organization/64890.pdf.

Adviser's Office at the United States Department of State); Ms. Andrea J. Menaker (Chief of the NAFTA Arbitration Division of the Office of International Claims and Investment Disputes in the Legal Adviser's Office at the United States Department of State); and Ms. Mary T. Reddy (Personnel Officer and Attorney Recruitment Coordinator in the Office of the Executive Director in the Legal Adviser's Office at the United States Department of State).

15. On 6 June 2006, the Tribunal rendered a Decision on the Preliminary Question.[6] Having recalled the procedural history described above, the Tribunal stated in that Decision: "Tembec is no longer a party to the present proceedings, subject to the matter of costs."[7]

16. In the Decision on the Preliminary Question of 6 June 2006, the Tribunal decided that it:

> (1) DETERMINES that Article 1901(3) of the NAFTA establishes that the United States did not consent to arbitrate under Chapter Eleven the claims of Canfor and Terminal filed in *Canfor Corporation v. United States of America* and in *Terminal Forest Products Ltd. v. The United States of America*, respectively, except to the extent that they concern the Byrd Amendment;
>
> (2) DECLARES to lack jurisdiction over the claims of Canfor and Terminal filed in *Canfor Corporation v. United States of America* and in *Terminal Forest Products Ltd. v. The United States of America*, respectively, except to the extent that they concern the Byrd Amendment; and
>
> (3) RESERVES the decision on the costs of the present phase of the proceedings to a subsequent order, decision or arbitral award.

17. The reasons for Decision No. 3 quoted above are stated at ¶ 351 of the Decision on the Preliminary Question:

---

[6]    Available online at: http://www.state.gov/documents/organization/67753.pdf.

[7]    At ¶ 28.

12

Canfor, Terminal and the United States filed cost submissions on 7 April 2006. The Tribunal reserves the decision on the award of costs of the present proceedings as referred to in Articles 38-40 of the UNCITRAL Arbitration Rules to a subsequent order, decision or arbitral award, having regard to the fact that this decision will depend on the next phase or phases of the proceedings as to which of the parties is to bear the costs or whether costs should be apportioned between the parties. Moreover, costs related to Tembec need to be addressed by affording Tembec an opportunity to present its case regarding costs.[8]

18.    In the meantime, the Governments of Canada and the United States had engaged in settlement discussions regarding the Softwood Lumber Dispute. On 1 July 2006, in Geneva, the Minister of International Trade of Canada, Mr. David Emerson, and the United States Trade Representative, Ms. Susan Schwab, initialed a text that was to become the 2006 Softwood Lumber Agreement (hereinafter the "SLA 2006"). The initial text was subject to a "legal scrub."[9] The text of the SLA 2006 contemplated the termination of all actions (the "Covered Actions") set out in paragraph 1 of a Termination of Litigation Agreement (hereinafter the "TLA"), annexed to the SLA 2006, upon entry into force of the SLA 2006, and provided for participants in the Covered Actions, by their signing of the TLA, to consent in advance to termination of each Covered Action if certain conditions were subsequently met.

19.    Accordingly, on 8 September 2006, the Canadian Trade Law Bureau (hereinafter the "CTLB") and the United States Trade Representative (hereinafter the "USTR") jointly sent copies of the TLA to representatives of all parties and participants to twenty "Covered Actions" set out in paragraph 1 of the TLA attached to the letter,

---

[8]    The accompanying footnote 369 reads: "*See* Termination Order of 10 January 2006, ¶ 27 *supra*, at ¶ 2."

[9]    Letter of 8 September 2006 from the Canadian Trade Law Bureau the United States Trade Representative, ¶ 19 *infra*, footnote.

requesting that they execute the TLA and return it by 20 September 2006.[10] One of the recipients of the 8 September letter was Tembec's counsel, Mr. Elliot J. Feldman of the law firm Baker Hostetler, LLP, who also represented a large number of other softwood lumber companies (as was shown on the second signature page of the attached TLA). The TLA consisted of thirteen signature pages containing fifty-two signature blocks, while paragraph 12 provided that the TLA "may be executed in counterparts." The twenty Covered Actions included:

> . . . .

> *Tembec et al. v. United States* (Consol. Ct. No. 05-00028 (CIT)) and the cases consolidated therein;[11]

> . . . .

> *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia);[12]

> . . . .

> NAFTA Chapter 11 claim of *Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. v. United States of America* (collectively "Tembec"); and

> The *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forests Products Ltd. v. United States of America.*

---

[10]    Annex A to the United States' submission of 29 January 2007.

[11]    A three-judge panel constituted at the United States Court of International Trade (hereinafter the "CIT") had ruled on 21 July 2006 that the antidumping and countervailing duty orders imposed in May 2002 by the United States were not supported by a valid injury determination.

[12]    *See* ¶ 13 *supra.*

20.    Paragraph 5 of the TLA provided:

> No party to this Termination Agreement shall seek to hold any
> other party liable to pay its costs and expenses of litigation
> relating to the Covered Actions.

21.    In the letter of 8 September 2006, the recipients were asked to do, *inter alia*, the
following:

> You are either counsel for, or an authorized representative of,
> one or more parties or participants to one or more Covered
> Actions. The TLA, two copies of which are enclosed, therefore
> provides a designated line for your signature.  We ask that you
> indicate you client's (or clients') agreement to the termination of
> the actions to which they are a party by signing and dating, on
> the line above your name, each copy of the TLA and returning
> your signature pages to the Government of Canada and the
> Government of the United States. (In accordance with paragraph
> 12 of the TLA, it is being signed in counterpart.)

22.    On 12 September 2006, Canada and the United States executed the SLA 2006.[13]
As mentioned above, Article II ("Entry into force") provided in relevant part:

> 1.    The SLA 2006 shall enter into force on a date designated by
> the Parties in an exchange of letters (the "Effective Date"). The
> exchange of letters shall confirm that:
>
> (a)  the Termination of Litigation Agreement in Annex 2A has
> been signed:
>
> (i)  by counsel on behalf of all represented parties and
> participants to the actions set out in the Termination Agreement,
> and
>
> (ii)  by authorized representatives of any unrepresented parties
> or participants to the actions set out in the Termination
> Agreement;

---

[13]    Annex (i) to the Unites States' letter to the Tribunal of 16 November 2006; *see* ¶ 60 *infra*.
Available online at: http://www.international.gc.ca/eicb/softwood/pdfs/SLA-en.pdf.

. . . .

23.     Annex 2A to the SLA 2006 contained the TLA sent to the parties and participants in the twenty Covered Actions on 8 September 2006. The copy of the TLA set forth in the Annex to the SLA 2006 had the caption "Annex 2A," which caption was lacking on the version sent on 8 September 2006.

24.     By facsimile dated 20 September 2006, Mr. Feldman wrote to DFAIT[14] (Ms. Meg Kinnear) and USTR (Mr. James Mendenhall)[15]:

> Dear Meg and Jim:
>
> We will not be able to return to you today the form provided with your letter of September 8, 2006. As I explained to Hugh Cheetham [of DFAIT] by phone a couple of days ago, our fiduciary duties run specifically to each client in each matter, and we are unable, therefore, to act for all clients in all matters in common. Moreover, we do not represent all of our clients in all of the cases listed on your form . . . .
>
> I must further note that we will not be responding on behalf of all clients today. Some are instructing us to act on their behalf today; others, especially the Associations that have complex procedural requirements, are not ready or have not taken decisions as to every litigation matter.
>
> Finally, all of our letters, each addressing each matter for each client, may not be the same. In some instances we are receiving instructions that involve conditions that must be added, and in some instances clients are declining to subscribe to all of the terms of termination as set out in the form . . . .

25.     Attached to the 20 September facsimile were seventeen individual forms, each captioned "Annex 2A – Termination of Litigation Agreement," and each addressing one of the twenty Covered Actions set out in the TLA annexed to the

---

[14]     The abbreviation "DFAIT" stands for: Department of Foreign And International Trade, Canada.

[15]     Exhibit B of the United States' submission to the Tribunal of 4 December 2006.

SLA 2006 (pages 6-41 of the facsimile). Some forms mentioned several companies, others a single company. Ten of the forms were signed by Mr. Feldman on behalf of Tembec Inc. These forms relating to Tembec concerned each a Covered Action, including at pages 40-41 of the facsimile:

> NAHA [*sic*] Chapter 11 claim of *Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. v. United States of America* (collectively "Tembec").

26.     As mentioned in Mr. Feldman's 20 September facsimile, a number of the forms signed by him had provisions that differed from the TLA submitted by CTBL and USTR on 8 September 2006. The forms relating to Tembec, for example, contained an added condition to the effect that the Government of Canada irrevocably committed to pay Tembec Inc. no later than 60 days after the date that the SLA 2006 entered into force at least 90 percent of the amount to be paid to Tembec Inc. (paragraph 2(d)). Paragraph 5 of the forms included the provisions on costs identical to paragraph 5 of the TLA quoted at ¶ 20 above, except that the expression "Covered Actions" was put in the singular: "Covered Action."

27.     As noted in ¶ 63 of this Joint Order, the Tribunal only received a copy of Mr. Feldman's explanatory 20 September cover facsimile letter on 4 December 2006, and not from Tembec or its counsel but rather by means of an attachment to a letter of that date from the United States to the Tribunal.

28.     The Tribunal invited Tembec to make its submissions on the costs of the arbitration on or before 15 September 2006 by letter of 1 September 2006. In the letter, the Tribunal referred, *inter alia*, to the press reports according to which the Softwood Lumber Dispute was in the process of being settled, and noted that Canfor, Terminal and the United States had already sufficiently set out their position regarding the costs of the proceedings in the Cost Submissions of 7 April 2006.

17

29.     As the Tribunal explained at the hearing on costs held at the seat of ICSID in Washington, D.C., on 31 January 2007, due to a clerical error at ICSID and unbeknownst to the Tribunal, the 1 September letter was not transmitted to Tembec.[16]  Having discovered the miscommunication, a letter with the same content was sent by the Secretary, on instructions of the President of the Tribunal, to Tembec on 22 September 2006, the time limit to file its submissions on the costs of the proceedings now having been set at 6 October 2006.

30.     On 24 September 2006, the U.S. District Court for the District of Columbia ordered a stay of the action seeking to vacate the Consolidation Order and further ordered that "the parties submit a joint status report concerning the status of the international agreement between the United States and Canadian governments" no later than 22 December 2006.[17]

31.     In a press release of 29 September 2006, Canada advised that Canada and the United States agreed to extend the entry-into-force date of the SLA 2006 to "no later than November 1, fulfilling a commitment to assist Canadian companies as they finalize implementation issues."[18]  It was also noted in the press release: "The limited extension comes after close consultation with and in direct response to requests from industry.  It should have no impact on the swift return of billions of dollars to Canadian softwood producers."

32.     On 5 October 2006, Tembec renewed its request to the CIT in the matter *Tembec et al. v. United States* (Consol. Ct. No. 05-00028 (CIT))[19] that the Court resolve

---

[16]     Tr. pp. 61-63.

[17]     Exhibit A-1 to Tembec's submission to the Tribunal of 30 January 2007.

[18]     Exhibit B-1 to Tembec's submission to the Tribunal of 30 January 2007.

[19]     *See* n. 11 *supra.*

18

the remedies issues as soon as it practically can.  In the letter, Mr. Feldman wrote on behalf of Tembec to the CIT,[20] amongst other things:

> Even though 120 days have elapsed since the United States requested a 90-day stay, no settlement has been finalized, and resolution of the remaining settlement issues is not imminent. The Governments of the United States and Canada have agreed on a settlement subject to a number of significant conditions precedent that remain unsatisfied.    Although the two Governments had hoped that these preconditions would be met by October 1, 2006, they have now recognized and agreed that, at a minimum, at least another month will be required, a new timetable that may also prove to be optimistic.

33.    The Tribunal learned of Mr. Feldman's 5 October 2006 letter to the CIT not from Mr. Feldman or from Tembec but rather from the United States which attached a copy of this letter to its own letter to the Tribunal of 13 October 2006.

34.    Mr. Feldman's letter of 5 October 2006 to the CIT was not accompanied by a copy of the form attached to the 20 September facsimile concerning the Covered Action "*Tembec et al. v. United States* (Consol. Ct. No. 05-00028 (CIT)) and the cases consolidated therein" (pages 34-35 of the facsimile) and signed by Mr. Feldman on 20 September 2006.

35.    One day later, on 6 October 2006, Mr. Feldman wrote on behalf of Tembec to this Tribunal in response to the invitation of 22 September 2006 (see ¶ 27 above). Again, in this letter of 6 October 2006 to the Tribunal, Mr. Feldman made no reference to the letter that he had dispatched the previous day to the CIT.  In his 6 October 2006 letter, Mr. Feldman stated, amongst other things:

> As explained below, any allocation of arbitration costs and expenses should be governed by a recent agreement between Tembec and the United States, which demonstrates the intent of

---

[20]    Annex to the United States' submission to the Tribunal of 13 October 2006.

the two parties that neither party shall seek to recover its costs and expenses from the other party.

. . . .

Annex 2A of the SLA is a "Termination of Litigation Agreement," ("Termination Agreement") according to which the parties to various legal actions in the *Softwood Lumber* dispute have agreed to terminate those actions, effective upon the SLA's entry into force. The Governments of the United States and Canada requested Counsel for Tembec to sign a Termination Agreement on behalf of Tembec with respect to Tembec's NAFTA Chapter 11 claim and its lawsuit in D.C. District Court seeking [to] vacate the Tribunal's decision of September 7, 2005. We signed the Termination Agreement on Tembec's behalf for both actions and returned the signed copies to the Governments of the United States and Canada as instructed on September 20, 2006. Pursuant to the terms of the Termination Agreement, upon the SLA's entry into force, Tembec and the United States will have terminated their litigation as to Tembec's NAFTA Chapter 11 claim and the related lawsuit in D.C. District Court. Copies of the Termination Agreement are attached hereto as Exhibit A.

Tembec has done all it can, under the terms of the SLA and the Termination Agreement, to enable the SLA to enter into force. We have not yet seen signed copies of the Termination Agreement from Counsel for the United States with respect to the two Tembec actions. However, all indications are that the United States will sign in furtherance of implementing the SLA. The Termination Agreement provides that it may be signed in counterparts, so it is possible that Counsel for the United States already have signed. We are unaware of whether Canfor or Terminal have signed Termination Agreements with respect to their Chapter 11 NAFTA claims. Their decisions whether to sign should have no effect on Tembec for purposes of allocating costs in the Consolidation Tribunal's proceedings.

. . . .

36.     Various arguments were made in the 6 October letter. Tembec relied in particular on paragraph 5 of the Termination of Litigation Agreement according to which no party would hold any other party liable to pay its costs and expenses of litigation relating to the Covered Action (see ¶¶ 19 and 24 above).

37.     In contrast to the 5 October letter to the CIT, Mr. Feldman's letter of 6 October 2006 to this Tribunal was accompanied, under Exhibit A, by a copy of two of the forms attached to the 20 September facsimile: one concerning the Covered Action "*Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia)" and the other concerning the Covered Action "NAHA [*sic*] Chapter 11 claim of *Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. v. United States of America* (collectively 'Tembec')" (pages 38-42 of the facsimile) signed by Mr. Feldman on 20 September 2006.  While the copies in Exhibit A to the 6 October letter were labeled "Annex 2A – Termination of Litigation Agreement," they were not identical to the TLA set out in Annex 2A to the SLA 2006.  That discrepancy was not mentioned in Mr. Feldman's cover letter to the Tribunal.

38.     Also on 6 October 2006, the Governments of Canada and the United States filed a joint motion with the CIT for leave to submit a status report.[21]  In the motion, the Governments mentioned that on the same date they tentatively agreed to amendments to the SLA 2006 and that the "two governments currently expect that, pursuant to the amended Agreement, the Agreement will enter into force on October 12, 2006."  Mr. Feldman was served a copy of the motion.

39.     The TLA set forth in Annex 2A to the SLA 2006 was subject to further negotiations between Canada and the United States on their own behalf and on behalf of their nationals.  In this regard, each of the two Governments consulted with their respective interested private nationals for the purpose of considering their concerns.  Thus, in the case of Tembec, any such private contacts were held with the Government of Canada and not with the Government of the United

---

[21]     Annex E to the United States' submission to the Tribunal of 29 January 2007.

States.[22] Those subsequent negotiations between the two Governments resulted in a Settlement of Claims Agreement (hereinafter "SCA").[23]  Paragraphs 1 and 2 of the SCA provide:

> 1.    On the Effective Date of the Softwood Lumber Agreement 2006, this Settlement of Claims Agreement (Claims Settlement Agreement) will constitute a full and complete settlement of the claims asserted in the actions referenced in this paragraph.  On the Effective Date, Canada and the United States shall file a joint stipulation of dismissal of Canada's complaint in *Canada v. United States* (Ct. No. 05-00033(CIT)).  Further, on the Effective Date:
>
> > The United States and Tembec Inc. and its affiliates shall file a joint stipulation of dismissal in *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia));
> >
> > the United States shall withdraw its request for an Extraordinary Challenge in Certain Softwood Lumber Products from Canada, Secretariat File No. ECC-2006-1904-01USA; and
> >
> > Canfor Corporation shall withdraw its claim against the United States in *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forests Products Ltd. v. United States of America.*
>
> 2.    In addition, on the Effective Date, Canada and the United States shall seek to dismiss the following actions:

---

[22]     With the limited exception of the text of the stipulation of dismissal of the action before the U.S. District Court for the District of Columbia, which was negotiated between Tembec and the United States on 10-12 October 2006, *see* ¶¶ 50-51 *infra*.

[23]     Annex (iii) to the United States' submission to the Tribunal of 16 November 2006; *see* ¶ 60 *infra*.

> *Certain Softwood Lumber Products from Canada (Original AD Investigation),* Secretariat File No. USA-CDA-2002-1904-02;
>
> *Tembec v. United States* (Consol. Ct. No. 05-00028 (CIT)) and the cases consolidated therein; and
>
> *Coalition for Fair Lumber Imports Executive Committee v. United States (Civil Action No. 05-1366 (D.C. Cir.)).*

40.     The SCA does not contain any reference to the NAFTA Chapter Eleven claim of Tembec or of Terminal, in contrast to the express mention of both claims in the TLA (see ¶ 19 above).

41.     Paragraph 8 of the SCA contains a provision similar to paragraph 5 of the TLA:

> No party to this Claims Settlement Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to any action referenced in this Claims Settlement Agreement.

42.     The SCA had three signature pages, containing thirteen signature blocks (contrary to the TLA which consisted of thirteen pages containing fifty-two signature blocks, see ¶ 19 above).

43.     On Wednesday, 11 October 2006 at 12:00 pm, Mr. Colin Bird of the Canadian Trade Bureau sent the following email to Canada's outside counsel in this matter, Ms. Jean Anderson at the law firm Weil, Gotshal & Manges, LLP, in Washington D.C., with copies to Mr. Hugh Cheetham of DFAIT and Mr. Jeff Weis of USTR, mentioning as subject "Settlement of Claims Agreement for Circulation to Counsel":

> Please circulate the attached document to all counsel for Canadian parties listed therein.   You can indicate that International Trade Canada has been in contact with their clients, who have indicated a willingness to sign this document.  You can also indicate that they will need to return signed copies of their signature pages TODAY to Hugh [Cheetham] and Jeff

[Weiss] as per the instructions in the original instruction letter for the original TLA.[24]

[capitals as in original text]

44.   Mr. Feldman was one of the counsel to whom Ms. Anderson forwarded the SCA. She did so in the afternoon of the same Wednesday, 11 October 2006, in an email of 3:42 pm:

> Attached is the Settlement of Claims Agreement that must be signed by the designated signatories before the SLA 2006 enters into force. As you know, that is expected to occur tomorrow, October 12.   Consequently, signatures to the Settlement of Claims Agreement are needed today.  As you undoubtedly know from your clients, in conversations with International Trade Canada, your clients have indicated their willingness to have this document signed on their behalf.[25]

45.   Mr. Feldman responded to Ms. Anderson by an email on the same day at 6:09 pm, writing, *inter alia*:

> . . . . We anticipated a concern about Chapter 11, but having already signed Termination agreements in all other matters, we don't understand why we are confronting a lengthy and complex document involving other matters . . . .
>
> As you have indicated that time is of the essence, perhaps you could lead us through the reasoning behind the Agreement so that we could understand better what we are being asked to sign. Especially perplexing is our inability to advise clients why these steps are required in view of the statements from the Government beginning last Friday that termination of litigation agreements no longer would be applicable to entry into force, recognizing that many had not been submitted and now may not be required pursuant to new but undisclosed amendments . . . .[26]

---

[24]   Annex C to the United States' submission to the Tribunal of 29 January 2007.

[25]   *Id.*

[26]   *Id.*

46.    At 6:16 pm, Ms. Anderson sent Mr. Feldman and others "the final Settlement Agreement," which contained a few corrections in comparison with the version sent in the afternoon, together with a redline version showing the changes. [27]

47.    At 6:18 pm, Ms. Anderson replied to Mr. Feldman's email of 6:09 pm:

> Elliot -- the final document, with redline, have been sent to you. We do need signatures today. You (and everyone else) should feel free to call me with any questions. Jeanie. [28]

48.    Mr. Feldman sent Ms. Anderson an email at 6:20 pm, stating: "We will look at the document now, but perhaps you could send us an e-mail with a more detailed response to our queries." [29] At 6:46 pm, Mr. Feldman sent Ms. Anderson another email, discussing the "without prejudice" clause and cross-references. [30]

49.    Mr. Feldman signed the SCA on behalf of Tembec Inc. and its affiliates later in the evening of 11 October 2006. In his facsimile, [31] sent on 9:39 pm and 9:52 pm, Mr. Feldman wrote to Mr. Cheetham and Mr. Weiss:

> Dear Hugh and Jeff:
>
> Accompanying this facsimile, and enclosed with the original of this letter, is our signature page to the Settlement of Claims Agreement. I want to raise with you, nonetheless, as counsel to various clients in the *Softwood Lumber* dispute, three particular concerns.
>
> First, this document was presented to us in final form for signature today around 6:00 P.M. We have had virtually no time to study it, and do not understand why we were given no notice

---

[27]    *Id.*

[28]    *Id.*

[29]    *Id.*

[30]    *Id.*

[31]    Exhibit D to the United States' submission to the Tribunal of 4 December 2006.

that it was being prepared and were not consulted at all about its contents. Some of the drafting problems we believe might have been avoided had we been given notice, and had the Government then been willing to correct the errors called to its attention.

Second, among the errors, we note especially the inconsistency between paragraph 6 and paragraph 8 of Annex 2A[32] of the signed Softwood Lumber Agreement. Annex 2A did not apply the contents of paragraph 9[33] in this agreement to the countervailing duty NAFTA appeal. We had proposed that paragraph 6 be modified, very very modestly, to retain consistency with Annex 2A, but our request was rejected.

We have heard two reasons for rejecting this request. The first is that the contents of paragraph 9 are now "boilerplate," but objections were raised throughout the negotiations over the "without prejudice" clauses, communicating unambiguously to the Government that industry did not regard these clauses as boilerplate. The second is that the intended interpretation of this language is that each party retains their own position without prejudice.

We believe (our third concern), assuming this intended meaning, that the statement should have read, "A party's signature on this Termination Agreement is without prejudice to the positions of that party in the Covered Actions." On behalf of all our clients, including here especially Tembec, I am asserting that we interpret paragraph 9 to have this meaning – without prejudice to one's own positions and no one else's – within this Agreement.

50.     At the same time and in contemplation of paragraph 1 of the SCA, Mr. Alexander

Haas of the U.S. Department of Justice engaged in an email exchange with Mr.

Feldman concerning the text of a stipulation of dismissal with prejudice to the

---

[32]     Paragraph 6 of Annex 2A provides: "This Termination Agreement is without prejudice to the position of any party on any issue in the Covered Actions." Paragraph 8 of Annex 2A provides: "For the purposes of paragraphs 4, 5, and 7, *Certain Softwood Lumber Products from Canada (Original CVD Investigation)*, Secretariat File No. USA-CDA-2002-1904-03 shall be treated in the same manner as a Covered Action."

[33]     Paragraph 9 of Annex 2A provides: "This Termination Agreement may not be altered, amended, modified, or otherwise changed other than through the written agreement of all parties hereto."

26

action seeking to set aside the Consolidation Order before the U.S. District Court for the District of Columbia.[34] The exchange was commenced by Mr. Haas on 10 October 2006 at 5:39 pm. On 12 October 2006, at 5:42 pm, he and Mr. Feldman reached agreement on behalf of the United States and Tembec, respectively, on the following text:

> Pursuant to Fed. R. Civ. P. 41(a)(1), the parties herewith stipulate that this civil action brought by Tembec, Inc. Tembec Investments Inc., and Tembec Industries, Inc. (collectively Petitioners), against Respondent the United States of America is dismissed with prejudice, subject to the terms and conditions of the Softwood Lumber Agreement 2006. The parties agree that each will bear its own costs and attorneys fees.

51.    With the permission of Mr. Feldman, Mr. Haas filed electronically the stipulation with the U.S. District Court for the District of Columbia on 12 October 2006 at 11:17 pm.[35] The District Court approved the stipulation on 17 October 2006.

52.    In the evening of 12 October 2006, at around 11:10 pm, the Governments of Canada and the United States executed an agreement amending the Softwood Lumber Agreement" of 12 September 2006 (hereinafter "SLA 2006 Amendments").[36] Two amendments merit to be mentioned here:

53.    First, Article II(1)(a) of the SLA 2006, quoted at ¶ 21 above, was amended as follows:

> ARTICLE I
>
> Article II(1)(a) of the SLA 2006 shall be deleted and replaced by the following:

---

[34]    Exhibit C to the United States' submission to the Tribunal of 4 December 2006.

[35]    Exhibit D to the United States' submission to the Tribunal of 29 January 2007.

[36]    Annex (ii) to the United States' submission to the Tribunal of 16 November 2006; *see* ¶ 60 *infra*. Available online at: http://www.international.gc.ca/eicb/softwood/pdfs/Agreementamending-en.pdf.

> "(a) the Settlement of Claims Agreement in Annex 2A has been signed by counsel on behalf of the parties set out therein;"

54.    Second, the SLA 2006 Amendments added the following provision:

> ARTICLE XI
>
> Annex 2A [i.e., TLA] of the SLA 2006 shall be deleted and replaced by Annex 2A [i.e., the SCA].

55.    Less successful was the United States' motion to dismiss the CIT action (Consol. Court No. 05-00028), filed in the evening of 12 October 2006, as contemplated by paragraph 2 of the SCA, since the CIT denied the motion and granted Tembec's motion for summary judgment, in a judgment of 13 October 2006.[37]  By Motion for Reconsideration and to Vacate Tembec II dated 13 November 2006, the United States requested the CIT to vacate its judgment and dismiss the case as moot.[38]

56.    Tembec asserts that it learned of the amendments to the SLA 2006 only when they were made public in the course of 13 October 2006 and after it had signed the SCA on 11 October 2006 and agreed to the stipulation on 12 October 2006.  But it is difficult for the Tribunal not to conclude that Tembec was aware of the increasing problems experienced by both Governments late in September of 2006 in seeking to implement the SLA 2006 and the TLA as drafted.  Its counsel, Mr. Feldman, was aware of these difficulties as was evidenced in his letter of 5 October 2006 to the CIT, quoted in ¶ 32 above, which letter the United States disclosed to the Tribunal on 13 October 2006.

57.    In this 13 October 2006 communication to the Tribunal, the United States submitted to this Tribunal a response to Tembec's submission of 6 October 2006.[39]

---

[37]    Exhibit E to the United States' submission to the Tribunal of 4 December 2006.

[38]    Exhibit G to the United States' submission to the Tribunal of 4 December 2006.

[39]    *See* ¶¶ 35-37 *supra.*

28

In that letter, the United States requested the Tribunal to reject Tembec's request to allocate the costs of the Tembec arbitration equally between the parties and to order Tembec to bear all costs and fees incurred by the United States in defending against Tembec's NAFTA Chapter Eleven claim. The United States argued, *inter alia*, that Tembec's NAFTA Chapter Eleven Claim was not among the claims terminated pursuant to the SCA. The United States also asserted that the document attached to Mr. Feldman's letter of 6 October 2006 to the Tribunal "labeled Annex 2A, Termination of Litigation Agreement, is not a true and correct copy of the Settlement of Claims Agreement which was concluded in connection with the Softwood Lumber Agreement," and that that "document was not counter-signed on behalf of the United States." The United States further contended that "Tembec's attempt to mislead the Tribunal by asserting that its claim was terminated pursuant to the Softwood Lumber Agreement, when the same claim was terminated nine months earlier, should not be countenanced . . ."

58.    Tembec reacted on 8 November 2006 by filing with the U.S. District Court for the District of Columbia a Notice of Reinstatement of Action or in the Alternative Rule 60(b) Motion to Set Aside Stipulation of Dismissal.[40] Tembec argued that "the stipulation of dismissal was subject to the terms of the SLA but that the terms of the SLA were changed without Tembec's agreement or knowledge." Tembec alternatively moved "for relief from the dismissal order pursuant to Rule 60(d) based on the United States' misrepresentation and misconduct regarding the applicable terms of the SLA."

59.    Having attempted in vain to organize a hearing on the issues that had arisen regarding the costs of arbitration in the course of November 2006, the Tribunal invited in its letter of 9 November 2006, *inter alia*, (i) Canfor, Tembec *et al.* and

---

[40]    Exhibit F to the United States' submission to the Tribunal of 4 December 2006. Exhibit A-2 to Tembec's submission to the Tribunal of 30 January 2007.

the United States to submit each a certified copy of the settlement agreement on which they rely, and (ii) counsel for Tembec *et al.* to submit any observations they may have on the United States' submission of 13 October 2006, by 16 November 2006.

60.     On 16 November 2006, the United States, also on behalf of Canfor, submitted (i) a final executed copy of the Softwood Lumber Agreement that was signed by Canada and the United States on 12 September 2006; (ii) a final executed copy of the Amendments to that Agreement signed on 12 October 2006; and (iii) the signature pages of Annex 2A (i.e., the SCA) to the 12 October 2006 Amendments, signed by all of the relevant parties on 11 or 12 October 2006, including by Mr. Feldman for Tembec. In the accompanying letter, the United States certified that "the attached [copies] collectively constitutes a true and correct copy of the Softwood Lumber Agreement."

61.     Also on 16 November 2006, Tembec submitted to the Tribunal its observations on the United States' submission of 13 October 2006, requesting that the Tribunal deny the United States' request to recover arbitration costs and fees from Tembec.

62.     The United States filed a response with the U.S. District Court to Tembec's motion to reinstate its setting aside proceeding on 22 November 2006.[41] The United States argued that its request for costs is fully within its rights because Tembec's NAFTA Chapter Eleven claim is not covered by the SCA's express terms. The United States also argued that the document on which Tembec relied, i.e., its 20 September revision of the TLA, was signed only by Tembec, whereas the controlling document is the final document signed by both Tembec and the United States, and that document is the SCA.

---

[41]     Exhibit A-3 to Tembec's submission to the Tribunal of 30 January 2007.

63.    Having been invited by the Tribunal to do so, the United States filed a response to Tembec's submission of 16 November 2006, on 4 December 2006, reiterating its request that full costs in defending against Tembec's NAFTA Chapter Eleven claim be awarded to the United States.  To this response, the United States attached a copy of Tembec's letter of 20 September 2006 to DFAIT and USTR, which Tembec itself had not previously submitted to the Tribunal.[42]

64.    Tembec filed a Reply Memorandum in support of its Notice of Reinstatement or, in the alternative, Motion under Rule 60(b) with the U.S. District Court for the District of Columbia also on 4 December 2006.[43]

65.    The United States' submission of 4 December 2006 led Tembec, by letter of 5 December 2006, to request the Tribunal for permission to file a response, to which the United States objected by letter of 6 December 2006, complaining of excessive rounds of correspondence on the subject.  The Tribunal granted Tembec's request by letter of 7 December 2006  to submit any observations it might have by 15 December 2006.

66.    Accordingly, Tembec submitted its observations on 15 December 2006, in which Tembec responded to the United States' assertion of "feign[ed] umbrage" ("Tembec is genuinely outraged") and the United States' reference to Tembec's CIT action; contended that the United States' other arguments were "self-contradictory;" and raised seven questions regarding the United States' position.

67.    Together with its submission of 15 December 2006, Tembec produced a copy of a letter dated 14 December 2006 from Ms. Andrea Lyon, Chief Trade Negotiator

---

[42]    *See* ¶26 *supra.*

[43]    Exhibit A to Tembec's submission to the Tribunal of 15 December 2006. Exhibit A-4 to Tembec's submission to the Tribunal of 30 January 2007.

North America of DFAIT, to Mr. James Lopez, President and CEO of Tembec, which reads as follows[44]:

> Dear Mr. Lopez:
>
> This letter is in response to your request of December 11, 2006, that the Government of Canada set out its understanding of the October 12, 2006 Softwood Lumber Agreement (the "Agreement"), in particular with respect to certain provisions of the Settlement of Claims Agreement ("SCA").
>
> The version of the Agreement signed on September 12, 2006 contemplated complete termination of all softwood lumber related litigation. The vehicle for terminating the litigation was the Termination of Litigation Agreement ("TLA"), incorporated into the Agreement as Annex 2A. Among other things, the TLA provided for the termination of listed actions without costs. In order to expedite entry into force of the Agreement, Canada and United States found it necessary to negotiate, amongst other things, revisions to the TLA, beginning October 4, 2006. The objective of the renegotiation of the TLA was to settle a sufficient number of claims to satisfy the United States that it had legal authority to revoke the duty orders on softwood lumber.
>
> In the negotiation of these revisions, the costs provision in the TLA (paragraph 5) was simply carried over to what became paragraph 8 in the SCA, albeit reflecting the change in name from TLA to SCA and changing the reference to "Covered Actions" to read "any action referenced in this Claims Settlement Agreement". Canada and the United States both recognized that the SCA would be signed by fewer parties than the TLA, but the United States never raised with Canada the suggestion that those parties who did sign the TLA should receive less favourable treatment under the SCA than they would have received under the TLA.
>
> In short, the replacement of the TLA with the SCA reflected the decision by Canada and the United States to seek to dismiss only those actions necessary for the United States to exercise its

---

[44]    Exhibit B to Tembec's submission to the Tribunal of 15 December 2006.

authority to revoke the anti-dumping and countervailing duty orders in order to permit entry-into-force of the Agreement. The renegotiation was not an attempt to modify the understanding reflected in the TLA that no costs would be sought for covered actions.

Paragraph 8 of the SCA provides that "No party to this Claims Settlement Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to any <u>action</u> referenced in this Claims Settlement Agreement". The consolidated NAFTA Chapter 11 proceeding is an <u>action</u> specifically listed in paragraph 1 of the SCA. In Canada's view, this was sufficient to ensure that no claim for costs would be made against any party in the consolidated proceeding, including Tembec.

The TLA included a specific reference to the Tembec Chapter 11 claim that was not carried over into the SCA. It was necessary in the TLA because, at the time the TLA was negotiated (May-June 2006), Tembec's NAFTA claim had not matured (or reverted) into an independent action, but there was a possibility that this would occur before the entry into force of the SLA 2006 as a result of the U.S. District Court proceeding where Tembec was seeking the re-establishment of the original NAFTA Tribunal. The inclusion of a stand-alone reference to Tembec's NAFTA claim in the TLA covered off that possibility. However, such a possibility disappeared when the U.S. District Court issued an indefinite stay order on September 24, 2006.

The absence of the separate Tembec reference in the SCA does not reflect a change in the terms of settlement for Tembec. Rather, it reflects a change in the status of the claim at the time the SCA was negotiated, that is, that it would not become an independent action prior to the intended date for entry-into-force of the revised Agreement on October 12, 2006. At no point in the negotiation of the SCA did the United States raise any suggestion that the SCA as redrafted should alter the terms of settlement for Tembec.

[emphasis as in original text]

68.    At the request of the Tribunal, both the United States and Tembec submitted chronologies on 22 December 2006.

33

69.    Having consulted the parties and being assured of their availability, the Tribunal determined in a letter dated 17 January 2007 that a hearing on the cost issues pending between Tembec and the United States would be held in Washington on 31 January 2007 (the "Costs Hearing").

70.    As anticipated in its letter of 17 January 2007 to the parties, the Tribunal submitted a list of questions to the parties by letter of 22 January 2007. The answers were provided by the United States on 29 January 2007 and by Tembec on 30 January 2007.

71.    On 30 January 2007, Tembec filed with the District Court for the District of Columbia in the reinstatement proceedings a "Memorandum of Points and Authorities in support of Motion for Leave to File Supplemental Brief," asserting to have discovered new information and correcting certain statements in Tembec's moving papers.[45] The new information is the letter of 14 December 2006 from Ms. Lyon to Mr. Lopez, quoted at ¶ 67 above, which shows, according to Tembec, that the "Government of Canada is now on record that Tembec's interpretation of the SLA and SCA is correct," as well as Terminal's notification of 22 January 2007, referred to at ¶ 80 below, which shows, according to Tembec, that the "United States appears to have singled out Tembec as the only NAFTA Chapter 11 claimant against whom it would seek to extract arbitration costs and fees, notwithstanding the terms and conditions of the SLA."[46]

---

[45]    Exhibit A-5 to Tembec's submission to the Tribunal of 30 January 2007.

[46]    The Tribunal takes notice of the Memorandum Opinion issued by the United States District Court for the District of Columbia in *Tembec Inc. et al v. United States of America* on 19 April 2007 (available online at: http://www.state.gov/documents/organization/83552.pdf). The Memorandum Opinion denied Tembec's motion to set aside its 12 October 2006 stipulation of dismissal previously described in ¶¶ 50, 51 and 58 *supra*. The Tribunal does not rely in any way upon the Memorandum Opinion of this separate and independent judicial body but does note that the reasoning contained therein is generally in keeping with that of the Tribunal in this Joint Order.

72.     Tembec and the United States, through their counsel, presented oral argument and responded to the Tribunal's inquiries at the Costs Hearing in Washington, D.C., the place of arbitration as agreed by the parties, on 31 January 2007.

73.     Pursuant to the Tribunal's directions given at the Costs Hearing, the United States submitted a Supplemental Submission on Costs dated 7 February 2007, claiming US$ 20,579.06 in legal fees during the period 22 September 2006 through 31 January 2007, as well as the Tribunal's expenses and administrative fees incurred from 22 September 2006 "through the date this proceeding is terminated with respect to Tembec's claim." The Submission of the United States was accompanied by further witness statements of Mr. Holobaugh, Ms. Menaker, and Ms. Reddy (see ¶ 14 above).

74.     Tembec also submitted a "Costs-on-Costs" Submission dated 7 February 2007, claiming US$ 101,052.50 as Tembec's costs of representation and US$ 2,019.36 in disbursements as of 13 October 2006.

75.     By an unsolicited letter dated 1 June 2007, Tembec wrote to the Tribunal: "Regardless of whether an action is referenced specifically in Annex 2A of the [SLA], all *Softwood Lumber* actions continue to be dismissed with no party bearing the fees or costs of any other," referring to the unopposed motions to dismiss their appeals in *Tembec Inc. et al. v. United States*,[47] filed by the United States and the Coalition for Fair Lumber Imports. Tembec argued: "Were this Tribunal to conclude that the United States' NAFTA Chapter 11 cost claim against Tembec is a Softwood Lumber action in which a cost award is appropriate, that decision would be conspicuously unique among the tens of different actions from the *Softwood Lumber* dispute now resolved."

---

[47]     U.S. Court of Appeals for the Federal Circuit, No. 2007-1102 and 2007-1111.

35

76.    Upon invitation by the Tribunal, the United States responded by letter of 18 June 2007, noting first that the Tribunal did not authorize Tembec's submission. The United States further argued that it is irrelevant that the parties in other softwood lumber-related cases have stipulated that they would not seek costs against one another.

77.    The Tribunal deliberated at various occasions, including deliberations in Washington, D.C.

C.    Withdrawal of Claims by Canfor and Terminal

78.    By letter dated 12 October 2006, Canfor, as contemplated by Paragraph 1 of the SCA (as quoted in ¶ 39 above), advised the Tribunal:

> Pursuant to a Settlement of Claims Agreement (a copy of which is attached) entered into between Canfor Corporation ("Canfor") and the United States of America, among others, in connection with the 2006 Softwood Lumber Agreement Canfor hereby withdraws its claim against the United States under NAFTA Chapter Eleven and requests that the Tribunal issue an order terminating the proceedings with respect to Canfor.

79.    On 3 November 2006, the United States wrote to the Tribunal:

> On behalf of respondent United States of America and in accordance with the Secretary's request, we write to confirm that we do not object to Canfor's withdrawal, by its letter of October 12, 2006, of its claim against the United States in this proceeding in accordance with Paragraph 1 of the Settlement of Claims Agreement (an executed copy of which is appended to the United States' letter to the Tribunal of October 13, 2006). The United States further confirms that, in accordance with Paragraph 8 of that agreement,[48] Canfor and the United States have agreed not to seek from the other party costs and expenses incurred in this proceeding.

---

[48]    Quoted at ¶ 41 *supra*.

80.    On 22 January 2007, Terminal notified the Tribunal:

> Further to my conversation with Mr. Flores, Terminal writes to notify the Tribunal that it has advised the United States that it wishes no longer to pursue its NAFTA Chapter Eleven claim. Accordingly, Terminal and the United States have agreed to terminate the Chapter Eleven proceedings with respect to Terminal, without costs to either party, and request that the Tribunal to issue an order to that effect.

81.    As noted in ¶ 40 above, Terminal's NAFTA Chapter Eleven claim was mentioned in the TLA but there was no reference to it in the SCA. Consequently, Terminal's claim was not subject to its terms. Subsequent to the conclusion of the SLA and the SCA, Terminal apparently decided independently not to pursue its claim further and thus submitted this letter of 22 January 2007 to the Tribunal requesting termination. In a letter of 18 June 2007, the United States confirmed that, as stated in Terminal's letter of 22 January 2007, the United States has agreed to terminate the proceedings with respect to Terminal, with each party bearing its own costs.

82.    In both cases, Canfor v. United States and Terminal v. United States, the parties agreed not to seek from the other party costs and expenses incurred in this proceeding. That is different for Tembec v. United States, to which matter the Tribunal will now turn.

**IV.    SUMMARY OF THE POSITIONS OF TEMBEC AND THE UNITED STATES AS TO COSTS**

    A.    Position of the United States

83.    The United States submits that Tembec should bear all of the United States' costs associated with defending against Tembec's claims, both in the *Tembec* Article 1120 arbitration and in the consolidation proceeding. According to the United States, by submitting its claim to arbitration, Tembec consented to all the procedures in the NAFTA Chapter Eleven, including the consolidation procedure

in Article 1126. The United States relies on NAFTA Article 1121(1);[49] Tembec's Notice of Arbitration of 3 December 2003 at ¶ 11;[50] and the Order of the Consolidation Tribunal of 7 September 2005 at ¶ 86.[51] The United States submits that "[b]ecause Tembec unilaterally abandoned its claim in the eleventh hour of this proceeding, Tembec should be deemed to be the unsuccessful party, and should bear all of the costs it imposed on the United States."[52]

84.   With respect to the *Tembec* Article 1120 arbitration, the United States claims an amount of costs of US\$ 125,086.71, comprising an advance deposit of US\$ 75,000 for arbitration expenses and US\$ 50,086.71 of legal fees of its in-house attorneys.

85.   In respect of the consolidation proceeding under Article 1126, the United States contends that all three Claimants[53] should bear the costs incurred by the United States in the consolidation proceeding between 7 March 2005 (the date on which the United States requested consolidation)[54] and 10 January 2006 (the date on which Tembec was permitted to withdraw from the proceeding"). The United States argues that the consolidation was decided in its favour; that this phase

---

[49]   Article 1121 ("Conditions Precedent to submission of a Claim to Arbitration") of the NAFTA provides in paragraph 1: "A disputing investor may submit a claim under Article 1116 to arbitration only if: (a) the investor consents to arbitration in accordance with the procedures set out in this Agreement; and (b) . . .'"

[50]   Tembec's Notice of Arbitration states at ¶ 11:"[Tembec] has consented to the submission of this claim to arbitration before a three arbitrator Tribunal appointed in accordance with the procedures set forth in NAFTA Chapter 11."

[51]   The Order of the Consolidation Tribunal states at ¶ 86: "[M]embers of an Article 1126 Tribunal are appointed by a neutral person, i.e., the Secretary-General of ICSID, a method to which all parties have consented as a result of Articles 1121 and 1123 of the NAFTA."

[52]   United States' Submission on Costs of 7 April 2006 at p. 4.

[53]   Having regard to the agreements subsequently made with Canfor and Terminal (*see* Section III.C *supra*), the Tribunal understands the reference to the three Claimants to have become a reference to Tembec insofar as costs incurred by the United States are attributable to Tembec.

[54]   The Tribunal has decided upon 6 May 2005 (the date of the constitution of the Tribunal) rather than 7 March 2005 as the start date for the accounting for the costs of the Tribunal and ICSID because neither the Tribunal nor ICSID incurred any costs before that date. *See also* the Tribunal's Costs Chart at ¶ 176 *infra.*

included a challenge by Claimants to the appointment of one of the Tribunal members, which was decided by the Secretary-General of ICSID in favour of the United States and against Claimants; and the unscheduled submission by Tembec of a "Motion to Dismiss" of 27 June 2005, to which the United States was required to respond separately on 12 July 2005, and which was decided in favour of the United States in the Consolidation Order at ¶ 226. The United States claims that the total costs for this phase of the consolidation proceeding were US$ 122,164.73, comprising an advance deposit to ICSID of US$ 50,000 and legal fees of its in-house attorneys of US$ 72,164.73.[55] The United States also requests an allocation of a portion of the advance it paid on 29 December 2005 (i.e., US$ 300,000) in light of the Tribunal's statement in its letter of 29 December 2005 that the requested amount covered outstanding costs of the Tribunal as well as future costs.[56]

86.    As mentioned in ¶ 73 above, the United States also claims US$ 20,579.06 in legal fees during the period 22 September 2006 through 31 January 2007, as well as the Tribunal's expenses and administrative fees incurred from 22 September 2006 "through the date this proceeding is terminated with respect to Tembec's claim."

87.    With respect to the agreement on costs as alleged by Tembec, the United States contends that Tembec's representation is incorrect. According to the United States, the 2006 Softwood Lumber Agreement was finalized and came into effect as of 12 October 2006; Tembec's NAFTA Chapter Eleven claim, however, was not among the claims that were terminated pursuant to the Softwood Lumber Agreement.[57]

---

[55]    United States' Submission on Costs of 7 April 2006 at p. 5.

[56]    United States' Submission on Costs of 7 April 2006 at p. 6 n. 11.

[57]    United States' submission of 13 October 2006; *see also* ¶ 57 *supra.*

88. With respect to Tembec's submission of 16 November 2006, the United States responds in its submission of 4 December 2006:

   (a) Tembec's representation that the United States itself created the 20 September documents and that Tembec merely signed and returned them, is false because of the changes that Tembec unilaterally made to the form of the TLA sent by the Governments of Canada and the United States to Tembec on 8 September 2006 for the sole purpose of execution by Tembec of counterpart signature pages. Tembec's 20 September documents can at best be considered as eighteen separate counteroffers.

   (b) It is undisputed that the United States never signed Tembec's 20 September documents and that the TLA never came into force.

   (c) Tembec could not have reasonably believed that the SCA "supplemented" the TLA. The SCA was irreconcilable with the TLA in numerous respects. Moreover, the SCA did not state that it supplemented or amended the TLA, while the TLA provided at ¶ 9 that it "may not be altered, amended, modified, or otherwise changed other than through the written agreement of all parties hereto." Furthermore, Article XI of the SLA 2006 Amendments stipulated that "Annex 2A [i.e., the TLA] shall be deleted and replaced . . ." [58] and not that it shall be "supplemented."

   (d) Tembec's contention that it was stonewalled, when it supposedly demanded an explanation for the SCA, is not credible. Tembec's letter of 11 October 2006 does not reveal concerns with the SCA other than a single "very very modest[]" edit Tembec requested that was not accepted. Tembec's letter

---

[58] *See* ¶ 54 *supra.*

40

evidences that it had detailed discussions with Government of Canada representatives after receiving the SCA from Canada.

(e)    Tembec's failure to file any document in this arbitration regarding its contentions in respect of costs on or before 12 October 2006 betrays Tembec's understanding that there was no agreement with respect to its already-dismissed claim. Had Tembec truly believed that it had reached an agreement with the United States under the TLA concerning its Chapter Eleven claim, it would have contacted the United States to discuss the form and substance of the submission to be filed with this Tribunal contemporaneously with the entry into force of the SLA, but Tembec never contacted the United States (either directly or through the Government of Canada, Tembec's point of contact in the negotiations), nor filed any document in the arbitration.

(f)    Tembec's statement in its 6 October letter that an "agreement" had been reached with the United States regarding its claim in this arbitration, based on the eighteen documents it sent to the governments on 20 September, and its continued reliance on that point, are in sharp contrast to its representations before the CIT.

(g)    The United States does not base its request for costs solely, or even primarily, on the outcome of the consolidation dispute. Rather, the United States is entitled to costs because Tembec abandoned its claim on the eve of the jurisdictional hearing. Tembec is therefore the "unsuccessful party" under the UNCITRAL Arbitration Rules that Tembec chose to govern the arbitration (Article 40(1) of the UNCITRAL Rules). Awarding costs in favour of the United States under the circumstances is not only fair, but failing to do so would open the door to abusive tactics by future Chapter Eleven claimants.

41

(h)   The United States did not "abandon" Tembec's Article 1120 claim when it sought consolidation.

(i)   The consolidation dispute did not raise novel legal issues warranting an equal apportionment of costs.

(j)   Finally, Tembec's accounting of the costs sought by the United States is erroneous.

89.   The United States' answers to the Tribunal's questions of 22 January 2007 (*see also* ¶ 70 above) as well as the arguments it presented at the Costs Hearing are addressed directly or indirectly in the Tribunal analysis in Chapter V below.

B.    Position of Tembec

90.   Tembec contends that any allocation of arbitration costs and expenses should be governed by the agreement between Tembec and the United States evidenced by Annex 2A to the SLA 2006, "which demonstrates the intent of the two parties that neither party shall seek to recover its costs and expenses from the other party."[59]

91.   Accordingly, Tembec argues, the Tribunal should make no award of costs for expenses under UNCITRAL Rules: Article 38(c), cost of expert advice; 38(d), travel and other expenses of witnesses; or 38(e), reasonable costs for legal representation.[60]

92.   With respect to Article: 38(a), fees of the arbitral tribunal; 38(b), travel and other expenses incurred by the arbitrators; and 38(f), expenses of the appointing authority, Tembec asserts that Tembec and the United States each should bear their own respective shares of those costs during the proceedings until 7 December

---

[59]   Tembec's submission of 6 October 2006 at p. 2. *See also* ¶ 35 *supra.*
[60]   *Id.*

42

2005. Tembec contends that those costs should be divided by the parties with 50% to be paid by the United States and 50% to be divided evenly among the three Claimants, "as proposed by the Tribunal in its letter of November 22, 2005." Tembec adds that the costs should be offset by the US$ 50,000 advance deposits paid by each of the parties. [61]

93.    Tembec also argues that it should have no liability for any costs or expenses after 7 December 2005 when it notified all parties to the proceedings that it had removed its claim from the consolidated proceedings and had begun proceedings in the U.S. District Court for the District of Columbia to vacate the Consolidation Order of 7 September 2005. Tembec contends that, to the extent that there were any costs under Article 38(a), (b) or (f) associated with Tembec after 7 December 2005, "those costs were incurred by the United States to protest to the Tribunal that Tembec should not be allowed to remove its claim from the proceedings when it already had done so." [62]

94.    In response to the United States' assertions in its letter of 13 October 2006, Tembec states that: "For the United States to assert that Tembec did not provide a 'true and correct copy' of settlement terms on October 6 is a shameful misrepresentation, an act of bad faith," arguing that the document that the United States claims is a "true and fully executed copy of the Settlement of Claims Agreement dated October 12, 2006" had not been provided to Tembec, even in draft form, until 11 October 2006, five days after Tembec's submission to the Tribunal. [63]

---

[61]    *Id.*

[62]    Tembec's submission of 6 October 2006 at pp. 2-3.

[63]    Tembec's submission of 16 November 2006 at p. 2.

95.     As regards the SCA, "which does not make specific reference to Tembec's NAFTA Chapter 11 Claim," Tembec asserts that when Canada and the United States presented Tembec with that document on 11 October 2006 and demanded Tembec to sign it the same day, Tembec "reasonably believed that the document was supplemental to, and not in place of, the earlier Termination of Litigation Agreements."[64]

96.     Tembec further alleges that when Canada and the United States announced the 19 pages of amendments to the SLA 2006 on 12 October 2006, which includes the amendments quoted at ¶ 53-54 above, they had not consulted with or obtained the agreement of Tembec. [65]

97.     Tembec further asserts that regardless whether there ever was a "meeting of the minds" between Tembec and the United States not to seek fees and costs from each other with respect to the NAFTA Chapter Eleven arbitration, the Tribunal should deny the United States' request as it "comes to its claim with unclean hands," as "it has acted in bad faith by its 'bait and switch' of the SLA documents that it required Tembec to sign and by its misrepresentation to this Tribunal about the veracity of Tembec's October 6 submission." [66]

98.     With respect to the merits of the United States' claim, Tembec argues that the United States appears to expect costs and fees on a theory of being the prevailing party on consolidation, but the United States has not necessarily prevailed on the issue as Tembec has moved in the U.S. District Court to reinstate its motion to vacate the Consolidation Order.  Tembec states that "The most prudent action for

---

[64]     *Id.* at p. 3.

[65]     *Id.* at p. 3.

[66]     *Id.* at p. 5.

44

this Tribunal under the circumstances would be for the Tribunal to leave the parties where they are and forego ruling on this issue." [67]

99.     Tembec then submits that even were the Tribunal to decide that the United States was the prevailing party as to consolidation, it still would be inappropriate to require Tembec to pay the United States' arbitration costs, let alone its legal fees. According to Tembec, while the United States had repeatedly represented that it did not plan consolidation and Tembec and the United States had already argued the issue of jurisdiction before an Article 1120 tribunal, the United States and not Tembec moved for consolidation. [68]

100.    Tembec also contends that most of the deposit of US$ 75,000 for the Article 1120 arbitration went unused[69] and that Tembec should not be forced to pay for a jurisdictional briefing on a motion that was never resolved as to Tembec.[70]

101.    Tembec further contends that it should not be punished for exercising its NAFTA right to file and pursue a Chapter Eleven claim, and should not be compelled to finance its opponents' procedural motions for its opponents' unique interests.[71]

102.    Finally, Tembec submits that the nature of the consolidation action further counsels against reallocation of fees and costs, even were the Tribunal to conclude that the United States was the prevailing party, arguing that consolidation under

---

[67]     *Id*. at p. 5.

[68]     *Id*. at pp. 5-6

[69]     ICSID refunded Tembec and the United States part of the advances. *See* ¶¶ 156 and 163 *infra*.

[70]     *Id*. at p. 6.

[71]     *Id*. at p. 6-7.

45

NAFTA Article 1126 presented novel legal issues that had been treated only once before.[72]

103.    In response to the United States' submission of 4 December 2006, Tembec contends in its submission of 15 December 2006, relying in particular on the letter dated 14 December 2006 by Ms. Lyon (quoted at ¶ 67 above):

(a)    The United States is unable to deny that it: altered the Settlement of Claims Agreement signed by Tembec by adding the words "Annex 2A;" never objected to Tembec's TLA prior to 13 October 2006; never responded to Tembec's 6 October 2006 letter prior to 13 October 2006; never informed Tembec that the SCA would replace the TLA or that the TLA would become irrelevant by 13 October 2006; changed the terms of the SLA 2006 after it obtained Tembec's stipulation of dismissal in the D.C. District Court case subject to the terms of the SLA 2006; and did not inform Tembec that it changed the SLA terms before filing the joint dismissal.

(b)    The United States' arguments in reference to Tembec's CIT action are irrelevant to whether the United States may recover costs and fees for Tembec's NAFTA Chapter Eleven arbitration. Any grievance the United States might have against Tembec in the CIT action should be argued before the CIT, not before this Tribunal.

(c)    The United States' assertion regarding Tembec's failure to file any document regarding its claim on or before 12 October 2006 is denied. In Tembec's submission of 6 October 2006, Tembec stated: "Pursuant to the terms of the Termination Agreement, upon the SLA's entry into force, Tembec and the United States will have terminated their litigation as to

---

[72]    *Id.* at p. 7-8.

Tembec's NAFTA Chapter 11 claim and the related lawsuit in D.C. District Court."

(d)  As to the point about Tembec's "already-dismissed claim," all parties to the arbitration knew that Tembec was pursuing legal action in the U.S. courts in furtherance of Tembec's NAFTA Chapter Eleven claim, and that when this Tribunal terminated the arbitration proceedings as to Tembec, it did not dismiss "with prejudice" as the United States had demanded.

(e)  The TLA's language, stating that the "Agreement may not be altered, amended, modified, or otherwise changed other than through the written agreement of all parties hereto" supports Tembec's interpretation that the SCA had to be supplemental instead of a replacement.

(f)  Tembec's participation in the jurisdictional hearing would have increased costs for the United States.

(g)  The United States motive for recovery is retribution for Tembec's challenge of the Consolidation Order.

(h)  The United States is looking for fees and costs associated primarily with the Article 1120 proceeding.

(i)  The Tribunal should award Tembec its costs and fees with respect to the United States' request for costs, and if the Tribunal does so, it should allow Tembec to submit evidence establishing the amount to be awarded.

104.  As mentioned in ¶ 74 above, Tembec also submitted a "Costs-on-Costs" Submission dated 7 February 2007, claiming US$ 101,052.50 as Tembec's costs of representation and US$ 2,019.36 in disbursements as of 13 October 2006.

105.    Tembec's answers to the Tribunal questions of 22 January 2007 (*see also* ¶ 70 above) as well as the arguments it presented at the Costs Hearing are addressed directly or indirectly in the Tribunal analysis in Chapter V below.

## V.    ANALYSIS BY THE TRIBUNAL OF THE POSITIONS OF TEMBEC AND THE UNITED STATES AS TO COSTS

### A.    Introduction

106.    In the analysis below, the Tribunal has not only considered the positions of Tembec and the United States as summarized in the preceding Chapter but also their numerous detailed arguments in support of those positions and in their responses to the questions of the Tribunal. To the extent that these arguments are not referred to expressly, they must be deemed to be subsumed in the analysis.

### B.    Jurisdiction

107.    The jurisdiction of this Tribunal to decide over the cost claims of the United States and Tembec arises out of Articles 38-40 of the applicable UNCITRAL Arbitration Rules.[73] Jurisdiction over claims for costs was retained in the Tribunal's Termination Order with respect to Tembec of 10 January 2006.[74] Tembec's objection to this Tribunal's jurisdiction was previously rejected in the Tribunal's Consolidation Order of 7 September 2005.[75]

108.    Tembec, therefore, is incorrect when it argues that the "matter, whether the United States can claim costs and fees from Tembec, arises from the SLA, specifically from the Settlement of Claims Agreement that amended the SLA."[76] The matter arises from the provisions of Chapter Eleven of the NAFTA, and in particular from

---

[73]    Reproduced under Chapter II *supra.*

[74]    At ¶ 2, reproduced at ¶ 11 *supra.*

[75]    *See* ¶¶ 6-8 *supra.*

[76]    Tr. p. 56 at 21-22 and 57 at 1.

48

Article 1126 that, in turn, refers to the UNCITRAL Arbitration Rules. Those Rules contain provisions concerning the costs of the arbitration in Articles 38-40.[77] That matter is certainly within the jurisdiction of the present Tribunal.

109.   Tembec also denies that the present Tribunal has jurisdiction over disputes arising out of the SLA and the Annexes to it (i.e., the TLA and its replacement, the SCA).[78] Tembec further contends that the letter by Ms. Lyon of 14 December 2006[79] is Canada's official statement of the intent of the State Parties to the SLA – Canada and the United States – with respect to the termination of litigation in connection with the implementation of that agreement.[80] Tembec asserts that the letter also means that the issue of costs is a matter of an international agreement, and that that agreement has its own mechanism for settling disagreements between the parties who negotiated it.

110.   Tembec is correct that Article XIV of the SLA contains its own dispute resolution mechanism.[81] However, Tembec's contentions denying jurisdiction of this Tribunal in relation to costs of the proceedings are irrelevant since the question before this Tribunal is whether Tembec and the United States have made an agreement on the costs of the present proceedings in the form of an annex to the SLA. Although initially the TLA, and subsequently the SCA, forms an integral part of the SLA,[82] as it will be seen below, the TLA purported to be, and the SCA

---

[77]   Quoted in Chapter II *supra*.

[78]   Tembec's answer to Question 1 of 30 January 2007.

[79]   *See ¶ 67 supra.*

[80]   Tembec's answer to Question 4 of 30 January 2007.

[81]   Article XIV of the SLA is reproduced online at: http://www.international.gc.ca/eicb/softwood/pdfs/SLA-en.pdf.

[82]   Article XI(3) of the SLA provides: "The Annexes are an integral part of the SLA 2006. No Person may assert any rights under the SLA 2006." The word "Person" is defined Article XIX(42) as: "a natural person, sole proprietorship, partnership, corporation, union, or association."

is, not simply an agreement between two States, but rather an agreement between the United States, Canada and, *inter alia*, Tembec.

111.    With respect to Ms. Lyon's letter of 14 December 2006, that is a letter by a Canadian Government official to the CEO of a Canadian corporation. The Tribunal does not regard it as "Canada's official statement of the intent of the parties to the SLA – the United States and Canada – with respect to the termination of litigation in connection with the implementation of that agreement" or as evidence under Article 31(4) of the Vienna Convention on the Law of Treaties of 1969, as it is contended by Tembec.[83] Nor does the letter qualify as a supplementary means of interpretation pursuant to Article 32 of the Vienna Convention.[84] The 14 December 2006 letter does not purport to be a submission by Canada under Article 1128 of the NAFTA either, as it is correctly pointed out by the United States.[85] At best, the letter is an untested witness statement that was not subject to cross-examination by the other State Party to the SLA, the United States. The Tribunal further notes that the United States chief negotiator with respect to the TLA and SCA, Mr. Jeff Weiss of USTR's Office of General Counsel (who attended the Costs Hearing), according to the United States' submission, which was not contested by Tembec, does not recall having had any discussions

---

[83]    Tembec's answer to Tribunal Question 4 of 31 January 2007. Article 31(4) of the Vienna Convention provides: "A special meaning shall be given to a term if it is established that the parties so intended." As mentioned in the Consolidation Order, n. 2 *supra*, at ¶ 59, while the 1969 Vienna Convention is not in force among the three NAFTA State Parties (the United States has never ratified it), Articles 31 and 32 are regarded as reflective of established customary international law.

[84]    Tr. pp. 154-160. Article 32 of the Vienna Convention provides: "Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31: (*a*) leaves the meaning ambiguous or obscure; or (*b*) leads to a result which is manifestly absurd or unreasonable."

[85]    Article 1128 (Participation by a Party) of the NAFTA provides: "On written notice to the disputing parties, a Party may make submissions to a Tribunal on a question of interpretation of this Agreement." *See* Tr. p. 142.

with Ms. Lyon regarding the TLA or SCA and that all discussions between Canada and the United States regarding the TLA and SCA appear to have been handled on Canada's side by lawyers from Canada's Trade Law Bureau.[86]

C.      The Alleged Agreement on the Costs of Arbitration

112.    Tembec asserts that it has agreed with the United States in respect of Tembec's NAFTA Chapter Eleven claim that each party bears its own costs and that the fees and disbursements of the Arbitral Tribunal and expenses of the administering authority are to be equally divided between the Tembec and the United States. Tembec bases that assertion on the provision in the TLA (8 September 2006), reading: "No party to this Termination Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to the Covered Actions,"[87] or at least on the "no costs no fees" provision in Tembec's version of the TLA (20 September 2006) in which the plural "Covered Actions" is set forth in the singular "Covered Action."[88]   Tembec further bases the assertion on the provision in the SCA (11-12 October 2006), reading: "No party to this Claims Settlement Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to any action referenced in this Claims Settlement Agreement."[89]   There being no reference to Tembec's NAFTA Chapter Eleven claim in the SCA, the United States denies that an agreement as contended by Tembec has been entered into.

113.    The Tribunal concludes that no agreement was reached between Tembec and the United States regarding the costs of Tembec's NAFTA Chapter Eleven claim, as contended by Tembec, for the following reasons.

---

[86]    United States' answer to Question 4 of 29 January 2007. *See also* at ¶ 135 *infra*.

[87]    *See* ¶ 20 *supra*.

[88]    *See* ¶ 26 *supra*.

[89]    *See* ¶ 41 *supra*.

114.    The Tribunal has to start its analysis with the TLA as submitted by Canada and the United States to Tembec (and others) on 8 September 2006. That version of the TLA included both Tembec's NAFTA Chapter Eleven claim and a "no costs no fees" provision. However, neither Tembec nor the United States signed that version of the TLA. By the terms of the TLA, signature was required "[a]s evidence of their consent to this Termination Agreement."[90]  Failing any convincing evidence of consent to the TLA of 8 September 2006 by either Tembec or the United States, it must be concluded that it has not become legally binding on Tembec and the United States.

115.    The next version of the TLA is the one prepared and signed by Tembec and submitted to Canada and the United States on 20 September 2006. That version of the TLA also included both Tembec's NAFTA Chapter Eleven claim and a "no costs no fees" provision. At the Costs Hearing on 31 January 2007, Mr. Feldman explained the reason why he was obliged to amend the format of the TLA. The 8 September version mentioned beneath his signature block a number of his clients. Several of them could not agree to the 8 September version. As a consequence, it would have been unethical for Mr. Feldman to execute the 8 September version of the TLA.[91]  In that respect, the Tribunal finds Mr. Feldman's ethical conduct commendable.    Nonetheless, the 20 September version deviated from the 8 September version in various respects,[92] while the cover letter from the two Governments of 8 September 2006 did not contemplate any changes to the text of the TLA. All that was asked for was the execution of the counterpart signature pages and their return. And that Tembec did not do.

---

[90]    TLA of 8 September 2006, at ¶ 11 ("As evidence of their consent to this Termination Agreement, the parties, through their duly-authorized Representatives, have signed below with respect to each of the actions to which they are a party.")

[91]    Tr. p. 95 and p. 102. *See also* Tembec's answer to Question 7 of 30 January 2007.

[92]    *See* ¶ 26 *supra*.

116.   Moreover, the 20 September version was never signed by the United States. Here again, by the terms of the 20 September TLA, signature was required "[a]s evidence of their consent to this Termination Agreement."[93] Nor has Tembec been able to produce any evidence that the United States has consented to the 20 September version in any other manner. At best, therefore, the 20 September version constituted a counteroffer that has not been accepted by the United States. Failing any convincing evidence of United States consent to the TLA of 20 September 2006, it must be concluded that that document never became legally binding on Tembec or on the United States either.

117.   In this connection, the Tribunal is troubled by the manner in which Tembec presented the TLA to the Tribunal through its letter of 6 October 2006. That letter opened with the announcement: "As explained below, any allocation of arbitration costs and expenses should be governed by a recent agreement between Tembec and the United States . . ."[94] While the letter mentioned later on that the signature of the United States has not been provided but was expected, Tembec did not mention that the documents attached to the letter of 20 September 2006 were not a copy of the TLA of 8 September 2006 nor did Tembec attach a copy of, or even mention, the cover letter of 20 September 2006 transmitting Tembec's version of the TLA to the Governments of Canada and the United States. The letter of Tembec's counsel of 6 October 2006 to this Tribunal is also in sharp contrast to his letter of 5 October 2006 to the CIT.[95] The United States, therefore, is justified

---

[93]   TLA of 20 September 206, at ¶ 11 ("As evidence of their consent to this Termination Agreement, the parties, through their duly-authorized Representatives, have signed below.")

[94]   *See* ¶ 35 *supra.*

[95]   *See* ¶ 37 *supra.* Tembec's answer of 30 January 2007 to Question 9, inquiring about the differences between the letters of 5 and 6 October, is, in the Tribunal's view, not helpful. Tembec relies on the press release of the Canadian Government of 29 September 2006 (*see* ¶ 31 *supra*), but omits to mention the status report of Canada and the United States of 6 October 2006 to the CIT (*see* ¶ 38 *supra*). Nor does Tembec's answer to Question 27 advance the matter any further.

when it complains about Tembec's letter of 6 October 2006 as being less than forthcoming.

118. Contrary to the TLAs of 8 and 20 September, the SCA was signed by both Tembec and the United States. They did so on 11 – 12 October 2006. As recalled above, the SCA contains a "no costs no fees" provision, but does not mention Tembec's NAFTA Chapter Eleven claim.

119. Tembec asserts that the document presented by the United States to this Tribunal on 13 October 2006 is not a "true" copy of the SCA executed by Tembec because it is labeled "Annex 2A" at the top, while the version signed and returned by it on 11 October 2006 did not have such label.[96] However, contrary to the documents submitted by Tembec on 6 October 2006, which differed in substance from the TLA submitted by Canada and the United States on 8 September 2006, the copy of the SCA submitted by the United States to this Tribunal on 13 October 2006 appears to have a content that is identical to the one signed and returned by Mr. Feldman on Tembec's behalf on 11 October 2006. The SCA provided that it could be executed in counterparts.[97] Tembec's contention that: "Where there is a dispute over authenticity, only the documents submitted by Tembec would qualify"[98] must be rejected in light of the foregoing and the considerations in ¶ 117 above. Furthermore, for reasons given below, Tembec should have, and in any event could have, known as of 11 October 2006 that the SCA would replace the TLA and, as a consequence, also replace the TLA in Annex 2A to the SLA as amended.

120. Tembec contends that it has been misled by the United States by a "bait and switch" scheme. Tembec also asserts that it "was induced in signing the SCA

---

[96]    Tembec's submission of 16 November 2006 at fn. 4.

[97]    At ¶ 14.

[98]    Tembec's submission of 16 November 2006 at p. 3.

54

through misrepresentation by the United States."[99] Tembec further contends that "Tembec's signature on the SCA also was obtained through undue influence, duress, and coercion."[100] Tembec then argues that the SCA supplements the TLA rather than replacing it.  All these arguments are to no avail for Tembec if one looks at what actually happened on and around 11 October 2006, which is set out in detail in ¶¶ 39-51 above.  In short:

(a)   Tembec negotiated with the Government of Canada and not the Government of the United States (except for the text of the Joint Stipulation of Dismissal) because in the negotiations between Canada and the United States concerning the SLA and its Annexes (including first the TLA and subsequently the SCA), the Government of Canada represented, *inter alia*, the interests of the Canadian softwood lumber producers, amongst which was included Tembec;[101]

(b)   Tembec had already indicated to the Government of Canada their willingness "to have this document [i.e., the SCA] signed on their behalf;"[102]

(c)   Canada's outside counsel in Washington (Ms. Anderson) offered Tembec's outside counsel in Washington (Mr. Feldman) to call her "with any questions" that he may have;[103]

---

[99]   Tembec's answer to Question 11 of 30 January 2007.

[100]   *Id.*

[101]   Tr. p. 45. *See also* Tembec's answers to Questions 6, 7 and 8 of 30 January 2007.  United States' answer to Question 8 of 29 January 2007.  Tembec was also aware of the increasing problems experienced by both Governments late in September of 2006 in seeking to implement the SLA 2006 and the TLA as drafted, *see* ¶ 56 *supra*.

[102]   *See* ¶ 44 *supra*.

[103]   *See* ¶ 47 *supra*.

(d)    Mr. Feldman appears to have had contact with Ms. Anderson during the evening of 11 October;[104]

(e)    Mr. Feldman appears also to have had contact with his clients during the evening of 11 October;[105]

(f)    Mr. Feldman acknowledged to Canada's outside counsel that he knew about "the statements from the Government beginning last Friday that termination of litigation agreements no longer would be applicable to entry into force, recognizing that many had not been submitted and now may not be required pursuant to new but undisclosed amendments;"[106]

(g)    Mr. Feldman further appears to have been able to study the SCA and to comment on it during the evening of 11 October;  actually, he had proposed that "paragraph 6 be modified, very very modestly . . ."[107] and he stated in some detail the reasoning therefor.

121.    A cursory comparison between the 8 and 20 September versions of the TLA, on the one hand, and the SCA, on the other, reveals that the SCA does not supplement the TLA but rather replaces the TLA.  As it is rightly pointed out by the United States,[108] under the TLA all of the cases that were referenced therein were to be terminated.  Under the SCA, only a few of those same cases were to be terminated,

---

[104]    Tr. p. 72.  If Ms. Anderson had answered, as Mr. Feldman declared: "I don't know.  I would have to call Ottawa, and it's rather late," and Mr. Feldman was dissatisfied with that answer, Mr. Feldman should have refused to sign the SCA.  Mr. Feldman later stated at the hearing: "And I believe that [during] the interval she [Ms. Anderson] was on the phone with the folks in Vancouver."  Tr. p. 88 at 11-13.  It seems that Mr. Feldman was also in contact with a "confidential Canadian source" that evening (*see* ¶ 127 *infra*).  The cover letter of 11 October 2006 from Mr. Feldman shows that substantive aspects of the SCA were discussed (*see* ¶ 49 *supra*).

[105]    Tr. p. 82 at 21-22 and p. 83 at 1-2.

[106]    *See* ¶ 45 *supra*.

[107]    *See* ¶ 49 *supra*.

[108]    Tr. pp. 38-39.

while others were subject to a joint motion to dismiss, and again others were not to be terminated at all. Thus, the same cases were treated differently in the TLA and the SCA. An example in point is Canfor's case, which is mentioned in both documents. If the documents supplemented each other, there would be no need to mention Canfor's case twice.

122.    In addition, Tembec's 20 September version of the TLA contained an additional condition that the Government of Canada should pay Tembec within 60 days.[109] Tembec contends that the condition is "based on verbal assurances from Canada at Cabinet level" and that Canada in fact paid Tembec within eighteen days of the entry into force of the SLA. Tembec argues that that commitment did not affect the United States.[110] The Tribunal notes that, while sent to both Canada and the United States, the 20 September version of the TLA, prepared by Tembec, provides for signatures by Tembec and the United States only, and not Canada.

123.    Furthermore, the TLA provided: "This Termination Agreement may not be altered, amended, modified, or otherwise changed other than through the written agreement of all parties hereto."[111] That being the case, if the TLA was legally binding and if the SCA supplemented the TLA, the SCA would have stated that it altered, amended, modified, or otherwise changed the TLA. Such a provision was absent from the SCA. For this reason too, and contrary to what Tembec argues, Tembec had no basis to assume that the SCA supplemented the TLA rather than "deleting and replacing" it as expressly specified in the SLA 2006 Amendments.

124.    Importantly, Tembec would and should have noted that its NAFTA Chapter Eleven claim was no longer mentioned in the SCA. Supported by certain

---

[109]    *See* ¶ 26 *supra.*

[110]    Tembec's answer to Question 7 of 30 January 2007 and its Reply Memorandum in support of its Notice of Reinstatement or, in the alternative, Motion under Rule 60(b) at p. 18.

[111]    TLA at ¶ 10; Tembec's TLA, ¶ 25 *supra,* at ¶ 9.

observations in Ms. Lyon's letter of 14 December 2006, Tembec now argues that the reference to the set aside action before the U.S. District Court for the District of Columbia covered Tembec's NAFTA Chapter Eleven claim because the "possibility [of a re-establishment of the original NAFTA Tribunal] disappeared when the U.S. District Court issued an indefinite stay order on September 24, 2006."[112]    That argument is unpersuasive since an indefinite stay of court proceedings does not mean that a case is dismissed.  The distinction is also shown in the present case where, by a separate step, Tembec and the United States filed a joint stipulation of dismissal with the U.S. District Court for the District of Columbia.[113]  Moreover, irrespective of the distinction between an indefinite stay and a dismissal, a U.S. District Court does not re-establish an arbitral tribunal; it may decide on the setting aside of an order or an arbitral award, which is a different matter.  Tembec itself also made the latter distinction at the time.  In its letter of 6 October 2006 to this Tribunal (i.e., well after the stay order of 24 September 2006), it mentioned specifically: "We signed the Termination Agreement on Tembec's behalf for *both actions* . . ." (emphasis added),[114] to which letter were attached two separate forms of Tembec's version of the TLA, one concerning the setting aside action before the District Court, and the other concerning Tembec's NAFTA Chapter Eleven claim.[115]

125.    For the same reason, Ms. Lyon's argument in her letter of 14 December 2006, adopted by Tembec,[116] that the word "action" in the reference to Canfor's NAFTA Chapter Eleven claim in the SCA covered Tembec's NAFTA Chapter Eleven claim must fail.  The reference is very specific in that it concerns the consolidated

---

[112]    *See* ¶ 67 *supra.*

[113]    *See* ¶¶ 50-51 *supra.*

[114]    *See* ¶ 35 *supra.*

[115]    *See* ¶ 37 *supra.*

[116]    Tembec's answer to Question 18 of 30 January 2007.

proceedings of *Canfor v. the United States* and *Terminal v. the United States*.[117] There is no reference to Tembec, which, in contrast, is specifically mentioned in the same paragraph in connection with the set aside action before the U.S. District Court for the District of Columbia.

126.    Moreover, if the SCA were to supplement the TLA, Tembec itself would surely have inquired as to the status of the signature by the United States to the TLA prior to indicating its willingness to have the SCA signed on its behalf. Such an inquiry would certainly have ensued when its outside counsel received the SCA on 11 October. That is in particular so since, in its letter of 6 October 2006, Tembec represented to this Tribunal that "all indications are that the United States will sign in furtherance of implementing the SLA."[118] As mentioned before, signature of the TLA was required "[a]s evidence of their consent to this Termination Agreement."[119] In contrast, there is no indication in the record that Tembec even made an attempt to ascertain whether the United States had signed the TLA. It, therefore, must be inferred that, at the time, Tembec too was of the view that the SCA replaced the TLA and, in any event, that either version of the TLA had not acquired the status of a legally binding agreement. It may be added that Ms. Lyon in her letter of 14 December 2006 also refers to "the replacement of the TLA with the SCA"[120] rather than a supplementing of the TLA by the SCA, as Tembec argues.

127.    Tembec claims to have had a conversation with a "confidential Canadian source asking for confidentiality" on the evening of 11 October 2006. The source allegedly indicated, *inter alia*, that "the Governments could not satisfy the TLA

---

[117]    *See* ¶ 39 *supra.*
[118]    *See* ¶ 35 *supra.*
[119]    *See* ¶¶ 114-115 *supra.*
[120]    *See* ¶ 67 *supra.*

condition precedent for entry into force of the SLA and would take other action enabling entry into force, including a possible substitution of the SCA [*sic*]."[121] The Tribunal is in no position to verify the veracity of what the undisclosed confidential Canadian source said. In any event, if the statement is correct, it would have been yet another reason for Tembec to inquire about the status of the TLA. Moreover, the alleged communication shows that matters relating to the SLA, TLA and SCA were treated by the Government of Canada, and not by the Government of the United States, insofar as Canadian subjects were concerned.

128. At the Costs Hearing on 31 January 2007, the United States stated that the reference to Tembec's NAFTA Chapter Eleven claim in the TLA submitted to Tembec (Mr. Feldman) on 8 September 2006, was "in error," although "[i]t had no legal effect whatsoever".[122] The United States further stated that it "never occurred to the United States that its absence would not be noticed."[123] The United States adds that "[t]here was no trickery here."[124] In light of the circumstances described above, the Tribunal finds that explanation credible. Under those circumstances, Tembec could and should have noticed the absence of the reference to its NAFTA Chapter Eleven claim in the SCA and, if it had been opposed to it, Tembec should have raised an objection or refrained from signing the SCA. Furthermore, the Government of Canada subscribed to the new SCA and must be presumed as a State Party to the SLA 2006 Amendments to have been aware of the changes that occurred between the TLA and the SCA.

---

[121]    Tembec's answer to Question 16 of 30 January 2007. *See also* Tembec's Memorandum of Points and Authorities in support of Motion for Leave to File Supplemental Brief," ¶ 71 *supra*, at p. 4 n. 1, filed with the U.S. District Court for the District of Columbia.

[122]    Tr. p. 23 at 7-12.

[123]    Tr. p. 29 at 20-22. *See also* United States' answer to Question 5 of 29 January 2007.

[124]    *Id.*

129.    Tembec argues that its NAFTA Chapter Eleven claim somehow survived because this Tribunal did not dismiss it with prejudice to reinstatement. However, Tembec's NAFTA Chapter Eleven claim was legally no longer pending before this Tribunal (save for the costs of arbitration) or any other tribunal or court because Tembec had the claim removed. An action for setting aside an order or award is not equivalent to a continuation of a claim on the merits. In the Termination Order, the Tribunal declared that it lacked the power to dismiss Tembec's claim with prejudice or without prejudice to reinstatement. In that Order, the Tribunal also stated that the question whether or not the termination as to Tembec is with or without prejudice to reinstatement is "to be considered and decided upon by the Article 1120 tribunal, if any, to which Tembec may resubmit the afore-mentioned NAFTA claims notwithstanding, *inter alia*, the provisions of Article 1121(1)(b) of the NAFTA, Tembec's waiver made thereunder and the provisions of Article 1126(8) of the NAFTA."[125] In September 2006, therefore, Tembec's NAFTA Chapter Eleven claim was not extant or pending as a legal matter.

130.    The Tribunal finds it difficult to accept that Tembec was forced to sign the SCA "because what we were also told, that if we didn't sign, there would be no Softwood Lumber Agreement."[126] Rather, the facts show that the following happened on 11 October 2006: Mr. Feldman received the SCA around 6:00 pm, sent emails at 6:09 pm and 6:20 pm to Ms. Anderson inquiring about the SCA, then studied the SCA and sent another email at 6:46 pm with some technical comments.[127] Mr. Feldman signed the SCA around 9:00 pm and sent it via facsimile to the Governments of Canada and the United States. It is significant to note that the cover letter of Mr. Feldman does not contain any reservation of rights, or even complaint, regarding duress or other lack of consent or

---

[125]    *See* ¶ 11 *supra*, at ¶ 1.3.

[126]    Tr. p. 73 at 1-3.

[127]    *See* ¶¶ 44-48 *supra*.

understanding regarding the SCA; nor does the cover letter mention in any manner either version of the TLA.[128] To the contrary, the cover letter merely suggested a "very very modest[]" modification of the SCA.

131.    Tembec also invokes the negotiations regarding the stipulation of dismissal with prejudice of the set aside action with respect to the Consolidation Order before the U.S. District Court for the District of Columbia.[129]    Tembec contends that it relied on the TLA in the email exchange with Mr. Haas of the U.S. Department of Justice.  The relevant passage is in an email of Mr. Feldman to Mr. Haas of 11 October 2006 at 5:18 pm in response to a proposed text for a stipulation of dismissal by Mr. Haas in his email of 10 October 2006 at 5:39 pm. [130]  Tembec's reference to the TLA, however, was made prior to Tembec's receipt of the SCA on 11 October 2006.  In the email exchange subsequent to Mr. Haas' email of 10 October 2006, the TLA was not mentioned or even alluded to.  At that point in time, Tembec must have been aware that the TLA was being replaced by the SCA.

132.    The reference in the draft of the stipulation of dismissal to the parties' agreement that each will bear its own costs and attorney fees of the action before the District Court[131] should have made Tembec particularly aware regarding the issue of the costs of its NAFTA Chapter Eleven claim.  Tembec knew that the issue of costs was, as contemplated by the Termination Order of 10 January 2006,[132] still

---

[128]    *See* ¶ 49 *supra.*

[129]    *See* ¶¶ 50-51 *supra.*

[130]    "I have just been authorized to sign a stipulation as attached.  It adds a sentence taken directly from the Termination of Litigation Agreements fashioned by the two federal governments and already signed by Tembec, and then the clarification of fees.  Please confirm that you agree to this version of the stipulation."  Exhibit C to the United States' submission to the Tribunal of 4 December 2006. The added sentence read: "This Termination Agreement is without prejudice to the position of any party on any issue in the Covered Actions." (Tr. p. 131 at 18-21)

[131]    *See* ¶ 50 *supra.*

[132]    *See* ¶ 11 *supra.*

pending before this Tribunal, as it is shown by Tembec's letter to this Tribunal of 6 October 2006.[133]

133.    In light of the foregoing, the fact that the SLA Amendments included a provision to the effect that the TLA was replaced by the SCA should not have come as a surprise to Tembec. As it is seen in the foregoing, when Tembec signed and returned the SCA on 11 October 2006, it knew, or should have known, that the TLA was being replaced by the SCA. It is then logical that the SLA 2006 between Canada and the United States was amended by the two States as well in order expressly to confirm that fact. Canada and the United States, therefore, did not need to consult with, or obtain agreement from, Tembec regarding the SLA Amendments, to which, moreover, Tembec was not a party.

134.    In her letter of 14 December 2006, Ms. Lyon states that the "renegotiation [of the TLA] was not an attempt to modify the understanding reflected in the TLA that no costs would be sought for covered actions."[134] That may have been the intent of Canada, but the United States rightly points out that the renegotiated SCA no longer lists Tembec's NAFTA Chapter Eleven claim as "any action referenced in this Claims Settlement Agreement," which, according to Ms. Lyon, was a change from the reference to "Covered Actions" in the TLA.

135.    Ms. Lyon further states in her letter of 14 December 2006: "At no point in the negotiation of the SCA did the United States raise any suggestion that the SCA as redrafted should alter the terms of settlement for Tembec." The United States disputes the reliability of Ms. Lyon's statement, contending that she was not closely involved in the (re)negotiations.[135] Whatever may be Ms. Lyon's direct

---

[133]    *See* ¶35 *supra.*
[134]    *See* ¶67 *supra.*
[135]    Tr. pp. 141-144.

63

knowledge of the (re)negotiations – she was not tendered for cross-examination before this Tribunal[136] – if what Ms. Lyon states is correct, one wonders what the reason was for Canada not to raise the question with the United States as to why the reference to Tembec's NAFTA Chapter Eleven claim had been deleted. Canada after all was the second State Party to the SLA and thereby is responsible for its contents as well as for those of annexes to the SLA, especially when one takes into account the fact that the standard operating procedure was for the Government of Canada to look after the affected interests of its private nationals and for the United States to look after the affected interests of its private nationals. Failing evidence to the contrary beyond what is set forth in Ms. Lyon's untested letter, it must be assumed that Canada has accepted the deletion as a State Party to the SLA 2006 Amendments.

136.     Finally, as part of its "bait and switch" contention, Tembec asserts that the United States waited with its cost claim against Tembec until 13 October 2006,[137] after Tembec had signed the SCA and the SLA had entered into force. However, the United States had specifically requested in its letter of 13 December 2005 "the opportunity to make a submission detailing its costs in defending against Tembec's claim," so that Tembec was on notice that the United States was to claim costs from Tembec following its withdrawal from the proceedings. The United States filed its cost claim against Tembec with this Tribunal on 7 April 2006.[138] At that time, Tembec received a copy. The Tribunal followed up on the cost claim in September 2006 by allowing Tembec to respond to the United States' cost claim.[139] Tembec did so on 6 October 2006.[140] It may be a coincidence that

---

[136]     See also ¶ 111 *supra*.

[137]     See ¶ 56 *supra*.

[138]     See ¶ 14 *supra*.

[139]     See ¶ 27 *supra*.

[140]     See ¶¶ 35-37 *supra*.

the United States responded on 13 October 2006, but a week for a response is timely and cannot be viewed as part of an alleged "bait and switch" scheme. Rather, when the Tribunal in mid-August 2006 began again to pursue the United States' cost claim, Tembec should have been on the alert that the cost claim was very much alive and in process.  It is not the mandate of this Tribunal to repair mistakes that Tembec may have made in that respect.

137.    In conclusion, Tembec has failed to prove that it has made a legally binding agreement with the United States in respect of Tembec's NAFTA Chapter Eleven claim that each party bears its own costs and that the fees and disbursements of the Arbitral Tribunal and the expenses of the administering authority are to be equally divided between the Tembec and the United States.

    D.    Determination of Which of Tembec and the United States Shall Bear the Costs

138.    Article 1135 of the NAFTA provides: ". . . . A tribunal may also award costs in accordance with the applicable arbitration rules."  The UNCITRAL Arbitration Rules being the applicable rules in the present case, the principle for awarding costs of arbitration is, according to those Rules, that an arbitral tribunal shall determine that the costs shall in principle be borne by the unsuccessful party, unless it finds an apportionment of the costs between the parties reasonable under the circumstances of the case (Article 40(1)).[141]  With respect to the costs of legal representation and assistance, the UNCITRAL Rules provide that the arbitral tribunal, taking into account the circumstances of the case, is free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable (Article 40(2)).[142]  Article 40(1)

---

[141]    Article 40(1) of the UNCITRAL Arbitration Rules is reproduced at ¶ 5 *supra*.

[142]    Article 40(2) of the UNCITRAL Arbitration Rules is reproduced at ¶ 5 *supra*.

and (2) grant a wide discretion to an arbitral tribunal in awarding costs of arbitration.[143]

139.   The Tribunal is aware of a certain practice in investment arbitrations that each party bears its own costs and the parties bear the fees and costs of the tribunal and administering arbitral institution equally.   That practice is not binding on this Tribunal, which prefers the more recent practice to apply also in investment arbitration the general principle of "costs follow the event," save for exceptional circumstances such as issues concerning access to justice.[144]   That approach is the more compelling in the present case which is governed by the UNCITRAL Arbitration Rules that expressly contemplate the rule of "costs follow the event" in Article 40(1) by its emphasis on "success" or lack thereof.

140.   Tembec has advanced a number of arguments why the costs of arbitration should not be awarded in favour of the United States.

---

[143]   For the question of the difference between the first and second paragraph of Article 40, *see* *S.D. Myers v. Canada*, UNCITRAL (NAFTA), Final Award, 30 December 2002, at ¶ 34, online at http://ita.law.uvic.ca/documents/SDMyersFinalAward.pdf; *International Thunderbird Gaming Corporation v. Mexico*, UNCITRAL (NAFTA), Arbitral Award, 26 January 2006, at ¶ 213, available online at: http://ita.law.uvic.ca/documents/ThunderbirdAward.pdf.

[144]   *See Thunderbird*, n. 143 *supra*, at ¶ 214. *See also* U.S. District Court for the District of Columbia, *International Thunderbird Corporation v. Mexico*, Civil Action 06-00748, 14 February 2007, rejecting the petition to set aside the Award of 26 January 2006, at ¶ 3: "Undeterred by the rule's [i.e., Article 40(1)-(2) of the UNCITRAL Rules] plain language, Thunderbird cites prior NAFTA and UNCITRAL arbitrations for the proposition that precedent has narrowed the rule's wide scope. Nothing in those decisions, however, persuades the court that they have meaningfully narrowed the discretion granted in the rule. Even if Thunderbird had identified such precedent, its argument would still fail, as Thunderbird has not shown that the panel expressly recognized that precedent as controlling and nonetheless refused to apply it," available online at: http://ita.law.uvic.ca/documents/Thunderbird-setaside.pdf; *Generation Ukraine, Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003, at ¶ 24.8, available on line at: http://ita.law.uvic.ca/documents/GenerationUkraine_000.pdf; *Fireman's Fund Insurance Company v. Mexico*, ICSID Case No. ARB(AF)/02/01, Final Award, 17 July 2006, at ¶ 221, available online at:    http://ita.law.uvic.ca/documents/FiremansFinalAwardRedacted.pdf;    *Telenor    Mobile Communications AS v. Hungary*, ICSID Case No. ARB/04/15, Award, 13 September 2006, at ¶ 107: "Though aware of a common practice in ICSID arbitrations for the parties to bear their own costs and bear the costs of ICSID and the tribunal equally regardless of the outcome of the case, this Tribunal is among those who favour the general principle that costs should follow the event," available online at: http://ita.law.uvic.ca/documents/Telenorv.HungaryAward_000.pdf.

141.   A first argument of Tembec is that the United States has not necessarily prevailed on the issue of consolidation because Tembec has moved to reinstate its motion before the U.S. District Court for the District of Columbia to vacate the Consolidation Order.

142.   In this regard, the Tribunal has already noted in footnote 46 above that the District Court denied Tembec's motion on 19 April 2007.

143.   Furthermore, the United States prevailed on the issue of consolidation.   The success of a party in an arbitration cannot be undone by the other party merely filing an action for setting aside the order or award, let alone by seeking to reinstate a set aside action that has already been dismissed with prejudice. Tembec's first argument, therefore, must fail.

144.   A second argument of Tembec is that the United States moved for consolidation while it had repeatedly represented that it did not plan to do so, and that Tembec and the United States had already argued the issue of jurisdiction before an Article 1120 tribunal.

145.   Tembec's argument is factually incorrect as the *Tembec* Article 1120 Tribunal did not hold a hearing on the jurisdictional challenge by the United States before the consolidation proceedings were instituted.   In the Consolidation Order of 7 September 2005, the Tribunal also rejected Tembec's assertion that the United States was too late with requesting consolidation pursuant to Article 1126 of the NAFTA.[145]  Tembec's second argument, therefore, must fail as well.

146.   A third argument by Tembec is that it should not be punished for exercising its NAFTA right to file and pursue a Chapter Eleven claim, and should not be

---

[145]   Consolidation Order at ¶¶ 163-169, available online at: http://www.state.gov/documents/organization/53113.pdf.

compelled to finance its opponents' procedural motions for its opponents' unique interests. In this connection, Tembec refers to the Tribunal's finding in the Consolidation Order that the consolidation provision in the NAFTA was intended to "alleviat[e] the resources of the State Parties in defending multiple claims . . . ."

147.    Tembec's fourth argument is that the nature of the consolidation action further counsels against reallocation of fees and costs, even were the Tribunal to conclude that the United States was the prevailing party, arguing that consolidation under NAFTA Article 1126 presented novel legal issues that had been treated only once before.

148.    Tembec's third and fourth argument might have carried weight if Tembec had not unilaterally withdrawn as claimant from the proceedings. When Tembec availed itself of the dispute resolution mechanism of NAFTA Chapter Eleven for its claim against the United States, Article 1126 of the NAFTA concerning consolidation was part and parcel of the mechanism. Tembec disagreed with the outcome of the United States' request for consolidation, but such a disagreement does not entitle a claimant to withdraw unilaterally without consequences, and in particular cost consequences.

149.    The UNCITRAL Arbitration Rules do not address expressly the issue of a unilateral withdrawal by a claimant. However, the issue can be resolved on the basis of an interpretation of the UNCITRAL Rules. Accordingly, the Tribunal interprets the reference to "the unsuccessful party" in Article 40(1) of the UNCITRAL Rules to include a party that unilaterally withdraws its claim. It triggers also the general principle of "costs follow the event," which, according to this Tribunal, is the guiding principle for the application of Article 40(2) of the Rules. The rule that a claimant is liable for the costs of the proceedings when that claimant unilaterally withdraws from the proceedings is in accord with many national legal systems.

The Tribunal recognizes that the rule may not be applicable in exceptional circumstances, which, however, are not present in the instant case.

150. Tembec did unilaterally seek to withdraw from the proceedings by its letter of 7 December 2005.[146] The Tribunal's 10 January 2006 Termination Order meant that Tembec had indeed withdrawn its claims under Chapter Eleven of the NAFTA (save for the costs of arbitration). As it is explained in the Consolidation Order, in the case of an order for consolidation under Article 1126(2), the Article 1126 Tribunal takes over the proceedings, in the capacity of an arbitral tribunal, to hear and determine the disputes from the respective Article 1120 Tribunals.[147] Thus, this Tribunal took over the jurisdiction from the *Tembec* Article 1120 Tribunal to hear and determine Tembec's NAFTA Chapter Eleven claim. Accordingly, when Tembec "remove[d] its Statement of Claim from these Article 1126 arbitration proceedings,"[148] it withdrew its NAFTA Chapter Eleven claim altogether, and this is so even though the Tribunal's Order of 10 January 2006 was neither with nor without prejudice to the question of reinstatement.

151. Tembec advances one further argument, which is that it is singled out by the United States, motivated by retribution for Tembec's challenge of the Consolidation Order, while the United States treated Canfor and Terminal differently. That argument is of no avail to Tembec either. Pursuant to the applicable UNCITRAL Arbitration Rules, the United States is entitled to seek the costs of arbitration from Tembec, and, in the absence of an abuse of right, motive for the use of a right is irrelevant when an arbitral tribunal exercises its discretion in awarding costs. Moreover, the situation of Tembec differs from that of Canfor and Terminal. Tembec unilaterally withdrew from the proceedings, while Canfor

---

[146]    Quoted at ¶ 10 *supra*.

[147]    Consolidation Order, n. 2 *supra*, at ¶ 100.

[148]    Tembec's letter of 7 December 2005, ¶ 10 *supra*.

and Terminal continued the proceedings. When Tembec did so, the United States made it clear that it would seek costs from Tembec.[149] [150]

152.    Consequently, Tembec shall have to bear the costs of arbitration referred to in Articles 38 and 39 of the UNCITRAL Arbitration Rules insofar as it concerns the Article 1120 and Article 1126 proceedings between it and the United States.

## VI.    THE COSTS OF THE PROCEEDINGS AS BETWEEN CLAIMANTS CANFOR AND TERMINAL AND RESPONDENT UNITED STATES

153.    With regard to the costs of Claimants Canfor and Terminal and Respondent United States, this Joint Order has previously referred (1) in ¶¶ 78 and 79 above to the correspondence of Canfor of 12 October 2006 and of the United States of 3 November 2006 with the Tribunal, confirming their adherence to the SCA and thus agreeing "not to seek from the other party costs and expenses incurred in this proceeding" and (2) in ¶ 83 above to the 22 January 2007 letter from Terminal to the Tribunal, noting agreement with the United States "to terminate the Chapter Eleven proceedings with respect to Terminal, without costs to either party. . ." and the letter of the United States of 18 June 2007, confirming that "Terminal and the United States have agreed to terminate the proceedings with respect to Terminal, with each party bearing its own costs".

154.    In this connection, the Tribunal recalls that Article 40(3) of the applicable UNCITRAL Arbitration Rules provides:

> 3.    When the arbitral tribunal issues an order for the termination of the arbitral proceedings or makes an award on agreed terms, it shall fix the costs of arbitration referred to in

---

[149]    United States' letter of 13 December 2005, quoted in the Termination Order of 10 January 2006, ¶ 11 *supra*, at ¶ 2.1.

[150]    The Tribunal's considerations in this paragraph are also responsive to Tembec's submission of 1 June 2007 referred to in ¶ 75 *supra*, assuming that the Tribunal would have taken into account that unauthorized submission.

article 38 and article 39, paragraph 1, in the text of that order or award.

Thus, with regard to Claimants Canfor and Terminal and Respondent United States, this Joint Order addresses not only a fixing of costs but also a termination of the proceedings. As previously reported, Claimant Tembec's participation in these proceedings was terminated by order of the Tribunal on 10 January 2006 but subject to the condition subsequent of an award of costs as between Tembec and the United States, an award that is later set forth in this Joint Order as well.

155.    In view of the agreements on costs made between Canfor and the United States and between Terminal and the United States mentioned above, the Tribunal need only to fix its fees and those of ICSID, as required by Article 38(a) of the UNCITRAL Arbitration Rules, and then to allocate those costs as agreed by those parties.[151] In the present case, as previously mentioned, the arbitrators' fees are determined in accordance with the ICSID schedule as provided in Article 39(2) of the UNCITRAL Rules.[152]

## VII.    THE COSTS OF THE NAFTA ARTICLE 1120 PROCEEDINGS

156.    The Tribunal is obliged to consider the costs in the Article 1120 proceedings separately. The financial practice appears to be that, with the constitution of a NAFTA Article 1126 tribunal, fresh advances for fees and expenses are requested and the balance of any advance stemming from the NAFTA Article 1120 tribunals is refunded to the parties. Such a financial practice leaves unaltered the legal

---

[151]    Article 38(a) provides: "The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39." Article 39 of the UNCITRAL Rules is quoted at ¶ 5 *supra.*

[152]    Article 39(2) provides: "If an appointing authority has been agreed upon by the parties or designated by the Secretary-General of the Permanent Court of Arbitration at The Hague, and if that authority has issued a schedule of fees for arbitrators in international cases which it administers, the arbitral tribunal in fixing its fees shall take that schedule of fees into account to the extent that it considers appropriate in the circumstances of the case."

principle that the case remains the same and that a NAFTA Article 1126 tribunal merely takes the place of the Article 1120 tribunals.[153]

157.    The Article 1120 proceeding in *Canfor* was not administered by ICSID. The fees and expenses of the NAFTA Article 1120 Tribunal in *Canfor* are (amounts in US$):

|     |                                                      | (i) Fees   | (ii) Expenses | (iii) Total |
|-----|------------------------------------------------------|------------|---------------|-------------|
| (a) | Professor Emmanuel Gaillard, Presiding Arbitrator    | 134,950.00 | 24,873.29     | 159,823.29  |
| (b) | Professor Joseph H.H. Weiler, Arbitrator             | 68,750.00  | 12,569.27     | 81,319.27   |
| (c) | Conrad K. Harper, Esq., Arbitrator                   | 15,000.00  | 169.05        | 15,169.05   |
| (d) | Yas Banifatemi, Esq., Administrative Secretary       | 79,242.00  | 18,741.29     | 97,983.29   |
| (e) | Expenses                                             |            | 18,328.35     | 18,328.35   |
| (f) | Total                                                |            |               | 372,623.25  |

158.    Pursuant to their agreement, Canfor and the United States are to bear the fees and expenses of the Article 1120 Tribunal in *Canfor* in equal shares. The Tribunal notes that the Article 1120 Tribunal in *Canfor* has refunded to Canfor and the United States US$ 163,688.38 each on account of the advances made by Canfor and the United States in the amount of US$ 350,000 each (in total US$ 700,000). As a result, the Tribunal need not make any further determination in that regard.

159.    No NAFTA Article 1120 Tribunal was constituted in *Terminal*. Again, the Tribunal need not make any further determination in that regard.

160.    As mentioned, in both cases the parties agreed that each party was to bear its own costs.

---

[153]    *See* Consolidation Order, n. 2 *supra*, at ¶ 100.

161.    As analyzed in Section V.C above, no such agreement was reached between Tembec and the United States.  The United States claims on account of the *Tembec* Article 1120 arbitration an amount of costs of US$ 125,086.71, comprising an advance deposit of US$ 75,000 for arbitration expenses and US$ 50,086.71 of legal fees of its in-house attorneys.[154]

162.    The Article 1120 proceeding in *Tembec* was administered by ICSID.  The fees and expenses of the Article 1120 Tribunal in *Tembec* are (amounts in US$):

|     |                                                      | (i) Fees  | (ii) Expenses | (iii) Total |
| --- | ---------------------------------------------------- | --------- | ------------- | ----------- |
| (a) | Judge Florentino P. Feliciano, Presiding Arbitrator  | 16,590.00 | 0             | 16,590.00   |
| (b) | Professor James R. Crawford, Arbitrator              | 4,800.00  | 0             | 4,800.00    |
| (c) | Professor Kenneth W. Dam, Arbitrator                 | 4,800.00  | 0             | 4,800.00    |
| (d) | ICSID's administrative charges                       |           | 8,139.15      | 8,139.15    |
| (e) | Total                                                |           |               | 34,329.15   |

163.    The Tribunal notes that ICSID refunded to Tembec US$ 62,409.99 on 20 December 2006 on account of the advance made by Tembec in the amount of US$ 75,000, and that ICSID refunded to the United States US$ 62,683.69 on 31 January 2007 on account of the advance made by the United States in the amount of US$ 75,000.  The refunds included interest accrued on the advances.  The difference between the amounts of reimbursement is due to interest accrued on the advances and the different dates of reimbursement.  Consequently, Tembec is to pay the United States (75,000 – 62,683.69=) US$ 12,316.31 on account of the cost of arbitration in the *Tembec* Article 1120 proceedings.  The legal fees claimed by the United States for that part of the proceedings will be considered in Chapter XI below.

---

[154]    *See* ¶ 84 *supra.*

73

## VIII.    ADVANCES OF THE PARTIES IN THE NAFTA ARTICLE 1126 PROCEEDINGS

164.    As of 10 January 2006, the date of the Tribunal's Tembec Termination Order, Canfor, Tembec and Terminal, as Claimants, and the United States, as Respondent, had, upon request from the Tribunal, each previously advanced in June of 2005 US$ 50,000 on account of the Article 1126 proceedings. This equality was in keeping with UNCITRAL Article 41(1) that provides: "The arbitral tribunal, on its establishment, may request each party to deposit an equal amount as an advance for the costs referred to in article 38, paragraphs (a), (b) and (c)."

165.    Subsequently, in response to a 29 December 2005 request from the Tribunal pursuant to UNCITRAL Article 41(2),[155] Claimants Canfor and Terminal made a further advance of US$ 100,000 each and Respondent United States made a further advance of US$ 300,000, all such payments being received by ICSID before the Tribunal's 10 January 2006 Termination Order with respect to Tembec. For its part, Tembec never responded to the Tribunal's 29 December 2005 request that Tembec also make a further advance of US$ 100,000 on account of the Article 1126 proceedings. The 29 December 2005 request of the Tribunal was based on its conclusion that each of the Claimants should deposit one-sixth each of the total then requested advance and Respondent United States one-half.

166.    In August of 2006, upon further request from the Tribunal pursuant to UNCITRAL Article 41(2),[156] Claimants Canfor and Terminal made a further advance of US$ 50,000 each (or one-quarter each of the then total requested deposit) and the United States made a further advance of US$ 100,000 (or one-half of the then total requested deposit).

---

[155]    Article 41(2) of the UNCITRAL Rules provides: "During the course of the arbitral proceedings the arbitral tribunal may request supplementary deposits from the parties."

[156]    *See* n. 155 *supra.*

167.    Lastly, in July 2007, upon another further request from the Tribunal pursuant to UNCITRAL Article 41(2),[157] Claimant Tembec and the United States made a further advance of US$ 50,000 each.

168.    In sum, during the course of this NAFTA Article 1126 proceeding, Claimants Canfor and Terminal have advanced US$ 200,000 each, Claimant Tembec has advanced US$ 100,000 and Respondent United States has advanced US$ 500,000. These advances have thus totaled US$ 1,000,000.    The following chart depicts these advances by the parties:

### Advances from the Claimants and the Respondent (in US Dollars)

| Date | Canfor | Tembec | Terminal | USA | All Parties |
|---|---|---|---|---|---|
| Jun-05 | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 |
| Dec-05/ Jan-06 | 100,000 | 0 | 100,000 | 300,000 | 500,000 |
| Aug-06 | 50,000 | 0 | 50,000 | 100,000 | 200,000 |
| Jul-07 | 0 | 50,000 | 0 | 50,000 | 100,000 |
| Totals | 200,000 | 100,000 | 200,000 | 500,000 | 1,000,000 |

## IX.    THE THREE SEPARATE PHASES OF THE NAFTA ARTICLE 1126 PROCEEDING FOR PURPOSES OF ALLOCATION OF COSTS

169.    In light of the analysis contained in Part V hereof, the Tribunal has determined that the NAFTA Article 1126 proceedings, for costs purposes, fall into three separate and distinguishable time periods:    the first, from 6 May 2005 (the date of the establishment of the Tribunal, before which neither the Tribunal nor ICSID

---

[157]    *See* n. 155 *supra*.

incurred any costs) until 10 January 2006 (the date of the issuance by the Tribunal of the Order for the Termination of the Arbitral Proceedings with respect to Tembec), this first period involving as Claimants Canfor, Tembec and Terminal ("Phase I");  the second, from 11 January 2006 (the day after the issuance by the Tribunal of the Tembec Termination Order) until 6 June 2006 (the date of  the issuance by the Tribunal of the Decision on the Preliminary Question), this second period involving as Claimants only Canfor and Terminal ("Phase II"); and the third, from 7 June 2006 (the day after the issuance by the Tribunal of the Decision on the Preliminary Question) until the date of this Joint Order, this third period involving all three initial Claimants but for differing reasons and in varying proportions as hereafter explained ("Phase III").

170.    In light of the agreements on costs made as between Canfor and the United States and between Terminal and the United States mentioned above and in light of the Tribunal's previous conclusions on costs as between Tembec and the United States, the Tribunal has decided to allocate the costs among the parties for each of the three Phases of the case described in the preceding paragraph as follows:

(1)    The fees and expenses of the Article 1126 Tribunal during Phase I from 6 May 2005 until 10 January 2006 are to be borne in the following fashion: two-thirds of such costs are allocated to Canfor, Terminal and the United States, on the one hand, and this two-thirds portion of such costs is to be borne by Canfor and Terminal at 25% each and by the United States at 50%; and one-third of such costs is allocated to Tembec and the United States, on the other hand, and this one-third portion of such costs is to be borne 100% by Tembec and 0% by the United States;

(2)    The fees and expenses of the NAFTA Article 1126 Tribunal during Phase II from 11 January 2006 until 6 June 2006 are to be borne by Canfor and

76

Terminal at 25% each and by the United States at 50%.  This is so because Tembec did not participate in the case during Phase II; and

(3)    The fees and expenses of the NAFTA Article 1126 Tribunal during Phase III from 7 June 2006 until the date of this Joint Order are to be borne in the following fashion:  10% of such costs are allocated to Canfor, Terminal and the United States, on the one hand, and this 10% portion of such costs is to be borne by Canfor and Terminal at 25% each and by the United States at 50%; and 90% of such costs are allocated to Tembec and the United States, on the other hand, and this 90% portion of such costs is to be borne 100% by Tembec and 0% by the United States.  With regard to this 10%-90% distribution, this is so because the Tribunal has concluded that Phase III was only minimally engaged with issues as between Canfor and Terminal as Claimants on the one hand and the United States as Respondent on the other hand whereas Phase III was largely dominated by the prolonged and accusatory battle over costs as between Tembec on the one hand and the United States on the other hand.  The vast bulk of the arbitrators' time during Phase III, for example, was devoted to absorbing and contending with the factual and legal charges and counter-charges of Tembec and the United States.  This 10%-90% disparity is generally evidenced in the proportions of this Joint Order that are devoted to issues involving Canfor, Terminal and the United States, on the one hand, and Tembec and the United States, on the other hand.

171.    With regard to Phase I, the Tribunal notes that after the issuance of the Consolidation Order on 7 September 2005, it took more than three months of consultations with the parties in order to issue Procedural Order No. 1, which set into motion a preliminary and separate phase of the proceedings with respect to the objection raised by the United States on the basis of Article 1901(3) of the

NAFTA against the Claimants' NAFTA Chapter Eleven claims.[158]  As previously noted, when the Tribunal was about to issue Procedural Order No. 1, Tembec advised, on 7 December 2005, that it sought to withdraw from the proceedings. Tembec's withdrawal was accepted by the Tribunal in its Termination Order of 10 January 2006, except for the costs of arbitration.[159]

172.    At this point, it is to be recalled that Tembec argues that it should have no liability for any costs or expenses after 7 December 2005 when it notified all parties to the proceedings that it had removed its claim from the consolidated proceedings and had begun proceedings in the U.S. District Court for the District of Columbia to vacate the Consolidation Order of 7 September 2005.[160]  However, the fact that the United States opposed the withdrawal was a consequence of Tembec's decision to withdraw in the first place.  Moreover, as provided in ¶ 1.2 of Procedural Order No. 1 of 17 December 2005, Tembec continued to be a party to the proceedings.[161] It was only in the Termination Order of 10 January 2006 that the proceedings were terminated with respect to Tembec, save for the issue of costs.[162] The Tribunal, therefore, determines that the cut-off date for Tembec's liability for costs in Phase 1 is the date of the Termination Order, i.e., 10 January 2006, subject to its potential liability for costs as expressly saved under the terms of the 10 January 2006 Termination Order.

---

[158]    *See* ¶ 9 *supra.*

[159]    *See* ¶ 11 *supra.*

[160]    *See* ¶ 93 *supra.*

[161]    Procedural Order No. 1 provides at ¶ 1.2: "Pending resolution of Tembec's request, Tembec is considered to continue to be a party to the present proceedings and, accordingly, is referred to in this Order on the same footing as the other Claimants.  Upon resolution of that request, this Order may be modified as will be required, having regard to Tembec's position as resolved."

[162]    *See* ¶ 11 *supra.*

173.    Prior to quantifying the costs of the arbitration, the Tribunal must fix itself its fees for each arbitrator separately, as required by Article 38(a) of the UNCITRAL Arbitration Rules.[163]

174.    In the present case, the fees are determined in accordance with the ICSID schedule as provided in Article 39(2) of the UNCITRAL Rules,[164] considering that the Secretary-General of ICSID is the Appointing Authority under Article 1126 of the NAFTA.

175.    There follows a chart that sets forth for Phase I, Phase II and Phase III of this proceeding the costs of the Tribunal (including the respective fees of each arbitrator):

[continued next page]

---

[163]    Article 38(a) provides: "The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39." Article 39 of the UNCITRAL Rules is quoted at ¶ 5 *supra*.

[164]    Article 39(2) provides: "If an appointing authority has been agreed upon by the parties or designated by the Secretary-General of the Permanent Court of Arbitration at The Hague, and if that authority has issued a schedule of fees for arbitrators in international cases which it administers, the arbitral tribunal in fixing its fees shall take that schedule of fees into account to the extent that it considers appropriate in the circumstances of the case."

**Arbitrators' fees and expenses for Phases I, II and III**

| Arbitrator | Period | Hours | Days | Fees | Expenses | Travel Expenses | Total Paid |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| AdM[165] | 6 May - 15 June 2005 | 40 | 5.00 | 12,000.00 | 6.93 | 1,478.08 | 13,485.01 |
| | 6 July - 7 Sep. 2005 | 72 | 9.00 | 27,000.00 | 116.55 | 958.88 | 28,075.43 |
| | 8 Sept. - 7 Dec. 2005 | 5 | 0.56 | 1,687.50 | 0.00 | 0.00 | 1,687.50 |
| | 8 Dec. 2005 - 10 Jan. 2006 | 44 | 5.50 | 16,500.00 | 0.00 | 0.00 | 16,500.00 |
| | **Phase I - 6 May 2005– 10 Jan 2006** | **161** | **20.06** | **57,187.50** | **123.48** | **2,436.96** | **59,747.94** |
| | 11 Jan. -15 Jan. 2006 | 32 | 4.00 | 12,000.00 | 944.92 | 1,081.10 | 14,026.02 |
| | 15 Jan. - 30 May 2006 | 88 | 11.00 | 33,000.00 | 0.00 | 0.00 | 33,000.00 |
| | **Phase II -11 Jan 2006– 6 June 2006** | **120** | **15.00** | **45,000.00** | **944.92** | **1,081.10** | **47,026.02** |
| | 31 Jan. 2007 | 0 | 0.00 | 0.00 | 119.00 | 1,434.00 | 1,553.00 |
| | 1 Jan. - end | 56 | 7.00 | 21,000.00 | 0.00 | 0.00 | 21,000.00 |
| | **Phase III - 7 June 2006 - Date of Order** | **56** | **7.00** | **21,000.00** | **119.00** | **1,434.00** | **22,553.00** |
| **Totals** | | **337** | **42.06** | **123,187.50** | **1,187.40** | **4,952.06** | **129,326.96** |
| | Period | Hours | Days | Fees | Expenses | Travel Expenses | Total Paid |
| DRR[166] | 6 May - 5 July 2005 | 63 | 7.88 | 18,900.00 | 843.85 | | 20,020.75 |
| | 6 July - 7 Sep. 2005 | 115 | 14.38 | 43,125.00 | 736.10 | 276.90 | 43,861.10 |
| | 8 Sep. 2005 - 10 Jan. 2006 | 132 | 16.50 | 49,500.00 | 41.65 | | 49,541.65 |
| | **Phase I - 6 May 2005– 10 Jan. 2006** | **310** | **38.75** | **111,525.00** | **1,621.60** | **276.90** | **113,423.50** |
| | 11 Jan. - 31 Mar. 2006 | 95 | 11.88 | 35,625.00 | 1,608.00 | 0.00 | 37,233.00 |
| | 1 Apr. - 5 June 2006 | 189 | 23.63 | 70,875.00 | 1,936.86 | 226.80 | 73,038.66 |
| | **Phase II -11 Jan. 2006– 6 June 2006** | **284** | **35.50** | **106,500.00** | **3,544.86** | **226.80** | **110,271.66** |
| | 9 Oct. 2006 - 24 Feb. 2007 | 65 | 8.13 | 24,375.00 | 734.97 | 0.00 | 25,109.97 |
| | 25 Feb. - end | 96 | 12.00 | 36,000.00 | 0.00 | 0.00 | 36,000.00 |
| | **Phase III - 7 June 2006 - Date of Order** | **161** | **20.13** | **60,375.00** | **734.97** | **0.00** | **61,109.97** |
| **Totals** | | **755** | **94.38** | **278,400.00** | **5,901.43** | **503.70** | **284,805.13** |

---

[165]    Professor Armand L.C. de Mestral.

[166]    Davis R. Robinson, Esq.

| | Period | Hours | Days | Fees | Expenses | Travel Expenses | Total Paid |
|---|---|---|---|---|---|---|---|
| AJB[167] | 6 May - 30 June 2005 | 152 | 19.00 | 45,600.00 | 1,205.44 | 3,121.77 | 49,927.21 |
| | 6 July - 7 Sept. 2005 | 328 | 41.00 | 123,000.00 | 1,645.65 | 3,691.33 | 128,336.98 |
| | 8 Sept. 2005 - 10 Jan. 2006 | 296 | 37.00 | 111,000.00 | 2,419.44 | 3,657.19 | 117,076.63 |
| | **Phase I - 6 May 2005 – 10 Jan 2006** | **776** | **97.00** | **279,600.00** | **5,270.53** | **10,470.29** | **295,340.82** |
| | February 3 – 10 June 2006 | 336 | 42.00 | 126,000.00 | 1,147.56 | 2,212.07 | 129,359.63 |
| | **Phase II - 11 Jan 2006 – 6 June 2006** | **336** | **42.00** | **126,000.00** | **1,147.56** | **2,212.07** | **129,359.63** |
| | 20 June 2006 - end | 240 | 30.00 | 90,000.00 | 1,462.26 | 0.00 | 91,462.26 |
| | **Phase III - 7 June 2006 - Date of Order** | **240** | **30.00** | **90,000.00** | **1,462.26** | **0.00** | **91,462.26** |
| **Totals** | | **1,352** | **169.00** | **495,600.00** | **7,880.35** | **12,682.36** | **516,162.71** |
| | | | | | | | |
| **TOTALS** | | **2,444** | **305.44** | **897,187.50** | **14,969.18** | **18,138.12** | **930,294.80** |

176.    On the basis of the above chart, and adding the administrative charges of ICSID, Phase I, Phase II, and Phase III show the following totals (hereinafter the "Tribunal's Cost Chart"):

**Totals by Phase, including ICSID's Administrative Charges**

| | Arbitrators | ICSID | Total |
|---|---|---|---|
| **Phase I** | 468,512.26 | 9,666.17 | 478,178.43 |
| **Phase II** | 286,657.31 | 41,538.64 | 328,195.95 |
| **Phase III** | 175,125.23 | 14,009.98 | 189,135.21 |
| | | | |
| **Totals** | **930,294.80** | **65,214.79** | **995,509.59** |

---

[167]    Professor Albert Jan van den Berg.

X.    **COMPUTATION OF AMOUNTS OWING IN THE NAFTA ARTICLE 1126 PROCEEDINGS**

177.    It is to be noted as a preliminary matter that the UNCITRAL Arbitration Rules contemplate the principle that advances for the costs of arbitration by one party are to be balanced with the advances by the other party, and that such balancing may result into an entitlement of one party against the other.  Article 41(1) of the UNCITRAL Rules provides that a tribunal, "upon its establishment," may request advances by the parties in "an equal amount."[168]  It also provides that those advances are applied to the costs referred to in Article 38(a), (b) and (c).  The latter costs cover the fees and expenses of the Tribunal as well as ICSID's administrative charges in the present case.  Article 41(2) provides that during the course of the arbitral proceedings the tribunal may request supplementary deposits "from the parties."  Article 41(5) of the UNCITRAL Rules further provides that "any unexpended balance" of the deposits received shall be returned to the parties.  Consequently, a party which has deposited more than the amount of the costs referred to in Article 38(a), (b) and (c) that it owes, becomes entitled to be paid the balance by the party which has deposited less than the amount that the latter party owes, as determined by the tribunal in question.

---

[168]    Article 41 of the UNCITRAL Rules provides:

"1.    The arbitral tribunal, on its establishment, may request each party to deposit an equal amount as an advance for the costs referred to in article 38, paragraphs *(a), (b)* and *(c)*.

2.    During the course of the arbitral proceedings the arbitral tribunal may request supplementary deposits from the parties.

3.    If an appointing authority has been agreed upon by the parties or designated by the Secretary-General of the Permanent Court of Arbitration at The Hague, and when a party so requests and the appointing authority consents to perform the function, the arbitral tribunal shall fix the amounts of any deposits or supplementary deposits only after consultation with the appointing authority which may make any comments to the arbitral tribunal which it deems appropriate concerning the amount of such deposits and supplementary deposits.

4.    If the required deposits are not paid in full within thirty days after the receipt of the request, the arbitral tribunal shall so inform the parties in order that one or another of them may make the

178.    The following six charts set forth (a) the allocation (as heretofore determined as between the parties) of the costs of the Tribunal and of ICSID for each of Phase I, Phase II, and Phase III; (b) the total amounts owed by each of the four parties; and (c) a comparison of the advances made by each of the four parties (*see* Chapter VIII above) and of the respective amounts consequently owing by Tembec to the other three parties:

### Allocation of Tribunal's Fees and Expenses and ICSID's Administrative Charges (in US Dollars)

#### Phase I  (6 May 2005 - 10 January 2006)

| | |
|---|---|
| Total from Tribunal's Costs Chart | 478,178.43 |
| | |
| 2/3 Allocation | 318,785.62 |
| Claimants – Canfor and Terminal 1/4 of 2/3 each | |
| Canfor | 79,696.41 |
| Terminal | 79,696.41 |
| Respondent – 1/2 of 2/3 | |
| United States | 159,392.81 |
| | |
| 1/3 Allocation | 159,392.81 |
| Claimant – Tembec – 100% of the 1/3 Allocation | 159,392.81 |

---

required payment. If such payment is not made, the arbitral tribunal may order the suspension or termination of the arbitral proceedings.

5.    After the award has been made, the arbitral tribunal shall render an accounting to the parties of the deposits received and return any unexpended balance to the parties."

**Phase II  (11 January 2006 - 6 June 2006)**

| | |
|---|---|
| Total from Tribunal's Costs Chart | 328,195.95 |
| | |
| Claimants – Canfor and Terminal - 1/4 each | |
| Canfor | 82,048.99 |
| Terminal | 82,048.99 |
| | |
| Respondent – 1/2 | |
| United States | 164,097.98 |

**Phase III  (7 June 2006 - Date of Order)**

| | |
|---|---|
| Total from Tribunal's Costs Chart | 189,135.21 |
| | |
| 10% Allocation | 18,913.52 |
| Claimants – Canfor and Terminal - 1/4 of 10% each | |
| Canfor | 4,728.38 |
| Terminal | 4,728.38 |
| Respondent – 1/2 of 10% | |
| United States | 9,456.76 |
| | |
| 90% Allocation | 170,221.69 |
| Claimant – Tembec – 100% of the 90% Allocation | 170,221.69 |

**Total Amounts Owed by Each of the Four Parties (in US Dollars)**

| | Canfor | Tembec | Terminal | USA | Totals |
|---|---|---|---|---|---|
| Phase I | 79,696.41 | 159,392.81 | 79,696.41 | 159,392.81 | 478,178.43 |
| Phase II | 82,048.99 | 0 | 82,048.99 | 164,097.97 | 328,195.95 |
| Phase III | 4,728.38 | 170,221.69 | 4,728.38 | 9,456.76 | 189,135.21 |
| **Totals** | **166,473.77** | **329,614.50** | **166,473.77** | **332,947.55** | **995,509.59** |

84

**Advances vs. Amounts Owed (in US Dollars)**

|                               | Canfor     | Tembec     | Terminal   | USA        | Totals       |
|-------------------------------|------------|------------|------------|------------|--------------|
| Advances                      | 200,000.00 | 100,000.00 | 200,000.00 | 500,000.00 | 1,000,000.00 |
| Amounts Owed                  | 166,473.77 | 329,614.50 | 166,473.77 | 332,947.55 | 995,509.59   |
| Unused Advance                |            |            |            |            | 4,490.41     |
| Unused Advance Apportioned[69]| 898.08     | 449.04     | 898.08     | 2,245.21   | 4,490.41     |
| **Balance**                   | **32,628.15** | **-230,063.54** | **32,628.15** | **164,807.25** |          |

**Tembec Owes Canfor, Terminal, and the United States (in US Dollars)**

| Canfor        | 32,628.15  |
|---------------|------------|
| Terminal      | 32,628.15  |
| United States | 164,807.25 |
| **Total**     | **230,063.54** |

## XI. DETERMINATION OF UNITED STATES LEGAL COSTS VIS-À-VIS TEMBEC IN THE NAFTA ARTICLE 1120 AND 1126 PROCEEDINGS

179.    The United States' claim for its legal costs vis-à-vis Tembec is set forth in various submissions.[170] It can be summarized as follows (amounts in US Dollars):

| (a) | Article 1120 *Tembec* arbitration | 50,086.71 |
|-----|-----------------------------------|-----------|
| (b) | Consolidation proceedings         | 72,164.73 |
| (c) | Tembec 1/3 of (b)                 | 24,054.91 |
| (d) | Costs-of-Costs                    | 20,579.06 |
| (e) | **Total (a)+(c)+(d)**             | **94,720.68** |

---

[169]    ICSID will refund Canfor, Tembec, Terminal and the United States the unused advance as apportioned here (i.e., 20%, 10%, 20% and 50%, respectively).

[170]    United States' Cost Submission of 7 April 2006, ¶¶ 14, 84-85 *supra*; 4; United States' submission of 4 December 2006, ¶ 63 *supra*; United States answers to Tribunal Questions of 29 January 2007, ¶ 70 *supra*, at Question 29; United States' Supplemental Cost Submission of 7 February 2007, ¶ 73 *supra. See also* ¶ 161 *supra.*

180.    Line item (a) refers to the NAFTA Article 1120 proceedings in *Tembec* mentioned at Chapter VII above.

181.    Line item (b) is the amount set forth in Part III of the Respondent's Submission on Costs on 7 April 2006.

182.    Line item (c) is exclusive of the two-thirds portion of the amount in line item (b) that the United States absorbs pursuant to its respective agreements with Canfor and Terminal described in Chapter VI above.

183.    Line item (d) was agreed by the parties at the Costs Hearing of 31 January 2007 as constituting an issue for Tribunal decision. In light of the extensive efforts by the parties in presenting their case on the costs of arbitration, the question was raised whether they wished to submit costs claims regarding those efforts (the so-called question of "Costs-of-Costs").[171]    The parties answered that question in the affirmative and submitted costs claims for the "Costs-of-Costs" on 7 February 2007.

184.    The above claimed legal fees concern the costs for legal representation and assistance under Article 38(e) of the UNCITRAL Arbitration Rules. In the present case, it consists of portions of the salaries of the lawyers of the State Department corresponding to the number of hours that they have worked on the case.

185.    The Tribunal notes that the amounts claimed by the United States are very modest. To take the example of "Costs-of-Costs" (i.e., line item (d), where the efforts of both sides during Phase III of this proceeding were comparable, the United States claims US$ 20,579.06, while Tembec claims almost five times that amount: US$

---

[171]    Tr. pp. 133-136; 170-171.

86

101,052.50.[172] The United States claims merely the amounts corresponding to the salary of its lawyers. It does not claim any other cost, and notably not overhead (or any indirect costs for that matter), stating that it does not have a system for tracking those costs.[173]

186. The claim of the United States is for gross salaries, which includes tax. That gave rise to the issue whether, in case of a costs award, the United States would receive approximately twice the same amount (i.e., one time from the employee in the form of income tax, and a second time from the party ordered to pay the gross salary, which includes the same amount of income tax).[174] That may be theoretically so, but the amount relating to tax is to be spent for public purposes, which takes away the character of a possible double recovery.

187. Contrary to what Tembec argues, the United States' costs claim does not include costs relating to the consideration of the Tribunal during Phase II of the proceedings with respect to the jurisdictional objection of the United States.[175]

188. In conclusion, the costs as claimed by the United States are, for purposes of Article 38(e) of the UNCITRAL Arbitration Rules, reasonable by any standard and, for the reasons stated, can be awarded against Tembec, and Tembec is not entitled to any costs award in these proceedings.

189. The Tribunal notes that the United States has not claimed interest over the amounts of costs it seeks to recover. The Tribunal is aware of the fact that interest

---

[172]    Tembec's Costs-on-Costs Submission of 7 February 2007 at p. 2, to which Tembec adds that it "has incurred US\$ 2,019.36 in long-distance telephone, delivery services, duplicating, automated legal research, postage, and telecopier expenses."

[173]    Tr. pp. 137-138.

[174]    Tr. pp. 138-139; United States' Supplemental Submission of 7 February 2007, at p. 3.

[175]    *See also* ¶ 172 *supra.*

87

over costs of arbitration is rarely claimed in international arbitration, although the rationale for that practice is not entirely clear.

190.    Consequently, in addition to the sums owing by Tembec to the United States on account of the NAFTA Article 1120 proceedings (i.e., US$ 12,316.31), and pursuant to the final chart contained in Chapter X hereof (i.e., US$ 164,807.25), Tembec is ordered also to pay to the United States as a part of its legal costs the further sum of US$ 94,720.68, or a total of US$ 271,844.24.

**XII.**    <u>DECISIONS</u>

For the foregoing reasons, the Tribunal renders the following decisions:

(1)    TERMINATES (i) the present proceedings with respect to Canfor, Terminal and the United States, and (ii) the proceedings with respect to Tembec insofar as costs are concerned, the latter proceedings having already been terminated in all other respects by the Tribunal's Termination Order of 10 January 2006;

(2)    DETERMINES that Canfor, Terminal and the United States bear their own costs pursuant to their respective agreements;

(3)    DETERMINES that Tembec shall have to bear the costs of arbitration referred to in Articles 38 and 39 of the UNCITRAL Arbitration Rules insofar as it concerns the NAFTA Article 1120 and Article 1126 proceedings between it and the United States;

(4)    NOTES that the fees and expenses of the Article 1120 Tribunal in *Canfor*, which amount to US$ 372,623.25, and the fees and expenses of the Article 1120 Tribunal in *Tembec* and ICSID's administrative charges in the latter proceedings, which amount to US$ 34,329.15, have been paid out of the advances made by Canfor, Tembec and the United States, the surplus having been refunded to Canfor, Tembec and the United States;

(5)    NOTES that the fees and expenses of the Article 1126 Tribunal and the administrative charges of ICSID, which amount to US$ 995,509.59, have been paid out of the advances made by Canfor, Tembec, Terminal and the United States, the surplus of which (US$ 4,490.41) shall be refunded by ICSID to Canfor (20%), Tembec (10%), Terminal (20%) and the United States (50%);

(6)    NOTES that Canfor, Terminal and the United States have advanced more than their respective share of such costs as determined in this Joint Order with respect to all parties, to the effect that Tembec owes Canfor and Terminal US$ 32,628.15 each and the United States US$ 164,807.25;

(7)    ORDERS Tembec to pay Canfor and Terminal US$ 32,628.15 each for the costs referred to in Decision (6) above, within 15 (fifteen) days after the date of notification of this Joint Order; and

(8)    ORDERS Tembec to pay the United States US$ 271,844.24, which amount comprises US$ 12,316.31 for the NAFTA Article 1120 proceedings, US$ 94,720.68 for legal costs in both the Article 1120 and the Article 1126 proceedings and US$ 164,807.25 for the costs referred to in Decision (6) above, within 15 (fifteen) days after the date of notification of this Joint Order.

Made in Washington, D.C., this 19th of July 2007,


THE TRIBUNAL:


_____[s]_____
Professor Armand L.C. de Mestral
Arbitrator

_____[s]_____
Davis R. Robinson, Esq.
Arbitrator


_____[s]_____
Professor Albert Jan van den Berg
Presiding Arbitrator

91

# *EXHIBIT 2*

## ANNEX 2A

### SETTLEMENT OF CLAIMS AGREEMENT

1.    On the Effective Date of the Softwood Lumber Agreement 2006, this Settlement of Claims Agreement (Claims Settlement Agreement) will constitute a full and complete settlement of the claims asserted in the actions referenced in this paragraph. On the Effective Date, Canada and the United States shall file a joint stipulation of dismissal of Canada's complaint in *Canada v. United States* (Ct. No. 05-00033 (CIT)). Further, on the Effective Date:

The United States and Tembec Inc. and its affiliates shall file a joint stipulation of dismissal in *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia));

the United States shall withdraw its request for an Extraordinary Challenge in *Certain Softwood Lumber Products from Canada*, Secretariat File No. ECC-2006-1904-01USA; and

Canfor Corporation shall withdraw its claim against the United States in *The Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America.*

2.    In addition, on the Effective Date, Canada and the United States shall seek to dismiss the following actions:

*Certain Softwood Lumber Products from Canada (Original AD Investigation)*, Secretariat File No. USA-CDA-2002-1904-02;

*Tembec v. United States* (Consol. Ct. No. 05-00028 (CIT)) and the cases consolidated therein; and

*Coalition for Fair Lumber Imports Executive Committee v. United States (Civil Action No. 05-1366 (D.C. Cir.)).*

3.    The United States shall ensure that the following actions are taken:

(a)    On the Effective Date, the U.S. Department of Commerce ("USDOC") shall retroactively revoke the Countervailing Duty Order regarding Certain Softwood Lumber from Canada, 67 Fed. Reg. 36,070 (May 22, 2002), as amended, and the Antidumping Duty Order regarding Certain Softwood Lumber from Canada, 67 Fed. Reg. 36,068 (May 22, 2002), as amended (the "Orders"), in their entirety as of May 22, 2002 without the possibility that they could be reinstated;

(b)    On the Effective Date, USDOC shall terminate all USDOC proceedings related to the Orders; and

(c)    No later than 3 days after the Effective Date, to the extent that USDOC is not enjoined against providing for liquidation, USDOC shall provide the instructions in Annex 3A of the SLA 2006 to U.S. Customs and Border Protection to cease collecting cash deposits and to liquidate entries covered by the Orders described in subparagraph 3(a) without regard to antidumping or countervailing duties and to pay interest in accordance with section 778 of the Tariff Act of 1930, as amended.

4.    Following the Effective Date, Canada and the United States shall continue to seek modification or clarification of the injunctions in *West Fraser v. United States* (Consol. Ct. No. 05-00079 (CIT)) such that the underlying entries may be liquidated without regard to antidumping and countervailing duties.  To the extent that USDOC is not enjoined against providing for liquidation, USDOC shall provide the instructions in Annex 3B of the SLA 2006, as amended, to USCBP at such time as the U.S. Court of International Trade modifies or clarifies the injunctions against liquidation issued in *West Fraser v. United States* to permit the United States to liquidate entries covered by the first AD administrative review, the liquidation of which had been enjoined.

5.    As promptly as possible after the Effective Date, Canada and the United States shall file joint motions to dismiss the following actions, if they have not been dismissed already, on the grounds of mootness:

> *Certain Softwood Lumber Products from Canada (CVD 1st Administrative Review)*, Secretariat File No. USA-CDA-2005-1904-01; and

> *West Fraser v. United States* (Consol. Ct. No. 05-00079 (CIT)).

6.    For purposes of paragraphs 7 through 10, *Certain Softwood Lumber Products from Canada (Original CVD Investigation)*, Secretariat File No. USA-CDA-2002-1904-03 shall be treated in the same manner as an "action referenced in this Claims Settlement Agreement".

7.    Canada and the United States shall request dismissal of any new lawsuits concerning the same subject matter as any action referenced in this Claims Settlement Agreement that are filed before the date of entry into force of the SLA 2006.

8.    No party to this Claims Settlement Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to any action referenced in this Claims Settlement Agreement.

9.    This Claims Settlement Agreement is without prejudice to the position of any party to this Claims Settlement Agreement on any issue in any action referenced in this Claims Settlement Agreement.

10.    Each party to this Claims Settlement Agreement shall not re-file any of the actions that are referenced in paragraph 1 of this Claims Settlement Agreement.

11.    This Claims Settlement Agreement may not be altered, amended, modified, or otherwise changed other than through the written agreement of all parties hereto.

12.    This Claims Settlement Agreement shall bind the parties, their officers, directors, employees, predecessors, subsidiaries, heirs, executors, administrators, agents, successors, and assigns.

13.    As evidence of their consent to this Claims Settlement Agreement, the parties, through their duly authorized Representatives, have signed below.

14.    This Claims Settlement Agreement may be executed in counterparts, each one of which shall be deemed an original and all of which together shall constitute one and the same Claims Settlement Agreement.

By: _____ Dated: _____, 2006

*Fraser v. United States* to permit the United States to liquidate entries covered by the first AD administrative review, the liquidation of which had been enjoined.

5.    As promptly as possible after the Effective Date, Canada and the United States shall file joint motions to dismiss the following actions, if they have not been dismissed already, on the grounds of mootness:

> *Certain Softwood Lumber Products from Canada (CVD 1ˢᵗ Administrative Review)*, Secretariat File No. USA-CDA-2005-1904-01; and

> *West Fraser v. United States* (Consol. Ct. No. 05-00079 (CIT)).

6.    For purposes of paragraphs 7 through 10, *Certain Softwood Lumber Products from Canada (Original CVD Investigation)*, Secretariat File No. USA-CDA-2002-1904-03 shall be treated in the same manner as an "action referenced in this Claims Settlement Agreement".

7.    Canada and the United States shall request dismissal of any new lawsuits concerning the same subject matter as any action referenced in this Claims Settlement Agreement that are filed before the date of entry into force of the SLA 2006.

8.    No party to this Claims Settlement Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to any action referenced in this Claims Settlement Agreement.

9.    This Claims Settlement Agreement is without prejudice to the position of any party to this Claims Settlement Agreement on any issue in any action referenced in this Claims Settlement Agreement.

10.    Each party to this Claims Settlement Agreement shall not re-file any of the actions that are referenced in paragraph 1 of this Claims Settlement Agreement.

11.    This Claims Settlement Agreement may not be altered, amended, modified, or otherwise changed other than through the written agreement of all parties hereto.

12.    This Claims Settlement Agreement shall bind the parties, their officers, directors, employees, predecessors, subsidiaries, heirs, executors, administrators, agents, successors, and assigns.

13.    As evidence of their consent to this Claims Settlement Agreement, the parties, through their duly authorized Representatives, have signed below.

14.    This Claims Settlement Agreement may be executed in counterparts, each one of which shall be deemed an original and all of which together shall constitute one and the same Claims Settlement Agreement.

By: _____ Date: Oct. 11, 2006
M. Jean Anderson
Weil, Gotshal & Manges, LLP
1300 Eye Street, NW.
Suite 900
Washington, DC 20005

Counsel for the Government of Canada in all the referenced proceedings other than *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia)) and the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _Seth P. Waxman_ Dated: Oct. 11, 2006
Seth P. Waxman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
1875 Pennsylvania Avenue, NW.
Washington, DC 20006-3642

Counsel for the Government of Canada in *Coalition for Fair Lumber Imports Executive Committee v. United States* (Civil Action No. 05-1366 (D.C. Cir.))

By: _____ Dated: _____, 2006
Reginald T. Blades, Jr.
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
1100 L Street, NW.
8th Floor
Washington, DC 20530

Counsel for the United States in *West Fraser v. United States* (Consol. Ct. No. 05-00079 (CIT)) and the cases consolidated therein

By: _____ Dated: _____, 2006
Stephen C. Tosini
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
1100 L Street, NW.
Room 12020
Washington, DC 20530

Counsel for the United States in *Tembec v. United States* (Consol. Ct. No. 05-00028 (CIT)) and the cases consolidated therein

3

14.    This Claims Settlement Agreement may be executed in counterparts, each one of which shall be deemed an original and all of which together shall constitute one and the same Claims Settlement Agreement.

By: _____ Dated: _____, 2006
M. Jean Anderson
Weil, Gotshal & Manges, LLP
1300 Eye Street, NW.
Suite 900
Washington, DC 20005

Counsel for the Government of Canada in all the referenced proceedings other than *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia)) and the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _____ .. Dated: _____, 2006
Seth P. Waxman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
1875 Pennsylvania Avenue, NW.
Washington, DC 20006-3642

Counsel for the Government of Canada in *Coalition for Fair Lumber Imports Executive Committee v. United States* (Civil Action No. 05-1366 (D.C. Cir.))

By: *Reginald T. Blades, Jr.* Dated: *October 12* 2006
Reginald T. Blades, Jr.
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
1100 L Street, NW.
8th Floor
Washington, DC 20530

Counsel for the United States in *West Fraser v. United States* (Consol. Ct. No. 05-00079 (CIT)) and the cases consolidated therein

By: _____ Dated: ___ , 2006
Stephen C. Tosini
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
1100 L Street, NW.
Room 12020
Washington, DC 20530

Counsel for the United States in *Tembec v. United States* (Consol. Ct. No. 05-00028 (CIT)) and the cases consolidated therein

By: _____ Dated: _____, 2006
M. Jean Anderson
Weil, Gotshal & Manges, LLP
1300 Eye Street, NW.
Suite 900
Washington, DC 20005

Counsel for the Government of Canada in all the referenced proceedings other than *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia)) and the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _____ Dated: _____, 2006
Seth P. Waxman
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
1875 Pennsylvania Avenue, NW.
Washington, DC 20006-3642

Counsel for the Government of Canada in *Coalition for Fair Lumber Imports Executive Committee v. United States* (Civil Action No. 05-1366 (D.C. Cir.))

By: _____ Dated: _____, 2006
Reginald T. Blades, Jr.
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
1100 L Street, NW.
8th Floor
Washington, DC 20530

Counsel for the United States in *West Fraser v. United States* (Consol. Ct. No. 05-00079 (CIT)) and the cases consolidated therein

By: _____ Dated: 10/12, 2006
Stephen C. Tosini
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
1100 L Street, NW.
Room 12020
Washington, DC 20530

Counsel for the United States in *Tembec v. United States* (Consol. Ct. No. 05-00028 (CIT)) and the cases consolidated therein

By: *Alexander Kenneth Haas*    Dated: *October 11,* 2006
Alexander Kenneth Haas
U.S. Department of Justice
20 Massachusetts Avenue, NW
Washington, D.C.

Counsel for the United States in *Tembec et al. v. United States* (Civil Action No. 05-2345
(U.S. District Ct. for the District of Columbia))


By: _____    Dated: _____, 2006
Douglas N. Letter
Litigation Counsel
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue N.W.
Room 7513
Washington, D.C. 20530-0001

Counsel for the United States in *Coalition for Fair Lumber Imports Executive Committee
v. United States* (Civil Action No. 05-1366 (D.C. Cir.))


By: _____    Dated: _____, 2006
John D. McInerney
U.S. Department of Commerce
14th & Constitution Avenue, N.W.
Room 3622
Washington, D.C. 20230

Counsel for United States Department of Commerce in *Certain Softwood Lumber
Products from Canada (Original AD Investigation)*, Secretariat File No. USA-CDA-
2002-1904-02; *Certain Softwood Lumber Products from Canada (Original CVD
Investigation)*, Secretariat File No. USA-CDA-2002-1904-03; *Certain Softwood Lumber
Products from Canada (CVD 1st Administrative Review)*, Secretariat File No. USA-CDA-
2005-1904-01


By: _____    Dated: _____, 2006
Andrea J. Menaker
Chief, NAFTA Arbitration Division
Office of the Legal Adviser
U.S. Department of State
Washington, D.C.

Counsel for the United States with respect to the *Consolidated Arbitration Pursuant to
Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL
Arbitration Rules between Canfor Corporation v. United States of America and Terminal
Forest Products Ltd. v. United States of America*


By: _____    Dated: _____, 2006
William Busis
Office of the United States Trade Representative
600 – 17th Street, N.W.
Washington, D.C. 20508

Counsel for the United States in *Certain Softwood Lumber Products from Canada*,
Secretariat File No. ECC-2006-1904-01USA

By: _____ Dated: _____, 2006
Alexander Kenneth Haas
U.S. Department of Justice
20 Massachusetts Avenue, NW
Washington, D.C.

Counsel for the United States in *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S.
District Ct. for the District of Columbia))

By: *Douglas N. Letter by*
    *Jeane E. Davidson*      Dated: Oct 12, 2006
Douglas N. Letter
Litigation Counsel
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue N.W.
Room 7513
Washington, D.C. 20530-0001

Counsel for the United States in *Coalition for Fair Lumber Imports Executive Committee v.
United States* (Civil Action No. 05-1366 (D.C. Cir.))

By: _____ Dated: _____, 2006
John D. McInerney
U.S. Department of Commerce
14th & Constitution Avenue, N.W.
Room 3622
Washington, D.C. 20230

Counsel for United States Department of Commerce in *Certain Softwood Lumber
Products from Canada (Original AD Investigation)*, Secretariat File No. USA-CDA-
2002-1904-02; *Certain Softwood Lumber Products from Canada (Original CVD
Investigation)*, Secretariat File No. USA-CDA-2002-1904-03; *Certain Softwood Lumber
Products from Canada (CVD 1st Administrative Review)*, Secretariat File No. USA-CDA-2005-
1904-01

By: _____ Dated: _____, 2006
Andrea J. Menaker
Chief, NAFTA Arbitration Division
Office of the Legal Adviser
U.S. Department of State
Washington, D.C.

Counsel for the United States with respect to the *Consolidated Arbitration Pursuant to Article
1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration
Rules between Canfor Corporation v. United States of America and Terminal Forest Products
Ltd. v United States of America*

By: _____ Dated: _____, 2006
Alexander Kenneth Haas
U.S. Department of Justice
20 Massachusetts Avenue, NW
Washington, D.C.

Counsel for the United States in *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia))

By: _____ Dated: _____, 2006
Douglas N. Letter
Litigation Counsel
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue N.W.
Room 7513
Washington, D.C. 20530-0001

Counsel for the United States in *Coalition for Fair Lumber Imports Executive Committee v. United States* (Civil Action No. 05-1366 (D.C. Cir.))

By: _____ Dated: 10|12, 2006
John D. McInerney
U.S. Department of Commerce
14th & Constitution Avenue, N.W.
Room 3622
Washington, D.C. 20230

Counsel for United States Department of Commerce in *Certain Softwood Lumber Products from Canada (Original AD Investigation)*, Secretariat File No. USA-CDA-2002-1904-02; *Certain Softwood Lumber Products from Canada (Original CVD Investigation)*, Secretariat File No. USA-CDA-2002-1904-03; *Certain Softwood Lumber Products from Canada (CVD 1st Administrative Review)*, Secretariat File No. USA-CDA-2005-1904-01

By: _____ Dated: _____, 2006
Andrea J. Menaker
Chief, NAFTA Arbitration Division
Office of the Legal Adviser
U.S. Department of State
Washington, D.C.

Counsel for the United States with respect to the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _____ Dated: _____, 2006
Alexander Kenneth Haas
U.S. Department of Justice
20 Massachusetts Avenue, NW
Washington, D.C.

Counsel for the United States in *Tembec et al. v. United States* (Civil Action No. 05-2345 (U.S. District Ct. for the District of Columbia))

By: _____ Dated: _____, 2006
Douglas N. Letter
Litigation Counsel
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue N.W.
Room 7513
Washington, D.C. 20530-0001

Counsel for the United States in *Coalition for Fair Lumber Imports Executive Committee v. United States* (Civil Action No. 05-1366 (D.C. Cir.))

By: _____ Dated: _____, 2006
John D. McInerney
U.S. Department of Commerce
14th & Constitution Avenue, N.W.
Room 3622
Washington, D.C. 20230

Counsel for United States Department of Commerce in *Certain Softwood Lumber Products from Canada (Original AD Investigation)*, Secretariat File No. USA-CDA-2002-1904-02; *Certain Softwood Lumber Products from Canada (Original CVD Investigation)*, Secretariat File No. USA-CDA-2002-1904-03; *Certain Softwood Lumber Products from Canada (CVD 1st Administrative Review)*, Secretariat File No. USA-CDA-2005-1904-01

By: *Andrea J. Menaker* Dated: Oct. 12, 2006
Andrea J. Menaker
Chief, NAFTA Arbitration Division
Office of the Legal Adviser
U.S. Department of State
Washington, D.C.

Counsel for the United States with respect to the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _____ Dated: _____, 2006
**William Busis**
Office of the United States Trade Representative
600 – 17th Street, N.W.
Washington, D.C. 20508

Counsel for the United States in *Certain Softwood Lumber Products from Canada*,
Secretariat File No. ECC-2006-1904-01USA

By: _____  Dated: Oct. 11, 2006
Elliot J. Feldman
Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304

Counsel for Tembec Inc. and its affiliates


By: _____  Dated: _____, 2006
P. John Landry
DAVIS & COMPANY
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*


By: _____  Dated: _____, 2006
Keith E.W. Mitchell
Harris and Company
14 Floor Bentall 5, 550 Burrard
Vancouver, British Columbia
V6C 2B5

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*


By: _____  Dated: _____, 2006
B. Thomas Peele, III
Baker & McKenzie, LLP
815 Connecticut Avenue, NW.
Suite 900
Washington, DC 20006-4078

Counsel for Canadian Forest Products Ltd., Canfor Corporation and its affiliates, Canfor Wood Products Marketing Ltd.

By: _____ Dated: _____, 2006
Elliot J. Feldman
Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW,
Washington, DC 20036-5304

Counsel for Tembec Inc. and its affiliates

By: _____ Dated: _____, 2006
Ty John Landry
DAVIS & COMPANY
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _____ Dated: _____, 2006
Keith E.W. Mitchell
Harris and Company
14 Floor Bentall 5, 550 Burrard
Vancouver, British Columbia
V6C 2B5

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _____ Dated: _____, 2006
B. Thomas Peele, III
Baker & McKenzie, LLP
815 Connecticut Avenue, NW.
Suite 900
Washington, DC 20006-4078

Counsel for Canadian Forest Products Ltd., Canfor Corporation and its affiliates, Canfor Wood Products Marketing Ltd.

By: _____ Dated: _____, 2006
Elliot J. Feldman
Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304

Counsel for Tembec Inc. and its affiliates


By: _____ Dated: _____, 2006
P. John Landry
DAVIS & COMPANY
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*

By: _____ Dated: 10/16, 2006
Keith E.W. Mitchell
Harris and Company
14 Floor Bentall 5, 550 Burrard
Vancouver, British Columbia
V6C 2B5

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*


By: _____ Dated: _____, 2006
B. Thomas Peele, III
Baker & McKenzie, LLP
815 Connecticut Avenue, NW.
Suite 900
Washington, DC 20006-4078

Counsel for Canadian Forest Products Ltd., Canfor Corporation and its affiliates, Canfor Wood Products Marketing Ltd.

5

By: _____ Dated: _____, 2006
Elliot J. Feldman
Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304

Counsel for Tembec Inc. and its affiliates


By: _____ Dated: _____, 2006
P. John Landry
DAVIS & COMPANY
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*


By: _____ Dated: _____, 2006
Keith E. W. Mitchell
Harris and Company
14 Floor Bentall 5, 550 Burrard
Vancouver, British Columbia
V6C 2B5

Counsel for Canfor Corporation in the *Consolidated Arbitration Pursuant to Article 1126 of the North American Free Trade Agreement (NAFTA) and the UNCITRAL Arbitration Rules between Canfor Corporation v. United States of America and Terminal Forest Products Ltd. v. United States of America*


By: _____ Dated: Oct 11, 2006
B. Thomas Peele, III
Baker & McKenzie, LLP
815 Connecticut Avenue, NW.
Suite 900
Washington, DC 20006-4078

Counsel for Canadian Forest Products Ltd., Canfor Corporation and its affiliates, Canfor Wood Products Marketing Ltd.

5

# *EXHIBIT 3*



United States Department of State

*Washington, D.C.  20520*

March 7, 2005

*By Facsimile*

Mr. Roberto Dañino
Secretary-General
International Centre for Settlement
  Of Investment Disputes
1818 H Street, N.W. .
Washington, D.C. 20433

Re:    *Canfor Corp. v. United States of America;*
       *Terminal Forest Products Ltd. v. United States of America;* and
       *Tembec Inc., et al. v. United States of America*

Dear Mr. Dañino:

Pursuant to Article 1126(3) of the NAFTA, the United States respectfully requests that the Secretary-General establish a tribunal in accordance with Article 1126(5) to decide issues of fact and law common to three arbitrations pending under NAFTA Chapter Eleven, *Canfor Corp. v. United States of America, Terminal Forest Products Ltd. v. United States of America* and *Tembec Inc., et al. v. United States of America.*

On March 2, 2005, a member of the *Canfor* tribunal withdrew from that proceeding while the United States' objection to jurisdiction was pending.  The United States has filed a similar objection to jurisdiction in the *Tembec* arbitration, which is in the process of being briefed.  In light of the *Canfor* arbitrator's resignation and the resulting delays to that proceeding, and in the interest of fair and effective dispute resolution, the United States seeks consolidation of the three NAFTA arbitrations.

Article 1126(5) of the NAFTA provides that "the Secretary-General shall establish a tribunal comprising three arbitrators" within sixty-days of receiving a request by a disputing party.  The tribunal may, "in the interests of fair and efficient resolution of the claims," consolidate any claims "that have a question of fact or law in common."[1]

The relevant issues of fact and law in the three arbitrations are nearly identical.  In addition, the United States intends to object to the jurisdiction of a tribunal established under Article 1126(5) on the same basis with respect to the three claimants' claims.  Accordingly, in the interest of a fair and efficient resolution of the claims, the United requests the establishment of a tribunal under Article 1126(5) to decide the United States' objection to jurisdiction and, if necessary, resolve the claims on the merits.

---

[1] NAFTA art. 1126(2).

-2-

The United States sets forth below the procedural background of the three arbitrations. We then provide a brief overview of the issues of fact and law common to the three arbitrations.

*Procedural Background*

*Canfor*: Canfor Corporation, a Canadian forest products company, filed a notice of arbitration under NAFTA Chapter Eleven and the UNCITRAL Arbitration Rules on July 11, 2002.[2] Canfor alleges breaches of Articles 1102, 1103, 1105 and 1110 of the NAFTA with respect to certain U.S. antidumping and countervailing duty determinations.[3] The United States objected to the jurisdiction of the tribunal, and a hearing on jurisdiction was held in December 2004.[4] On March 2, 2005, before the tribunal rendered its decision on jurisdiction, one of the tribunal members withdrew from the proceedings. A replacement arbitrator has not yet been appointed. In the absence of consolidation, a rehearing of the United States' objection would likely be necessary.[5]

*Terminal Forest Products*: Terminal Forest Products, also a Canadian forest products company, filed its notice of arbitration under NAFTA Chapter Eleven and the UNCITRAL Arbitration Rules on March 30, 2004.[6] Terminal Forest Products is represented by the same counsel as Canfor. Terminal Forest Product's notice of arbitration is virtually identical in all relevant respects to that of Canfor. No tribunal has yet been constituted in this case.

*Tembec*: Tembec Inc., Tembec Investments Inc. and Tembec Industries Inc. (collectively "Tembec"), also Canadian forest product companies, submitted a claim to arbitration under NAFTA Chapter Eleven and the UNCITRAL Arbitration Rules on April 5, 2004.[7] Tembec alleges breaches of the same NAFTA provisions as Canfor and Terminal Forest Products with respect to the same antidumping and countervailing duty determinations. A tribunal has been constituted and the United States filed an objection to jurisdiction on February 4, 2005.[8] That objection is in the process of being briefed, and a hearing on jurisdiction is scheduled for June 2005. The United States has sought a stay of those proceedings pending a decision on consolidation.

---

[2] Canfor's Notice of Arbitration and Statement of Claim ("Canfor Statement") is appended hereto as Exhibit A.

[3] *See id.* ¶¶ 96-106.

[4] The parties' submissions on jurisdiction and the hearing transcript are available at http://www.state.gov/s/l/c7424.htm.

[5] *See* UNCITRAL Arbitration Rules art. 14.

[6] Terminal Forest Products' Notice of Arbitration ("Terminal Forest Products Notice") is appended hereto as Exhibit B.

[7] Tembec's Notice of Arbitration and Statement of Claim ("Tembec Statement") is appended hereto as Exhibit C.

[8] The U.S. objection to jurisdiction is available at http://www.state.gov/documents/organization/42165.pdf.

-5-

*Issues of Fact and Law Common To the Three Arbitrations*

      The relevant issues of fact and law in the three notices of arbitration are nearly identical. Canfor, Terminal Forest Products and Tembec each allege breaches with respect to the same U.S. government measures, including: (i) the U.S. International Trade Commission's ("ITC") May 2001 preliminary material injury determination concerning softwood lumber imports from Canada;[9] (ii) the U.S. Department of Commerce's ("Commerce") August 2001 preliminary antidumping and countervailing duty determinations (as well as its preliminary critical circumstances finding);[10] (iii) Commerce's March 2002 final antidumping and countervailing duty determinations;[11] (iv) the ITC's May 2002 final material injury determination;[12] and (v) the *Continued Dumping and Subsidy Offset Act of 2000* (the "Byrd Amendment").[13] Likewise, Canfor, Terminal Forest Products and Tembec allege breaches of the same NAFTA provisions, including Article 1102 (national treatment), Article 1103 (most-favored-nation treatment), Article 1105 (minimum standard of treatment) and Article 1110 (expropriation).[14]

      In addition, for purposes of the United State's objection to jurisdiction, the legal issues with respect to the three arbitrations are nearly identical. In a consolidated proceeding, the United States would object to the jurisdiction of the tribunal over the claims of all three claimants on the basis of Articles 1901(3) and 1101(1), and over the claims of Canfor and Tembec on the basis of Article 1121(1).

      Accordingly, in light of the similarity of the issues of fact and law in the three arbitrations, in the interest of a fair and efficient resolution of those claims, and to avoid the possibility of conflicting determinations, the United States requests that the Secretary-General establish a tribunal under Article 1126(5) of the NAFTA.

Respectfully submitted,

Mark A. Clodfelter
Assistant Legal Adviser for International
Claims and Investment Disputes

---

[9] *See* Canfor Statement ¶ 108; Tembec Statement ¶¶ 28-31, 101(b).

[10] *See* Canfor Statement ¶¶ 110-22; Terminal Forest Products Notice ¶¶ 21-24; Tembec Statement ¶¶ 32-47, 101(c).

[11] *See* Canfor Statement ¶¶ 123-30; Terminal Forest Products Notice ¶¶ 22, 26; Tembec Statement ¶¶ 51-61, 101(d).

[12] *See* Canfor Statement ¶ 149; Terminal Forest Products Notice ¶¶ 22, 27; Tembec Statement ¶¶ 68-72, 101(f).

[13] *See* Canfor Statement ¶¶ 141-47; Terminal Forest Products Notice ¶¶ 41-49; Tembec Statement ¶¶ 26-27, 101(a), (g).

[14] *See* Canfor Statement ¶¶ 96-106; Terminal Forest Products Notice ¶¶ 19-40; Tembec Statement ¶ 100-10.

# *EXHIBIT 4*

# International Centre for Settlement of Investment Disputes

1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534   Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsd

April 19, 2005

**United States of America**
c/o Mr. Mark A. Clodfelter
Assistant Legal Adviser
Office of the Legal Adviser
 and
Ms. Andrea Menaker
Chief, NAFTA Arbitration Division
Office of International
Claims and Investment Disputes
Department of State
2430 E Street NW
Suite 203, South Building
Washington, DC 20037-2800

**Canfor Corporation**
**Terminal Forests Products, Ltd.**
c/o Mr. P. John Landry, Esq
Davis & Company
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7
 and
c/o Mr. Keith E. W. Mitchell, Esq
Harris & Company
14th Floor Bentall 5
550 Burrard Street
Vancouver, B.C.
Canada V6C 2B5

**Tembec Inc., Tembec Investements**
**Inc., and Tembec Industries, Inc.**
c/o Mr. Elliot J. Feldman, Esq.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

Re:   **Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v. United States of America; Tembec *et al.* v. United States of America;**
**Request for the establishment of a Consolidation Tribunal pursuant to NAFTA Article 1126**

Dear Sirs and Madam,

I write in connection with the United States of America' request for consolidation under Article 1126 of the NAFTA, dated March 7, 2004.

In accordance with NAFTA Article 1126(5), we are appointing to the Consolidation Tribunal **Dr. Albert Jan van den Berg** of The Netherlands, as presiding arbitrator, and **Mr. Davis R. Robinson**, a U.S. national and **Mr. L. Yves Fortier**, a national of Canada, as co-arbitrators. Attached please find the curricula vitae of Dr. van den Berg, Mr. Robinson and Mr. Fortier on file with the Centre.

We shall notify you as soon as the appointees have accepted their appointment.

Sincerely yours,

Gonzalo Flores
Senior Counsel

Attachments

<u>Curriculum Vitae</u>

# ALBERT JAN VAN DEN BERG

14 June 1949, Amsterdam, The Netherlands
Office: IT Tower, 9th Floor, Avenue Louise 480 B.9, 1050 Brussels, Belgium
T +32 (2) 290 3913; F +32 (2) 290 3939; M +32 476 960 591; E ajvandenberg@hvdb.com

## EXPERIENCE

| | |
|---|---|
| 2001 – | Attorney-at-Law, Hanotiau & van den Berg, Brussels (partner) |
| 1999 – 2001 | Attorney-at-Law, Freshfields Bruckhaus Deringer, Amsterdam (partner) |
| 1988 – 1999 | Attorney-at-Law, Stibbe Simont Monahan Duhot, Amsterdam (partner) |
| 1982 | Attorney-at-Law, Law Firm of Salah Hejailan, Riyadh (in association with Clifford-Turner/Van Doorne & Sjollema) |
| 1980 – 1988 | Attorney-at-Law, Van Doorne & Sjollema Advocaten, Rotterdam (partner) |
| 1980 – 1988 | Secretary-General, Netherlands Arbitration Institute |
| 1978 – 1980 | TMC Asser Institute for International and European Law, The Hague, department international commercial arbitration |
| 1975 – 1978 | Private assistant to Professor Pieter Sanders, Schiedam, the Netherlands. |

## EDUCATION

| | |
|---|---|
| 18.09.1981 | Erasmus University, Rotterdam. Degree: Doctor of Laws. Thesis: *The New York Arbitration Convention of 1958 - Towards a Uniform Judicial Interpretation* (mention: cum laude). Thesis-director: Professor Pieter Sanders |
| 26.11.1977 | University of Aix-en-Provence. Degree: Docteur en droit. Thesis: *Etude comparative du droit de l'arbitrage commercial dans les pays de Common Law* (mention: très bien). Thesis-director: Professor René David |
| 1974 – 1975 | New York University, Institute of Foreign Law. Degree: Master of Comparative Jurisprudence (composite grade: A) |
| 1973 – 1974 | University of Aix-en-Provence, Faculty of Law. Post-doctorate course in Comparative, European and International Law |
| 1968 – 1973 | University of Amsterdam, Faculty of Law. Degree: Master of Laws. |

## LANGUAGES

Dutch, English, French
Reading: German, Italian and Spanish.

## PROFESSIONAL ACTIVITIES

- Professor at Law (arbitration chair), Erasmus University, Rotterdam
- General Editor, *Yearbook Commercial Arbitration*
- Vice-President, Netherlands Arbitration Institute (NAI), Rotterdam; former Vice-President, London Court of International Arbitration (LCIA)
- FCIArb (Fellow of the Chartered Institute of Arbitrators), London
- Member, Editorial Board, *Global Counsel*, London; *Tijdschrift voor Arbitrage*, Rotterdam
- Member, International Council for Commercial Arbitration (ICCA); Commission on International Arbitration of the International Chamber of Commerce (ICC), Paris; Court of Appointment of the Hong Kong International Arbitration Centre; International Advisory Board of the Stockholm Chamber of Commerce (SCC); Arbitration Consultative Commission of the World Intellectual Property Organization (WIPO), Geneva
- Arbitrator on the Arbitral Tribunal concerning the Bank for International Settlements (Hague Treaty of 20 January 1930)
- Various panels of arbitrators, including: American Arbitration Association (AAA), New York; Arbitral Centre of the Federal Economic Chamber, Vienna; Arbitral Tribunal for Football, World Cup Division for the 2002 FIFA World Cup, Geneva; China International Economic and Trade Arbitration Commission (CIETAC), Beijing; International Centre for the Settlement of Investment Disputes (ICSID), Washington; Kuala Lumpur Regional Centre for Arbitration; Singapore International Arbitration Centre (SIAC)
- Presiding and party-appointed arbitrator in numerous international arbitrations (*ad hoc*, ICC, ICSID, LCIA, NAI and UNCITRAL, relating to, *inter alia*, banking, broadcasting, construction, defense projects, distributorship, energy, futures and options, information technology, investments, joint ventures, post M&A, professional associations, sales, sports, telecom, turnkey projects)
- Extensive publications and lectures on international commercial arbitration (see list of publications).

May 2002

Prof. Dr. Albert Jan van den Berg

<u>LIST OF PUBLICATIONS</u>

February 1991

---

- <u>Erasmusprijs voor Prof. René David</u>, in NRC-Handelsblad, 14 May 1976.

- <u>Bibliography of Recent Publications on Arbitration</u>, Yearbook Comm. Arb., Vol. I (1976)
  pp. 237-252; Vol. II (1977) pp. 277-280; Vol. III (1978) pp. 307-311.

- <u>Étude comparative du droit de l'arbitrage commercial dans les pays de Common Law</u>,
  Thesis, Université d'Aix-Marseille III (1977), abbreviated version in XIX Rassegna dell'
  Arbitrato (1979) pp. 11-74.

- <u>Arbitration and the Third World</u>, Financial Times, 6 December 1978.

- <u>Arbitration and the New York Convention</u>, European Law Letter - Financial Times, February
  1979, pp. 2-3.

- <u>L'arbitrage commercial en Amérique latine</u>, Revue de l'arbitrage (1979) pp. 123-203.

- <u>Internationale geschillen eisen een nieuwe aanpak [International disputes require a new
  approach]</u>, De Financiële Telegraaf, 3 February 1979.

- <u>Nationalisatie is nu efficient te pareren [Nationalization can now be parried effi-
  ciently]</u>, De Financiële Telegraaf, 4 August 1979.

- <u>Bookreview : Anuario de Arbitraje Comercial Vols. I-III, (1976-1978)</u>, Derecho
  Comparado : Revista de la Asociacion Argentina de Derecho Comparado (1979) pp. 167-171.

- <u>English Arbitration Act 1979</u>, Tijdschrift voor Arbitrage, 1980/1, pp. 29-31.

- <u>L'arbitrage au Canada</u> (Note supplémentaire), XX Rassegna dell'Arbitrato (1980)
  pp. 43-45.

- <u>Bookreview : Julian D.M. Lew, Applicable Law in International Commercial Arbitration</u>
  (1978), 23 Netherlands International Law Review (1980) pp. 254-257.

- <u>Comparative Table : TOPCO v. LIBYA and BP v. LIBYA</u>, Yearbook Comm. Arb., Vol. V (1980)
  pp. 161-167.

- Arbitration in The Netherlands, Netherlands Arbitration Institute (27 March 1981), paper submitted to the ESC Ltd. Conference on Arbitration under International Commercial Contracts - Current Issues and Practical Problems, London 7/8 May 1981.

- Warsaw Meeting Considers Multiparty Business Disputes, European Law Letter-Financial Times, July 1981, p. 4.

- Tenuitvoerlegging en aantasting van arbitrale vonnissen in Nederland [Enforcement of and means of recourse against arbitral awards in The Netherlands], Tijdschrift voor Arbitrage, 1981/4, pp. 104-110.

- The New York Arbitration Convention of 1958 - Towards a Uniform Judicial Interpretation, Thesis, Erasmus University Rotterdam (Kluwer, Deventer, 1981).

- Alternatieve rechters in de lift [Alternative Judges Become More Popular], Financieel Economisch Magazine, 6 May 1982, pp. 39-43.

- Arbitrage in Nederland [Arbitration in The Netherlands], Kamer van Koophandel, August 1982 (bulletin of the Chamber of Commerce and Industry, Rotterdam).

- Commentaries on Court Decisions on the New York Convention of 1958, Yearbook Comm. Arb., Vol. VII (1982) pp. 290-311; Vol. VIII (1983) pp. 337-359; Vol. IX (1984) pp. 332-399; Vol. X (1985) pp. 338-416; Vol. XI (1986) pp. 402-477; Vol. XII (1987) pp. 409-475; Vol. XIV (1989) pp. 528-613.

- Wetsontwerp Iran-United States Claims Tribunal [Proposed Dutch Law on the Iran-US Claims Tribunal], Nederlands Juristenblad (1984) pp. 170-172; Proposed Dutch Law on the Iran-US Claims Settlement Declaration, International Business Lawyer, September 1984, pp. 341-344.

- Second Bermuda International Arbitration Conference 19-22 April 1983, Tijdschrift voor Arbitrage, 1983/4, pp. 117-123.

- Arbitrage opnieuw in de belangstelling [New Interest in Arbitration], Kamer van Koophandel, September 1983, p. 3 (bulletin of the Chamber of Commerce and Industry, Rotterdam).

- National Report : Saudi Arabia, Yearbook Comm. Arb., Vol. IX (1984) pp. 7-36; International Handbook on Commercial Arbitration, 31 p. + annex : Arbitration Regulation of Saudi Arabia.

- The Art of Arbitration, Liber Amicorum Prof. Pieter Sanders (1984) in co-editorship with J.C. Schultsz (Kluwer, Deventer, 1984).

- Should an International Arbitrator Apply the New York Arbitration Convention of 1958 ?, in The Art of Arbitration, supra, pp. 39-49.

- Wetsontwerp nieuwe arbitragewet [Draft New Dutch Arbitration Act], Special issue "Aan de balie van het scheidsgerecht [Arbitration at the Bar]" Tijdschrift voor Arbitrage/Advocatenblad, 1984/6, pp. 171-226.

- International and Regional Conventions, Seminar International Commercial Arbitration, Paris, 17-18 December 1984.

- Arbitrage [Arbitration], 12 Status Quo, Juridische Faculteit VU, no. 6 (January 1985) pp. 10-14.

- The Enforcement of Arbitral Awards against a State - The Problem of Immunity from Execution, with Prof. G. Bernini, Inaugural Conference of the School of International Arbitration, London, 25-27 March 1985, Queen Mary College - University of London.

- Arbitrating International Construction Claims, CCIC Seminar "International Construction Claims", London, 22-23 April 1985.

- Does the New York Arbitration Convention of 1958 Apply Retroactively ? Government of Kuwait v. Sir Frederic Snow c.s., Case comment, 1 Arbitration International (1985) pp. 103-107.

- Dient er een aparte Nederlandse wet voor internationale arbitrages te komen ? [Should There be a Separate Dutch Act on International Arbitration ?], Ars Aequi (1985) pp. 389-393.

- The New York Arbitration Convention of 1958 and the Arab Countries, Conference on Arbi-
  tration in Euro-Arab Relations, Sousse, Tunisia, 24-27 September 1985, reprinted in Euro-
  Arab Chambers of Commerce, Euro-Arab Arbitration (London, 1987) pp. 54-65.

- When is an Arbitral Award Non-Domestic under the New York Convention of 1958 ? Pace Law
  Review (1985) pp. 25-65.

- Non-domestic Arbitral Awards under the 1958 New York Convention, 2 Arbitration Interna-
  tional (1986) pp. 191-219.

- Yearbook Commercial Arbitration (General Editor as of Vol. XI (1986)).

- Internationale bouwarbitrage [International Construction Arbitration], Bouwrecht (1986)
  pp. 281-292.

- Consolidated Arbitrations and the 1958 New York Arbitration Convention, 2 Arbitration
  International (1986) pp. 367-369.

- Nieuwe Arbitragewet door de Tweede Kamer aanvaard [New Arbitration Act Approved by Dutch
  Parliament], 66 Advocatenblad (1986) pp. 267-271.

- De Gewijzigde Statuten (1987) van de Raad van Arbitrage voor de Bouwbedrijven in Neder-
  land [The Amended Statute of the Board of Arbitration for the Building Industry in the
  Netherlands], 24 Bouwrecht (1987) pp. 709-730.

- National Report : The Netherlands, Yearbook Comm. Arb., Vol. XII (1987) pp. 3-38; Inter-
  national Handbook on Commercial Arbitration, 37 p. + annex : Arbitration Act.

- Internationale Arbitrage in Nederland en Arbitrage buiten Nederland [International Arbi-
  tration in the Netherlands and Arbitration Outside the Netherlands], Tijdschrift voor
  Arbitrage, 1987/5, pp. 121-128.

- Consolidated Arbitrations, The New York Arbitration Convention and the Dutch Arbitration
  Act 1986 - A replique to Mr. Jarvin, 3 Arbitration International (1987) pp. 257-262.

- The Netherlands Arbitration Act 1986, International Business Lawyer (1987) pp. 356-359.

- <u>The Netherlands Arbitration Act 1986</u>, with P. Sanders, Text and Notes, English, French
  and German (Kluwer, Deventer, 1987).


- <u>Some Recent Problems in the Practice of Enforcement under the New York and ICSID Conven-
  tions</u>, 3 ICSID Review - Foreign Investment Law Journal (1988) pp. 439-456.


- <u>L'arbitrage et les tiers : le droit néerlandais</u>, Comité français de l'arbitrage, Collo-
  que, Paris, 5 May 1988, 11 p., Revue de l'arbitrage (1988) pp. 536-541.


- <u>Arbitragerecht [Law on arbitration]</u>, with R. van Delden and H.J. Snijders (Tjeenk Wil-
  link, Zwolle, 1988).


- <u>Procedures in arbitrage [Proceedings in Arbitration]</u>, in <u>Checkboek voor Advocaten</u>, (Klu-
  wer, Deventer, 1989).


- <u>Improvement of civil litigation by lessons of arbitration procedure</u>, with J. Rozemond,
  in <u>Justice and Efficiency</u>, The Eighth World Conference on Procedural Law, Dutch National
  Reports (Kluwer, Deventer, 1989) pp. 71-74.


- <u>Le droit néerlandais de l'arbitrage</u>, in <u>L'Arbitrage - Travaux offerts au professeur Albert
  Fettweis</u> (Bruxelles, 1989)

## DAVIS R. ROBINSON

**RETIRED PARTNER**

WASHINGTON, D.C., OFFICE
(202) 986-8049
EMAIL: DRROBINS@LLGM.COM

**AREAS OF PRACTICE**

International Trade and Investment
Public International Law
Transnational Litigation and International Arbitration
Government Relations

Davis Robinson has spent two thirds of his career in private law practice in
Washington, D.C., and on Wall Street and the other one third in federal govern-
ment service in international affairs. In 1981, Mr. Robinson was appointed the
Legal Adviser to the U.S. Department of State, the senior attorney in the U.S.
Government in international law matters. As general counsel to Secretaries of
State Haig and Shultz for four years, Mr. Robinson had extensive dealings in
Europe, the former Soviet Union, the Middle East, China and Japan and played
an important role in various trade policy and treaty law matters. He was in
charge of the U.S.-Iran Claims Tribunal on behalf of the United States and led the
U.S. team in two major cases before the World Court in the Hague. In private
practice, Mr. Robinson concentrates in international boundary disputes, in inter-
national trade and investment law (including United States economic sanctions
and export controls) and in international arbitration. He has a working knowl-
edge of French and basic Arabic.

**EDUCATION**

B.A.     Yale College, *magna cum laude,* Phi Beta Kappa, 1961
LL.B.    Harvard University, *cum laude,* 1967
         President, *Harvard Legal Aid Bureau*

**ADMITTED TO PRACTICE**

New York, 1968
District of Columbia, 1972
*Court Admittances:* Supreme Court of the United States, 1972

**DAVIS R. ROBINSON**

### SELECTED ACTIVITIES

#### MEMBER

- Council on Foreign Relations
- United States Panel, International Centre for Settlement of Investment Disputes (ICSID)
- American Arbitration Association's approved list of International Arbitrators
- London Court of International Arbitration

#### PANELIST

- U.S. Canada Free Trade Agreement, Chapter 18 Dispute Resolution Panel
- ICC Court of Arbitration Panel
- President of ICSID Arbitral Tribunal

#### FORMER CHAIRMAN

- Foreign Investment in the United States Committee, American Bar Association

#### ADVISOR

- American Law Institute's Restatement Third on the Foreign Relations Law of the United States

#### DIRECTOR

- Middle East Policy Council



## OGILVY RENAULT

**L. Yves Fortier, C.C., Q.C.**

**Senior Partner**
**Lawyer**

Montréal
(514) 847-4740
yfortier@ogilvyrenault.com



Quebec Bar 1961

**Practice Area(s)**
Arbitration and Alternative Dispute Resolution
Litigation

| BIOGRAPHY | PUBLICATIONS |
| --- | --- |

Mr. Fortier is a trial lawyer who has pleaded important cases before all court jurisdictions in Canada and before domestic as well as international arbitral tribunals. He has also served as an arbitrator and chairman on many ad hoc international arbitration tribunals as well as tribunals constituted by different arbitral institutions, including the International Arbitration Court of the International Chamber of Commerce (Paris), the London Court of International Arbitration (LCIA), the American Arbitration Association (New York), the Court of Arbitration for Sport (Lausanne), the Zurich Chamber of Commerce and the International Centre for Settlement of Investment Disputes (ICSID). In 1984, he represented Canada before the International Court of Justice in The Hague in the Canada-U.S. Gulf of Maine case.

Since being called to the Bar, he has served as Counsel to many Royal Commissions and Commissions of Inquiry in Canada. He served from 1987 to 1989 as Canada's Chief Negotiator in the Canada-France fishing dispute. In 1991, he was Counsel for Canada before the "ad hoc" International Tribunal of Arbitrators which was constituted to determine the maritime boundary between Canada and France in the North Atlantic. He served from 1993 to 1998 as Canada's Chief Negotiator for the Canada-U.S. Pacific Salmon Treaty negotiations. In 1993, Mr. Fortier served as Special Negotiator for the Government of Quebec with the Cree Nation.

In April 1993, Mr. Fortier was appointed by the Security Council of the United Nations as Chairman of Panel "C" of the United Nations Compensation Commission in Geneva (Iraq-Kuwait). In September 1995, Mr. Fortier was appointed Counsel for Canada in the mediation of the Canada-U.S. Pacific Salmon dispute. In August 1997, Mr. Fortier was appointed by the Secretary General of the United Nations as his Special Envoy to Malaysia. In November 1997, Mr. Fortier was appointed judge ad hoc of the International Court of Justice in the land and maritime boundary dispute between Bahrain and Qatar. In 2002, he was appointed judge ad hoc of the International Court of Justice in the boundary dispute between Colombia and Nicaragua. In August 2003, he was appointed by the Secretary General of the United Nations as his personal representative and mediator in the Equatorial Guinea and Gabon boundary dispute.

In January 1998, he was appointed as an Arbitrator and Senior Claims Judge on the Claims Resolution Tribunal for Dormant Accounts in Switzerland. In 1998, he was lead counsel for the Government of Canada in the Supreme Court of Canada Reference concerning Quebec. In January 1999, he was appointed by the Security Council of the United Nations as Chairman of Panel F3 of the United Nations Compensation Commission in Geneva (Iraq-Kuwait). In May 2000, he was appointed one of the Trustees of the International Accounting Standards Committee (IASC). In December 2000, he was appointed by the President of the World Bank to the ICSID Panel of Conciliators and Arbitrators.

In 2001, Mr. Fortier was lead counsel for the Government of Nova Scotia before the international tribunal which was constituted to determine the offshore boundary between the province of Nova Scotia

and the province of Newfoundland and Labrador.

In July 1988, Mr. Fortier was appointed Canada's Ambassador and Permanent Representative to the United Nations in New York. On leave from his law practice, Mr. Fortier served as Canada's Ambassador until January 1992. During his term at the United Nations, Mr. Fortier was Canada's Chief Delegate to the 43rd, 44th, 45th and 46th Sessions of the U.N. General Assembly. In September 1990, he was elected Vice-President of the 45th General Assembly. From January 1989 to December 1990, Mr. Fortier served as Canada's Representative to the Security Council of the United Nations.

In 1989, he served as President of the Council. While in New York, Mr. Fortier was a Director of the International Peace Academy and the United Nations International School. He is a member of the Executive Board of the International Association of Permanent Representatives to the United Nations.

Mr. Fortier has been the Chairman (now Co-Chair) of the firm since January 1992, when he resumed his law practice.

In recent years, Mr. Fortier has concentrated his practice in the field of international arbitration.

On January 1, 1998, he was elected President of the London Court of International Arbitration (LCIA). He served as President until June 30, 2001, at which time he became Honorary Vice-President of the Court. Since August 2003, he has been Chair of the Hong Kong International Arbitration Court (HKIAC). He is a member of numerous international arbitral institutions including the CPR International Panel of Distinguished Neutrals (New York), the Quebec National and International Commercial Arbitration Centre (Chairman, Committee of Experts), the British Columbia International Commercial Arbitration Centre (member - Panel of Arbitrators), the ADR Chambers International Panel (President), the International Council for Commercial Arbitration (ICCA), the College of Commercial Arbitrators (CCA), the Court of Arbitration for Sport (CAS) (Lausanne), the Legal Service and Research Centre (LSRC) and the International Arbitration Club (London).

From 1984 to 1989, Mr. Fortier was a member of the Permanent Court of Arbitration at The Hague. From 1992 to 1995, Mr. Fortier was Legal Advisor to the Commission on Global Governance in Geneva. Mr. Fortier has been a Member of the Trilateral Commission (member of the North American Executive Committee) since 1993.

**Professional Involvement**

Mr. Fortier is a member of numerous professional organizations, including the Canadian Bar Association, which he headed as National President in 1982-83, the American Bar Association (honorary), the International Commission of Jurists (Canadian Section), the International Bar Association, the Union Internationale des Avocats, the ICC Institute of International Business Law and Practice, the International Law Association (Canadian Branch), the American College of Trial Lawyers (member of the Board of Regents 1992-96) and The American Society of International Law.

Mr. Fortier is Governor and a director of Hudson's Bay Company, a director and Chairman of the Board of Alcan Inc. and a director of the Royal Bank of Canada, Nortel Networks Corporation, Nortel Networks Limited, Nova Chemicals Corporation and other Canadian companies. In 2001, Mr. Fortier was elected a Fellow of the Institute of Corporate Directors of Canada. Mr. Fortier is a former Governor of McGill University, a former director of the Montreal Neurological Institute and the Clinical Research Institute of Montreal. Mr. Fortier serves as a director, governor or patron of several non-profit organizations, including the Historica Foundation of Canada, the Canadian Unity Council, the C.D. Howe Institute, the Canadian Foundation for AIDS Research (CANFAR) and the Canadian Institute for Advanced Legal Studies. He is a member of the Advisory Council of the Quebec Chapter of the Institute of Corporate Directors. He is one of the Founding Directors of the Canadian Bar Association Law for the Future Fund and patron of the International Centre for Human Rights and Democratic Development.

In December 1991, Mr. Fortier was appointed an Officer of the Order of Canada. In April 1994, Mr. Fortier was made a Companion of the Order of Canada, the highest level of the Order.

In June 1992, Mr. Fortier was awarded the Médaille d'Or du Barreau du Québec, the highest distinction of the Quebec Bar. In August 1993, he was awarded the President's Award, the highest distinction of the Canadian Bar Association. In March 1989, Mr. Fortier received the degree of Doctor of Laws *honoris causa* from the Law Society of Upper Canada, in May 1992, from Acadia University, in May 1993, from the University of British Columbia and, in October 1999, from the Université de Montréal. In

2004. Mr. Fortier received the degree of Doctor of Commerce honoris causa from Ryerson University.

**Education**
B. Litt.- Rhodes Scholar (Oxford University, 1960)
B.C.L. First Class Honours (McGill University, 1958)
B.A.- *summa cum laude* (Université de Montréal, 1955)

# *EXHIBIT 5*

FROM WB-ICSID                                (WED) 5. 4'05 18:29/ST. 18:15/NO. 4864117939 P  2

# International Centre for Settlement of Investment Disputes
1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534   Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsd

May 4, 2005

**United States of America**
c/o Mr. Mark A. Clodfelter
Assistant Legal Adviser
Office of the Legal Adviser
  and
Ms. Andrea Menaker
Chief, NAFTA Arbitration Division
Office of International
Claims and Investment Disputes
Department of State
2430 E Street NW
Suite 203, South Building
Washington, DC 20037-2800

**Canfor Corporation**
**Terminal Forests Products, Ltd.**
c/o Mr. P. John Landry, Esq
Davis & Company
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7
  and
c/o Mr. Keith E. W. Mitchell, Esq
Harris & Company
14th Floor Bentall 5
550 Burrard Street
Vancouver, B.C.
Canada V6C 2B5

**Tembec Inc., Tembec Investements**
**Inc., and Tembec Industries, Inc.**
c/o Mr. Elliot J. Feldman, Esq.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

Re:    Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v. United
       States of America; Tembec *et al.* v. United States of America;
       Request for the establishment of a Consolidation Tribunal pursuant to NAFTA Article 1126

Dear Sirs and Madam,

This will confirm our receipt yesterday of a letter from counsel for Tembec *et al,* a copy of which
we are attaching for the United States of America and counsel for Canfor Corp. and Terminal Forests
Products, Ltd. We are also conveying Tembec's observations to Mr. Davis Robinson.

We have been informed by Mr. Yves Fortier that he is not available to serve as an arbitrator in the
consolidation proceedings. Accordingly, we are appointing Professor Armand de Mestral, a national of
Canada, as a coarbitrator in this case. Attached is a copy of Professor de Mestral's curriculum vitae as on
file with the Centre.

Sincerely yours,

Gonzalo Flores
Senior Counsel

Attachments

# BAKER
### &
## HOSTETLER llp
#### COUNSELLORS AT LAW

WASHINGTON SQUARE, SUITE 1100  •  1050 CONNECTICUT AVENUE, N.W.  •  WASHINGTON, D.C. 20036-5304  •  (202) 861-1500
FAX (202) 861-1783
ELLIOT J. FELDMAN
WRITER'S DIRECT DIAL NUMBER (202) 861-1679
E-MAIL: EFELDMAN@BAKERLAW.CO

May 2, 2005

**VIA FACSIMILE**

Mr. Jose Antonio Rivas
Secretary of the Tribunal
International Centre for Settlement
 of Investment Disputes
1818 H Street, N.W.
Washington, D.C.  20433

   Re: *Tembec Inc. v. United States of America*

Dear Mr. Rivas:

   On behalf of Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively, "Tembec"), we are writing in regard to the appointment of Mr. Davis R. Robinson to the proposed Article 1126 Consolidation Tribunal as noted in ICSID's letter of April 19, 2005.

   We understand that Mr. Robinson may have a familial relationship to the President of the United States, George W. Bush.  The existence of such a relationship is a circumstance that could "give rise to justifiable doubts as to the arbitrator's impartiality and independence" in proceedings before the proposed Article 1126 tribunal.[1]  Tembec's concerns about the appearance of such a relationship are heightened by Mr Robinson's prior service as a political appointee in two Republican Administrations.  Mr. Robinson was Assistant Legal Counsel and Legal Adviser in the U.S. State Department, "the senior attorney in the U.S. Government on international law matters," as noted in Mr. Robinson's resume.  The office that Mr. Robinson once directed now represents the United States in Tembec's case.  Absent some clarification about the nature of Mr. Robinson's  relationships that would alleviate doubts, Tembec would be obliged to object to Mr. Robinson's appointment.

---

[1] UNCITRAL Rules Article 10(1); *see also* Standard 2(b), (*Conflicts of Interest*), IBA Guidelines on *Conflicts* (suggesting disqualification where "facts or circumstances exist ... that, from a reasonable third person's point of view having knowledge of the relevant facts, give rise to justifiable doubts as to the arbitrator's impartiality or independence....").

FROM WB-ICSID                          (WED) 5. 4'05 18:29/ST. 18:15/NO. 4864117939 P  4

Mr. Jose Antonio Rivas
May 2, 2005
Page 2

      Justifiable doubts about an arbitrator's impartiality arise when "[t]he arbitrator has a close family relationship with one of the parties or with a manager, director or member of the supervisory board or any person having a similar controlling influence in one of the parties or with a counsel representing the parties."[2]  Publicly available information regarding President Bush's family relations suggests that Mr. Robinson may be related, either by blood or by law, to the President.  The President has a controlling influence over the United States.  President Bush is the Chief Executive of the U.S. Government and the final decision-maker in the Executive Branch for U.S. policy on international trade matters.  He controls the U.S. Department of Commerce and nominates the six members of the U.S. International Trade Commission.  President Bush also controls the U.S. State Department that has appeared on behalf of the United States in Tembec's case.  President Bush has dealt personally with the softwood lumber dispute, the subject matter of Tembec's arbitration, in meetings with the Canadian Prime Minister and perhaps on other occasions.  He has also discussed publicly, and privately with the Canadian Prime Minister and the President of México, problems with NAFTA's trade dispute institutions.

      The unavoidable policy implications of Tembec's dispute with the United States increase apprehension about any tribunal member who could be seen as having strong ties to the current U.S. Administration or to the agencies engaged in the case.  Tembec's claims concern measures undertaken by the Department of Commerce and the International Trade Commission during President Bush's Administration and allege improper political interference from different parts of the U.S. Government.  The outcome of Tembec's dispute could have implications adverse to the President and his policy aims.

      Were Mr. Robinson to serve as an arbitrator, his ability to be impartial and independent, in fact or in appearance, could be compromised by a close familial relationship to the President of the United States.  Furthermore, Mr. Robinson would be asked to judge impartially between arguments made by the claimants and arguments made by the Office of the Legal Adviser of the U.S. State Department, which he once directed.  Mr. Robinson's political appointment to that office under a Republican Administration amplifies Tembec's concerns.

      Tembec does not question Mr. Robinson's integrity, nor does it seek to impugn the highly distinguished government service he has rendered for many years on behalf of the United States.  Mr. Robinson already may have disclosed to ICSID the nature of any personal or familial relationship he may have to the President and any concerns about ties to the Office of the Legal Adviser.  However, Tembec is not yet aware of any disclosures and is concerned about the appearance of impartiality and independence among the members of the proposed tribunal.  Therefore, unless Mr.

---

[2] *IBA Guidelines on Conflicts,* example 2.3.8.

FROM WB-ICSID                          (WED) 5. 4'05 18:29/ST.18:15/NO.4864117939 P 5

Mr. Jose Antonio Rivas
May 2, 2005
Page 3

Robinson's relationships can be clarified to allay these concerns. Tembec would
request that ICSID appoint an alternative candidate.

Respectfully,

Elliot J. Feldman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

Counsel to Tembec Inc., Tembec Investments
Inc., and Tembec Industries Inc.

cc:    Gonzalo Flores, Esq.
       Mark A. Clodfelter, Esq.
       Andrea Menaker, Esq.
       Mark McNeill, Esq.
       P. John Landry, Esq.
       Keith Mitchell, Esq.

FROM WB-ICSID                    (WED) 5. 4' 05 18:29/ST. 18:15/NO. 4864117939 P  6

# CURRICULUM VITAE

### Armand de Mestral

**Date of Birth:**        17.11.41, Montreal, Canada

**Citizenship:**         Canadian, Swiss

**Family:**             Married to Rosalind Pepall, 17 September 1979; Philippe born 12 June 1981; Charles born July 26, 1984.

---

**Profession:**

-   Member of the Bar of the Province of Quebec, as of June 1967.

-   Professor of Law, McGill University (July 1976-).

-   Legal Officer of Department of Justice (1970-1976).

-   Member of United Nations Secretariat (1969-70).

**Studies:**
-   Harvard College, 1959-63; A.B. Magna cum laude.
-   Université de Paris, 1961-62.
-   McGill University: Faculty of Law
    B.C.L. Hons. 1963-66.
-   Harvard Law School, 1967-68, LL.M.
-   Institut universitaire de hautes études internationales, 1968-69

**Honours:**
-   Doctorat *honoris causa*, December 6, 1995, Université Jean Moulin (Lyon 3)
-   LL.D *honoris causa*, December 20, 2001, Kwansei Gakuin University, Nishinomyia, Kobe, Japan
-   Appointed Jean Monnet Professor of the Law of International Economic Integration 2003

**Scholarships:**
-   Harvard College Scholarship (1959-63).
-   McGill National Scholarship (1963-64).
-   Harvard Law School Fellowship (1967-68).
-   Government of Québec Fellowship (1967-68).

**Languages:**
    English, French, (read Spanish and German)

**Employment:**

- Royal Commission on bilingualism and biculturalism, research on administrative, constitutional law, summer 1964 to 1965. (Prepared report on Language and Education Laws in Canada, 1867-1964; prepared chapters on bilingualism in federal laws, regulations, federal-provincial agreements, treaties in C.A. Sheppard, Language and the Law in Canada, B & B Study no. 10).

- Office de révision du Code civil de la Province de Québec. Research into private international law, summers 1966, 1967. (Prepared report: La preuve de la loi étrangère, pp. 1-136 (1968)).

- Advisory Committee on Confederation, Government of the Province of Ontario. Research project on "Human rights under the law of the Province of Quebec," August - October 1967. (See publications).

- Department of External Affairs. Research into the law governing the exploration and exploitation of the resources of the seabed and subsoil of the oceans, summer 1968. (Prepared draft conventions and legal opinions).

- United Nations secretariat, United Nations Conference on trade and development, Geneva. Officer in international shipping legislation unit, September 1969 - May 1970. (Prepared secretariat reports of Working Group on International Shipping Legislation, Background Document: UNCTAD Doc. TD/B/ISL.2 and research reports).

- Department of Justice, Ottawa, 1970 - 1976. (Worked principally in fields of Public and Private International Law, Constitutional and Administrative Law. Responsible for federal-provincial arrangements to implement Hague Conventions on P.I.L. Prepared numerous opinions on matters of constitutional law, particularly relating to implementation of international treaties. Considerable work on Official Languages Act, advisor to Bilingual Districts Advisory Board. Principal officer of Department responsible for law of the sea issues. Participation in drafting several statutes. Participated in preparatory work of Victoria Conference 1971, etc.).

- Université d'Ottawa, 1973, 1974 (Part-time lecturer, masters program, section le droit civil course: "Le droit commercial international").

- 1976- , Associate Professor of Law, Faculty of Law, McGill University.

- 1976- , Associate Professor of Law, Faculty of Law, McGill University.

- 1976- , Consultant to public and private parties on questions of constitutional law and international trade law.

- 1979, Full Professor of Law.

- 1977-78, Consultant to U.N. Environment Program. (See publications).

- 1978, Consultant to Task Force on National Unity. (Preparation of Task Force Report, advisor on constitutional matters).

- 1980-81, Special Advisor, Bureau of Legal Affairs, Department of External Affairs, resident in Ottawa.

- 1982-83, Consultant to Department of External Affairs on Gulf of Maine litigation with the U.S.A. before International Court of Justice.

- 1981-89, Counsel, McDougall, Caron, Montréal.

- 1984-89 Director, Institute of Comparative Law, Faculty of Law.

- 1984-85, Consultant "Macdonald Commission" on the Canadian Economy.

- 1986, Department of Justice, Quebec Consultant on Constitutional Negotiations before Meech Lake Accord.

- 1988-92, Member, National Marine Council, by Minister of Fisheries and Oceans.

- 1989-, Counsel, Gottlieb & Associates, Montréal, Toronto, Brussels. (Advising on questions of constitutional law, international trade law.

- 1989, Appointed Member, Binational Dispute Settlement Panel under Chapter 18 of the Canada-U.S.A. Free Trade Agreement, by Minister of International Trade.

- 1991-2, Consultant to Québec Ministère de la Justice and Commission sur l'accès du Québec à la souveraineté

- 1992-3 Appointed by the Canadian and US Governments to Chair the Panel on UHT MILK IN PUERTO RICO under Chapter 18 of the Canada - USA Free Trade Agreement

- 1994-, Appointed to the Task Force on Trade and the Environment, Department of Foreign Affairs and International Trade.

- 1995-98 Advisory Committee on International Trade of the Minister of Foreign Affairs and International Trade (I.T.A.C.).

- 1995-, Appointed to the Canadian list of experts available for selection as members of dispute settlement panels of the World Trade Organization.

- 1996-,Appointed advisor to the Minister of Justice on constitutional issues. This appointment is of a confidential and contractual nature.

- 1997 - Nominated to the Roster of Dispute Settlement Experts, NAFTA Chapter 20 by the Minister of FAIT

- June 1998- Acting Director, Institute of Air and Space Law

- 1999 - Appointed to the Advisory Group in International Trade Disputes, Department of Foreign Affairs and International Trade

- 1999- Appointed to the Deputy Minister=s Academic Advisory Committee on Canada=s Trade Policy, Department of Foreign Affairs and International Trade

3

- 1999- Appointed to the Sectoral Advisory Group on International Trade - Department of Foreign Affairs and International Trade

- 2000- Appointed to the NAFTA Chapter 11 Arbitral Panel under ICSID Additional Facility Rules ADF Ltée v USA

- 2000- Appointed to WTO Panel on United States – s 211 Omnibus Appropriations Act

- 2002- Appointed to the Canadian Roster of Arbitrators of the Canadian Council on International Business (ICC Court of Arbitration)

**Pro bono:** Canadian Red Cross Society, Board Member 1993- ; President, October 1999- 2001; Chair, Humanitarian Law Committee 2003

**International Missions Delegations:**

- Conference 1972; IMCO Marine Pollution from Ships 1973; Third U.N. Conference on the Law of the Sea 1973-81; many preparatory and intersessional meetings on LOS; bilateral negotiations with U.S.A.; 1977 UNEP Experts Meeting on Environmental Responsibility.
  Observer on the Canadian Delegation to the 26th International Red Cross Conference, Geneva, 1995. Member of the Canadian Red Cross Delegation to the International Federation Conference in Seville, November 1997; Head of Delegation International Red Cross Conference, Geneva, November 1999;Member Delegation International Red Cross Conference, Geneva, November 2003.

**Publications:**   Articles, Contributions to collective books and digests

- de Mestral and Fraiberg, "Language Guarantees and the Power to amend the Canadian Constitution", 12 McGill Law Journal 502-20 (1966-67).

- "The Provinces and the Protection of Civil Rights in Canada: the province of Quebec", Ontario Advisory Committee on Confederation, Background Papers and Reports, (The Queen's Printer of Ontario, 1967), p. 37-73.

- "Le régime juridique de l'exploration et de l'exploitation des ressources de fond des mers", la revue générale de droit international public (1970), vol. 7, pp.640-667.

- Canadian Practice in International Law during 1972 as Reflected in Resolutions and Statements in the House of Commons, XI
  C.Y.I.L. 314-346 (1973);Id. (1973), XII
  C.Y.I.L. 340-70 (1974); Id., XIII
  C.Y.I.L. 374-395 (1975); Id., XIV
  C.Y.I.L. 344-370 (1976); Id., XV
  C.Y.I.L. 337-372 (1977); Id., XVI
  C.Y.I.L. 378-405; Id. XVII
  C.Y.I.L. 337 (1979); Id. XIX
  C.Y.I.L. 347 (1980); Id XIX
  C.Y.I.L. 347 (1981); Id. XX
  C.Y.I.L. 302 (1982); Id. XXI

4

C.Y.I.L. 302-361 (1983); Id. XXII
C.Y.I.L. 335-389 (1984); Id. XXIII
C.Y.I.L. 350-403 (1985); Id. XXIV
C.Y.I.L. 404-457 (1986); Id.XXV (with M. Irish).

- "La convention sur la prévention de la pollution résultant de l'immersion de déchets", XII A.C.D.I. 226-243 (1974).

- "La convention internationale de 1973 sur la prévention de la pollution par des navires", XIII A.C.D.I. 239-254 (1975).

- "Accord entre le Canada et la Norvège sur leurs relations en matière de pêche", XIV A.C.D.I. 270-282 (1976).

- "Deux récents accords bilatéraux en matière de pêche en 1977, XV A.C.C.I. 287-300 (1977).
  Bermuda Conference on the Law of the Sea, November 1976, Proceedings. Paper presented on "Enforcement of anti-pollution standards - questions of jurisdiction in the international zone", Bermuda Seminar on Law of the Sea, in Implications to Western North Atlantic Countries of the new Law of the Sea, eds. Seaton, Burnett-Herkes. April 1977.

- "Resolution of Disputes between Canada and the U.S.A. concerning pollution of the environment", Paper presented to Canadian Council on International Law, Proceedings of Sixth Annual Conference, Ottawa, Oct. 21-22, 1977, 1 Cda. U.S. Law Journal, 78-97, (1978).

- Study of Offshore Mining and Drilling Carried Out Within the Limits of National Jurisdiction, by A.L.C. de Mestral, Consultant, U.N. Environment Program, W.G. of Exports on Environmental Law, U.N. Doc./UNEP/W.G.14/2, 23/2/78. pp. 1-50.

- The Prevention of Pollution of the Marine Environment arising from Offshore Mining and Drilling", 20 Harvard International Law Journal, 469-518 (1979).

- With L.H.J. Legault, Multilateral Negotiation.  Canada and the Law of the Sea Conference in International Journal. (Autumn 1979).

- "The GATT and Government Procurement in Canada" in Non-Tariff Barriers After the Tokyo Round ed. Quinn & Slayton (I.R.P.P. 1982).

- "The Law Applicable to the Canadian East Coast Off-Shore" 21 Alta L. Rev. 63-81 (1983).

- Editor, Communications and Information:  International Legal Aspects, Proceedings of the 1982 Annual Conference of the Canadian Council in Int'l Law (1983), p. 1-241.

- Note: "Treaty Power and More on Rules and Obiter Dicta". 61 Can. Bar Rev. 856-865 (1983).

- "Le rôle de la pratique dans la formation du droit int'l public", 14 R.D.U.S., 441-453 (1983-84); Travaux de l'Association Henri Capitant, Tome XXXIV (1983) pp. 559-568.

- "Compulsory Dispute Settlement in the 3rd U.N. Convention on the Law of the Sea" in Contemporary Issues in International Law, Essays in Honour of L.B. Sohn, 169-188 (N.P. Engel, Kehl, 1984).

FROM WB-ICSID                    (WED) 5. 4'05 18:30/ST. 18:15/NO. 4864117939 P 11

"L'Application aux gouvernements administratifs régionaux et locaux de l'accord général sur les tarifs douaniers et le commerce ....", I R.S.Q.D.I. 34-43 (1985).

[1985] A.I.J.C. pp. 325-338 (chronique canadienne).

"Constitutional Aspects of Free Trade Negotiations: Canada" in Shoenbaum and Dallmeyer Eds., How to Achieve Free and Fair Trade Between the United States and Canada, Dean Rusk Centre monograph, University of Georgia, Athens, 1986, pp. 17-28.

"Position of Aliens in Canada" in Frowein & Stein (eds.) The Legal Position in National and International Law/Le régime juridique des étrangers en droit national et international, Max Planck Conference Proceedings, Springer-verlag, Heidelburg/Berlin 1987, pp. 765-838.

"The Implementation of Canada's International Economic Obligations" in International Law Critical Choices for Canada 1985-2000, Queen's Law Journal, Kingston, 1986, pp. 132-205.

"Commentaires" in Antaki & Prujiner, L'arbitrage Commercial International, Yvon Blais, Cowansville, 1986, pp. 33-39.

Access to Markets under the Canada/U.S.A. Free Trade Agreement, de Mestral, Janda (Eds) Institute of Comparative Law, McGill University (1988) pp. 1-79.

"L'évolution des rapports entre le droit canadien et le droit international ..." (1987) 25 C.Y.I.L. pp. 301-323.

[1986] A.I.J.C., pp. 115-117 (Rapport canadien); pp. 279-282 (Chronique canadienne 1986).

"Legal Status of Aliens in Canadian Law" (1988) 22 Kobe J.L.R. 47-61.

Ibid., translated into Japanese by Prof. H. Nishitoni (1988) Hiroshima Law Journal 71-84.

"L'application extraterritoriale des lois" 1987 Proceedings of the C.C.I.L. 203-219.

de Mestral, "The Liberalisation of East-West Trade and GATT" in McWhinney, Ross, Tunkin and Vereshchetin, in From Coexistence to Cooperation, Nijhoff, Dordrecht, Boston, London, 1991, pp.221-240. ISBN 0-7923-1401-8

de Mestral & Larouche, "L'évolution du droit constitutionnel canadien en 1988," Annuaire international de justice constitutionnelle, t.5, 1989, pp.385-392. Economica-Presses universitaires d'Aix-Marseille (1991).

de Mestral & Larouche, "L'évolution du droit constitutionnel canadien en 1989," Annuaire international de justice constitutionnelle, t.5, 1989, pp.393-400. Economica-Presses universitaires d'Aix-Marseille (1991) ISBN 2-7178 2109-0

6

deMestral, "Le Québec et les relations internationales," in Patenaude, Québec-Communauté française de Belgique: Autonomie et spécificité dans le cadre d'un régime fédéral, Actes du Colloque du 22 mai 1991, Wilson et Lafleur, Montréal, 1991, pp.209-223. ISBN 2-89127-205-6.

-de Mestral, "Canada" in K.M. Meessen (ed), International Law of Export Control, Graham & Trotman/ Nijhoff, London, Dordrecht, Boston, 1992, pp.41 - 56. ISBN 1-85333-483-9.

de Mestral et C. Verdon, "La conclusion et la mise en oeuvre des traités dans les états unitaires et fédérés" in Contemporary Law: Droit Contemporain, Rapports Canadiens au congrès international de droit comparé, Les Éditions Yvon Blais, Cowansville, 1992, pp.442-463.

de Mestral, "Economic Integration under the GATT, the FTA, the Treaty of Rome and the Canadian Constitution" in Tangled Web, Legal Aspects of Deconfederation, The Canada Round: A Series on the Economic Aspects of the Breakup of Confederation - No. 15, C.D. Howe Institute, Toronto, 1992 ISBN 0-88806-298-2.

A.L.C. de Mestral & P. Larouche, "L'évolution du droit constitutionnel en 1990" in (1990) VI Annuaire International de Justice Constitutionnelle, pp.519-529; ISBN 2-7178 2337-9.

A.L.C. de Mestral, "L'union économique canadienne et la place du Québec au sein de cette union: une étude comparative" in Société française pour le droit international/Société québécoise de droit international, Colloque du Québec:Perspectives convergentes et divergentes sur l'intégration économique en Eurpoe et en Amérique, Editions Pédonne, Paris, 1993. pp.141-157. ISBN?

A.L.C. de Mestral, "Dispute Settlement under the NAFTA" in A.R. Rigs & T. Velk (Eds) Beyond NAFTA, Frazer Institute, Vancouver, 1993. pp.260-265. ISBN 0-88975-162

A.L.C. de MESTRAL, "La subsidiarité est-elle une menace au grand marché intérieur?" (1993) 3 Revue nationale de droit constitutionnel 391-414.

A.L.C. de Mestral & Jan Winter, "Dispute Settlement Under the Treaty of European Union and the North American Free Trade Agreement," 17 Journal of European Integration 235 (1994)

A.L.C. de Mestral, "The Resolution of Disputes between Japan, Canada and the United States: A Modest Proposal," To be published in collective work edited by Michael Young and Y. Iwasawa arising out of the ASIL\JAIL\CCIL Trilateral Conference, Tokyo, August 1994.

A.L.C. de Mestral, "La structure de l'association économique Québec - Canada" Choix, IRPP, série Québec - Canada, vol. 1, n. 6, 1995. ISSN 0711-0685

A.L.C de Mestral, AThe Significance of the NAFTA Side Agreements on Environmental and Labour Cooperation, (1998) 15 Ariz. J. of Int=l and Comp. Law 169-185

A.L.C. de Mestral, Reconciling Human Rights and International Trade Law (1999) 3 Candian International Lawyer 71-79

- Hague Academy of International Law, THE NORTH-AMERICAN FREE TRADE AGREEMENT: A COMPARATIVE ANALYSIS, 275 *Recueil des cours* 223 – 416 (1998) [Published in 2000]

- A.L.C. de Mestral & J.A. Winter, "Mobility Rights in the European Union and Canada" (2001) 46 McGill L.J. 979 – 1009

- A.L.C. de Mestral, "L'obligation constitutionnelle de respecter les conventions de Genève: quelques Réflexions sur la place du droit humanitaire en droit canadien" in Essays in Honour of Gérald Beaudoin (Editions Yvon Blais, Cowansville, 2002, pp 1-521) pp.155-162

- A.L.C. de Mestral, "The consequences of the European Court of Justice "open skies" decisions, Proceedings of the ICAO International Air Transport Conference, Montréal, March 27, 2003

- A.L.C. de Mestral, "The NAFTA Commission on Environmental Cooperation - Voice for the North American Environment?" in A. Kiss, D. Shelton and K. Ishibashi eds., Economic Globalization and Compliance with International Environmental Agreements. (Kluwer Law International, 2003, pp. 302) at pp. 283-301.

- A.L.C. de Mestral, « Guest Editorial : Bisystemic Law-Teaching – The McGill Programme and the Concept of Law in the EU » ( 2003) 40 CMLR 799 – 807

- William A Dymond & Armand de Mestral, "New Destinations in International Air Policy," IRPP, Policy Matters, October,2003 Vol 4, no2

- A.L.C. de Mestral & Jan Winter "Giving Direct Effect to NAFTA" in IRPP, The Art of the State, Vol II, no 6 pp 35 – 98 (2004)

Publications:    Book Reviews

- LV Can. Bar Rev. 782-3 (1977), Journal of Maritime Law & Commerce Queens Law Journal; 1983 Can. Bar Rev. inter alia.

- Student Casebooks: Cases and Materials on International Business Law (1st ed. 1976), with J.G. Castel (2nd ed. 1978), (3rd ed. 1980) J.G. Castel with W. Graham (4th Ed. 1982) (5th ed. 1983);
- de Mestral, Cases and Materials on the Law of International Trade 1990 – revised anually With G. Alexandrowicz (Queen's); Cases and Materials on the Law of the Sea (1978). Digests: Ocean Law: a Canadian Perspective, with G. Alexandrowicz (Queen's University). Vol. 1 Historical Material, High Seas;  Vol. 2 Territorial Sea, Special Bodies of Water Vol. 3 Part I Continental Shelf (Preliminary photocopied editions are in McGill Law Library, draft of Vol. 1 revised edition was prepared; Vol. 4 - Fisheries, preliminary edition almost completed; Vol. 5 - Pollution, in preparation). Droit Constitutionnel - Documents supplémentaires 1979 - 1998 Supplementary Materials on EEC Law. 1992 (with J.A. Winter)

Publications:  Books
- With Kindred et al, International Law Chiefly as Interpreted and Applied in Canada, 5th ed. Emond Montgomery Publications Ltd., Toronto, 1993, p. 1-958.

- With S. Williams Introduction to International Public Law, Chiefly as Interpreted and Applied in Canada, (Butterworths 1979), pp. 338. Translation by Professor E. Groffier-Atala, de Mestral & Williams, Introduction au droit international public (Butterworths, 1982) pp. 340.

- Williams & de Mestral, An Introduction to International Law, Chiefly as Interpreted and Applied in Canada, 2nd ed., Butterworths, Toronto, 1987, pp. 1-437.

- Castel, de Mestral and Graham, International Business Transactions, Emond Montgomery Canada Law Book, Toronto, 1986.

- de Mestral, Birks, Cotler, Morel, Klinck, Bothe (Eds). The Limitation of Human Rights in Comparative Constitutional Law, Les Editions Yvon Blais, Cowansville, 1986, pp. 1-593.

- de Mestral & T. Gruchalla-Wesierski, Extraterritorial Application of Export Control Legislation: Canada and the U.S.A., Kluwer, December 1990.

- de MESTRAL, L. REIF (eds) Canada, Japan and International Law, Proceedings of the 1990 Annual Conference of the Canadian Council on International Law, C.C.I.L., Ottawa, 1992, pp.1 - 330. ISBN 0-920157-16-5

- Castel, de Mestral, Graham, The Canadian Law and Practice of International Trade, Emond Montgomery, Toronto, 2nd Ed.,1997, pp.1-766 .ISBN 0-920722-91-1.

- With H.Kindred et al, International Law (6th ed) Emond Montgomery, Toronto, 2000. pp. 1 - 1212. ISBN 1-55239-052-7
  Id. Documentary Supplement pp. 1 - 148. ISBN 1-55239-055-1

- Co-editor responsible for French language contributions since 1983 eg: C.Bourne & A.L.C. de Mestral, (eds), Canadian Yearbook of International Law\Annuaire canadien de droit international , vols 21-40 1983 et seq, UBC Press, Vancouver, 1984 et seq., ISBN 0-7748-0389-4. Published annually, latest volume XL 2002 (issued 2003) ISBN 0-7748-0937-x Co-Editor with D.M. McRue

**Teaching and lecturing**

European community law; International trade law; Law of regional economic international integration; Law of the sea; Constitutional law; Comparative constitutional law; International environmental law. International Humanitarian Law

**Current Research and Writing:**
- Research on the law governing regional economic integration and the multilateral system
- Contract for a new and reconceived version of Williams and de Mestral, Public International Law

**Long-term Projects:**

- The law governing regional economic integration at the international, regional and federal levels

**Research Grants:**

- SSHRC $22,000 1990-91, Research on International Contracts and the Law of Quebec.

- Social Sciences & Humanities Research Council of Canada, $8,000 to complete research with G.S. Alexandrowicz and prepare Digest on Canada and the Law of the Sea 1979-80.

- Petroleum Law Foundation, Research Grant $2000, 1980; $1500, 1981.

- C.C.I.L. Dept. of External Affairs, $20,000, (1984-85).

- Department of Justice, Ottawa, Quebec, S.S.H.R.C., McGill University $57,000 to fund conference and publication (1984-85).

- Ministère de l'Education du Québec - Sabbatical leave grant $3,000 (1986-87).

- SSHRC research grant on arbitration under the law of Quebec, 1989 grant of 34,000 with three other researchers

- Challenge 88.

- Challenge 89.

- Concours Rousseau 1988-89, $3,000.

- Conference on Japan, Canada and International Law Grants of 31,000 from Japan Foundation, Pacific 2000 Fund and Law Firms.

- Fondation du Barreau 1990, 1991, 1882 grants of $10,000

- Ministère de la Justice du Québec 1991 grant of $5000

- Department of the Environment 1992 grant of $10,000 to organise a conference on the depletion of the ozone layer.

- Research project and Conference organized with the Japanese Association of International Law, the American Society of International Law and the Canadian Council on International              Law $(150,000 in Japan, U.S.A. and Canada) - 1992-1994

- Projet de recherche sur le droit civil du Québec et les contrats internationaux - FCAR (min. de l'éducation du Québec) $48,000 pour trois ans (partage avec 5 autres chercheurs). Current grant 1994-1997.

- North American Commission on Environmental Cooperation - research on dispute settlement under the NAAEC grants of $20,000 1995-96, 1996-97

10

- Research project and conference held in Ottawa on October 25-26, 2000 with the CCIL, the Japanese Association of International law and the American Society of International Law. Grant of 15,000 from the ASIL for a conference and publication of a book of the proceedings.

- IRPP Research project – preparation of paper and draft treaty on deepening of NAFTA for major IRPP Conference October 17-19,2003; total grant of $7000
- SSHRC Research project on the open skies concept and its implications for Canada, $136.000 shared 2004-2005
- SSHRC Research project on regional economic integration agreements, $210,000 shared with three colleagues 2005 – 2008.

Law Review/Editing:

- Canadian Yearbook of International Law/Annuaire Canadien de droit international (Adjoint au rédacteur de Langue française, 1974-83); Rédacteur de langue française (1983-).

- International Business Law Journal Editorial Board (1986-).

- Revue du droit et de la pratique du commerce international (Paris) Editorial Board (1987-).

- Member of Editorial Board, McGill Law Journal, 1964-66.

- Harvard International Law Journal, 1967-68.

- International Law Journal\Revue de droit international, Toronto, Comité de rédaction, 1995-.

- Etudes internationales, Québec, Comité de rédaction, 1995-.

- Croatian Journal of Comparative Law 1996-

**Conferences organized:**

- McGill Conference on Constitutional Change December 1978 organized with Professors McCall, Brierley & Cotler.

- Symposium on the Free Movement of Goods, Capital and Services in Canada and the E.E.C. Joint McGill, Université de Montréal Conference, September 22, 1979, organized with Professor Soldatos of U. de M. and Professor Crépeau.

- 8th Annual Conference of the Canadian Council on International Law on "International Economic Law, Ottawa, October 25-27th, 9th, 10th & 11th Annual Conferences, organized in capacity of Secretary of C.C.I.L.

- Conference on Comparative Constitutional Protection of Human Rights, McGill University, May 23-24, 1985.

- Conference on Access to Markets under the Canada-U.S. Free Trade Agreement, February 12, 1988.

- "A Comprehensive Examination of International Trade Issues, December 2, 3, 1988.

- "Ready for Free Trade", conference on the implementation of the Canada-U.S.A. F.T.A., Friday, March 10, 1989.

- 19th Annual Conference of the C.C.I.L., Canada-Japan and International Law, October 1990.

- October 1992 Conference on the Depletion of the Ozone Layer. Organized with Professor Brunée.

- Conference organized with the Japanese Association of International      Law, the American Society of International Law and the Canadian Council on International Law -Conference in Tokyo, Kyoto and Hiroshima, July-August 1994.
- Third Trilateral Conference – CCIL/JAIL/ASIL, Ottawa, October 2000

- McGill Institute of Air and Space Law, 50th Anniversary Conference "Air and Space Law before the Challenges of the 21st Century, McGill April 19 – 21, 2002
- 2001- Conferences and round tables for the European Studies Institute, McGill University-Université de Montréal
- Numerous round tables and workshops for the Institute of European Studies 2001-

## Learned Societies:

- Canadian Council on International Law, Secretary, 1978-82; Member of Board, 1972-84; Vice-President, 1984-87, President, 1987-91.

- Canadian Bar Association, 1967-.

- American Soc. Int'l. Law, 1964-.

- Canadian Human Rights Foundation (Member, National Council, 1978- ).

- F.I.E.D.A. McGill Representative.

- International Law Association - Member of Committees on Extraterritoriality. and International Trade Law

- European Society of International Law

## Editorial Boards
- Rédacteur associé responsable des contributions en français Annuaire Canadien de droit international / Canadian Yearbook of International Law, 1983-
- Revue du droit et de la pratique du commerce international (Paris) Editorial Board 1987-.
- International Law Journal\Revue de droit international, Toronto, Comité de rédaction, 1995-
- Etudes internationales, Québec, Comité de rédaction, 1995-.
- Croatian Critical Law Review 1996-

**Conference participation:**

- Frequent; e.g. Congrès Henri Capitant, Lausanne, Switzerland, paper presented June 20, 1983. Max-Planck Institute Conference on Aliens, September 1985. Paris, Aix, Montpellier 1986-87 etc. Table ronde de droit constitutionel comparé.- Aix en Provence 1987-.etc

**Lectures:**
- Universities of Paris, Aix-Marseille III, Sienna, Frankfurt (1986-87), Kobe, Kwansei Gakuin (1989), Basel ( 1989). Free University of Amsterdam (1990-2003), Sherbrooke (1991) Tokyo 1989 Fukuoka 2000, Tokyo, Kobe, Takamatsu 2001, Madrid, Barcelona 2002 , Amsterdam, Geneva 2003

- Invité: Institut des Hautes Etudes Internationales, (Paris II) Conférences sur l'ALENA, March 1996

- Académie de droit international, (La Haye) Cours de l'Académie on NAFTA, July, 1996.

- Visiting professor, Faculty of Law, Kwansei Gakuin University, Nishinomyia, Kobe, Japan 2001.

**University Activities:**
- Co-Director McGill – Université de Montréal Institute of European Studies 2002-

- Director, Institute of Comparative Law, 1984-89.

- Acting Director, Institute of Air and Space Law 1998-2002

- Responsible for the organization of the Joint McGill – U de Montréal Institute of European Studies with the support of the European Community 1999 -

- Law Faculty: Committees - Curriculum (1976-7); Graduate Studies (Chairman 1978); Admissions (1978-79, Chairman, 1981-83), various promotion and tenure committees; Ad hoc review preparatory committee. Faculty Appointments Committee (1983).

- University: Cttee. on Copyright; Verbal and Written Opinions on Bill 101 for assistant to Principal (1977-8).

- Law/Management: Cttee. on Law/M.B.A. Degree; Cttee. on B.A./Law Degree (1977).

- C.A.I..T. Representative (1977-8).

- Jessup International Law Moot Court Program Judge (frequently 1972-).

- Concours Rousseau, Faculty organizer, Judge, 1985-.

- Institute of Comparative Law - Special Responsibility for courses on Int'l. Business Law at request of Director (1978- ); Admissions Cttee. (Member 1978, Co-Chairman 1981-83).

- Programme d'études canadiennes françaises (Conférencier invité pour faire trois cours sur "La crise constitutionnelle 1945-1977" (nov. 1977, janvier-février 1978). Oceanography Lectures on LOS; Management, etc.

- University Appeals Committee 1991- (Chair 1992 )

- University Policy and Planning Committee

**Thesis and Study Direction:**

- University of Ottawa, section de droit civil, while part-time lecturer 1972-75.
- McGill Currently supervising 2 doctoral theses - and 7 masters theses. I have regularly supervised at least 1-2 doctoral students and at least 4-5 LL.M. graduate students each year.
- External reader Universities of Toronto, Queens, York, Montréal, Laval, UQUAM, Ottawa
- Many independent research papers past and present by B.C.L., LL.B. students.
- Graduate research papers

**Address:** Office:    Faculty of Law, McGill University
3674 Peel St.,
Montréal, Québec
H3A 1W9
Phone: 398-6643
FAX: 398-3233
E mail: armand.de.mestral@mcgill.ca

Home:    45 Thornhill Avenue
Westmount, Quebec,
Canada   H3Y 2E3
514-934-1621

14

# *EXHIBIT 6*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Arbitration between )<br><br>)<br>TEMBEC INC., TEMBEC INVESTMENTS )<br>INC., TEMBEC INDUSTRIES INC. )<br><br>)<br>                Petitioners, )<br><br>)<br>     and )<br><br>)<br>THE UNITED STATES OF AMERICA )<br><br>)<br>           Respondent )| Case No. 05-2345 (RMC) |

## DECLARATION OF RONALD A. CASS

I, Ronald A. Cass, declare as follows:

1.      I am over 18 years of age, am competent to make this Declaration, and have personal knowledge of the matters stated herein.

2.      I am currently President of Cass & Associates, PC, a legal consultancy firm specializing in international trade, intellectual property, antitrust, and administrative law. I have served in this position since 2004.

3.      I was Dean of Boston University School of Law from 1990 to 2004 and also was the Melville Madison Bigelow Professor of Law. Prior to joining the law school as Dean, I served as a Commissioner, and then Vice Chairman, of the United States International Trade Commission from 1988 to 1990. I also have been a law professor at the University of Virginia and Boston University, and a visiting professor at the Université Jean Moulin (Lyon III, France), the

Université Aix-en-Provence (France), and Universidad Francisco Marroquin
(Guatemala), and an adviser to the United Nations Conference on Trade and
Development.

4.       I have experience as an international arbitrator, having served on a
variety of international arbitral panels appointed under the Rules of the United
Nations Commission on International Trade Law ("UNCITRAL Rules"), the
International Centre for Settlement of Investment Disputes (ICSID), and the
American Arbitration Association's international arbitration rules.  Among
other matters, I presently serve on the NAFTA Chapter 11 tribunal in *United
Parcel Service v. Canada.*

5.       I have a thorough knowledge of the UNCITRAL Rules and have
interpreted and applied the UNCITRAL Rules as an arbitrator.

6.       I am familiar with the NAFTA Chapter 11 arbitration at issue in
this proceeding.   I have several observations relevant to Tembec's challenge to
the September 7, 2005 Order rendered by the arbitration consolidation tribunal
constituted under NAFTA Article 1126 *In the Matter of Canfor Corp. v. United
States, Tembec et al. v. United States, and Terminal Forest Products Inc. v.
United States.*

7.       When parties challenge arbitrators for lack of impartiality, or for
conflicts of interest that raise questions respecting impartiality, even the most
experienced arbitrators whose reputations for fairness are strong routinely
withdraw.  Arbitrators do not withdraw solely in circumstances where partiality
has been shown.  Far more commonly, arbitrators withdraw in situations

where a challenge is at most colorable. Withdrawal in these circumstances shows sensitivity to the possible appearance of partiality and to the special nature of decision-maker selection in arbitrations. Arbitrators occasionally refuse to withdraw when a challenge appears frivolous or completely unfounded.

8.      A challenge to an arbitrator's impartiality is at least colorable in circumstances where the arbitrator is related to an officer of one of the parties, and where the same arbitrator was the former head of the legal office responsible for defending that party in international arbitrations. I would expect that the challenged arbitrator in such a situation would withdraw from the arbitral tribunal. Certainly, the grounds for challenge of that arbitrator are just as strong as the grounds for challenge of the Canadian arbitrator who withdrew after challenge by the United States in the consolidation proceeding at issue in this case.

9.      Arbitration derives its value from the consent of the parties. An arbitrator should respect the consensual nature of arbitration by deferring to a colorable objection by one of the parties that calls into question his or her impartiality. For that reason, the threshold for withdrawal in arbitration is lower than that for judicial recusal in a court of law.

10.     I am familiar with the UNCITRAL Rules governing challenges to arbitrators. See UNCITRAL Rules, Articles 9-12 (Attachment A). Pursuant to Article 10, parties are allowed fifteen days to challenge an arbitrator's impartiality. Based on my experience as an arbitrator, as well as my

understanding of the UNCITRAL Rules, it is simple common sense that arbitrators should allow the parties the fifteen-day period for challenge and should not take actions affecting the case during that time. The selection of the arbitral tribunal is the base upon which the arbitration proceeding rests. Arbitrators should not act until the time for challenge has run without a demand for withdrawal being lodged.

11.     The same understanding of the basis for withholding action applies to the situation where a challenge is lodged. When a challenge to the impartiality of a nominee to arbitrate has been asserted, the arbitrators should not act while the challenge is pending. They should stay their hand unless and until the challenge is resolved. The basis for requiring timely challenges to arbitrators within a short time period is to resolve and remove any potential cloud on the conduct of the tribunal. The basis for staying action pending the time for initial challenge – and equally or more so, for staying action pending the resolution of a challenge – is to prevent a situation in which decisions of the tribunal are under a cloud and potentially would need to be decided again by a successor panel. Absent compelling reasons for an urgent need to dispose of issues, arbitrators operating under the UNCITRAL Rules should refrain from acting while a challenge to one of them is pending.

12.     In the arbitral proceeding at issue here, Tembec challenged the appointment of Mr. Davis Robinson under Article 10 of the UNCITRAL Rules. The nominated arbitrators took action affecting the overall, long-term disposition of the proceeding during the fifteen-day time within which

challenges to the composition of the arbitral tribunal are permitted. The arbitrators took action affecting the overall, long-term disposition of the proceeding during the pendency of Tembec's challenge. Based on my knowledge and experience, any action that is taken by arbitrators, despite a pending challenge to the impartiality of one of them, contravenes the evident intent of the UNCITRAL Rules.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  February 14, 2006

Ronald A. Cass

5

ATTACHMENT A

3. If within thirty days after the appointment of the second arbitrator the two arbitrators have not agreed on the choice of the presiding arbitrator, the presiding arbitrator shall be appointed by an appointing authority in the same way as a sole arbitrator would be appointed under article 6.

## Article 8

1. When an appointing authority is requested to appoint an arbitrator pursuant to article 6 or article 7, the party which makes the request shall send to the appointing authority a copy of the notice of arbitration, a copy of the contract out of or in relation to which the dispute has arisen and a copy of the arbitration agreement if it is not contained in the contract. The appointing authority may require from either party such information as it deems necessary to fulfil its function.

2. Where the names of one or more persons are proposed for appointment as arbitrators, their full names, addresses and nationalities shall be indicated, together with a description of their qualifications.

## CHALLENGE OF ARBITRATORS (Articles 9 to 12)

## Article 9

A prospective arbitrator shall disclose to those who approach him in connexion with his possible appointment any circumstances likely to give rise to justifiable doubts as to his impartiality or independence. An arbitrator, once appointed or chosen, shall disclose such circumstances to the parties unless they have already been informed by him of these circumstances.

## Article 10

1. Any arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrators impartiality or independence.

2. A party may challenge the arbitrator appointed by him only for reasons of which he becomes aware after the appointment has been made.

## Article 11

1. A party who intends to challenge an arbitrator shall send notice of his challenge within fifteen days after the appointment of the challenged arbitrator has been notified to the challenging party or within fifteen days after the circumstances mentioned in articles 9 and 10 became known to that party.

2. The challenge shall be notified to the other party, to the arbitrator who is challenged and to the other members of the arbitral tribunal. The notification shall be in writing and shall state the reasons for the challenge.

3. When an arbitrator has been challenged by one party, the other party may agree to the challenge. The arbitrator may also, after the challenge, withdraw from his office. In neither case does this imply acceptance of the validity of the grounds for the challenge. In both cases the procedure provided in article 6 or 7 shall be used in full for the appointment of the substitute arbitrator, even if during the process of appointing the challenged arbitrator a party had failed to exercise his right to appoint or to participate in the appointment.

## Article 12

1. If the other party does not agree to the challenge and the challenged arbitrator does not withdraw, the decision on the challenge will be made:

   *(a)* When the initial appointment was made by an appointing authority, by that authority;

   *(b)* When the initial appointment was not made by an appointing authority, but an appointing authority has been previously designated, by that authority;

   *(c)* In all other cases, by the appointing authority to be designated in accordance with the procedure for designating an appointing authority as provided for in article 6.

2. If the appointing authority sustains the challenge, a substitute arbitrator shall be appointed or chosen pursuant to the procedure applicable to the appointment or choice of an arbitrator as provided in articles 6 to 9 except that, when this procedure would call for

the designation of an appointing authority, the appointment of the arbitrator shall be made by the appointing authority which decided on the challenge.

## REPLACEMENT OF AN ARBITRATOR

### Article 13

1. In the event of the death or resignation of an arbitrator during the course of the arbitral proceedings, a substitute arbitrator shall be appointed or chosen pursuant to the procedure provided for in articles 6 to 9 that was applicable to the appointment or choice of the arbitrator being replaced.

2. In the event that an arbitrator fails to act or in the event of the *de jure* or *de facto* impossibility of his performing his functions, the procedure in respect of the challenge and replacement of an arbitrator as provided in the preceding articles shall apply.

## REPETITION OF HEARINGS IN THE EVENT OF THE REPLACEMENT OF AN ARBITRATOR

### Article 14

If under articles 11 to 13 the sole or presiding arbitrator is replaced, any hearings held previously shall be repeated; if any other arbitrator is replaced, such prior hearings may be repeated at the discretion of the arbitral tribunal.

## Section III. Arbitral proceedings

### GENERAL PROVISIONS

### Article 15

1. Subject to these Rules, the arbitral tribunal may conduct the arbitration in such manner

# *EXHIBIT 7*

FROM HB-TGBID                              (MON) 5   1 05 16:29/01 16:15/No 100111999

# BAKER
## & 
## HOSTETLER LLP
### COUNSELLORS AT LAW

WASHINGTON SQUARE, SUITE 1100   •   1050 CONNECTICUT AVENUE, N.W.   •   WASHINGTON, D.C. 20036-5304   •   (202) 861-1500
FAX (202) 861-1783
ELLIOT J. FELDMAN
WRITER'S DIRECT DIAL NUMBER (202) 861-1679
E-MAIL: EFELDMAN@BAKERLAW.CO

May 2, 2005

**VIA FACSIMILE**

Mr. Jose Antonio Rivas
Secretary of the Tribunal
International Centre for Settlement
   of Investment Disputes
1818 H Street, N.W.
Washington, D.C.  20433

Re:    *Tembec Inc. v. United States of America*

Dear Mr. Rivas:

On behalf of Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively, "Tembec"), we are writing in regard to the appointment of Mr. Davis R. Robinson to the proposed Article 1126 Consolidation Tribunal as noted in ICSID's letter of April 19, 2005.

We understand that Mr. Robinson may have a familial relationship to the President of the United States, George W. Bush.  The existence of such a relationship is a circumstance that could "give rise to justifiable doubts as to the arbitrator's impartiality and independence" in proceedings before the proposed Article 1126 tribunal.[1]  Tembec's concerns about the appearance of such a relationship are heightened by Mr Robinson's prior service as a political appointee in two Republican Administrations.  Mr. Robinson was Assistant Legal Counsel and Legal Adviser in the U.S. State Department, "the senior attorney in the U.S. Government on international law matters," as noted in Mr. Robinson's resume.  The office that Mr. Robinson once directed now represents the United States in Tembec's case.  Absent some clarification about the nature of Mr. Robinson's  relationships that would alleviate doubts, Tembec would be obliged to object to Mr. Robinson's appointment.

---

[1] UNCITRAL Rules Article 10(1); *see also* Standard 2(b), (*Conflicts of Interest*), IBA Guidelines on *Conflicts* (suggesting disqualification where "facts or circumstances exist ... that, from a reasonable third person's point of view having knowledge of the relevant facts, give rise to justifiable doubts as to the arbitrator's impartiality or independence....").

FROM HD 1661D                                    (WED) 9. 4 09 10:29/01. 10:19/NO. 4604117959 P 4

Mr. Jose Antonio Rivas
May 2, 2006
Page 2

Justifiable doubts about an arbitrator's impartiality arise when "[t]he
arbitrator has a close family relationship with one of the parties or with a manager,
director or member of the supervisory board or any person having a similar controlling
influence in one of the parties or with a counsel representing the parties."[2] Publicly
available information regarding President Bush's family relations suggests that Mr.
Robinson may be related, either by blood or by law, to the President. The President
has a controlling influence over the United States. President Bush is the Chief
Executive of the U.S. Government and the final decision-maker in the Executive Branch
for U.S. policy on international trade matters. He controls the U.S. Department of
Commerce and nominates the six members of the U.S. International Trade
Commission. President Bush also controls the U.S. State Department that has
appeared on behalf of the United States in Tembec's case. President Bush has dealt
personally with the softwood lumber dispute, the subject matter of Tembec's arbitration,
in meetings with the Canadian Prime Minister and perhaps on other occasions. He has
also discussed publicly, and privately with the Canadian Prime Minister and the
President of México, problems with NAFTA's trade dispute institutions.

The unavoidable policy implications of Tembec's dispute with the United
States increase apprehension about any tribunal member who could be seen as having
strong ties to the current U.S. Administration or to the agencies engaged in the case.
Tembec's claims concern measures undertaken by the Department of Commerce and
the International Trade Commission during President Bush's Administration and allege
improper political interference from different parts of the U.S. Government. The
outcome of Tembec's dispute could have implications adverse to the President and his
policy aims.

Were Mr. Robinson to serve as an arbitrator, his ability to be impartial and
independent, in fact or in appearance, could be compromised by a close familial
relationship to the President of the United States. Furthermore, Mr. Robinson would be
asked to judge impartially between arguments made by the claimants and arguments
made by the Office of the Legal Adviser of the U.S. State Department, which he once
directed. Mr. Robinson's political appointment to that office under a Republican
Administration amplifies Tembec's concerns.

Tembec does not question Mr. Robinson's integrity, nor does it seek to
impugn the highly distinguished government service he has rendered for many years on
behalf of the United States. Mr. Robinson already may have disclosed to ICSID the
nature of any personal or familial relationship he may have to the President and any
concerns about ties to the Office of the Legal Adviser. However, Tembec is not yet
aware of any disclosures and is concerned about the appearance of impartiality and
independence among the members of the proposed tribunal. Therefore, unless Mr.

---

[2] *IBA Guidelines on Conflicts*, example 2.3.8.

FROM HB-1001D                                (WED) 5. 4 05 10:29/ST. 10:13/NO. 10011119997 P. 9

Mr. Jose Antonio Rivas
May 2, 2005
Page 3

Robinson's relationships can be clarified to allay these concerns, Tembec would request that ICSID appoint an alternative candidate.

Respectfully,

Elliot J. Feldman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

Counsel to Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc.

cc:    Gonzalo Flores, Esq.
       Mark A. Clodfelter, Esq.
       Andrea Menaker, Esq.
       Mark McNeill, Esq.
       P. John Landry, Esq.
       Keith Mitchell, Esq.

# *EXHIBIT 8*

FROM HB-1681D                                    (FRI) 5. 6 05 16:12/ST. 16:66/NO. 1001111626  P  2

# International Centre for Settlement of Investment Disputes
1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534    Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsd

May 6, 2005

**United States of America**
c/o Mr. Mark A. Clodfelter
Assistant Legal Adviser
Office of the Legal Adviser
    and
Ms. Andrea Menaker
Chief, NAFTA Arbitration Division
Office of International
Claims and Investment Disputes
Department of State
2430 E Street NW
Suite 203, South Building
Washington, DC 20037-2800

**Canfor Corporation**
**Terminal Forests Products, Ltd.**
c/o Mr. P. John Landry, Esq
Davis & Company
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7
    and
c/o Mr. Keith E. W. Mitchell, Esq
Harris & Company
14th Floor Bentall 5
550 Burrard Street
Vancouver, B.C.
Canada V6C 2B5

**Tembec Inc., Tembec Investements**
**Inc., and Tembec Industries, Inc.**
c/o Mr. Elliot J. Feldman, Esq.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

Re:    **Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v.**
**United States of America; Tembec et al. v. United States of America;**
**Request for the establishment of a Consolidation Tribunal pursuant to NAFTA**
**Article 1126**

Dear Sirs and Madam,

    I am pleased to confirm that Dr. Albert Jan van den Berg, Professor Armand de Mestral
and Mr. Davis R. Robinson have accepted their appointments as presiding arbitrator and co
arbitrators, respectively, in the Consolidation Tribunal that will decide The United States'
Request for Consolidation under NAFTA Article 1126 of March 7, 2005.

    Attached please find a copy of a statement that we have received today from Mr.
Robinson with his acceptance.

FROM WB-ICSID                    (FRI) 5. 6 05 16:12/ST. 16:00/NO. 4604117020 P 5

2                                           May 6, 2005

The Consolidation Tribunal is accordingly deemed to be established on this date.

I shall have the honor to serve as the Secretary of the Consolidation Tribunal and will be contacting you shortly regarding the next steps in the proceeding.

Sincerely yours,

Gonzalo Flores
Senior Counsel

Attachment

c.c. (with attachment):

Dr. Albert Jan van den Berg
Prof. Armand de Mestral

c.c. (without attachment):

Mr. Davis R. Robinson

FROM HB-LGSID .....                    (FRI) 5. 6 05 18:12/ST. 18:06/NO. 4864117028 P 4

**Davis R. Robinson**
3729 Fordham Road, N.W.
Washington, D.C. 20016
Office Telephone: (202) 986-8049
Office Facsimile: (202) 986-8102
Office E-Mail: drrobins@llgm.com

May 6, 2005

_VIA FACSIMILE AND MAIL_

Gonzalo Flores, Esq.
Senior Counsel
International Centre for Settlement of Investment
    Disputes (ICSID)
The World Bank Group
1818 H Street, N.W.
Washington, D.C. 20433

Re:    Canfor Corporation v. United States of America; Terminal
       Forest Products Ltd. v. United States of America; Tembec et al.
       v. United States of America; Request for the Establishment of
       <u>a Consolidation Tribunal Pursuant to NAFTA Article 1126</u>

Dear Mr. Flores:

Thank you for today's e-mail message requesting my acceptance to appointment as an arbitrator to serve on a Consolidation Tribunal to be established pursuant to a request submitted under Article 1126 of the North American Free Trade Agreement (NAFTA). I hereby formally accept this appointment, and it is a privilege to do so.

As we have discussed by telephone, I have had no prior involvement or association with Canfor Corporation, Terminal Forest Products Ltd. or the Tembec affiliates to which you made reference in earlier telephone conversations. Furthermore, I am not aware (a) of any conflict of interest that would result from my acceptance of this appointment or (b) of any fact or circumstance that could give rise to any justifiable doubts as to my impartiality and independence. I have, of course, until today's e-mail message from you requesting my acceptance of this appointment, had no occasion or responsibility to make any statement or disclosure to the parties or their counsel.

I wish to comment in this regard upon the contents of one attachment to your May 6, 2005 e-mail message, to wit, a letter dated May 2, 2005 from Elliot J. Feldman of Baker & Hostetler L.L.P., counsel to Tembec et al. (the "May 2 Letter"). In the May 2 Letter to Mr. Jose Antonio Rivas of ICSID, Mr. Feldman wrote in pertinent part: "We

(FAX) 9. 0 0 16:12/ST. 18:06/NO. 4864117028 P  5

Gonzalo Flores, Esq.
May 6, 2005
Page 2 of 2

understand that Mr. Robinson may have a familial relationship to the President of the United States . . . Tembec's concerns about the appearance of such a relationship are heightened by Mr. Robinson's prior service as a political appointee in two Republic Administrations." For the information of ICSID, the parties and their counsel, my wife, Suzanne, is a first cousin, once removed, of the President.[1] As such, I have no personal family blood relationship with the President whatsoever. Since the President assumed office in 2001, I have had the privilege of shaking hands with him on two occasions, once at a reception attended by approximately 500 people and on another occasion at a luncheon attended by approximately 250 people. I have had no further personal, direct contact with the President, and have held no substantive conversations with him on any subject, during this period.

With regard to the reference in the May 2 Letter regarding "prior service as a political appointee in two Republican Administrations," this reference is incorrect. My sole non-career appointment that required confirmation by the United States Senate was by President Ronald Reagan (a Republican) in 1981 to serve as the Legal Adviser to the United States Department of State. My prior Federal Government service during the 1960's followed my appointment by President John F. Kennedy (a Democrat) in 1961 as a junior career Foreign Service Officer, for which career position I was among the few selected following a nationwide and score-based examination process in which neither politics nor politicians played any role.

In further response to the May 2 Letter, I might add that, a number of years after the end in 1985 of my tenure as the Legal Adviser to the United States Department of State, I was chosen in 1992 to serve on a binational panel established to decide certain questions arising from a dispute between the United States and Canada pursuant to Chapter 18 of the Canada-United States Free Trade Agreement. The Final Report of the Panel dated February 8, 1993 in the matter styled "The Interpretation of, and Canada's Compliance with, Article 701.3 with Respect to Durum Wheat Sales" was adopted unanimously, and generally in favor of the position argued by Canada.

Please let me know if you, the parties or their counsel have any further questions or require any further information.

Very truly yours,

Davis R. Robinson

---

[1]     As you may know, the President's larger family is sizeable, and she is one of twenty or more who fit this designation.

# *EXHIBIT 9*

FROM WB-ICSID

(FRI) 5. 6'05 18:12/ST. 18:06/NO. 4864117028 P  4

**Davis R. Robinson**
**3729 Fordham Road, N.W.**
**Washington, D.C. 20016**
**Office Telephone: (202) 986-8049**
**Office Facsimile: (202) 986-8102**
**Office E-Mail: drrobins@llgm.com**

May 6, 2005

*VIA FACSIMILE AND MAIL*

Gonzalo Flores, Esq.
Senior Counsel
International Centre for Settlement of Investment
    Disputes (ICSID)
The World Bank Group
1818 H Street, N.W.
Washington, D.C. 20433

Re:     **Canfor Corporation v. United States of America; Terminal**
        **Forest Products Ltd. v. United States of America; Tembec et al.**
        **v. United States of America; Request for the Establishment of**
        **a Consolidation Tribunal Pursuant to NAFTA Article 1126**

Dear Mr. Flores:

        Thank you for today's e-mail message requesting my acceptance to appointment
as an arbitrator to serve on a Consolidation Tribunal to be established pursuant to a
request submitted under Article 1126 of the North American Free Trade Agreement
(NAFTA). I hereby formally accept this appointment, and it is a privilege to do so.

        As we have discussed by telephone, I have had no prior involvement or
association with Canfor Corporation, Terminal Forest Products Ltd. or the Tembec
affiliates to which you made reference in earlier telephone conversations. Furthermore, I
am not aware (a) of any conflict of interest that would result from my acceptance of this
appointment or (b) of any fact or circumstance that could give rise to any justifiable
doubts as to my impartiality and independence. I have, of course, until today's e-mail
message from you requesting my acceptance of this appointment, had no occasion or
responsibility to make any statement or disclosure to the parties or their counsel.

        I wish to comment in this regard upon the contents of one attachment to your May
6, 2005 e-mail message, to wit, a letter dated May 2, 2005 from Elliot J. Feldman of
Baker & Hostetler L.L.P., counsel to Tembec et al. (the "May 2 Letter"). In the May 2
Letter to Mr. Jose Antonio Rivas of ICSID, Mr. Feldman wrote in pertinent part: "We

FROM WB-ICSID                    (FRI) 5. 6'05 18:12/ST. 18:06/NO. 4864117028 P  5

Gonzalo Flores, Esq.
May 6, 2005
Page 2 of 2

understand that Mr. Robinson may have a familial relationship to the President of the
United States . . . Tembec's concerns about the appearance of such a relationship are
heightened by Mr. Robinson's prior service as a political appointee in two Republican
Administrations." For the information of ICSID, the parties and their counsel, my wife,
Suzanne, is a first cousin, once removed, of the President.[1]  As such, I have no personal
family blood relationship with the President whatsoever.  Since the President assumed
office in 2001, I have had the privilege of shaking hands with him on two occasions, once
at a reception attended by approximately 500 people and on another occasion at a
luncheon attended by approximately 250 people.  I have had no further personal, direct
contact with the President, and have held no substantive conversations with him on any
subject, during this period.

        With regard to the reference in the May 2 Letter regarding "prior service as a
political appointee in two Republican Administrations," this reference is incorrect.  My
sole non-career appointment that required confirmation by the United States Senate was
by President Ronald Reagan (a Republican) in 1981 to serve as the Legal Adviser to the
United States Department of State.  My prior Federal Government service during the
1960's followed my appointment by President John F. Kennedy (a Democrat) in 1961 as
a junior career Foreign Service Officer, for which career position I was among the few
selected following a nationwide and score-based examination process in which neither
politics nor politicians played any role.

        In further response to the May 2 Letter, I might add that, a number of years after
the end in 1985 of my tenure as the Legal Adviser to the United States Department of
State, I was chosen in 1992 to serve on a binational panel established to decide certain
questions arising from a dispute between the United States and Canada pursuant to
Chapter 18 of the Canada-United States Free Trade Agreement.  The Final Report of the
Panel dated February 8, 1993 in the matter styled "The Interpretation of, and Canada's
Compliance with, Article 701.3 with Respect to Durum Wheat Sales" was adopted
unanimously, and generally in favor of the position argued by Canada.

        Please let me know if you, the parties or their counsel have any further questions
or require any further information.

                                    Very truly yours,

                                    Davis R. Robinson

_____
[1]      As you may know, the President's larger family is sizeable, and she is one of twenty or more who fit this
designation.

# *EXHIBIT 10*

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

🖨 CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
May 23, 2002

## Nominations
President Bush Today Announced His Intention to Appoint Nine Individuals to Serve in His Administration

President George W. Bush today announced his intention to appoint nine individuals to serve in his administration.

The President intends to appoint Charles H. Williams to be Director of the Office of Multifamily Restructuring Assistance.

The President intends to appoint the following individuals to serve as Members of the Panel of Arbitrators of the International Centre for the Settlement of Investment Disputes.

> Fred Fisher Fielding of Virginia, for the remainder of a six-year term expiring March 14, 2007
> O. Thomas Johnson, Jr. of Virginia, for the remainder of a six-year term expiring February 7, 2007
> Daniel M. Price of Maryland, for the remainder of a six-year term expiring February 7, 2007
> Davis R. Robinson of the District of Columbia, for the remainder of a six-year term expiring February 7, 2007.

As Members of the Panel of Conciliators of the International Centre for the Settlement of Investment Disputes:

> H. Douglas Barclay of New York, for the remainder of a six-year term expiring February 7, 2007
> Oscar M. Garibaldi of Maryland, for the remainder of a six-year term expiring February 7, 2008
> Steven M. Lucas of Maryland, for the remainder of a six-year term expiring February 7, 2007
> Charles E. Roh, Jr. of the District of Columbia, for the remainder of a six-year term expiring February 7, 2007.

###

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2002/05/20020523-5.html

 CLICK HERE TO PRINT

# *EXHIBIT 11*

**Your report displays: election cycles 2007-2008,2005-2006,2003-2004,2001-2002,1999-2000,1997-1998,1995-1996,1993-1994,1991-1992,1989-1990,1987-1988,1985-1986,1983-1984,1981-1982,1979-1980**

| Ind. donor - Name | contains | Davis Robinson |
|---|---|---|

## Individual donations

Download Data

**Found 27 contribution(s)**

| From | To | Details |
|---|---|---|
| ROBINSON, DAVIS<br>WASHINGTON, DC 20016 | Gov. Whitman, Christine Todd (R-N.J.) (Open seat, Senate)<br>WHITMAN FOR US SENATE | -$65, 10/19/1999<br>View filing<br>Contribution Refund to Individual |
| ROBINSON, DAVIS<br>WASHINGTON, DC 20009<br>LEBOEUF LAMB GREENE & MACRAE | LEBOEUF LAMB GREENE & MACRAE POLITICAL ACTION COMMITTEE | $740, 02/09/1996<br>View filing<br>Individual Contribution to PAC |
| ROBINSON, DAVIS<br>WASHINGTON, DC 20009<br>LEBOEUF, LAMB, GREENE & MACRAE | LEBOEUF LAMB GREENE & MACRAE POLITICAL ACTION COMMITTEE | $205, 06/06/1995<br>View filing<br>Individual Contribution to PAC |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>ATTORNEY | REPUBLICAN NATIONAL COMMITTEE - RNC | $1,000, 09/26/2000<br>View filing<br>Individual Contribution to Party |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>ATTORNEY | REPUBLICAN NATIONAL COMMITTEE - RNC | $200, 08/28/2000<br>View filing<br>Individual Contribution to Party |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>LE BOEUF LAMB GREENE & MAC RA | NATIONAL REPUBLICAN SENATORIAL COMMITTEE | $1,000, 01/12/2000<br>View filing<br>Individual Contribution to Party |
| ROBINSON, DAVIS R<br>WASHINGTON, DC<br>LAWYER | D C REPUBLICAN COMMITTEE FEDERAL CAMPAIGN COMMITTEE | $1,000, 11/03/1999<br>View filing<br>Individual Contribution to Party |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>ATTORNEY | BUSH, GEORGE W (R) (Presidential candidate)<br>BUSH FOR PRESIDENT INC | $500, 04/14/1999<br>View filing<br>Individual Contribution to Candidate |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>ATTORNEY | BUSH, GEORGE W (R) (Presidential candidate)<br>BUSH FOR PRESIDENT INC | $500, 04/14/1999<br>View filing<br>Individual Contribution to Candidate |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016 | NATIONAL REPUBLICAN SENATORIAL COMMITTEE | -$265, 04/01/1999<br>View filing<br>Contribution Refund to Individual |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>LE BOEUF LAMB GREENE & MAC RA | NATIONAL REPUBLICAN SENATORIAL COMMITTEE | $265, 01/28/1999<br>View filing<br>Individual Contribution to Party |

| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>LE BOEUF LAMB GREENE & MAC RA | NATIONAL REPUBLICAN<br>SENATORIAL COMMITTEE | $1,000, 01/28/1999<br>View filing<br>Individual Contribution to Party |
|---|---|---|
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20009<br>LLG&M L L P | LEBOEUF LAMB GREENE & MACRAE<br>POLITICAL ACTION COMMITTEE | $2,310, 03/09/1998<br>View filing<br>Individual Contribution to PAC |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20009<br>LEBOEUF LAMB GREENE & MACRAE | LEBOEUF LAMB GREENE & MACRAE<br>POLITICAL ACTION COMMITTEE | $2,240, 03/03/1997<br>View filing<br>Individual Contribution to PAC |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>LEBOEUF LAMB GREENE & MAC | DOLE, ROBERT J (R) (Presidential<br>candidate)<br>DOLE/KEMP '96 COMPLIANCE<br>COMMITTEE INC | $1,000, 05/28/1996<br>View filing<br>Individual Contribution to<br>Candidate |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20009<br>LEBOEUF, LAMB, GREENE & MACRAE | LEBOEUF, LAMB, GREENE &<br>MACRAE | $205, 11/02/1994<br>View filing<br>Individual Contribution to PAC |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>HOGAN & HARTSON | BUSH, GEORGE (R) (Presidential<br>candidate)<br>BUSH - QUAYLE '92 PRIMARY<br>COMMITTEE INC | $1,000, 11/22/1991<br>Individual Contribution to<br>Candidate |
| ROBINSON, DAVIS R<br>WASHINGTON, DC 20016<br>PARTNER LEVA HALLS SIMINGTON<br>M | BUSH, GEORGE (R) (Presidential<br>candidate)<br>GEORGE BUSH FOR PRESIDENT | $250, 01/18/1979<br>Individual Contribution to<br>Candidate |
| ROBINSON, DAVIS R MR<br>WASHINGTON, DC 20016<br>PILLSBURY, MADISON & SUTRO | BUSH, GEORGE (R) (Presidential<br>candidate)<br>GEORGE BUSH FOR PRESIDENT,<br>INC | $1,000, 03/03/1987<br>Individual Contribution to<br>Candidate |
| ROBINSON, DAVIS R MR.<br>WASHINGTON, DC 20016<br>SELF-EMPLOYED / ATTORNEY | BUSH, GEORGE W (R) (Presidential<br>candidate)<br>BUSH-CHENEY '04 INC | $2,000, 12/16/2003<br>View filing<br>Individual Contribution to<br>Candidate |
| ROBINSON, DAVIS R MRS<br>WASHINGTON, DC 20016<br>HOMEMAKER | BUSH, GEORGE (R) (Presidential<br>candidate)<br>GEORGE BUSH FOR PRESIDENT | $250, 01/18/1979<br>Individual Contribution to<br>Candidate |
| ROBINSON, DAVIS R. MR.<br>WASHINGTON, DC 20009<br>LLG&M L.L.P | LEBOEUF LAMB GREENE & MACRAE<br>POLITICAL ACTION COMMITTEE | $1,575, 11/30/1999<br>View filing<br>Individual Contribution to PAC |
| ROBINSON, DAVIS R. THE HON.<br>WASHINGTON, DC 20016<br>RETIRED | MCCAIN, JOHN S. (R) (Presidential<br>candidate)<br>JOHN MCCAIN 2008 INC. | $1,000, 01/09/2008<br>View filing<br>Individual Contribution to<br>Candidate |
| ROBINSON, DAVIS R. THE HON.<br>WASHINGTON, DC 20016<br>RETIRED | MCCAIN, JOHN S. (R) (Presidential<br>candidate)<br>JOHN MCCAIN 2008 INC. | $600, 12/10/2007<br>View filing<br>Individual Contribution to<br>Candidate |

| ROBINSON, DAVIS R. THE HON.<br>WASHINGTON, DC 20016<br>RETIRED | MCCAIN, JOHN S. (R) (Presidential candidate)<br>JOHN MCCAIN 2008 INC. | $300, 09/30/2007<br>View filing<br>Individual Contribution to Candidate |
|---|---|---|
| ROBINSON, DAVIS R. THE HON.<br>WASHINGTON, DC 20016<br>RETIRED | MCCAIN, JOHN S. (R) (Presidential candidate)<br>JOHN MCCAIN 2008 INC. | $200, 06/07/2007<br>View filing<br>Individual Contribution to Candidate |
| ROBINSON, DONALD DAVIS<br>MONROEVILLE, AL 36460<br>HARRIGAN LUMBER CO | Sen. SESSIONS, JEFF (R-Ala.)<br>(Open seat, Senate)<br>FRIENDS OF SESSIONS SENATE COMMITTEE INC | $500, 12/14/1995<br>View filing<br>Individual Contribution to Candidate |

**CQ** © 2008 • All Rights Reserved • Congressional Quarterly Inc.
1255 22nd Street N.W. • Washington, D.C. 20037 • 202-419-8500
CQ MoneyLine Home | Help | About CQ | Privacy Policy | Masthead | Terms & (

**Your report displays: election cycles 2007-2008,2005-2006,2003-2004,2001-2002,1999-2000,1997-1998,1995-1996,1993-1994,1991-1992,1989-1990,1987-1988,1985-1986,1983-1984,1981-1982,1979-1980**

| Ind. donor - Name | | contains | Suzanne W. Robinson |
|---|---|---|---|

## Individual donations

Download Data

### Found 4 contribution(s)

| From | To | Details |
|---|---|---|
| ROBINSON, SUZANNE W WASHINGTON, DC 20016 | BUSH, GEORGE W (R) (Presidential candidate) BUSH FOR PRESIDENT INC | $500, 04/14/1999 View filing Individual Contribution to Candidate |
| ROBINSON, SUZANNE W WASHINGTON, DC 20016 | BUSH, GEORGE W (R) (Presidential candidate) BUSH FOR PRESIDENT INC | $500, 04/14/1999 View filing Individual Contribution to Candidate |
| ROBINSON, SUZANNE W WASHINGTON, DC 20016 HOMEMAKER | BUSH, GEORGE (R) (Presidential candidate) BUSH - QUAYLE '92 PRIMARY COMMITTEE INC | $1,000, 11/22/1991 Individual Contribution to Candidate |
| ROBINSON, SUZANNE W MS WASHINGTON, DC 20016 | BUSH, GEORGE (R) (Presidential candidate) GEORGE BUSH FOR PRESIDENT, INC | $1,000, 04/03/1987 Individual Contribution to Candidate |

CQ  © 2008 • All Rights Reserved • Congressional Quarterly Inc.
1255 22nd Street N.W. • Washington, D.C. 20037 • 202-419-8500
CQ MoneyLine Home | Help | About CQ | Privacy Policy | Masthead | Terms &

# *EXHIBIT 12*

1 of 1 DOCUMENT

Copyright 1991 Associated Press
All Rights Reserved

The Associated Press

December 1, 1991, Sunday, AM cycle

**SECTION:** Washington Dateline

**LENGTH:** 831 words

**HEADLINE:** Bush Makes Global Relations a Family Affair

**BYLINE:** By CHRISTOPHER CONNELL, Associated Press Writer

**DATELINE:** WASHINGTON

**BODY:**

Having a relative in the White House has its privileges.

President Bush has sent members of his extended family on 15 occasions to be his official stand-ins at ceremonies in exotic parts of the globe, from Morocco to Western Samoa.

But presidential brother Jonathan Bush calls such an assignment "hard work."

"You're over there for two days, you have a lot of meetings and then you come home, and then it takes you three or four days to recover," said Bush, a New York businessman who attended a 1989 Argentine presidential inauguration and went to the Ukraine in October to mark the 50th anniversary of the massacre of 30,000 Jews at Babi Yar. His wife Jody also was part of the official party.

White House records show that Bush's three other siblings have also gone overseas on official U.S. delegations. So has his wife Barbara, four of the five Bush children, several in-laws, two nephews and a cousin.

There have been 41 presidential delegations to foreign events in Bush's 34 months in office, and White House records show that he's chosen family members to take 15 of the trips.

Bush isn't the first president to enlist his family as goodwill ambassadors for ceremonial occasions.

Former President Ronald Reagan sent his daughter, Maureen, on similar trips. And former President Jimmy Carter repeatedly sent his wife Rosalynn abroad, not only for ceremonies, but as his personal representative to Latin countries. Carter sent his 78-year-old mother Lillian to India, where she had been a Peace Corps worker, for the funeral of a president.

Sending presidential kin abroad "is mostly harmless as long as they behave themselves," said Hume Horan, president of the American Foreign Service Association, a union of foreign service officers. "It helps provide tone to an occasion."

Mrs. Bush has traveled abroad once without her husband, attending the 1990 inauguration of Costa Rica's new president. The delegation she headed included her son, Jeb, and his wife Columba.

Bush's sister Nancy Ellis led the U.S. delegation to the September celebration of 2,500 years of democracy in Athens, Greece. She also represented the president in Western Samoa two years ago.

William H.T. Bush, the president's youngest brother, and his wife Patty went to Malta in 1989 to help the island celebrate 25 years of independence. They were in Istanbul, Turkey, last month to attend the enthronement of Bartholomew I as the new patriarch of the Eastern Orthodox Church.

Bush Makes Global Relations a Family Affair The Associated Press December 1, 1991, Sunday, AM cycle

The presidential children have had various assignments.

George W. Bush went to Gambia in 1990. Dorothy Bush LeBlond journeyed to Paraguay in 1989 and to Morocco in 1990. Neil and Sharon Bush, accompanied by Mrs. Bush's nephew, James Pierce Jr., went to Benin for the recent presidential inauguration there.

Only son Marvin Bush hasn't carried the U.S. banner abroad.

Some delegations are small, sometimes consisting only of the U.S. ambassador. Others comprise a half-dozen or more VIPs, often political or business leaders with ethnic ties to the country they're visiting.

"There's no question that these people are very, very glad to see the brother or sister of the president," said Jonathan Bush.

William "Bucky" Bush's trip to Malta in September 1989 received a certain notoriety after the president decided to hold his first summit with Soviet President Mikhail S. Gorbachev there.

When the weather failed to cooperate for their December 1989 "seasick summit," Bush and others later joked about Bucky's shortcomings as an advance man.

"I'm blameless," said the president's brother, who runs an investment business in St. Louis.

"I was taken with Malta and I wrote a report on Malta and on the people and government leaders I talked to there," he said. "I got a call from the president a week later and he asked me some rather deep questions about the country. I had no idea why he was calling. And the next thing I know they were announcing the Malta summit."

Other Bush family missions abroad include a trip by brother Prescott Bush to Bolivia in 1989. A nephew, James L. Bush, went to January's presidential inauguration in Guatemala.

Suzanne Robinson, a Bush cousin, and her husband Davis Robinson, a former State Department lawyer, were in the official U.S. party that attended the dedication of a new wing of the Polish-American Children's Hospital in Krakow, Poland. Pope John Paul II also attended the ceremony in his hometown, along with Polish President Lech Walesa.

Delegations customarily travel on U.S. Air Force jets from Andrews Air Force Base outside Washington to the foreign capitals, where they are wined and dined as guests of the host country.

The trips are often a whirlwind of events crammed into a short period of time, and the invitations from the White House frequently come at the last moment.

"You get about 48 hours notice," said William Bush.

But, he added: "We're just delighted to be in consideration. ... We're there to help him where he wants us to help him."

# *EXHIBIT 13*

HOSTETLER LLP                                    TO #1287768481              P.02/15

# BAKER
### &
# HOSTETLER LLP
COUNSELLORS AT LAW

WASHINGTON SQUARE, SUITE 1100   •   1050 CONNECTICUT AVENUE, N.W.   •   WASHINGTON, D.C. 20036-5304   •   (202) 861-1500
FAX (202) 861-1783

ELLIOT J. FELDMAN
WRITER'S DIRECT DIAL NUMBER (202) 861-1679
E-MAIL: EFELDMAN@BAKERLAW.COM

May 20, 2005

**VIA FACSIMILE**

Mr. Gonzalo Flores
ICSID
1818 H Street, N.W.
Washington, D.C. 20433

Re:     Tembec Inc. v. United States of America; Canfor Corp. v. United States
        of America; Terminal Forest Products Ltd. v. United States of America

Dear Mr. Flores:

On behalf of Tembec Inc., Tembec Investments Inc., and Tembec
Industries Inc. (collectively, "Tembec"), and in accordance with NAFTA Article 1126(1)
and Article 11 of the UNCITRAL Arbitration Rules, we submit this challenge to the
appointment of Davis R. Robinson to the NAFTA Article 1126 tribunal. Mr. Robinson's
family relationship to President George Walker Bush; his political appointment to the
Office of Legal Adviser when his wife's first cousin was Vice-President of the United
States; his service in that capacity as counsel to the United States in international legal
disputes and head of the legal office now representing the United States in this
arbitration; are all circumstances that, in the particular context of Tembec's claim
against the United States, give rise to justifiable doubts that Mr. Robinson could be
impartial in this arbitration.

## The Applicable Conflict Of Interest Standard

The establishment of a tribunal under NAFTA Article 1126 is governed by
the UNCITRAL Arbitration Rules. *See* Article 1126(1). Article 10(1) of the UNCITRAL
Rules states: "Any arbitrator may be challenged if circumstances exist that give rise to
justifiable doubts as to the arbitrator's impartiality or independence." The "justifiable
doubts" standard is not defined in the UNCITRAL Rules, but is explained in the *IBA
Guidelines on Conflicts of Interest*, which adopted the same standard from the
UNCITRAL Rules. *See* Explanation (b) to General Standard 2.

Mr. Gonzalo Flores
May 20, 2005
Page 2

The *IBA Guidelines* use an "appearance test" to determine whether there are justifiable doubts about an arbitrator's ability to be impartial. *See id.* Thus, whether the circumstances give rise to justifiable doubts must be considered "from a reasonable third person's point of view having knowledge of the relevant facts." *See* General Standard 2(b).[1] General Standard 2(c) of the *IBA Guidelines* explains:

> (c) Doubts are justifiable if a reasonable and informed third party would reach the conclusion that there was a likelihood that the arbitrator may be influenced by factors other than the merits of the case as presented by the parties in reaching his or her decision.

The *IBA Guidelines* also provide a non-exclusive list of examples of potential conflicts to provide guidance as to the practical application of conflict of interest questions. Two of those examples pertinent here are found on the "Waivable Red List" of the *IBA Guidelines*:

> 2.2 Arbitrator's direct or indirect interest in the dispute
>
> > 2.2.3 The arbitrator or a close family member of the arbitrator has a close relationship with a third party who may be liable to recourse on the part of the unsuccessful party in the dispute.
>
> 2.3 Arbitrator's relationship with the parties or counsel
>
> > 2.3.8 The arbitrator has a close family relationship with one of the parties or with a manager, director or member of the supervisory board or any person having a similar controlling influence in one of the parties or an affiliate of one of the parties or with a counsel representing a party.

These principles under the "justifiable doubts" standard, when applied to the circumstances of Tembec's claim against the United States and the circumstances of Mr. Robinson's appointment, warrant the replacement of Mr. Robinson on the Article 1126 tribunal with a different arbitrator.

**The Context Of Tembec's Claim Against The United States**

The circumstances of Mr. Robinson's appointment must be considered in light of the particular claims and issues upon which he would pass judgment. Unlike other investor-state arbitrations arising from disputes with state or municipal governments, Tembec's claim directly challenges the protectionist trade policies of the

---

[1] The UNCITRAL Rules also require that ICSID "shall have regard to such considerations as are likely to secure the appointment of an independent and impartial arbitrator...." Article 6(4) of the UNCITRAL Rules; *see also* Articles 7(3), 11(3) and 12(1) and (2) incorporating the requirement in Article 6.

Mr. Gonzalo Flores
May 20, 2005
Page 3

Bush Administration in the current round of *Softwood Lumber from Canada* antidumping and countervailing duty proceedings (commonly referred to as "*Lumber IV*"). *Lumber IV*, by many accounts, has been the most contentious and the most politically charged of all trade disputes. Tembec has alleged in its claims against the United States, *inter alia*, that the final antidumping and countervailing duty determinations and orders in *Softwood Lumber from Canada* were the products of political pressure from the Bush Administration, the United States House of Representatives and Senate, and the U.S. lumber industry discriminating against Canada, rather than of fair and impartial proceedings as required by law.[2] Tembec has alleged that the policy of the Bush Administration has been to ignore the decisions of multiple international tribunals — formed under NAFTA and the WTO — that have found no legal basis for the imposition of duties on Canadian softwood lumber, and to both flout and delay resolution of those proceedings to the detriment of Tembec and its investments in the United States.[3]

Tembec has cited examples of political pressure, such as: the public acknowledgement by former Undersecretary of Commerce Grant Aldonas that President Bush and former Secretary of Commerce, Donald Evans, carry out the administration's wishes regarding Canadian lumber;[4] legal findings have been reached by the Department of Commerce at the suggestion of the President's Trade Representative;[5] a letter from 51 U.S. Senators urging the International Trade Commission to make a final determination against Canadian lumber producers was designed to yield politically-sensitive rather than strictly legal outcomes;[6] and a preliminary determination by the U.S. Commerce Department was made at the urging of a U.S. Senator against Canadian producers.[7]

Since Tembec submitted its claim, President Bush has continued to be involved directly in the United States' fight to retain unlawful duties on Canadian softwood lumber, and has carried that fight to Canada's Prime Minister, Paul Martin. Earlier this year, Republican Senator Larry Craig reported on the floor of the U.S. Senate:

> President Bush was well prepared to answer the Canadian Prime Minister when they last met. The President told the Prime Minister that the problem of subsidies and dumping is caused by Canada, and the solution lies with Canada, unless Canada wants the solution to be permanent duties to offset the subsidies and dumping.[8]

---

[2] *See, e.g.*, Tembec Statement of Claim at 2-3, 17, 21.
[3] *See id.* at 28-33.
[4] *See id.* at 21-22.
[5] *See id.* at 17.
[6] *See id.* at 22.
[7] *See id.* at 16.
[8] 151 Cong. Rec. S136 (daily ed. Jan 24, 2005) (statement of Sen. Craig).

Mr. Gonzalo Flores
May 20, 2005
Page 4

Republican Senator Michael Crapo explained that the President's policy in response to adverse decisions by the WTO and by NAFTA Chapter 19 binational panels was not to comply with the rulings:

> The Bush Administration has concluded that duty deposits amounting to approximately $3 billion and growing daily, cannot and will not be returned absent a negotiated settlement between the Canadian and U.S. Governments. ... There is zero likelihood that the countervailing duty, antisubsidy, order will disappear absent settlement of the lumber subsidy and dumping issues, no matter how often a NAFTA panel tries to achieve this outcome.[9]

$3 billion in duty deposits—over $250 million from Tembec—have been collected as a result of final determinations by the Department of Commerce and International Trade Commission that were rejected by multiple panels of the WTO and NAFTA Chapter 19. The Bush Administration's policies to retain these funds and continue this dispute is being made at the highest level and with President Bush's personal involvement.

The United States recognized in December 2004, in testimony before the *Canfor* tribunal that "...antidumping and countervailing duty matters are a very politically sensitive topic...."[10] This political sensitivity is especially apparent in Tembec's case, where improper political influence in the *Softwood Lumber* proceedings plays a central part in Tembec's claims against the United States.

In light of the political sensitivities surrounding *Lumber IV*, the United States has raised objections to potential arbitrators who, because of their own or their law firms' representation of Canadian softwood lumber producers—not even necessarily in the *Lumber IV* disputes—arguably might be sympathetic to allegations of political caprice and arbitrariness by the United States Government. The United States objected to the nominations of Messrs. Rowley and Fortier on the Article 1126 tribunal presumably on this principle. Neither Tembec nor Canfor protested the objection to Mr. Fortier, and sympathized with the objection to Mr. Rowley, even though Tembec thought the connection of these distinguished Canadians to the issues in Tembec's Chapter 11 claims were tenuous.[11] But some connection to lumber producers cannot be the only

---

[9] 151 Cong. Rec. S136-7 (daily ed. Jan. 24, 2005) (statement of Sen. Crapo). Through a "colloquy" on the Senate floor, Senators Crapo, Larry Craig (R-ID), and Max Baucus (D-MT) advised Tembec and other parties that the United States Government would not live up to its legal obligations under NAFTA Chapter 19, nor its international obligations arising from the WTO rejection of the Byrd Amendment.

[10] Transcript of Jurisdictional hearing in the matter of *Canfor Corporation v. United States of America*, Arbitration under NAFTA Chapter 11, Vol 2, December 8, 2004 at page 583.

[11] As the United States' April 22, 2005 letter suggested, the lawyers principally responsible for the *Softwood Lumber* representations at Mr. Fortier's firm, Ogilvy Renault, had already departed. Two lawyers remained who, according to the United States, had "represented Canada in the WTO proceeding

ID #1287788481     P.06/15

Mr. Gonzalo Flores
May 20, 2005
Page 5

test. As a matter of fairness to the parties, extra care should be taken to ensure that the arbitrators of the Article 1126 tribunal have no ties to the United States Government or to key policy-makers in position to control the very policies and measures being complained of by Tembec.

## The Existing Circumstances That Give Rise To Justifiable Doubts

Mr. Robinson's familial relationship with President Bush raises justifiable doubts about his impartiality and independence to decide this dispute. Mr. Robinson's wife, Suzanne Walker Robinson, is a cousin once removed of the President of the United States, George Walker Bush, whose governance of agencies and policies will be directly at issue in Tembec's claim against the United States. It seems inconceivable to Tembec that someone with a close family relationship to the President would sit in judgment of Tembec's claim.

Mr. Robinson's career has also included high political appointment in a Republican administration. He served as the Legal Adviser to the United States— appointed when his wife's first cousin, George Herbert Walker Bush, was Vice- President of the United States—and represented the United States in international legal disputes. He was the chief of the same legal office at the Department of State responsible for presenting the United States' arguments to the Article 1126 tribunal.

Applying the standards in the UNCITRAL Rules and the *IBA Guidelines* to these circumstances, the question presented is whether a reasonable third person would have justifiable doubts about an arbitrator's impartiality or independence where:

(1) the arbitrator is related by marriage to the current Chief Executive of one of the parties;

(2) the arbitrator previously served as the General Counsel for that same party, although not during the tenure of the Chief Executive to whom the arbitrator is related; and

(3) the office of the current General Counsel for that same party, who ultimately reports to the Chief Executive to whom the arbitrator is related, is presenting the arguments before the arbitrator.

Two practical examples of conflicts from the *IBA Guidelines* also are implicated by the existing circumstances. Mr. Robinson's appointment implicates example 2.2.3 of the *IBA Guidelines*. Mr. Robinson's wife, Suzanne Walker Robinson,

---

challenging the antidumping determination," but there was no suggestion that they or the firm continued that representation of the Government of Canada, who is not a party here. The United States' objection to Mr. Fortier, therefore, relied primarily on the firm's "continued promotion of those relationships on its website" and its prior connections to *Lumber IV*.

Mr. Gonzalo Flores
May 20, 2005
Page 6

is the cousin of former Vice-President and President George Herbert Walker Bush, who is the father of the current President of the United States, George Walker Bush. Mrs. Robinson is a close family member to the named arbitrator, Mr. Robinson. President Bush, in his capacity as the Chief Executive of the United States, would be responsible for administering the payment of damages were the United States to lose its dispute with Tembec.

Mr. Robinson's appointment also implicates example 2.3.8 of the *IBA Guidelines*. Mr. Robinson has a close family relationship with President Bush, who has a controlling influence over the United States Government and particularly its policies on softwood lumber duties.

Tembec does not believe that the United States would accept an arbitrator with such close ties to Tembec, especially in light of the United States' own objections to arbitrators who have been affiliated with individuals representing companies completely distinct from, and in competition with, Tembec in the *Softwood Lumber* proceedings. But Tembec does not need to prove that much. The standard only requires justifiable doubts which, according to the IBA Guidelines, mean that a "reasonable and informed third party would reach the conclusion that there was a likelihood that the arbitrator may be influenced by factors other than the merits of the case...." *See* General Standard 2(c).

We would like to make plain that Tembec's challenge to Mr. Robinson should in no way be construed as a condemnation of his political affiliation, his service at the State Department as the United States' legal representative in international disputes, or his family's relationship with the current and former Presidents of the United States. Nor should Tembec's challenge be construed as questioning Mr. Robinson's integrity.

Tembec submits only that the circumstances of Mr. Robinson's appointment cannot be ignored for their potential to influence the judgment of an arbitrator who is to decide (a) whether the United States is entitled to consolidate the *Tembec* case after Tembec has spent very substantial sums of money, over many months, to form tribunals cooperatively with the United States and to respond to the United States' various procedural and jurisdictional defenses; and possibly (b) whether the Bush Administration's conduct of the antidumping and countervailing duty proceedings in *Softwood Lumber from Canada* breached the United States' obligations under NAFTA Chapter 11, such that the United States Government should pay Tembec $250 million or more in damages. A reasonable third party would have justifiable doubts that, in light of the existing circumstances, someone with a close family relationship to the United States President, and who is the former head of the legal office representing the United States in this very proceeding, should sit in judgment of such matters.

Mr. Gonzalo Flores
May 20, 2005
Page 7

Articles 11(3) and 12 of the UNCITRAL Rules outline the procedures for challenges to the appointment of an arbitrator. Article 11(3) provides:

> When an arbitrator has been challenged by one party, the other party may agree to the challenge. The arbitrator may also, after the challenge, withdraw from his office. In neither case does this imply acceptance of the validity of the grounds for the challenge. ...

In the event that the United States does not agree to the challenge or Mr. Robinson does not agree to withdraw from the Article 1126 tribunal, Tembec is entitled to request that ICSID decide the challenge under Article 12(1).

The circumstances tying Mr. Robinson to the United States Government, and specifically to President Bush and the State Department's Office of the Legal Adviser, would not convey to Tembec or to the public in general the appearance of an independent and impartial tribunal. Tembec therefore requests, in accordance with Article 11(3) of the UNCITRAL Rules, that the United States agree to Tembec's challenge of Mr. Robinson's appointment, or that Mr. Robinson withdraw from the Article 1126 tribunal.

Respectfully submitted,

Elliot J. Feldman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington D.C. 20036

Counsel to Tembec Inc.
Tembec Investments Inc.
Tembec Industries Inc.

cc:   Davis R. Robinson, Esq. (c/o Mr. Flores)
      Professor Albert Jan van den Berg (c/o Mr. Flores)
      Professor Armand de Mestral (c/o Mr. Flores)
      Mark A. Clodfelter
      Andrea J. Menaker
      P. John Landry
      Keith E. W. Mitchell

# *EXHIBIT 14*



United States Department of State

*Washington, D.C.  20520*

May 9, 2005

*By Facsimile*

Prof. Albert Jan van den Berg
Davis R. Robinson, Esq.
Prof. Armand de Mestral
c/o Mr. Gonzalo Flores
Senior Counsel, ICSID
1818 H Street, N.W.
Washington, D.C. 20433

Re:    *Tembec Inc. et al v. United States of America;*
       *Canfor Corp. v. United States of America;* and
       *Terminal Forest Products Ltd. v. United States of America*

Dear Members of the Tribunal:

On behalf of respondent United States of America, we write to request that the Tribunal issue an order staying the NAFTA Chapter Eleven proceedings captioned *Tembec Inc. et al. v. United States of America* and *Canfor Corp. v. United States of America*.[1]  Article 1126(9) of the NAFTA empowers a consolidation tribunal such as this Tribunal to stay underlying proceedings pending its decision on whether to assume jurisdiction over consolidated claims.[2]

The need for such an order – particularly with respect to the *Tembec* arbitration – is immediate.[3]  The hearing on the United States' jurisdictional objections in *Tembec* is scheduled for June 2-3, 2005.  Because the hearing is fast approaching, the United States (and presumably Tembec) will be compelled to expend resources to prepare for that hearing unless a stay is granted immediately.

A stay of these claims is the only way to give effect to the United States' right to seek consolidation pursuant to Article 1126.  Allowing the *Canfor* or *Tembec* cases to continue where a decision may be issued before this Tribunal has an opportunity to decide whether to consolidate would render moot this Tribunal's function.  Furthermore, allowing those arbitrations to proceed further would be wasteful of resources if this

---

[1] A tribunal has not been established in *Terminal Forest Products Ltd. v. United States of America*.

[2] *See* NAFTA art. 1126(9) ("On application of a disputing party, a Tribunal established under this Article, pending its decision under paragraph 2, may order that the proceedings of a Tribunal established under Article 1120 be stayed, unless the latter Tribunal has already adjourned its proceedings.").

[3] The United States has also sought a stay of the *Tembec* proceedings from the *Tembec* tribunal.  That request is pending.

Tribunal ultimately decides to assume jurisdiction, a result inconsistent with the efficiency goals of Article 1126. Accordingly, the United States respectfully requests that the Tribunal stay those proceedings pending its decision on consolidation.

Respectfully submitted,

Andrea J. Menaker
Chief, NAFTA Arbitration Division
Office of International Claims and
    Investment Disputes

Copies:
Elliott J. Feldman, Esq.
Mark A. Cymrot, Esq.
P. John Landry, Esq.
Keith E.W. Mitchell, Esq.
José Antonio Rivas

# *EXHIBIT 15*

# BAKER
### &
# HOSTETLER LLP
#### COUNSELLORS AT LAW

WASHINGTON SQUARE, SUITE 1100  •  1050 CONNECTICUT AVENUE, N.W.  •  WASHINGTON, D.C. 20036-5304  •  (202) 861-1500
FAX (202) 861-1783

ELLIOT J. FELDMAN
WRITER'S DIRECT DIAL NUMBER (202) 861-1679
E-MAIL: EFELDMAN@BAKERLAW.COM

May 9, 2005

**VIA E-MAIL AND FACSIMILE**

Mr. Gonzalo Flores
Mr. Jose Antonio Rivas
International Centre for Settlement
 of Investment Disputes
1818 H Street, N.W.
Washington, D.C.  20433

Re:    *Tembec Inc. v. United States of America; Canfor Corp. v. United States of America; Terminal Forest Products Ltd. v. United States of America*

Dear Messrs. Flores and Rivas:

On behalf of Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively, "Tembec"), we are writing in regard to Mr. Flores' letter dated May 6, 2005, which states that "[t]he Consolidation Tribunal is accordingly deemed to be established on this date." As you are aware, we had raised questions about the appropriateness of Mr. Robinson's appointment to the proposed Article 1126 Consolidation Tribunal. Contemporaneously with your letter we received for the first time concrete information about Mr. Robinson's relation by marriage to the President of the United States. This information apparently had not been previously disclosed. It would be premature at this stage to assume that the Article 1126 tribunal is fully operative, or that it should be making substantive decisions affecting Tembec's rights to arbitration under Articles 1116, 1117 and 1120, before Tembec has been given the time provided in the UNCITRAL rules to determine whether to proceed with a formal arbitrator challenge.

The UNCITRAL Arbitration Rules governing the Article 1126 proceedings provide Tembec 15 days from learning of "circumstances that give rise to justifiable doubts about an arbitrator's impartiality or independence" in which to respond. *See* Articles 10 and 11 of the UNCITRAL Rules. Consistent with these rules, Tembec must be allowed time to evaluate the previously undisclosed information regarding Mr.

Mr. Jose Antonio Rivas
May 9, 2005
Page 2

Robinson's relation to the President of the United States, especially in light of known information regarding Mr. Robinson's prior representation of the United States.

The United States has asked the Article 1126 Tribunal to stay proceedings in *Tembec Inc. et al v. United States*, even before Tembec has been allowed to determine whether to make a formal arbitrator challenge based on the information received after close of business just one business day ago. *See* United States' May 9, 2005 letter to the proposed Article 1126 tribunal. The United States attributes the urgency of its request to the immediacy of a hearing on jurisdictional issues in that case and the need to expend resources in preparation for the hearing. Tembec, however, has asked its Tribunal to resolve the jurisdictional issues based on the briefs provided, without need for resort to a hearing, and the United States has not objected to Tembec's request. Were the Tribunal to make its decision on the arguments presented in the briefs, no hearing preparation expenses would be necessary, and there would be no urgency for the Article 1126 tribunal to take action before Tembec had exercised its rights within the reasonable time limitations provided in the UNCITRAL Rules.

Even were the United States to insist upon a hearing, its protest about preparation time and expense must be understood in the context of its rush to consolidate. The United States recently completed three days of hearings before a Chapter 11 tribunal on the very issues for which it would now need to prepare. Were the issues so identical as to justify consolidation, little or no new preparation would be required. Were the issues so different as to require such preparation, there would be no basis for consolidation. The United States is reporting to a tribunal it is rushing to declare empowered that it must act swiftly to spare the United States of an expense that, according to the reasoning behind the demand for consolidation, the United States should not need to incur.

ICSID and the members of the proposed Article 1126 Consolidation Tribunal should pause to consider the United States' urgency that the Article 1126 Tribunal rush to stay proceedings of Tembec's Article 1120 Tribunal in the face of "a decision [that] may be issued before this Tribunal has an opportunity to decide whether to consolidate [and] render moot this [Article 1120] Tribunal's function." Article 1126 has its purpose in the scheme of NAFTA Chapter 11, but that purpose does not include frustrating the decisions of duly constituted tribunals under Article 1120, nor does it include exposing Chapter 11 claimants to duplicative proceedings after having expended significant time and resources to obtain an adjudication of claims on the merits. Article 1126 may be a shield against duplicative proceedings, but it must not be a sword to eviscerate established tribunals and to avoid their judgments.

Neither the presumptive finality of the proposed Article 1126 tribunal, nor the United States' request for immediate action furthers the "efficiency goals of Article 1126" cited by the United States. Tembec respectfully requests that it be allowed to complete its evaluation of Mr. Robinson's role as a tribunal member in the time allotted

Mr. Jose Antonio Rivas
May 9, 2005
Page 3


by the UNCITRAL Rules, and that any question of whether to stay Tembec's proceedings be deferred for debate by the parties until the membership of the Article 1126 tribunal has been settled by all of the parties in accordance with the rules.

Respectfully,

Elliot J. Feldman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

Counsel to Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc.


cc:     Mark A. Clodfelter, Esq.
        Andrea Menaker, Esq.
        Mark McNeill, Esq.
        P. John Landry, Esq.
        Keith Mitchell, Esq.

# *EXHIBIT 16*



*from the office of:*  P. John Landry
direct tel:  604.643.2935
direct fax:  604.605.3588
john_landry@davis.ca

May 10, 2005                                    *file number:*  63595-00056

**VIA FACSIMILE**

Professor Albert Jan van den Berg
Davis R. Robinson, Esq.
Professor Armand de Mestral
        all care of
Mr. Gonzalo Flores and
Mr. Antonio Rivas
International Centre for Settlement of
Investment Disputes
1818 H Street, N.W.
Washington, DC, 20433

Dear Sirs:

Re:    Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v. United
       States of America; Tembec et al v. United States of America;
       Request for the establishment of a Consolidation Tribunal pursuant to NAFTA Article
       1126

We are in receipt of correspondence dated May 6, 2005 from Mr. Flores advising that a consolidation panel comprising Professor Albert Jan van den Berg, Davis R. Robinson and Professor Armand de Mestral has now been constituted.

We note from Professor de Mestral's resume provided to us with his letter of May 4, 2005, that Professor de Mestral has, since 1989 been counsel to the law firm Gottlieb & Pearson. That law firm is counsel in connection with the claim brought by the Canadian Cattlemen for Fair Trade against the Government of the United States under NAFTA Chapter 11. It has come to our attention that Professor Todd Weiler, who is a member of the counsel team representing Canfor in this proceeding, and who appeared as counsel at the jurisdictional hearing in December 2004, is also, with Gottlieb & Pearson, a member of the counsel team representing the CCFT.

We are raising this issue so that all parties to the United States' consolidation application have the ability to assess the connection between Professor Weiler, Gottlieb & Pearson and both the

# DAVIS
## &company

CCFT case and the Canfor cases, as well as the connection between Gottlieb & Pearson, as counsel on the CCFT case, and Professor de Mestral, as counsel to that firm, to ensure that all parties are satisfied there are no facts that could give rise to justifiable doubts as to Professor de Mestral's independence or impartiality in this proceeding.

Yours truly,

DAVIS & COMPANY

Per:

P. John Landry
PJL/czs

cc:  Mr. Mark A. Clodfelter
     Ms. Andrea Menaker
     Mr. Elliot J. Feldman, Esq.

VANLIT Library:265041.1

# *EXHIBIT 17*

(Inu/ 9.19 09 11:58/81. 11:49/No. 4864117259 P 2

# International Centre for Settlement of Investment Disputes

1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534   Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsd

May 19, 2005

United States of America
c/o Mr. Mark A. Clodfelter
Assistant Legal Adviser
Office of the Legal Adviser
  and
Ms. Andrea Menaker
Chief, NAFTA Arbitration Division
Office of International
Claims and Investment Disputes
Department of State
2430 E Street NW
Suite 203, South Building
Washington, DC 20037-2800

Canfor Corporation
Terminal Forests Products, Ltd.
c/o Mr. P. John Landry, Esq.
Davis & Company
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7
  and
c/o Mr. Keith E. W. Mitchell, Esq
Harris & Company
14th Floor Bentall 5
550 Burrard Street
Vancouver, B.C.
Canada V6C 2B5

Tembec Inc., Tembec Investements
Inc., and Tembec Industries, Inc.
c/o Mr. Elliot J. Feldman, Esq.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

Re:   Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v.
      United States of America; Tembec *et al.* v. United States of America;
      NAFTA Article 1126 Consolidation Proceedings

Dear Sirs and Madam,

Further to my letter of May 6, 2005, I write on instruction of the Consolidation Tribunal, in regard to the next steps in the consolidation proceedings:

In connection with the application of the United States of America for a stay of the proceedings of the Tribunals in *Tembec* and *Canfor* pursuant to NAFTA Article 1126(9), the Consolidation Tribunal, having reviewed the request and subsequent correspondence on this matter, and its scope of powers under NAFTA Article 1126, has, after due deliberation, unanimously decided to order that those proceedings be stayed pending its decision under NAFTA 1126(2).

At the same time, the Consolidation Tribunal has also decided to fix an expedited schedule respecting the question of consolidation. The parties are directed to simultaneously file their observations on the question of the consolidation of the above captioned proceedings by

FROM HB 1061D                    (THU) 5.19'05 11:58/ST. 11:49/NO. 4864117259 P  3

2

May 19, 2005

Friday, June 2, 2005. The Tribunal will then hold a hearing on the question of the consolidation of these cases, at the seat of the Centre in Washington, D.C., on Thursday, June 16, 2005.

The parties' written pleadings shall be fully particularized (a) focusing on the factual and legal issues connected with the question of consolidation of these proceedings and (b) elaborating on the legal grounds that should guide the Consolidation Tribunal in its interpretation and application of Article 1126 of the NAFTA.

The Consolidation Tribunal is mindful of the NAFTA Free Trade Commission's Note of Interpretation of July 31, 2001 on the question of confidentiality. The Consolidation Tribunal is also aware of the fact that a number of hearings in other NAFTA proceedings have been open, with limited restrictions, to the public. The Consolidation Tribunal invites the parties to express their view on this matter by Monday, May 23, 2005.

Finally, the parties are invited to express their position on the place of arbitration in the legal sense, also by Monday, May 23, 2005.

Sincerely yours,

Gonzalo Flores
Secretary of the Consolidation Tribunal

c.c.:

Dr. Albert Jan van den Berg
Prof. Armand de Mestral
Mr. Davis R. Robinson

# *EXHIBIT 18*

# International Centre for Settlement of Investment Disputes

1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534    Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsd

May 20, 2005

**United States of America**
c/o Mr. Mark A. Clodfelter
Assistant Legal Adviser
Office of the Legal Adviser
    and
Ms. Andrea Menaker
Chief, NAFTA Arbitration Division
Office of International
Claims and Investment Disputes
Department of State
2430 E Street NW
Suite 203, South Building
Washington, DC 20037-2800

**Canfor Corporation**
**Terminal Forests Products, Ltd.**
c/o Mr. P. John Landry, Esq
Davis & Company
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7
    and
c/o Mr. Keith E. W. Mitchell, Esq
Harris & Company
14th Floor Bentall 5
550 Burrard Street
Vancouver, B.C.
Canada V6C 2B5

**Tembec Inc., Tembec Investements**
**Inc., and Tembec Industries, Inc.**
c/o Mr. Elliot J. Feldman, Esq.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

Re:    Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v. United
States of America; Tembec *et al.* v. United States of America;
NAFTA Article 1126 Consolidation Proceedings

Dear Sirs and Madam,

Please find attached a note that Professor Armand de Mestral has asked me to convey to you.

Sincerely yours,

Gonzalo Flores
Secretary of the Consolidation Tribunal

Attachment

c.c. (with attachment):

Dr. Albert Jan van den Berg
Prof. Armand de Mestral
Mr. Davis R. Robinson



"Armand De Mestral ,
Prof."
<armand.de.mestral@m
cgill.ca>
05/19/2005 06:03 PM

Subject  RE: Canfor Corporation v. United States of America; Terminal
Forest Products Ltd. v. United States of America; Tembec et al. v.
United States of America; Consolidation Proceedings pursuant to
NAFTA Article 1126

Gonzalo Flores
ICSID Secretariat

May 20, 2005

Dear Gonzalo,

     I write in response to our telephone conversation of this
afternoon and the letter of Mr Landry of May 10, 2005 to provide further
particulars concerning the nature of my past association with the Montréal
firm of Gottlieb & Pearson. I would ask you to send this letter to the
Parties.

     On Saturday May 14 I sent the following letter to Mr Gottlieb
terminating my association with his firm in the following terms:

Dear Richard,

In 1989 you did me the honour of asking me to serve as counsel to your firm. I
have enjoyed my association with you. This has involved responding to requests
for advice from time to time if I was available. In recent years, particularly
since my appointment to the ADF Arbitral Tribunal in 2000, I have done no work
for you.

Having been appointed to a Consolidation Tribunal under article 1126 of NAFTA
last week and having several major research projects to undertake in the next
years, I believe that it would be prudent ex abundante cautela for me to
resign as counsel.

Please accept this expression of my warm regards.

Sincerely,

Armand

     My association with the Gottlieb & Pearson firm has always been a
loose one. I served as counsel. I did not maintain an office and had no
financial interest in the firm. I responded to requests for specialised
advice, normally not more than two or three times a year. I was paid by the
hour for services rendered. The only recurring remuneration was my bar fee of
roughly $1000CDN per annum.

     Since being asked to serve on the ADF Arbitration Tribunal in
2000 I have done no work for Mr Gottlieb. I have not been consulted or been
privy in any way to the work the firm has done in the Chapter 11 claim of
Canadian Cattlemen for Fair Trade v The United States of America.

     For all these reasons I am morally certain that I have no
conflict whatsoever and there should be no apprehension of bias toward any
party or interest in the matters that may come before this Consolidation
Tribunal.

Sincerely,

Armand de Mestral
Jean Monnet Professor of Law
Member of the Bar of Québec

To:     <Gflores@Worldbank.Org>
        <Ajvandenberg@Hvdb.Com>
        "Robinson, Davis R." <Drrobins@Llgm.Com>
cc:     "Sarah Wazen" <Sarah.Wazen@Hvdb.Com>

# *EXHIBIT 19*

# BAKER
## &
# HOSTETLER LLP
### COUNSELLORS AT LAW

WASHINGTON SQUARE, SUITE 1100  •  1050 CONNECTICUT AVENUE, N.W.  •  WASHINGTON, D.C. 20036-5304  •  (202) 861-1500
FAX (202) 861-1783

ELLIOT J. FELDMAN
WRITER'S DIRECT DIAL NUMBER (202) 861-1679
E-MAIL: EFELDMAN@BAKERLAW.COM

May 20, 2005

**VIA FACSIMILE**

Professor Albert Jan van den Berg
Mr. Davis R. Robinson
Professor Armand de Mestral
c/o
Mr. Gonzalo Flores
ICSID
1818 H Street, N.W.
Washington D.C. 20433

> Re:   Tembec Inc. v. United States; Canfor Corp. v. United States, Terminal
> Forest Products Ltd. v. United States

Dear Sirs:

On behalf of Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively "Tembec"), we have received your instructions through Mr. Flores regarding the schedule respecting the question of consolidation. We were surprised that the Tribunal would take action to stay the Article 1120 proceedings while time remained under the UNCITRAL Rules, which govern the establishment of this Tribunal, for parties to review potential conflicts of interest and to challenge the appointment of arbitrators, especially after Tembec had written on May 9 and May 12, 2005 expressing its intent to consider information provided about potential conflicts within the time provided by the rules. Today, only after the Tribunal had already stayed the Article 1120 proceedings, did we receive Professor de Mestral's communication responding to potential conflict of interest concerns. The Tribunal's action to stay proceedings while potential conflict issues remain open and challengeable under the Rules is improper, *ultra vires* and should be withdrawn. Furthermore, we inform you that Tembec challenges the appointment of Mr. Robinson under Article 10 of the UNCITRAL Rules. The basis for that challenge will be set forth in a separate letter. We have yet to complete our evaluation of the information disclosed for the first time today by Professor de Mestral.

Tembec objects to the timing and prejudicial nature of the schedule offered by the Tribunal. The United States argued that an immediate stay of the Article

Professor Albert Jan van den Berg
Mr. Davis R. Robinson
Professor Armand de Mestral
May 20, 2005
Page 2

1120 proceedings was necessary because it was too burdensome on the United States to prepare for the June 2, 2005 jurisdictional hearing in *Tembec* that had been scheduled since December 2004 and for which the parties had completed four months of briefs, on issues that the United States contends are the same issues it already had briefed and argued in a previous hearing for *Canfor*. The June 2 date, moreover, had been dictated by objections from the United States against an earlier date.

The Tribunal's decision to stay the Article 1120 proceedings would alleviate the United States' burden of preparing during the next two weeks for the Tembec hearing, but impose instead on all of the parties the burden of submitting arguments about the legal situs of the arbitration in two business days, then briefing the question of consolidation—a subject that the parties have not briefed before—in two weeks, on June 2, 2005, to be followed by two weeks' preparation for a hearing on that question. The parties are significantly more burdened by the Tribunal's stay than they would have been had the Tribunal waited until Tembec's jurisdictional hearing had taken place.[1] Expedition of the United States' demand for consolidation does not cure the consequences of delay in deciding issues already briefed, and the expedited deadlines given by the Tribunal will not allow fair and thorough briefing of the consolidation question.

The Tribunal's request that briefs on consolidation be submitted simultaneously prejudices the parties opposed to consolidation. The United States is the moving party requesting consolidation and should bear the burden of presenting its case in favor of that motion. Presumably it has studied consolidation before moving for it. Having offered assurances to all parties that it did not intend to move for consolidation, parties other than the United States had no reason to devote resources to this subject. The parties in opposition, therefore, should be permitted to see what factual grounds and legal arguments the United States offers in favor of its motion so they may respond. It is unfair to ask the parties in opposition to respond to facts and arguments that they have not seen from the moving party, and therefore to brief simultaneously issues they have not raised.

The *Tembec* Tribunal conferred with the parties to set out briefing and hearing schedules and to deal with procedures. This Tribunal, not even properly

---

[1] Tembec has spent hundreds of thousands of dollars and endured an eight-month delay in the resolution of its claim to arrive at a hearing and decision on the United States' objections to jurisdiction. Now, on the eve of the hearing, the United States wants to defer, to brief other issues on consolidation, and to reargue its jurisdictional objections in front of a new tribunal. To the extent that this Tribunal proceeds to hear the United States' arguments on consolidation, it should be mindful of the burden that a stay of Article 1120 proceedings has on Tembec, to say nothing of the burdens that a decision to consolidate might impose. The goal of Article 1126 is "fair and efficient resolution of the claims." The Tribunal should allow the Article 1120 tribunals to complete their adjudication of the United States' objections to jurisdiction before deciding whether there are any efficiencies to be gained by consolidating on the merits.

Professor Albert Jan van den Berg
Mr. Davis R. Robinson
Professor Armand de Mestral
May 20, 2005
Page 3

constituted, has ordered procedures and schedules without consultation with the parties, not even discussing whether the parties and their counsel are available on the proposed hearing date. While Tembec appreciates a prompt disposition of the consolidation issue so that it may return to the merits of a case that already has been delayed enough by the United States, the Tribunal must not structure briefing and hearing on the consolidation question in such a fashion that the parties are prejudiced by the expedited procedures.

Should the Tribunal agree with Tembec that the stay of Article 1120 proceedings was issued prematurely, the Tribunal should withdraw the stay and wait until questions regarding the establishment of the Tribunal have been finally resolved in accordance with the Rules before taking any further action. Should the Tribunal insist on going forward, it should (a) allow the parties in opposition to consolidation the opportunity to read and respond to the United States' arguments; and (b) allow the parties to agree among themselves to an expedited schedule for arguments on consolidation and any issues relating to it. Should the parties be unable to agree mutually to an expedited schedule, the Tribunal may then establish a schedule after due consideration for the concerns raised by the different parties.

Respectfully submitted,

Elliot J. Feldman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington D.C. 20036

Counsel to Tembec Inc.
Tembec Investments Inc. and
Tembec Industries Inc.

cc:    Mark A. Clodfelter
       Andrea J. Menaker
       P. John Landry
       Keith E. W. Mitchell
       Jose Antonio Rivas
       Florentino P. Feliciano (c/o Mr. Rivas)
       James R. Crawford (c/o Mr. Rivas)
       Kenneth W. Dam (c/o Mr. Rivas)

# *EXHIBIT 20*

# BAKER
### &
# HOSTETLER LLP
#### COUNSELLORS AT LAW

WASHINGTON SQUARE, SUITE 1100  •  1050 CONNECTICUT AVENUE, N.W.  •  WASHINGTON, D.C. 20036-5304  •  (202) 861-1500
FAX (202) 861-1783

ELLIOT J. FELDMAN
WRITER'S DIRECT DIAL NUMBER (202) 861-1679
E-MAIL: efeldman@bakerlaw.com

May 12, 2005

**VIA FACSIMILE**

Mr. Roberto Dañino
Secretary-General
ICSID
1818 H Street, N.W.
Washington D.C. 20433

Re:   *Tembec Inc. et al. v. United States of America*;
      *Canfor Corp. v. United States of America*; and
      <u>*Terminal Forest Products Ltd. v. United States of America*</u>[1]

Dear Secretary Dañino:

On behalf of Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively "Tembec"), we write in regard to ICSID's letter dated May 6, 2005, which stated that the Consolidation Tribunal requested by the United States under NAFTA Article 1126 for the cases referenced above "is accordingly deemed to be established on this date." ICSID's statement is premature and inconsistent with the UNCITRAL Rules that govern the formation of tribunals under NAFTA Article 1126. To the extent that the May 6, 2005 letter has any legal significance with respect to the formal establishment of the proposed Article 1126 tribunal, we request that ICSID withdraw its letter.

The factual background of the United States' request for consolidation provides important context to the formation of the Article 1126 tribunal:

- On March 7, 2005, the United States requested that ICSID establish a tribunal under NAFTA Article 1126 for the *Tembec*, *Canfor*, and *Terminal* cases on the basis that an arbitrator in *Canfor* (specifically, the arbitrator appointed by the United States) had resigned from that tribunal while its decision on the United States' objection to jurisdiction in that case was pending.[1]

---

[1] *See* Letter form Mark A. Clodfelter to Mr. Roberto Dañino (Mar. 7, 2005) at 1. *See also* Letter from Keith E.W. Mitchell to Gonzalo Flores (Apr. 1, 2005) at 2 (referring to resignation of Mr. Harper).

CINCINNATI  •  CLEVELAND  •  COLUMBUS  •  COSTA MESA  •  DENVER  •  HOUSTON  •  LOS ANGELES  •  NEW YORK  •  ORLANDO  •  WASHINGTON, D.C.
*International Affiliates* — SÃO PAULO, BRAZIL  •  JUÁREZ, MEXICO
www.bakerlaw.com

Secretary General Robert Dañino
May 12, 2005
Page 2

- ICSID wrote to the parties to the proposed consolidation tribunal on March 18, 2005 stating that it was considering appointment of Prof. Christopher J. Greenwood as the tribunal chair, Mr. J. William Rowley QC as the representative from Canada, and Mr. O. Thomas Johnson Jr. as the representative from the United States to the proposed Article 1126 tribunal. ICSID requested that the parties provide any objections about the appointment of those candidates by April 1, 2005.

- On April 1, 2005, counsel for Tembec and counsel for Canfor both objected to the appointment of Messrs. Rowley and Johnson on the basis that they were employed by law firms involved in the U.S. trade proceedings entitled *Certain Softwood Lumber Products from Canada*.[2] The United States objected to Mr. Rowley's appointment on the basis of his law firm's involvement in the *Softwood Lumber* proceedings, but conspicuously not to Mr. Johnson's appointment, although he personally was representing a party in those proceedings.[3] Counsel to Tembec and Canfor also objected to the appointment of Professor Greenwood on the basis that he recently had been employed by the United States as an expert in another NAFTA Chapter 11 case.[4]

- The United States responded in opposition to the objections to Professor Greenwood on April 4, 2005, arguing that he should yet be appointed to the Article 1126 tribunal.[5] Tembec renewed its objection to Professor Greenwood on April 6, 2005 on the basis of his contractual relationship with the United States.[6] The United States renewed its defense of Professor Greenwood on April 7, 2005 and also stated for the first time that it agreed with the objection to Mr. Johnson.[7] Counsel to Canfor and Terminal reiterated their objections to Professor Greenwood on April 7, 2005.[8]

- ICSID next wrote to the parties on April 19, 2005 and stated "we are appointing to the Consolidation Tribunal Dr. Albert Jan van den Berg of the Netherlands, as presiding arbitrator, and Mr. Davis R. Robinson, a U.S. national and Mr. L. Yves Fortier, a national of Canada as co-arbitrators."[9]

---

[2] *See* Letter from Elliot J. Feldman to Jose Antonio Rivas (Apr. 1, 2005) at 2; Letter from Keith E.W. Mitchell to Gonzalo Flores (Apr. 1, 2005) at 2.
[3] *See* Letter from Andrea J. Menaker to Gonzalo Flores (Apr. 1, 2005) at 1.
[4] *See* Letter from Elliot J. Feldman to Jose Antonio Rivas (Apr. 1, 2005) at 1; Letter from Keith E.W. Mitchell to Gonzalo Flores (Apr. 1, 2005) at 2.
[5] *See* Letter from Andrea J. Menaker to Gonzalo Flores (Apr. 4, 2005) at 1.
[6] *See* Letter from Elliot J. Feldman to Jose Antonio Rivas (Apr. 6, 2005).
[7] *See* Letter from Andrea J. Menaker to Gonzalo Flores (Apr. 7, 2005) at 1.
[8] *See* Letter from Keith E.W. Mitchell to Gonzalo Flores (Apr. 7, 2005) at 1.
[9] *See* Letter from Gonzalo Flores to the parties (Apr. 19, 2005) at 1.

Secretary General Robert Dañino
May 12, 2005
Page 3

- The United States wrote to ICSID on April 22, 2005 stating that it had no objection to the appointment of Mr. van den Berg or Mr. Robinson, but objected to the appointment of Mr. Fortier on the basis that his law firm had been involved with the *Softwood Lumber* proceedings.[10]

- On May 2, 2005, Tembec wrote to ICSID raising questions about Mr. Robinson's suitability for the Article 1126 tribunal and asking for clarification of certain information to provide a basis for Tembec to determine whether to formally challenge Mr. Robinson's appointment.[11]

- ICSID wrote to the parties on May 4, 2005 to inform them that Mr. Fortier had withdrawn from consideration for the consolidation tribunal, and added, "we are appointing Professor Armand de Mestral, a national of Canada, as a co-arbitrator in this case."[12]

- ICSID wrote to the parties again on May 6, 2005 stating:

  > I am pleased to confirm that Dr. Albert Jan van den Berg, Professor Armand de Mestral and Mr. Davis R. Robinson have accepted their appointments as presiding arbitrator and co arbitrators, respectively, in the Consolidation Tribunal that will decide the United States' Request for Consolidatoin under NAFTA Article 1126 of March 7, 2005.

  > Attached please find a copy of a statement that we have received today from Mr. Robinson with his acceptance.

  > The Consolidation Tribunal is accordingly deemed to be established on this date.[13]

  Submitted contemporaneously with that letter was information provided by Mr. Robinson in response to questions raised by Tembec regarding the appearance of conflicts of interest. The letter from Mr. Robinson provided new information not previously available to Tembec regarding Mr. Robinson's potential conflicts of interest.

- On May 9, 2005, the United States requested that named members of the Article 1126 tribunal issue an order to stay proceedings in the *Tembec* and *Canfor* cases in light of the immediate need, in its view, to prevent the June 2-

---

[10] See Letter from Andrea J. Menaker to Gonzalo Flores (Apr. 22, 2005) at 1.
[11] See Letter from Elliot J. Feldman to Jose Antonio Rivas (May 2, 2005).
[12] See Letter from Gonzalo Flores to the parties (May 4, 2005).
[13] See Letter from Gonzalo Flores to the parties (May 6, 2005).

Secretary General Robert Dañino
May 12, 2005
Page 4

3, 2005 hearing on jurisdictional issues in *Tembec* from going forward.[14]
Tembec opposed the United States' request that same day, pointing out that
the requested stay was premature because Tembec had not been allowed
the 15 days allotted under the UNCITRAL Rules to evaluate the information
provided by Mr. Robinson contemporaneously with ICSID's May 6 letter.[15]

- On May 10, 2005, counsel to Canfor provided a letter to the parties advising
  that Professor Armand de Mestral is of counsel to a law firm that is pursuing
  another NAFTA Chapter 11 claim against the United States, and that
  Professor Todd Weiler was acting as co-counsel with that firm in the other
  case while he continued as co-counsel to Canfor.

- The United States replied in opposition to Tembec on May 10, 2005. The
  United States relied on ICSID's May 6 letter to assert that the Article 1126
  tribunal was duly constituted, and stated that any challenge that Tembec may
  raise with respect to Mr. Robinson "will be addressed at that time," meaning
  not before the formation of the tribunal. Meanwhile, it urged the named
  members of the Article 1126 tribunal again to stay the proceedings in *Tembec*
  and *Canfor*,[16] thus urging the named tribunal to take an important action even
  before a challenge to its formation could be heard. The United States did not
  comment upon the new information provided by Canfor's counsel about the
  potential conflict of interest concerning Professor de Mestral.

- On May 11, 2005, Canfor wrote to the Article 1126 tribunal requesting that
  any decision to stay proceedings be made after the time allowed to challenge
  arbitrators has expired under the UNCITRAL Arbitration Rules, and that the
  tribunal establish a schedule for briefing the question of the stay requested by
  the United States.[17]

    This factual background demonstrates the potential for conflicts of interest
arising with candidates for the Article 1126 tribunal, particularly where one party (here,
the United States) is intent on retaining arbitrators about whom questions of potential
conflict are raised. An arbitration tribunal's legitimacy is at risk when the tribunal is
empowered to take actions while questions remain unresolved as to the composition of
the tribunal.

    The need for ICSID to declare a tribunal constituted cannot be justified by
the UNCITRAL Rules, NAFTA, or by the United States' conduct. NAFTA Article 1126(1)
specifies that consolidation tribunals appointed by ICSID must be established in

---

[14] *See* Letter from Andrea J. Menaker to Prof. Albert Jan van den Berg *et al* (May 9, 2005) at 1.
[15] *See* Letter from Elliot J. Feldman to Gonzalo Flores (May 9, 2005).
[16] *See* Letter from Andrea J. Menaker to Prof. Albert Jan van den Berg *et al* (May 10, 2005).
[17] *See* Letter from P. John Landry to Prof. Albert Jan van den Berg *et al* (May 11, 2005).

Secretary General Robert Dañino
May 12, 2005
Page 5

accordance with the UNCITRAL Arbitration Rules.[18]  Where an appointing authority is charged with forming an arbitration tribunal, the UNCITRAL Rules require the appointing authority to take into account questions concerning potential conflicts of interest.  Article 6(4) places an obligation on appointing authorities that, when making appointments, they "shall have regard to such considerations as are likely to secure the appointment of an independent and impartial arbitrator...."  *See also* Article 7(3), Article 11(3) and Article 12(1) and (2) adopting appointment procedure under Article 6.  Article 11(1) of the UNCITRAL Rules allows the parties 15 days to evaluate information that could give justifiable doubts about an arbitrator's impartiality or independence.  *See also* Article 10(1).  ICSID is not empowered to declare a tribunal constituted when the UNCITRAL Rules give the parties 15 days to review information about tribunal members, consistent with the obligation to secure the appointment of independent and impartial arbitrators.  While NAFTA Article 1126 has a 60-day time frame for appointing a consolidation tribunal, that time frame cannot override the Rules that must be applied under Article 1126(1).

It is inconsistent with the obligations under the UNCITRAL Rules for ICSID to empower the Article 1126 tribunal to take actions binding on the parties before there has been adequate time provided, in accordance with the same Rules, for the parties to evaluate the independence and impartiality of the named arbitrators.  The Rules allow a reasonable, limited period of time—15 days under Article 11(1)—for the parties to make such evaluations.[19]  The limited time allowed by the Rules prevents any risk of unnecessary delays to the proceedings for unmeritorious challenges.

ICSID already has acted well within the 60-days required by Article 1126 but, unfortunately, the United States – as well as the other parties – found grounds to object to ICSID's initial appointments.  Conspicuously, a nominee to whom the United States objected withdrew, but a nominee questioned by Tembec did not.  Without further recourse, ICSID declared a tribunal thus approved by the United States, but not by Tembec, as duly constituted.  There is a failure here of both process and justice.

The United States has interpreted ICSID's May 6, 2005 letter as empowering the Article 1126 tribunal to take action, even though the parties had only learned of the appointment of Professor de Mestral two days earlier, and the parties have not had 15 days to evaluate Mr. Robinson's statements in response to questions raising potential conflicts of interest.  To consider a tribunal operative under such circumstances would create an entirely unnecessary risk that a party to the arbitration could be the victim of actions taken by an unqualified tribunal.

ICSID's premature declaration that the consolidation tribunal is constituted is abetting the United States' strategy, manifest for some eighteen months, of delay and

---

[18] *See* NAFTA Article 1126(1).
[19] The *IBA Guidelines on Conflicts of Interest in International Arbitration* allow twice as long (30 days) for parties to evaluate potential conflicts among named arbitrators.  *See Guideline* 4(a).

Secretary General Robert Dañino
May 12, 2005
Page 6

disruption.  The United States has not named a replacement for its arbitrator in *Canfor*, who resigned on March 2, 2005, nor has ICSID named a replacement.  The United States' request for consolidation has been part of a strategy to delay these proceedings and avoid decisions, both on the jurisdictional objection raised by the United States, and on the merits.

Tembec first raised the issue of consolidation with the United States in January 2004.  The United States then and on several occasions since has refused to commit itself.  The United States raised frivolous objections about Tembec's waivers under NAFTA Articles 1116 and 1117, which ICSID overruled, but the issue took six months to resolve.  The United States then asserted a frivolous jurisdictional defense, and on the eve of a jurisdictional hearing, requested consolidation to disrupt the hearing.  It has taken eight months for the hearing to be scheduled, largely due to U.S. objections.  Now the United States has moved to have the prematurely constituted consolidation tribunal stay the jurisdictional hearing it had required.

ICSID, until the last few days, has moved deliberately and carefully.  Now it has rushed into denials of process and justice.  Tembec respectfully requests that ICSID withdraw its May 6, 2005 statement deeming established the Article 1126 consolidation tribunal, and that ICSID reserve such declarations until the time for challenging the independence and impartiality of the proposed arbitrators has expired under the applicable UNCITRAL Rules.  On that principle, the time allowed under Article 11 to challenge Mr. Robinson's appointment, based on the information provided in his letter received May 6, 2005, would run until the end of May 21, 2005.  The time allowed under Article 11 to challenge Professor de Mestral's appointment should run from May 10, 2005, when the letter from Canfor disclosed a potential conflict of interest, until May 25, 2005.  And whatever time may be required to achieve a tribunal free of conflicts thereafter must be respected in accordance with the UNCITRAL Rules.

Respectfully submitted,

Elliot J. Feldman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington D.C.  20036

Counsel to Tembec Inc.
Tembec Investments Inc.
Tembec Industries Inc.

Secretary General Robert Dañino
May 12, 2005
Page 7


cc:    Mark Clodfelter
       Andrea J. Menaker
       P. John Landry
       Keith E. W. Mitchell
       Gonzalo Flores
       Jose Antonio Rivas

# *EXHIBIT 21*



DAVIS &company    LEGAL ADVISORS *since* 1892

*from the office of:*  P. John Landry
direct tel:  604.643.2935
direct fax:  604.605.3588
john_landry@davis.ca

May 24, 2005                                    *file number:*  63595-00056

**BY FAX**

International Centre For Settlement Of Investment Disputes
1818 H Street
Washington, DC  20433

**Attention:    Mr. Robert Danino**
**Secretary General**

Dear Mr. Danino:

Re:     Canfor Corporation v. United States of America;
Terminal Forest Products Ltd. v. United States of America; and
Tembec Inc. et al v. United States of America

We are in receipt of correspondence from counsel for Tembec dated May 20, 2005 concerning the appointment of Mr. Robinson and the reply of the United States of today's date.

Regrettably, and with no disrespect intended towards Mr. Robinson, Canfor Corporation and Terminal Forest Products Ltd. have no choice but to support Tembec's request that Mr. Robinson withdraw.

Our position has been consistent throughout.  In our April 1, 2005 correspondence to Mr. Flores, we said the following:

> We preface our comments with the observation that, in light of the significance of the softwood lumber dispute to relations between Canada and the United States, and in light of the extensive history of litigation between Canada and the United States and between Canadian softwood lumber producers and the United States arising out of this dispute, it is absolutely critical that no litigant before the panel have any question or concern as to the independence and impartiality of any panel member.

> While independence and impartiality are required of every arbitrator, the history of the softwood lumber dispute makes it even more critical here.  You will be aware, for instance, of the prior history of challenges to tribunal members in this context.  In the

# DAVIS
## & company

Canfor claim, the United States challenged Mr. McKenna's appointment on the basis of a passing comment made by Mr. McKenna in a speech given to a Canadian farmers' association, which challenge Mr. Parra indicated would be upheld had Mr. McKenna not withdrawn. In that same claim, Mr. Harper resigned in the face of a late disclosed conflict of interest. And, the United States has filed two extraordinary challenges under NAFTA Chapter 19 or its predecessor chapter of the Canada United States Free Trade Agreement, in softwood lumber proceedings, each time alleging a conflict of interest or lack of appearance of independence or impartiality of a panel member.

Those comments are equally apt here.

Indeed, they echo the very position advanced by the United States itself when it challenged Canfor's nomination of Mr. McKenna to the Canfor panel. In that case, where Mr. McKenna's connection to the matters in dispute was extremely tenuous, the United States said:

> Finally, the United States notes that the softwood lumber dispute is one very much in the public eye. Canada's Minister of International Trade has described it as "the biggest trade battle on the planet." *Softwood Sides Still Try to Nail Deal Down*, FINANCIAL POST: CANADA (Feb. 3, 2003), App. Ex. U. It is of utmost importance to the institution of investor-State arbitration under the NAFTA that these proceedings be conducted in a manner that is immune from charges of bias, partiality or political influence.

Given the undisputed need for no party to be able to assert subsequently that any member of the tribunal be perceived as lacking independence or impartiality, the familial relationship between a tribunal member and the President of the United States in a case as significant as this, in and of itself, supports Mr. Robinson's withdrawal.

That fact is independent of the additional points raised by Tembec concerning Mr. Robinson's appointment to high governmental office and the fact that Mr. Robinson previously held the position heading the Department of the United States' Government advancing the consolidation motion and defending these proceedings[1].

---

[1] The United States observes that four previous officials of the State Department have served on Chapter 11 tribunals and not "been challenged on that basis" [i.e. of holding office in the State Department]. Of note, two of those arbitrators withdrew on the basis of conflict of interest. With respect to Mr. Harper, one of the factors noted prior to his withdrawal was the fact that Canfor had elected not to challenge his appointment based *solely* upon his having held the office of Legal Advisor, but that when he subsequently disclosed his conflict of interest involving Harvard University there was no option but for him to withdraw. The fact of his prior office was most certainly relevant to that determination. Obviously, factors which impact upon independence and impartiality cannot be considered individually; rather, all relevant considerations must be weighed together.

# DAVIS
## &company

Accordingly, we respectfully join with Tembec in requesting Mr. Robinson withdraw.

Yours truly,

DAVIS & COMPANY

Per:

P. John Landry
PJL/sas

cc via fax:
    Mr. Antonio Parra
    Deputy Secretary General

    Mr. Mark Clodfelter
    United States State Department

VANLIT Library:266153.1

# *EXHIBIT 22*



*United States D...*

*Washington, D.C.  20520*

May 24, 2005

*By Facsimile*

Mr. Roberto Dañino
Secretary General
International Centre for
  Settlement of Investment Disputes
1818 H Street, N.W.
Washington, D.C.  20433

Re:   *Tembec Inc. et al. v. United States of America*;
      *Canfor Corp. v. United States of America*; and
      *Terminal Forest Products Ltd. v. United States of America*

Dear Mr. Dañino:

On behalf of respondent United States of America, we respond to Tembec's May 20 letter to Mr. Gonzalo Flores challenging Mr. Davis R. Robinson as an arbitrator in the above-captioned NAFTA Article 1126 proceeding.  Tembec's challenge is untimely and, in any event, lacks merit.

The UNCITRAL Arbitration Rules governing this proceeding allow a party 15 days to challenge an arbitrator from the date of the arbitrator's appointment, or from the date the party learns of the circumstances giving rise to its challenge.[1] ICSID appointed Mr. Robinson on April 19. Mr. Robinson's *curriculum vitae*, attached to ICSID's April 19 letter, discloses Mr. Robinson's 1981 appointment to the position of Legal Adviser to the U.S. Department of State. Tembec thus had until May 4 to challenge Mr. Robinson on this basis.  As Tembec did not do so by that date, its challenge to Mr. Robinson on the ground that he served previously as Legal Adviser is untimely and should be rejected by ICSID.[2]

Tembec's challenge on the basis of Mr. Robinson's relationship with the President of the United States is likewise untimely.  On May 2, Tembec informed ICSID that it had "publicly available information" suggesting that Mr. Robinson has "a close familial relationship" with the President.  Assuming Tembec learned that information only on May 2, Tembec had until May 17

---

[1] *See* UNCITRAL Arbitration Rules art. 11(1).

[2] Indeed, in its May 2 letter to ICSID, Tembec raised concerns regarding Mr. Robinson, including the fact that he had served as Legal Adviser.  Thus, even assuming that Tembec overlooked the disclosure in Mr. Robinson's two-page *curriculum vitae*, Tembec knew no later than May 2 of Mr. Robinson's prior appointment as Legal Adviser.  In that event, Tembec would have had until May 17 to challenge Mr. Robinson on that basis, and its May 20 challenge would therefore still be untimely.

to challenge Mr. Robinson. Accordingly, Tembec's May 20 challenge on the basis of that relationship is untimely and should be rejected.[3]

Tembec's challenge also fails on the merits. Mr. Robinson's appointment as Legal Adviser 25 years ago – long before the NAFTA came into force – does not call into question his ability to serve impartially as an arbitrator in this case. Notably, four other former State Department officials – including senior officials in the Office of the Legal Adviser – have been appointed to serve on NAFTA Chapter Eleven tribunals without being challenged on that basis.[4]

Moreover, Mr. Robinson's May 6 letter should allay any concerns Tembec professes to have about Mr. Robinson's supposedly "close familial relationship" with President Bush. That letter reveals that Mr. Robinson is not related by blood to the President, and is five degrees removed from him.[5] Moreover, as Mr. Robinson disclosed, he has had no personal relationship with President Bush since the President assumed office, and has never held any substantive conversations with President Bush during that time. Such an attenuated relationship does not give rise to justifiable doubts as to Mr. Robinson's ability to serve impartially and independently as an arbitrator in this matter.

Finally, Tembec's comparison of its challenge to the United States' objection to the appointments of Messrs. Rowley and Fortier is baseless. As ICSID is aware, Messrs. Rowley's and Fortier's law firms represent Canadian interests in the softwood lumber dispute. Those relationships presented a direct, financial conflict with Messrs. Rowley's and Fortier's roles as arbitrators in this proceeding. Indeed, all three claimants in this arbitration – including Tembec – objected to Mr. Rowley (as well as to Mr. Johnson) on precisely that basis.[6] Tembec's attempt in its May 20 letter to distance itself from that objection by claiming that it merely "sympathized" with the objection, but actually considered the relationship to be "tenuous," is disingenuous.

For the reasons set forth above, the United States disagrees with Tembec's challenge to the appointment of Mr. Robinson and respectfully requests that Mr. Robinson refuse Tembec's

---

[3] Tembec's suggestion that Mr. Robinson's May 6 letter revealed new information that confirmed its concerns is belied by the facts. As set forth below, Mr. Robinson's letter revealed that his familial and social connection to the President is highly attenuated, thus providing no new grounds for challenge beyond those already known by Tembec as of May 2.

[4] Warren Christopher, former Secretary of State, served as an arbitrator in *Methanex Corp. v. United States of America*; Conrad Harper, former Legal Adviser, served as an arbitrator in *Canfor Corp. v. United States of America*; Judge Stephen Schwebel, former Deputy Legal Adviser, served as an arbitrator in *Mondev International Ltd. v. United States of America*; and John R. Crook, former Assistant Legal Adviser, is serving as an arbitrator in *Grand River Enterprises et al. v. United States of America*.

[5] President Bush is Mr. Robinson's (i) wife's (ii) parent's (iii) sibling's (iv) offspring's (v) offspring.

[6] *See* letter dated April 1, 2005 from Tembec to ICSID ("Messrs. Rowley and Johnson are both partners at law firms that represent parties to the U.S. trade proceedings entitled *Certain Softwood Lumber Products from Canada*[,]" and thus "have conflicts of interest that disqualify them from serving on the Consolidation Tribunal."); *see also* letter dated April 1, 2005 from Canfor & Terminal Forest Products to ICSID ("[T]he Toronto office of Mr. Rowley's firm appears as counsel in connection with the ongoing Chapter 19 proceedings on behalf of a Canadian trade organization, and at least one other member of his firm is a registered lobbyist in connection with this dispute[,]" which is "obviously a relevant factor in considering . . . Mr. Rowley's appointment.").

request to withdraw as an arbitrator and that ICSID reject Tembec's challenge.

Respectfully submitted,

*Andrea J. Menaker*

Andrea J. Menaker
Chief, NAFTA Arbitration Division
Office of International Claims and
    Investment Disputes

Copies:
Mr. Gonzalo Flores
Dr. Albert Jan van den Berg (through Mr. Flores)
Mr. Davis R. Robinson (through Mr. Flores)
Prof. Armand de Mestral (through Mr. Flores)
Elliot J. Feldman, Esq.
Mark A. Cymrot, Esq.
P. John Landry, Esq.
Keith E.W. Mitchell, Esq.

# *EXHIBIT 23*

## International Centre for Settlement of Investment Disputes
1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534   Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsd

June 1, 2005

United States of America
c/o Mr. Mark A. Clodfelter
Assistant Legal Adviser
Office of the Legal Adviser
   and
Ms. Andrea Menaker
Chief, NAFTA Arbitration Division
Office of International
Claims and Investment Disputes
Department of State
2430 E Street NW
Suite 203, South Building
Washington, DC 20037-2800

Canfor Corporation
Terminal Forests Products, Ltd.
c/o Mr. P. John Landry
Davis & Company
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7
   and
c/o Mr. Keith E. W. Mitchell
Harris & Company
14th Floor Bentall 5
550 Burrard Street
Vancouver, B.C.
Canada V6C 2B5

Tembec Inc., Tembec Investements
Inc., and Tembec Industries, Inc.
c/o Mr. Elliot J. Feldman
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

Re:    Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v. United
       States of America; Tembec *et al.* v. United States of America;
       NAFTA Article 1126 Consolidation Proceedings

Dear Sirs and Madam,

       I write on instruction of the President of the Consolidation Tribunal, in connection with the
correspondence exchanged by the parties on the May 19, 2005 schedule of pleadings and order of stay of
the Tribunal.

       In this regard, the Consolidation Tribunal has, after reviewing the above correspondence and due
deliberation, decided the following:

   1.    The order of stay of the *Tembec* and *Canfor* proceedings of May 19, 2005 is hereby
         confirmed;

   2.    On the basis of the Tribunal's discretionary powers under the UNCITRAL Arbitration
         Rules, the consolidations proceedings are not suspended pending the challenge of Mr.
         Davis R. Robinson;

2                                                                June 1, 2005

3.  The United States of America will file its observations on the question of consolidation by Friday, June 3, 2005;

4.  Canfor Corp., Terminal Forest Products Ltd. and Tembec *et al.*, will file their observations on the question of consolidation by Friday, June 10, 2005;

5.  The parties will have the opportunity to make their rebuttal arguments during the hearing on consolidation, which, as stated in our May 19, 2005 letter, will be held on Thursday, June 16, 2005 at the seat of the Centre in Washington, D.C. I shall shortly provide you with further details of the arrangements made for the hearing;

6.  The parties will have the opportunity, if they so wish, to file post-hearing briefs on the question of consolidation.

The President of the Consolidation Tribunal has asked me to remind the parties that the question before this Tribunal at this stage is that of the consolidation requested by the United States of America pursuant to NAFTA Article 1126.

The President of the Consolidation Tribunal has also asked me to reassure the parties that they will have the opportunity to present their cases in full.

Sincerely yours,

Gonzalo Flores
Secretary of the Consolidation Tribunal

c.c.:

Dr. Albert Jan van den Berg
Prof. Armand de Mestral
Mr. Davis R. Robinson

# *EXHIBIT 24*

Davis R. Robinson
5729 Fordham Road, N.W.
Washington, D.C. 20016
Office Telephone: (202) 966-8049
Office Facsimile: (202) 966-8102
Office E-Mail: drrobins@llgm.com

June 3, 2005

*VIA FACSIMILE AND MAIL*

Antonio R. Parra, Esq.
Deputy Secretary-General
International Centre for Settlement of
    Investment Disputes
1818 H Street, N.W.
Washington, D.C. 20433

      Re:    **Canfor Corporation v. United States of America; Terminal Forest Products
             Ltd. v. United States of America; Tembec *et al.* v. United States of America;
             NAFTA Article 1126 Consolidation Proceedings**

Dear Mr. Parra:

      Thank you for your letter of June 2, 2005 inviting me to submit observations on the
challenge that has been raised in connection with my appointment to the NAFTA Article 1126
Consolidation Tribunal established in the referenced proceedings. In this regard, I refer you to
my letter dated May 6, 2005 to Gonzalo Flores, Esq., Senior Counsel of ICSID, a copy of which
is attached hereto as Exhibit A (the "May 6 Letter").

      I have reviewed with care (i) the May 20, 2005 letter from counsel to Tembec raising the
challenge; (ii) the May 24, 2005 letter from counsel to the United States of America disagreeing
with the challenge; (iii) the May 24, 2005 letter from counsel to Canfor and Terminal Forest
Products joining the challenge; and (iv) the May 26, 2005 letter from counsel to Tembec replying
to the May 24, 2005 letter of the United States of America.

      Having considered the contents of these letters, I hereby respectfully refuse the request to
withdraw as an arbitrator in this matter. Furthermore, I hereby confirm the May 6 Letter and
specifically reaffirm that I am not aware (a) of any conflict of interest that would result from my
acceptance of this appointment or (b) of any fact or circumstance that could give rise to any
justifiable doubts as to my impartiality or independence.

                                Very truly yours,

                                Davis R. Robinson

Attachment

# *EXHIBIT 25*

# International Centre for Settlement of Investment Disputes

1818 H Street, N.W., Washington, D.C. 20433, U.S.A.
Telephone: (202) 458-1534    Faxes  (202) 522-2615/2027
Website: www.worldbank.org/icsid

May 23, 2005

<u>BY FAX</u>

Tembec Inc., Tembec Investements Inc.,
and Tembec Industries, Inc.
c/o Mr. Elliot J. Feldman, Esq.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

United States of America
c/o Mr. Mark A. Clodfelter
Assistant Legal Advisor
 and.
Ms. Andrea J. Menaker
Chief, NAFTA Arbitration
Division   •
Office of International Claims
and Investment Disputes
Office of the Legal Adviser
Suite 203, South Building
Washington, D.C. 20037-2800

Re: <u>NAFTA/UNCITRAL Arbitration: Tembec, Inc. *et al* v. United States of America</u>

Dear Sirs and Madam, ·

At the request of the Tribunal, I write to inform you that the Tribunal has decided as follows with respect to the stay of the proceedings in this case:

The Tribunal, after consideration of the request of the Respondent United States of America dated May 9, 2005 for a stay of the proceedings in this case, the letter dated May 9, 2005 of the Claimants, the letter dated May 10, 2005 of the Respondent, and the subsequent letter dated May 12, 2005 of the Claimants, in accordance with the provisions of NAFTA Article 1126 and in the light of the letter dated May 19, 2005 of the Consolidation Tribunal, has decided to stay the proceedings in the present case pending the decision of the Consolidation Tribunal under NAFTA Article 1126(2).

Accordingly, the oral hearing scheduled for June 2-3, 2005 in Washington D.C. is cancelled.

Sincerely yours,

José Antonio Rivas
Secretary of the Tribunal

cc:

Judge Florentino P. Feliciano
Professor James R. Crawford
Professor Kenneth W. Dam

# *EXHIBIT 26*

# BAKER
&
# HOSTETLER LLP
### COUNSELLORS AT LAW

---

WASHINGTON SQUARE, SUITE 1100  •  1050 CONNECTICUT AVENUE, N.W.  •  WASHINGTON, D.C. 20036-5304  •  (202) 861-1500
FAX (202) 861-1783

**June 9, 2005**

**VIA FACSIMILE**

Mr. Antonio R. Parra
Deputy Secretary-General
ICSID
1818 H Street, N.W.
Washington, D.C.   20433

   Re: Tembec Inc. *et. al.* v. United States of America;
      Canfor Corp. v. United States of America; and
      <u>Terminal Forest Products Ltd. v. United States of America</u>

Dear Deputy Secretary-General Parra:

   On behalf of Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively, "Tembec"), we write in response to the Deputy Secretary-General's letter of June 6, 2005, seeking our "further observations" regarding Tembec's outstanding challenge to the appointment of Mr. Davis R. Robinson to the Article 1126 Tribunal.  The Deputy Secretary-General's June 6, 2005 letter also provided us a copy of Mr. Robinson's letter of June 3, 2005 addressed to ICSID.  Mr. Robinson in that letter refused to withdraw as an arbitrator in this proceeding.

   Mr. Robinson's June 3, 2005 letter confirmed and relied upon his letter of May 6, 2005 as support for his decision not to withdraw.  He offered no other explanations or grounds to support his continued appointment to the Tribunal.

I.  **Tembec Has Raised Justifiable Doubts About Mr. Robinson's Impartiality**

   Tembec reiterates all of its concerns about Mr. Robinson that were expressed to the Tribunal in its letters of May 2, 2005, May 20, 2005, and May 26, 2005.  Tembec raised in those letters serious questions about the appearance of Mr. Robinson's

---

CINCINNATI  •  CLEVELAND  •  COLUMBUS  •  COSTA MESA  •  DENVER  •  HOUSTON  •  LOS ANGELES  •  NEW YORK  •  ORLANDO  •  WASHINGTON
*International Affiliates—SÃO PAULO, BRAZIL  •  JUÁREZ, MEXICO*
www.bakerlaw.com

Deputy Secretary-General Parra
June 9, 2005
Page 2

impartiality, particularly in reference to Mr. Robinson's close familial relationship to George Walker Bush, President of the United States, and in reference to Mr. Robinson's previous tenure as Director of the Office of Legal Adviser to the Department of State, the office that now represents the United States in these proceedings.

### A.     Mr. Robinson Has A Close Familial Relationship With President Bush And The Bush Family

Mr. Robinson's familial relationship with George Walker Bush and the Bush family is one of the circumstances that could "give rise to justifiable doubts as to the arbitrator's impartiality and independence" in these proceedings.[1] Tembec has explained that Mr. Robinson's ability to be impartial in this proceeding may be compromised by the fact that his wife, Suzanne Walker Robinson, is a first cousin to former Vice President and former President George Herbert Walker Bush, who is also the father of the current President of the United States, George Walker Bush. Mr. Robinson's wife is, therefore, the first cousin, once removed, to the President of the United States.[2]

This close familial relationship creates justifiable doubt about impartiality in light of the facts and circumstances unique to this case.[3] President Bush, cabinet officers, and senior advisers have engaged directly in the *softwood lumber* dispute, which is one of the largest and most contentious trade disputes on record. President Bush himself has advised the Prime Minister of Canada that he would personally intervene only to assist his domestic industry, and the President's negotiators have demanded during the past two years that the NAFTA Chapter 11 claims, the subject of this arbitration, be withdrawn as a condition of any negotiated settlement of the *softwood lumber* dispute. Therefore, the Administration is particularly intent on the disposal of these Chapter 11 claims, which seek damages caused by the conduct of the Administration.

Tembec's claim in these proceedings includes the coordinated and systematic application of political pressure to influence the outcome of the *softwood lumber* dispute. Notwithstanding that an Executive Branch agency, the Department of

---

[1] *See* UNCITRAL RULES Article 10.1; *see also* Standard 2(b), *(Conflicts of Interest), IBI Guidelines on Conflicts in International Arbitration* (suggesting disqualification where "facts or circumstances exist . . . that, from a reasonable third person's point of view having knowledge of the relevant facts, give rise to justifiable doubts as to the arbitrator's impartiality or independence . . . ").

[2] Suzanne Walker Robinson is as close to the President as his middle name, and so, therefore, is her spouse. *See* Letter from Elliot J. Feldman to Roberto Danino (May 26, 2005) at 2.

[3] *See IBA Guidelines on Conflicts in International Arbitration*, 2.3.8 (stating that justifiable doubts about an arbitrator's impartiality arise when "the arbitrator has a close family relationship with one of the parties or with a manager, director or member of the supervisory board or any person having a similar controlling influence in one of the parties or with a counsel representing the parties.")

Deputy Secretary-General Parra
June 9, 2005
Page 3

Commerce, is required to be a neutral arbiter in trade disputes, the Bush Administration has not been neutral, and the International Trade Commission, which is controlled by Congress, has been very much controlled by Congress in the *softwood lumber* proceedings before it. In the Executive Branch, Tembec has identified hundreds of unlawful *ex parte* communications between executive agencies and the domestic U.S. industry, brought to light by a Freedom of Information Act suit initiated by this law firm, as well as Executive Branch disregard of numerous decisions of international tribunals, both NAFTA and WTO, that have found no legal basis for the U.S. Government's continued imposition of antidumping and countervailing duties on Canadian softwood lumber.[4] The Bush Administration has taken the position that this dispute will be resolved only by a settlement in which the U.S. domestic industry will receive a substantial portion of the $4 billion in unlawfully collected duties, no matter how many international tribunals rule against the United States. The conduct and policies of President Bush and his Administration is thus central to Tembec's claim.

Mr. Robinson's response of June 6 to Tembec's justifiable doubts about impartiality relies entirely on the very same May 6 letter that prompted Tembec's challenge. Mr. Robinson thereby has dismissed Tembec's claims without comment, as if they were not to be taken seriously or were not worthy of response.

Mr. Robinson asserts he is not conflicted because he has "no personal family blood relationship with the President."[5] This statement appears to be crafted with too many modifiers. The UNCITRAL Rules recognize no distinction between blood and in-law relationships. The concept of "family," after all, is not limited to "blood" relations.[6] The Family Research Council (FRC), an organization known to be influential in the Bush White House,[7] says in a published policy paper that, "Each marriage is also a covenant between the couple and their kin. In marriage, two families merge in a manner that

---

[4] *See, e.g.*, Letter from Elliot J. Feldman to Gonzalo Flores. (May 20, 2005) at 2, 3 (citing Tembec's Statement of Claim at 2, 3, 16, 17, 21, 22, 29-33).

[5] *See* Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005) at 2.

[6] The modern concept of "family" is broad enough to encompass parents, children living at home, children that have married, their spouses, and their offspring, as well as elderly dependents. *See Family*, Encyclopedia Britannica Premium Service (2005) http://www.britannica.com (follow "members" search for "family"). Studies suggest that the Industrial Revolution "increased the importance of relatives beyond the nuclear family" because the changes brought about by urbanization "enabled individuals to receive help from their kinsman in times of hardship." *Id*. The United Nations takes an even broader view of what constitutes a "family," defining it without regard to "blood" or marriage as "the natural and fundamental group unit of society, and is entitled to legal protection." *See* Art. 16(3) of The *Universal Declaration of Human Rights*, G. A. Res. 217, U.N. Doc. A/RES/217 (Dec. 10, 1948).

[7] See John Nicols, *Karl Rove's Legal Tricks*, The Nation, Jul. 22, 2002. *Available* at http://www.thenation.com/doc.mhtml?i=20020722&s=nichols.

Deputy Secretary-General Parra
June 9, 2005
Page 4

perpetuates and invigorates both. . . . [T]he great chain of being, binding the living to ancestors and to posterity, remains as important as ever."[8]  Mr. Robinson is a close member of the President's family.

Mr. Robinson has confirmed a close familial relationship, trying to qualify it by adding a meaningless "blood" to the adjectives.  He does not deny that he and his wife maintain contact with President Bush or the rest of the Bush family, but has provided no details about the exact nature of his and his wife's relationship with them.

Mr. Robinson states in his May 6, 2005 letter that he has had the privilege of shaking hands with the President only twice "since the President assumed office in 2001."[9]  Mr. Robinson fails, however, to divulge the nature of his relationship with the President over the many years he has been a close member of the Bush family.[10]  Acknowledgment of two personal handshakes reports nothing about family relations, kinship and loyalty, which are the source of Tembec's justifiable doubts

Mr. Robinson states that he has "had no further personal, direct contact with the President," nor has he held any "substantive conversations with him" on any subject "during this period."[11]  The issue here, however, is not whether Mr. Robinson has discussed *softwood lumber* or Tembec with the President.  Instead, the issue is whether, because of a very close family relationship, Mr. Robinson would feel loyalty to the President that could affect his impartiality when confronted with allegations about the President's conduct.  Mr. Robinson, after two opportunities and a month of deliberation, has not addressed these justifiable doubts and concerns at all.

**B.    Mr. Robinson Has A Personal Relationship With The Legal Office Representing The United States In These Proceedings**

Mr. Robinson is the former Director of the very same legal office that represents the United States in these proceedings,[12] and Tembec has questioned whether Mr. Robinson can be impartial toward arguments advanced by attorneys from that office.

---

[8]  *See* Allan C. Carlson, *Speak Now or Forever Hold Your Peace:  On the Communal Nature of Marriage*, Family Research Council Policy Paper (Feb. 18, 2004), http://www.frc.org/get.cfm?i=PL04C04.

[9]  *See* Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005) at 2.

[10]  Both of the Robinsons apparently have traveled overseas with former President George Herbert Walker Bush as members of official United States delegations.  *See* Christopher Connell, *Bush Makes Global Relations a Family Affair:  Having a Relative in the White House has its Privileges*, Associated Press, (Dec. 1, 1991).

[11]  *See* Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005) at 2.

[12]  *See* Letter from Elliot J. Feldman to Jose Antonio Rivas (May 2, 2005).

Deputy Secretary-General Parra
June 9, 2005
Page 5

Mr. Robinson was appointed to that position, moreover, when his first cousin, George Herbert Walker Bush, was Vice President of the United States.

Mr. Robinson may feel no loyalty to the office he once directed, and perhaps is not inclined to perceive that its lawyers are superior or more reliable or trustworthy than opposing counsel bringing suit against the United States and his cousin's Administration. Nevertheless, it is not unreasonable to raise questions regarding this relationship. Mr. Robinson's June 3 letter does not address these concerns, other than to state generally that he is not aware of any conflict of interest that would result from his acceptance of this appointment, or any fact or circumstance that could give rise to justifiable doubts as to his impartiality or independence.[13]

To date, Mr. Robinson's only direct response to concerns about his former employment is a brief statement in his May 6 letter that he was appointed to serve as the Legal Adviser to the U.S. Department of State by then President Reagan (thus not acknowledging that his wife's first cousin was Vice President); that subsequent to that time he was chosen to serve on a binational panel under Chapter 18 of the Canada – U.S. Free Trade Agreement; and that the panel issued a unanimous decision "generally in favor of the position argued by Canada."[14]  Of course, the Office of the Legal Adviser would not have been counsel in a Chapter 18 NAFTA dispute.[15]  Mr. Robinson has said nothing as to whether he could be entirely impartial when judging arguments advanced by lawyers of the very office he used to direct.

Tembec's concerns grow when the only persons in this proceeding not calling for Mr. Robinson's removal are the lawyers in his former office.  To date, all parties to this proceeding have now called for Mr. Robinson to step down from these proceedings, except the United States.

II.    **Mr. Robinson's Participation In Decisions While Under Challenge Creates An Appearance Of Partiality**

All three claimants have expressed justifiable doubts and have asked reasonably for Mr. Robinson to withdraw.  Since he was challenged, however, Mr. Robinson has been making important decisions affecting substantive matters in this case.  He joined in issuing a stay that prevented Tembec from proceeding with a hearing or, alternatively, receiving a Tribunal decision without a hearing on jurisdiction.  He has issued briefing schedules and a hearing agenda.  All of these steps have been

---

[13] *See* Letter from Davis R. Robinson to Antonio R. Parra (June 3, 2005).

[14] *See* Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005) at 2.

[15] Mr. Robinson does not say, but the dispute may also not have involved claims about the conduct of a Bush Administration.

Deputy Secretary-General Parra
June 9, 2005
Page 6

prejudicial and contrary to Tembec's interests, and all have occurred since Mr. Robinson's *bona fides* as an impartial arbitrator have been challenged. Tembec believes that the very decision to take part in important decisions, while being challenged, creates an appearance that Mr. Robinson is dismissive of Tembec's concerns and legal arguments and is not impartial.

Mr. Robinson's refusal to withdraw from this proceeding has forced Tembec and the other parties into an escalated, adversarial relationship with Mr. Robinson. It also may have prejudiced Tembec with other Tribunal members with whom Mr. Robinson has improperly shared decision-making for more than a month. Mr. Robinson should not have permitted this development, which we, certainly, regret.

It is not unusual for arbitrators to step aside voluntarily when confronted with a request to do so, even when the person challenged maintains in all sincerity and confidence that there is no valid reason for withdrawal.[16] A challenge cannot automatically translate into withdrawal, and there must, of course, be full and fair consideration. Mr. Robinson, however, has chosen not to respond to detailed concerns, and his choice of language suggests a certain defiance inappropriate for the judicial appointment involved here. When three of four parties independently conclude that there are justifiable doubts about impartiality, the doubts more likely than not are justifiable. Having carried this dispute in this manner forward for more than a month, while making decisions Tembec perceives to be prejudicial and adverse to its interests, Mr. Robinson could now reasonably be thought to be in circumstances where "animus may arise."[17] Whether perceived or real, Tembec believes that the potential for such animus further requires that Mr. Robinson now step down from these proceedings.

**Conclusion**

Should Mr. Robinson not now withdraw, we respectfully request that ICSID replace him. We also ask that these proceedings be suspended until this matter is fully resolved, a proper tribunal is properly constituted, and all concerns arising from

---

[16] *See*, e.g., Response of Arbitrator Warren Christopher to Notice of Challenge, Methanex Corp. v. United States (Sep. 20 2002) (withdrawing as arbitrator notwithstanding his belief that there is no justifiable basis to question his independence or impartiality, so as to "avoid the continuing distractions of this issue for the tribunal and the parties.") *See also In the Arbitration Under Chapter 11 of the North American Free Trade Agreement and the UNCITRAL Arbitration Rules Between: Canfor Corporation, Tembec Inc., Tembec Investments Inc., Tembec Industries Inc., Terminal Forest Products Ltd., and the United States,* (wherein Mr. Frank McKenna resigned from the tribunal in the face of challenges to his impartiality by the United States).

[17] *See*, e.g., *Riahi v. Gov't of the Islamic Republic of Iran,* Iran – U.S., Cl. Trib., Dec. 133-485-1 (2004) (dissenting opinion of Judge Charles N. Brower).

Deputy Secretary-General Parra
June 9, 2005
Page 7


prejudice that may have been created through this dispute over Mr. Robinson have been satisfactorily addressed.

Respectfully submitted,

Elliot J. Feldman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036

Counsel to Tembec Inc.
Tembec Investments Inc.
Tembec Industries Inc.


cc:    Mark Clodfelter
       Andrea J. Menaker
       P. John Landry
       Keith E.W. Mitchell
       Gonzalo Flores
       Professor Albert Jan van den Berg (c/o Mr. Flores)
       Mr. Davis R. Robinson (c/o Mr. Flores)
       Professor Armand de Mestral (c/o Mr. Flores)
       Jose Antonio Rivas
       Florentino P. Feliciano (c/o Mr. Rivas)
       James R. Crawford (c/o Mr. Rivas)
       Kenneth W. Dam (c/o Mr. Rivas)

# *EXHIBIT 27*

# International Centre for Settlement of Investment Disputes

1818 H Street, N.W., Washington, D.C. 20433 U.S.A.
Telephone: (202) 458-1534    Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsid

June 15, 2005

United States of America
c/o Mr. Mark A. Clodfelter
Assistant Legal Adviser
Office of the Legal Adviser
 and
Ms. Andrea Menaker
Chief, NAFTA Arbitration Division
Office of International
Claims and Investment Disputes
Department of State
2430 E Street NW
Suite 203, South Building
Washington, DC 20037-2800

Canfor Corporation
Terminal Forests Products, Ltd.
c/o Mr. P. John Landry
Davis & Company
2800-666 Burrard Street
Vancouver, British Columbia
V6C 2Z7
 and
c/o Mr. Keith E. W. Mitchell
Harris & Company
14th Floor Bentall 5
550 Burrard Street
Vancouver, B.C.
Canada V6C 2B5

Tembec Inc., Tembec Investements
Inc., and Tembec Industries, Inc.
c/o Mr. Elliot J. Feldman
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304

Re:    Canfor Corporation v. United States of America; Terminal Forest Products Ltd. v.
United States of America; Tembec et al. v. United States of America;
NAFTA Article 1126 Consolidation Proceedings

Dear Sirs and Madam,

The above consolidation proceedings were initiated by request of the United States of America of March 7, 2005. Under NAFTA Article 1126, which governs these proceedings, the Secretary-General of ICSID is called upon to act as the appointing authority of the arbitrators forming the Consolidation Tribunal.

The appointees to the Consolidation Tribunal in this case have been Dr. Albert Jan van den Berg, a national of The Netherlands, as President of the Consolidation Tribunal, and Professor Armand de Mestral, a Canadian national, and Mr. Davis R. Robinson, a U.S. national, as co-arbitrators. On May 6, 2005, the parties were informed by the Centre that all of the arbitrators had accepted their appointment and that the Tribunal was established.

Article 10 of the UNCITRAL Arbitration Rules provides that an arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence. By letter of May 20, 2005, counsel for Tembec et al notified the ICSID that Tembec et al challenged the appointment of Mr. Davis R. Robinson as an arbitrator. As required by the UNCITRAL Arbitration Rules the notice stated the reasons for the challenge.

2

June 15, 2005

In accordance with Article 11(2) of the UNCITRAL Arbitration Rules, the notice of the challenge was sent to Mr. Robinson, to Dr. Van den Berg and to Professor de Mestral as well as to the representatives of the United States of America, Canfor Corporation and Terminal Forest Products Ltd.

The United States did not agree to the challenge and Mr. Robinson did not withdraw from his office as arbitrator. Accordingly it fell to the Secretary-General of ICSID, as the designated appointing authority, to make the decision on the challenge under Article 12(1) of the UNCITRAL Arbitration Rules.

My decision, made after careful review of all of the communications received by us in this regard, is not to sustain the challenge.

The somewhat distant familial relationship referred to in the challenge does not, in my judgment, raise justifiable doubts as to the impartiality or independence of Mr. Robinson. Nor, in my view, does the service of Mr. Robinson in the Department of State of the United States justify his exclusion from the Consolidation Tribunal. In the context of the NAFTA, with its special provisions allowing the appointment of co-nationals as arbitrators, there is a clear, consistent acceptance in the cases that prior governmental service, even at a higher level, does not in and of itself disqualify a person from service as an arbitrator. This conclusion is reinforced in this case by the fact that the governmental service concerned concluded some 20 years ago. It does not, in my view, especially having regard to the NAFTA context, raise justifiable doubts as to the impartiality or independence of Mr. Robinson.

Sincerely yours,

Roberto Dañino
Secretary-General


c.c.:

Dr. Albert Jan van den Berg
Prof. Armand de Mestral
Mr. Davis R. Robinson

# EXHIBIT 28

In the matter of consolidated proceedings pursuant to Article 1126 of the NAFTA in:

**(1) Canfor Corporation v. United States of America,**

**(2) Tembec *et al.* v. United States of America, and**

**(3) Terminal Forest Products Ltd. v. United States of America**

### ORDER FOR THE TERMINATION OF THE ARBITRAL PROCEEDINGS
### WITH RESPECT TO TEMBEC *ET AL.*

10 January 2006

<u>CONSIDERING :</u>

(A)    The Order of the Consolidation Tribunal of 7 September 2005;

(B) .  Tembec's letter of 7 December 2005, advising that "Tembec removes its Statement of Claim from these Article 1126 arbitration proceedings, and is filing in U.S. District Court for the District of Columbia notice of motion to vacate the Tribunal's decision and order of September 7, 2005, which terminated Tembec's Article 1120 arbitration proceedings," and requesting that "the Tribunal order its Secretary to terminate the Article 1126 proceedings as to Tembec, and make a final accounting of arbitration fees and costs up until today's date;"

(C)    The Tribunal's letter of 8 December 2005 to Canfor, Terminal and the United States, inviting them to comment on Tembec's letter of 7 December 2005 by 13 December 2005;

(D)    The letters of 13 December 2005 from Canfor, Terminal and the United States, commenting on Tembec's letter of 7 December 2005, the letter of Canfor and Terminal having as attachment Tembec's "Petition to Vacate Arbitration Award" and "Notice of Motion to Vacate Arbitration Award both dated 7 December 2005;"

(E)    Tembec's second letter of 15 December 2005, received by the Tribunal on 16 December 2005, advising that "As the only claimant seeking court review of the

Tribunal's September 7 order, Tembec acted so as not to interfere with the claims of the other parties;" that "Tembec has not withdrawn its claims against the United States under NAFTA Chapter 11;" that "The United States agrees that Tembec should be dismissed, but with prejudice . . . and effectively confirms that dismissal is in order;" that "The United States errs only with respect to prejudice;" and that "The Tribunal should order its Secretary to terminate the Article 1126 proceedings as to Tembec."

(F)   The Procedural Order No. 1 issued on 17 December 2005, *inter alia*, directing Canfor, Terminal and the United States to respond to the letters referred to in Recitals (D) and (E) above by 22 December 2005;

(G)   The letter of 22 December 2005 from the United States, contending that Tembec "does not have the prerogative of removing its claim from the proceedings while preserving it, and [that] the Tribunal has no authority to grant Tembec's request that its claims be dismissed from these proceedings without prejudice," and requesting the Tribunal to dismiss Tembec's claim with prejudice;"

(H)   The position of Canfor and Terminal, conveyed to the Tribunal's Secretary by telephone on 22 December 2005, that they do not have any further observations to make on Tembec's letters referred to in Recitals (D) and (E) above concerning Tembec's participation in these proceedings;

(I)   The draft of this Order, which was submitted to Canfor, Tembec, Terminal and the United States on 27 December 2005 for comment by 4 January 2006;

(J)   The comments received by letters of 4 January 2006 from Canfor, Tembec, Terminal, and the United States on the draft of this Order referred to in Preamble (I) above; while Canfor, Tembec and Terminal concurred with the draft of the Order, the United States advised that "to the extent that the Tribunal does not terminate Tembec's claim from these proceedings with prejudice, the United States categorically objects to the removal of Tembec's claims from these proceedings, and the Tribunal must remain seized of the claim;"

(K)   The telephone conference, requested by the United States in its letter of 4 January 2006, held on 9 January 2006, in which the members of the Tribunal and counsel for Canfor, Tembec, Terminal, and the United States participated.

### THE ARBITRAL TRIBUNAL HEREBY DECIDES AS FOLLOWS:

**1.    Termination**

1.1    The Tribunal hereby terminates the present proceedings with respect to Tembec, subject to the provisions of this Order, considering that Canfor, Terminal and the United States have not raised justifiable grounds for objection as provided in Article 34(2) of the UNCITRAL Arbitration Rules. The United States has not shown to the satisfaction of the Tribunal that this Tribunal has the competence referred to in Sub-section 1.3 below and, as a consequence, the United States has not raised a justifiable ground for objection.

1.2    The Tribunal rejects Tembec's request in its letter of 7 December 2005 that "the Tribunal order its Secretary to terminate the Article 1126 proceedings as to Tembec . . ." since the power to terminate pertains to the Tribunal.

1.3    The Tribunal does not declare the termination referred to in Sub-section 1.1 above either with prejudice to reinstatement or without prejudice to reinstatement of Tembec's NAFTA claims as filed in its Notice of Arbitration and Statement of Claim on 3 December 2004, considering (i) that neither any of the provisions of Chapter 11 of the NAFTA nor Article 28(1) or Article 34(2) or any other provision of the UNCITRAL Arbitration Rules confers upon the present Tribunal competence to issue such a declaration; and (ii) that the question whether or not the termination as to Tembec is with or without prejudice to reinstatement is to be considered and decided upon by the Article 1120 tribunal, if any, to which Tembec may seek to resubmit the afore-mentioned NAFTA claims notwithstanding, *inter alia*, the provisions of Article 1121(1)(b) of the NAFTA, Tembec's waiver made thereunder and the provisions of Article 1126(8) of the NAFTA.

**2.    Costs**

2.1    The Tribunal will determine at an appropriate time whether, and if so to what extent and in which manner, Tembec is to bear the costs of arbitration referred to in Articles 38 through 40 of the UNCITRAL Arbitration Rules, considering (i) that the Tribunal reserved its decision concerning costs to a subsequent order, decision or arbitral award in Decision No. 3 of the Consolidation Order of 7 September 2005; (ii) that the United States requested in its letter of 13 December 2005 "the opportunity to make a submission detailing its costs in defending against Tembec's

claim;" and (iii) that Canfor, Tembec and Terminal have not made a submission on the question of costs as to Tembec either.

2.2    For the purposes of the determination referred to in Sub-section 2.1 above, the Tribunal will invite Tembec, Canfor, Terminal and the United States to submit their views in a manner and according to a schedule to be determined by the Tribunal in consultation with Tembec, Canfor, Terminal and the United States.

2.3    Accordingly, at present, the Tribunal rejects Tembec's request in its letter of 7 December 2005 that "the Tribunal order its Secretary to . . . make a final accounting of arbitration fees and costs up until today's date" and to "provide a refund to Tembec of any remaining balance of the deposit paid."

**3.    Competence**

3.1    The Tribunal notes the pendency of Tembec's Petition and Notice of Motion to Vacate Arbitration Award, i.e., the Tribunal's Consolidation Order of 7 September 2005, filed with the United States District Court for the District of Columbia on 7 December 2005.

3.2    In regard of Sub-section 3.1 above, the Tribunal further notes that it is unaware of any applicable existing international or national law or other governing circumstance that affects the Tribunal's competence to decide any matters before it, including but not limited to the issuance of this Order for Termination of the present proceedings with respect to Tembec.

On behalf of the Arbitral Tribunal,

_____
Albert Jan van den Berg,
President